In The Matter Of

The Arbitration Between:

**Roger Williams University Faculty Association**
**and**
**Roger Williams University**

AAA Case No. 11 300 01321 06
Grievance of David Moskowitz
Date of Award: November 2, 2007

## Preliminary Statement

Arbitration hearings involving the above-captioned matter were held in Portsmouth & Bristol, Rhode Island on February 22, May 8, June 11 & June 18, 2007. Representing the Association at such hearings was John E. DeCubellis, Jr., Esq. and representing the University was Nicholas DiGiovanni, Jr., Esq. and Christopher Neronha, Esq.. A transcript of the hearings was made; both parties filed post-hearing briefs which were received by the undersigned on October 2, 2007.

## Issues

The parties agreed to submit the following issues for decision; they are: "Did the University act arbitrarily or capriciously in denying tenure to Professor David Moskowitz in April of 2006? If so, what shall be the contractually authorized remedy?"

## Background

David Moskowitz, Assistant Professor in the Department of Social & Political Science at the Feinstein College of Arts and Sciences in the University, was hired commencing with the 2000-01 academic year. In his sixth year at the University - the 2005-06 academic year - he was denied tenure, and he protests that decision.

In particular, the circumstances surrounding this case were as follows. The grievant holds a B.A., an M.A., and a Ph.D all from the

State University of New York at Stony Brook. The grievant has been teaching at the University level for more than 20 years. He was a teaching assistant at the State University of New York at Stony Brook from 1984-87, adjunct faculty member at Adelphi from 1988-89, an assistant professor at Georgia Southern University from 1989-93, an assistant professor at the University of North Carolina at Charlotte from 1993-2000, and, thereafter, an assistant professor at the University. He was named Professor of the Year in 1991-92 while at Georgia Southern University.

Shortly after the grievant was hired at the University for the 2000-01 academic year, Dean Ruth Koelle of the Feinstein College of Arts and Sciences met with the grievant to review the criteria utilized during the probationary evaluation period and the fact that his probationary period would be 6 years. There are four criteria used in making tenure decisions; they are: teaching; scholarship, professional and creative activities; academic advising and program development; and institutional and community service. The tenure review process is a cumulative review of a faculty member's probationary years, and the faculty member must meet or exceed each of the four evaluative criteria in order to receive tenure.

In the first year evaluation of the grievant - the 2000-01 academic year - Dean Koelle wrote that she was "very impressed by Professor Moskowitz's teaching; he is highly energetic" and "is a gifted teacher who is passionate about both his subject and about reaching his students". She expressed one concern: "The one reservation I have about Professor Moskowitz's style is that he peppers his remarks with humor and sarcasm. I question whether his students always get the point, and whether some students might not understand his humor." In reappointing the grievant to a second probationary year, Vice-President for Academic Affairs Loretta Shelton stated in a memorandum to the grievant: "As you know, a record of effective teaching and of scholarship that informs teaching and ensures currency in your discipline is of paramount importance as you proceed toward tenure. I encourage you to submit your research for publication. In any case, copies of articles and conference programs

documenting presentations need to be submitted with your self-study." Vice-President Shelton further noted: "The award of tenure is tied to a cumulative process that considers your full record of teaching and scholarship, although service to the University and to the external community are also considered."

In the second year evaluation of the grievant - the 2001-02 academic year - Dean Koelle wrote: "My previous area of concern, whether or not Prof. Moskowitz's students have the sophistication to fully understand his style, has diminished considerably. Perhaps Prof. Moskowitz's reputation is more well known, and his serious intention to get students thinking and working is familiar to more students and worries fewer of them…. Because being rather outrageous in class is part of Prof. Moskowitz's method of keeping students off-balance and thinking about significant issues, it remains hard to fault him for it. His palpable interest in getting students to think is very difficult to criticize." She further wrote: "Progress in professional development is necessary, and Prof. Moskowitz is strongly advised to divert some of his energy to that end…. Dedication to students and teaching is a laudable trait for a faculty member, but it cannot be used to replace progress in either professional development or work in community service….The University will ultimately support well-rounded faculty members who can show adequate progress in all areas."

The grievant testified that on account of Dean Koelle's remarks in her first year evaluation concerning his teaching style, he had curbed his use of humor some.

In the third year evaluation of the grievant - the 2002-03 academic year - Dean Koelle wrote: "Prof. Moskowitz comments in his self-evaluation that he has consciously decreased the sharpness of his humor in class. The style that makes him so popular will continue to offend a few students. His student evaluations show fewer comments from students who dislike his methods, and also show that students compliment him much less on being a comedian and more on being a good, albeit funny, instructor. Of the 10-12 class sets I read, only three students found his style annoying. The most observed comment was 'Moskowitz rules!'" She further wrote: "His evaluation this year shows

that he has taken this advice seriously <pay more attention to professional development and service to the university and community>: he is involved in two political science association meetings, and has also become interested in the proposed International Relations Center. Prof. Moskowitz has also been more visible in the affairs of the Political Science Department, and has made several very useful suggestions as to its workings.... Prof. Moskowitz serves as an important faculty member with regard to his teaching. I am concerned about the sparseness of the other parts of his self-study, and repeat my observation of last year, that the University will ultimately support well-rounded faculty members who can show adequate progress in all areas."

In reappointing the grievant to a fourth probationary year, Provost Edward Kavanagh stated: "To enhance our mission 'all faculty are expected to maintain a program of professional development and scholarly and/or creative activities.' Let me urge you to include in your Self-Study evidence of external validation of your activities in this important endeavor."

In the fourth year evaluation of the grievant - the 2003-04 academic year - Dean Koelle wrote: "There has been concern about Prof. Moskowitz's idiosyncratic method of teaching and whether or not students had the sophistication to appreciate his methods. This year, there are no indications that anyone misunderstands Prof. Moskowitz's approach. I believe that he has made his true stands on issues clearer." She went on to write: "I continue to believe that Prof. Moskowitz uses a rather dangerous method of teaching, because an appreciation of his style requires a certain level of sophistication on the part of students. It is not always clear whether students like/dislike him because he is sometimes outrageous, or whether they like/dislike him because he challenges them to face and evaluate many of the ideas that they hold but have never examined."

In his fourth year the grievant was named by Provost Edward Kavanagh as Coordinator for the Department of Social & Political Science; it was unusual for a probationary faculty member to be so appointed, but the grievant was the only one available and willing to

undertake the assignment. In recognition of the time demands imposed upon a department coordinator, the University gave the grievant a one course reduction in his teaching load each semester that he was Department Coordinator. Moreover, in his fourth year the grievant assumed responsibility for the development of a new program - a Masters in Public Administration - at the University. The grievant was largely responsible for designing the degree program and some 20 courses in support of the program; a lot of this work was done during the summer of 2003. While the masters program was controversial within the Department of Social and Political Science and while relationships grew somewhat contentious as the grievant shepherded the program through the Department, the University, and a governmental approval process, in the end the program got approved within one year's time by the University's Curriculum Committee and by the State of Rhode Island. The grievant received a merit pay increase for his role in the development of this program, and Dean Koelle wrote in his evaluation for his fourth year: "As Coordinator of the Department of Social and Political Science for the last academic year, Prof. Moskowitz has had primary responsibility for the development of the Masters in Public Administration (MPA) degree. He has proposed the curriculum, shepherded the proposal through his department, working with my office and others to set up the conditions for state approval, and worked with his future colleagues in Providence. His leadership during this process has been outstanding."

The grievant was not reappointed as Coordinator of the Department of Social and Political Science for a second year. Both Dean Koelle and Provost Kavanagh met with the grievant before the start of his fifth year; informed him that there was concern over the sparseness of his scholarship and that tenure review was coming up in two years' time; and Provost Kavanagh gave the grievant a reduction in his teaching load for his fifth year of one course per semester and informed the grievant that he was reducing the teaching load so that the grievant could focus more on scholarly research. In his reappointment to a fifth probationary year, the 2004-05 academic year, the grievant was advised by Provost Kavanagh as follows: "To enhance

our mission 'all faculty are expected to maintain a program of professional development and scholarly and/or creative activities'. Let me urge you to include in your Self-Study evidence of external validation of your activities in this important endeavor. Since the nature and rigor of different external validations varies among disciplines, I advise you to discuss this subject with your dean."

In the Fall of 2005 the grievant stepped down from the last MPA Committee on which he served as he had substantial concerns about the direction in which the program was heading and its academic rigor.

The grievant's self-study in preparation for tenure review showed that during his employment at the University he had presented a paper at the Annual Meeting of the Southern Political Science Association in January 2005 entitled "The Differential Effects of Values and Affect on Support for Gay Rights Policies"; that he would be presenting another paper entitled "Perceptions of Responsibility for Public Assistance" at the January 2006 annual meeting of the Southern Political Science Association; and that he would be co-presenting a paper entitled "Professors as Practicing Politicians: Impact on Student Perceptions and Pedagogy" with Professors Speakman and Garabedian at the American Political Science Association's Teaching and Learning Conference in February 2006. In addition, he had served as a panel discussant on "Issue Advocacy and Party Activism in American Politics" at the annual meeting of the Northeastern Political Science Association in November 2002. Also, the grievant had written a paper entitled "Fluff, Puff, and Stuff: Do Students have a Preferred Teaching Style?" which had not been accepted for publication; he had also written other unpublished manuscripts: "Race and Perceived Responsibility for Poverty"; and "Evaluating Measures of Racism from an African-American Perspective". Further, he was doing research as the principal investigator on a domestic partnership benefits study and was working with others on a study of three national civil rights interest groups.

In terms of service to the University and the community, the grievant had served as chair of two faculty search committees and a member of one faculty search committee within his department; as an

outside member of two faculty search committees in Forensic Psychology and a member of the Academic Integrity Committee. The grievant had also served on the Critical and Civil Discourse Group, the Civil Discourse Strategic Planning Committee and had been moderator of the Socrates Café and a Young Republican/Young Democrat debate. He had volunteered for five years as a guest teacher in the Barrington Public Schools.

In terms of his effectiveness as a teacher, his students had given him an overall rating of 3.55 on a 4.0 scale for the period from the Fall of 2002 through the Spring of 2005. The grievant was voted Teacher of the Semester for the spring semester of 2007.

In the Spring of 2006, the Faculty Review Committee (FRC), which is constituted under the collective bargaining agreement to provide recommendations on promotion and tenure to the appropriate dean, announced that it had unanimously voted to recommend the grievant for tenure but not for promotion to Associate Professor. In its summary of conclusions, the Faculty Review Committee stated: "Scholarship is one of Dr. Moskowitz's weakest contributions or activities over the previous probationary period. While the Committee recognizes that his contributions in other areas such as administration of his department as Coordinator and his contributions in terms of program development (the creation of the MPA) have been distractions from scholarly activities, it is important that Dr. Moskowitz redouble his scholarly work and develop a program of research that will make a contribution to his area of specialty, especially as it informs his teaching. This effort will provide the students he seems to value highly a broader and deeper academic experience."

In a written recommendation dated March 1, 2006 Dean Koelle, after reviewing the recommendation of the FRC, concluded that she could recommend neither tenure nor promotion for the grievant. In the case of the grievant's scholarship, she wrote: "Neither Dr. Moskowitz nor the FRC committee has engaged in any discussion of external validation of the presentations or the research agenda. There is no evidence of the acceptance ratio for papers submitted to the conferences and there is no external validation through comments by

external peers. She went on to state: "Several other factors regarding scholarship need to be pointed out. First, Dr. Moskowitz did not, in fact, make presentations or conduct research in his discipline before he became Program Coordinator for his department. This lack of publications/research has been noted in every one of his evaluations since his first year at RWU. Secondly, in the year following his period as Coordinator, he was granted a 3-3 load and urged to do reduced teaching during the summer by the Provost with the specific intention of affording Dr. Moskowitz some time to re-connect to his disciplinary research. It does not appear that the course releases resulted in adequate production of scholarship."

The grievant filed responses to both the FRC's recommendations and the Dean's recommendations. Also, it should be noted that during the 2003-04 and 2004-05 academic years when the grievant had one course release each semester, the grievant taught courses during the summer and winter intersessions.

By letter dated April 14, 2006 Interim Provost Jeffrey Martin informed the grievant: "I have reviewed your tenure and promotion self study, the evaluation reports by both the Faculty Review Committee and your Dean, and your responses to both evaluations.... I formally notify you that you will not be reappointed to the faculty."

A grievance was filed concerning the denial of tenure for the grievant, and inasmuch as that grievance has remained unresolved, the Association has elected to bring the matter on to arbitration for resolution.

## Position of the Parties

### Position of the Association

The Association contends that the denial of tenure for the grievant was an arbitrary and capricious act on the Employer's part. In particular, the Association says that pursuant to Art. VIII, Sec. B.3.i & k of the 2004-08 collective bargaining agreement, only the President and the Board of Trustees have the authority to make the

final decision with respect to tenure, and that in this case there was no evidence that either the President or the Board was aware of the decision to deny tenure to the grievant. The Association says that the interim provost, Jeffrey Martin, made the decision to deny tenure to the grievant, and that such decision was arbitrary and capricious and in excess of his authority; Provost Martin's role was to make a recommendation to the President but not to assume final decision-making authority.

The Association says that the contract specifies four criteria for tenure, and that while teaching is the primary criterion, there are three others to be considered, namely, academic advising and program development; scholarly, professional and/or creative activities; and institutional and/or community services. The Association also points out that the evaluation process for granting tenure is a cumulative process taking place over the course of 6 years.

The Association argues that the grievant demonstrated effectiveness with respect to each of the evaluative criteria. The Association says that the grievant was an excellent teacher, and that while there were some initial concerns about the grievant's idiosyncratic or unorthodox teaching style, those concerns dissipated over time as the grievant improved and adjusted his style; the grievant was in the view of the Dean responsible for evaluating him, Dean Koelle, "a dynamic instructor, a talented and effective teacher, a master of his discipline". The Association says that from the Fall of 2000 through the Spring of 2005, the grievant had an overall student rating of 3.58 in terms of his teaching effectiveness, and in his last semester of teaching (Spring 2007), he was elected by students as "Professor of the Semester".

The Association next argues that the grievant met or exceeded the criteria to be effective in the area of academic advising and program development. The Association says that the grievant advised a minimum of 25 students in the Political Science Department and/or the Masters in Public Administration (MPA) Program on both academic and non-academic issues. In terms of program development the Association says

that the grievant served as a member of the Core 102 History Committee, worked with Professor Sawoski on the program of the International Relations Center, and almost single-handedly created and developed the MPA program (comprising more than 20 graduate courses) which was approved by the necessary curriculum committees and public accrediting agencies. The Association argues that Dean Koelle's testimony that she did not become aware of reservations within the Political Science Department until after she had given the grievant a glowing, fourth year evaluation is not credible.

The Association further argues that the grievant met or exceeded the criteria for scholarship and professional and creative activities. The Association says that the University recognizes multiple forms of scholarship as articulated by Boyer and Glassick. The Association says that those who help design and implement a core curriculum, as the grievant did, are engaged in the scholarship of integration according to Boyer. The Association also says that research that informs teaching and that insures currency in an academic discipline is a form of scholarship, and that the grievant researched diligently every course he taught at the University. The Association further says that the grievant engaged in scholarship by producing a paper on teaching styles; by working on a National Interest Group manuscript on civil rights; by working on a manuscript entitled "Attributions of Responsibility for Poverty Revisited"; by working on a manuscript entitled "Attributions of Responsibility for Public Assistance"; by working on a domestic partnership benefits study entitled "Public Support for Domestic Partner Benefits" and a manuscript on the same which was accepted for presentation at the annual meeting of the APSA; by commencing a study on "Party Polarization"; by serving as a discussant on a panel entitled "Issue Advocacy and Party Activism in American Politics" at the annual meeting of the MPSA; by presenting a paper entitled "The Differential Effects of Values and Affect – Support for Gay Rights Policies" at the annual meeting of the SPSA; by submitting a number of papers which were rejected for publication; by serving as a moderator at the Socrates Café on the topic "Do Political Candidates have an obligation not to deliberately disseminate mis-

information?"; by serving as a moderator for a debate between the Young Democrat & Young Republican Clubs on campus; by doing extensive work in creating and implementing the MPA Program at the University; by serving on various MPA committees such as the Search and Ad Hoc Committees; and by performing community service work for the Barrington Schools.

The Association notes that the external validation of scholarship requirement was not added until the 2004-08 agreement, and that it would be arbitrary and capricious for the University to hold the grievant to the external validation standard prior to such agreement. The Association notes that in the grievant's 5th and 6th years he submitted several papers which were accepted for presentation at conferences and received high marks from his students for his teaching performance.

The Association contends that despite the University's contention to the contrary, the parties did not elevate the criterion of scholarship in the 2004-08 contract above the evaluative criteria of institutional/community service and academic advising/program development; scholarship was not elevated to a clear, second position behind teaching in the hierarchy of evaluative criteria. The Association argues that the University acted arbitrarily and capriciously when it elevated and ranked scholarship to a second position immediately behind teaching in a hierarchy of evaluative criteria.

The Association says that the University is not "a publish or perish" institution, and that there is no requirement that faculty members publish manuscripts in refereed journals.

The Association contends that the grievant met or exceeded the criterion of engaging in service to the University and the community. The Association says that the grievant participated in University Open Houses, Meet & Greet sessions, accepted student days, discovery days, and summer orientations; served on the CAS Faculty Congress and the University Academic Ad Hoc Committee; taught overload courses as well as summer and winter intersession courses at the University; worked with Professor Sawosky at the International Relations Center; served

as Coordinator the Department of Political Science; created and developed the MPA program; served as chair of the MPA Faculty Search Committee, a member of the Forensic Psychology Search Committee, a member of the International Relations Faculty Search Committee, a member of the Civil Discourse Strategic Planning Committee, and as co-chairman of a summer strategy session for "Critical Thinking & Discourse"; served as moderator for the Young Democrat & Young Republican Clubs; and taught in the Barrington public schools for 6 years.

The Association contends that the University acted arbitrarily and capriciously by failing to consistently apply the evaluative criteria for tenure in the case of its faculty members up for tenure review. The Association argues that such criteria should be applied in an equitable, consistent and uniform manner in tenure decisions. The Association argues that in one instance the University placed effectiveness in other evaluative criteria ahead of effectiveness in teaching in awarding tenure to Gerson Goldberg and in awarding promotion and tenure to Maria Kula. The Association argues that the grievant's accomplishments in each of the four evaluative areas were, at least, comparable, if not superior to, those of Laura Turner who was awarded promotion and tenure.

The Association next contends that the University acted arbitrarily and capriciously by failing to consider the grievant's cumulative performance throughout all 6 years of his employment at the University. The Association points out that Dean Koelle acknowledged that the sixth year evaluation is more cumulative as it looks back at the grievant's entire career; yet, the Association says that Dean Koelle and Interim Provost Martin only looked at the grievant's 6th year self-study and 6th year record rather than his entire cumulative record over six years in making the tenure decision.[1]

---

[1] **In a post-hearing document following the submission of briefs, the parties stipulated as follows: "Notwithstanding the arguments made in the Union's Brief, the parties agree that Professor Moskowitz's Self-Study, as required by Appendix G, Section VI, subsection 6, included prior comprehensive evaluations and that the Provost testified that he reviewed the Self-Study prior to rendering his decision on Professor Moskowitz's application for tenure."**

The Association contends that the University violated Art. VIII, Sec. B of the contract by failing to help the grievant improve his performance and by failing to engage in regular discussions about performance with the grievant. The Association says that during his 6 years of employment, no one discussed with the grievant any specific concerns about his performance, and that only generalized statements were made. The Association notes that in the 2004-08 contract the parties added language requiring deans to provide specific recommendations to faculty members in the evaluation review immediately preceding the tenure review. The Association notes that the grievant was not given a 5th year review, and that in the 4th year review his evaluation was extremely positive with no specific recommendations being made. The Association argues that going from an extremely positive review in his 4th year to an extremely negative review in his 6th year constituted arbitrary and capricious action on the University's part.

The Association next argues that assuming, arguendo, that the scholarship criterion for tenure was allegedly elevated under the 2004-08 contract, the University nevertheless violated Art. VIII, Sec. B.2.b by failing to notify the grievant of such change in the evaluative criteria. Such failure was arbitrary and capricious conduct on the University's part.

The Association contends that the University acted arbitrarily and capriciously by citing a stale shoving incident involving one of the grievant's students and another professor in its 6th year evaluation of the grievant and by citing an erroneous and misleading claim that the grievant made controversial statements which offended others. The Association says that Dean Koelle's recitation of these claims and Interim Provost Martin's reliance thereon constituted arbitrary and capricious conduct on the University's part.

The Association says that any claim that the grievant was ineffective as Political Science Department Coordinator and had a contentious relationship with his colleagues is false. The Association notes that Dean Koelle testified that she never brought any complaints to the grievant's attention and says that some allowance must be given

for the usual static when a new program is being created within a Department. The Association notes that in her 4th year review, Dean Koelle concluded that the grievant had been very effective as Department Co-ordinator. The Association argues that it would be arbitrary and capricious for the University to criticize now the grievant's role in creating and developing the MPA Program and his association with that program which lasted for a year and one-half after its creation.

In sum, the Association asks that the grievance be sustained, and that the grievant be reinstated as a probationary Assistant Professor for the 2008-09 academic year and be compensated for all benefits lost including back pay and out-of-pocket health care expenses. The Association further asks that all documents relating to the flawed evaluation process and his termination be expunged from his record, and that the University conduct a new 6th year cumulative evaluation of the grievant's performance.

Position of the University

The University contends that it did not act arbitrarily or capriciously in denying tenure to the grievant; it further says that the Association carries the burden of proof in this case.

In particular, the University contends that there were no procedural errors on its part in this case. It says that the grievant's 6th year self-study included all his prior evaluations, and that Dean Koelle had the grievant's complete record before her when she reviewed his file. The University further says that while the final letter denying tenure came from Provost Martin, the President of the University had been consulted, and that there is no provision in the contract that requires the President to write the final letter denying tenure.

The University further says that there can be no doubt that the grievant was aware that scholarship was an essential criterion for tenure. In the early months of employment Dean Koelle went over the

criteria for tenure with the grievant; the criteria are also set forth in the collective bargaining agreement. The University says that the grievant was duly warned about the need to increase his record of scholarship; the University cites the Shelton letter of April 15, 2001; the 2nd year evaluation by Dean Koelle dated February 15, 2002; the Shelton letter of March 14, 2002; the evaluation by Dean Koelle dated February 15, 2003; the letter from Provost Kavanagh dated April 11, 2003; the evaluation by Dean Koelle dated February 15, 2004; the fact that Provost Kavanagh and Dean Koelle relieved the grievant from his coordinator role in May 2004 and gave him a 25% course reduction in order to get him reconnected to his research; and the Spring 2005 meeting with Dean Koelle wherein Dean Koelle urged him to work on his research and scholarship. The University says that there was no agreement on Dean Koelle's part that scholarship had to be suspended due to the grievant's role as Department Coordinator and MPA Program developer. More specifically, the University says that 3 months after his 4th year review, the grievant met with Provost Kavanagh and Dean Koelle and was told that he needed to direct his energy to scholarship if he wished to obtain tenure and was given a 25% course reduction for the next two semesters in order to pursue scholarship. The University notes that in the year the grievant was given a reduced course load, he chose to teach overload, summer and intersession courses that year. The University claims that the grievant had more than sufficient notice about the need to pursue scholarship.

The University says that the grievant voluntarily taught course overloads, summer courses and winter intersession courses during his employment at the University rather than using such time to fulfill the requirements of the scholarship criterion. The University notes that the grievant taught 10 overload courses during his first four academic years plus 15 summer courses and 6 winter intersession courses.

The University contends that it was not obligated to provide any more guidance concerning scholarship than it did in this case. It says that it had no obligation to tell the grievant exactly what he needed to do in the scholarship area in order to be a worthy tenure

candidate; it had no obligation to micromanage the scholarship work of faculty members. The University says that the grievant did not lack for examples of scholarship, yet the grievant chose to do little in this arena.

The University says that it does not require publication of scholarly work as the sine qua non for tenure, and that it is not "a publish or perish" institution, but the University says that the complete absence of any published material in a refereed journal can be a hindrance to obtaining tenure. The University points out that Boyer & Glassick, cited in the contract, support a broad view of scholarship, but that the grievant failed to develop any substantive alternatives to publication.

The University argues that the role of scholarship was elevated in the 2004-08 contract to the second most important criterion following teaching. The University says that the parties changed the language of Art. VIII in the 2004 negotiations; they reduced the teaching load of faculty members so that more time could be devoted to scholarship and gave detailed examples and guidance as to what scholarship was. The University says that as a result of elevating the importance of scholarship, it could rightly expect more scholarly effort out of its faculty. The University says that the grievant's record showed no publication of articles in scholarly or refereed journals, no publication of articles even in general audience journals or magazines, no textbooks or chapters to his credit, no book reviews, no speaking engagements, no professional consulting work, no grants of any kind, and no media commentary; the University says that the grievant had only 2 presentations of papers without external expert validation to conferences over 6 years and was a discussant at a conference on only one occasion.

The University further says that the grievant provided in his self-study no external expert validation of any activities such as his research, grants or creative endeavors.

The University says that "current knowledge of subject matter" and "continuing development and updating of instructional materials" are required elements for effectiveness in teaching, not effectiveness

in scholarship. The University argues that the elements necessary for the criterion of effective teaching do not simultaneously fulfill the criterion of effective scholarship which is a separate criterion under the contract. The University argues that if the elements for excellent teaching also fulfilled the criterion for scholarship, the parties would not have created separate criteria for teaching and scholarship; the two would have been merged into one.

The University further argues that the grievant's MPA work cannot be considered scholarship as such work more properly falls under the separate criterion of program development. Again, if the grievant's MPA work were to be considered as scholarship, such determination would have the effect of merging two separate criteria into one. The University notes that even the grievant classified his MPA work under the criterion of program development in his self-study.

The University contends that given the contractual criteria and the grievant's record, it did not act arbitrarily or capriciously in denying the grievant's bid for tenure. The University says that under the arbitrary and capricious standard, there needs to be a rational connection between the facts found and the choice made, and that it had a rational basis for the decision it made in this case. Furthermore, the University says that the decision it made here was made following all appropriate contractual procedures and at the proper time and was made on the basis of the contractual evaluative criteria. The University argues that academic judgments are best left in the hands of administrators in a position to make such judgments. It notes that judicial review of tenure decisions is very limited, and that courts are reluctant to substitute their judgment for that of educators with respect to issues of promotion and tenure.

The University argues that there were considerations other than scholarship that entered the decision in this case. The University points to some questions about the grievant's confrontational style of teaching where one student with admitted problems treated a faculty member with disrespect thinking he was reflecting the grievant's views on women. The University also says that the grievant may have had some collegiality issues with other members of the Political Science

Department. The University also notes that the grievant was criticized for disassociating himself from the MPA Program after its roll-out.

The University argues that comparison of this case to other tenure cases does not serve to support the Union's contentions here. The University notes that in order for such comparisons to be compelling, the evidence must show such one-sidedness as to go beyond mere differences of judgment; the University says that nothing in the comparative cases suggests that it acted arbitrarily in the instant case or that it overlooked poor scholarship with respect to other faculty members.

The University says the fact that the grievant was reappointed each year does not mean he should be awarded tenure following his 6th year; the University says that the cumulative 6 year review showed that the grievant had shortcomings which have been pointed out herein.

The University argues that in the event that the Arbitrator should find for the grievant in this case, the grievant should not be awarded tenure but that his case should be remanded to the University for a re-evaluation by the current dean and provost who are now different from the dean and provost who initially reviewed his case for tenure. The University says that no new material should be part of such review process. The University says that the grievant could be reinstated for the Spring 2008 semester and paid back pay less interim, outside earnings and unemployment compensation for the Fall 2007 semester. The University says that if the grievant were not to return to work after reinstatement, he should be granted back pay less interim, outside earnings and unemployment compensation up until the point of the award in this case.

## Analysis

The fundamental question presented is whether the University acted arbitrarily or capriciously in denying tenure to Professor David Moskowitz in April of 2006.

If the University departs from the contractually prescribed tenure/promotion review process in some significant way in evaluating

tenure/promotion cases, then the University is vulnerable to a claim that it acted arbitrarily or capriciously.

Art. VIII, Sec. B.3.i provides in pertinent part as follows:

"It is understood that the Chief Executive Officer (President) and, when applicable, the Board of Trustees, have the authority to make all final decisions with respect to promotion and tenure. Final promotion and tenure decisions are made by the President and the Board considering: (1) the criteria in this Agreement; (2) the recommendations of deans and the Chief Academic Officer; (3) the evaluative background of the candidate; and (4) the specifically identified interests of the University. Decisions regarding tenure and/or promotion will be communicated to such faculty members, in writing, by June 30…."

In this case the evidence was that the Faculty Review Committee (FRC) had issued its written recommendations by unanimously voting in favor of tenure and against promotion for the grievant; then Dean Koelle made her written recommendation against both tenure and promotion for the grievant. The case then proceeded to the level of the Provost (Chief Academic Officer); the Provost at the time was an interim Provost, Jeffrey Martin. By letter dated April 14, 2006 interim Provost Martin informed the grievant: "I have reviewed your tenure and promotion self study, the evaluation reports by both the Faculty Review Committee and your Dean, and your responses to both evaluations…. I formally notify you that you will not be reappointed to the faculty."

There is no evidence in this case that the President or the Board of Trustees made the final decision in the grievant's tenure/promotion case in accordance with the criteria contained in Art. VIII, Sec. B.3.i of the contract; further, there is no evidence that Provost Martin was authorized by the President or the Board to write a letter on their behalf detailing their judgment.[2] Based on the quotation cited

[2] Provost Martin testified that he consulted with both Dean Koelle and the President before he issued his decision. Consulting with the President while making a final decision at the Provost level is not consistent with the contractual process requiring the President/Board to make the final decision in accordance with the specified contractual criteria after considering the recommendations of the FRC, the Dean and the Provost.

above, one is left with the distinct impression that Provost Martin reviewed the grievant's file and made the decision not to reappoint the grievant. Thus, the final disposition of the grievant's case for tenure/promotion did not conform to the process spelled out in the collective bargaining agreement as neither the President nor the Board made the final decision in accordance with the criteria specified in the contract.

If the process followed in this case were allowed to stand as an acceptable process, the consequence would be that the parties' contract would have been effectively rewritten by such a decision. Therefore, I cannot subscribe to such a result. I am obliged to conclude that the decision-making process that occurred here was arbitrary in that the contractually prescribed process was not followed as a significant step was omitted, namely, the final decision on tenure/promotion to be made by the President/Board.

Since the result of this case will be a re-visiting of the grievant's case for tenure, I need to address other issues the parties have raised in the present case so that such issues do not remain unanswered at the time of reconsideration of the grievant's tenure case.

The contract sets forth some important requirements in the performance evaluation process. Art. VIII, Sec. B. states that the "Evaluation for reappointment, promotion and/or tenure is a cumulative process." The contract also sets forth in Art. VIII, Sec. B.2 the four evaluative criteria to be used in assessing a faculty member's suitability for tenure/promotion; Sec. B.2 specifies the following:

"1) teaching;

"2) academic advising and program development;

"3) scholarly, professional and/or creative activities; and

"4) institutional and/or community service."

Also, Art. VIII, Sec. B.2 makes the following point:

"Roger Williams University is a student-centered teaching institution. Accordingly, the primary responsibility of faculty is teaching and the primary evaluation requirement is effectiveness in teaching. While all faculty are expected to maintain a program of

professional development, and scholarly and creative activities (especially as they inform and enrich teaching), a publish or perish atmosphere is not intended."

The focus of this case centered on the issue of whether or not the grievant satisfied the criterion of scholarship in his case for tenure. The other criteria can be deemed to have been met.

While the grievant's accomplishments have been detailed at length in the Background Section of this decision, I think it appropriate to say a few words about the grievant's teaching effectiveness which, as the contract states, is elevated above the other criteria as the primary, evaluative criterion. The evidence revealed that, on balance, the grievant is a dynamic and effective teacher. For the period from the Fall of 2002 through the Spring of 2005, the grievant's students gave him an overall rating of 3.55 on a 4.0 scale. The grievant was voted Teacher of the Semester for the spring semester of 2007.[3] The grievant's classes at the University were either over-enrolled or at the cap. The grievant utilizes a Socratic style of teaching. While Dean Koelle wrote in the grievant's initial evaluation that she was "very impressed by Professor Moskowitz's teaching; he is highly energetic", she did have one reservation about his teaching style, and that reservation concerned the fact that "he peppers his remarks with humor and sarcasm. I question whether his students always get the point, and whether some students might not understand his humor." Dean Koelle's concern, however, lessened over time. On the occasion of her second year evaluation of the grievant, she commented: "My previous area of concern, whether or not Prof. Moskowitz's students have the sophistication to fully understand his style, has diminished considerably. Perhaps Prof. Moskowitz's reputation is more well known, and his serious intention to get students thinking and working is familiar to more students and worries fewer of them.... Because being rather outrageous in class is part of Prof. Moskowitz's method of keeping students off-balance and thinking about significant issues, it remains hard to fault him for it. His palpable interest in getting

[3] The grievant had also been named Professor of the Year at a former institution – Georgia Southern University.

students to think is very difficult to criticize." With the advent of the grievant's fourth year evaluation, Dean Koelle wrote: "There has been concern about Professor Moskowitz's idiosyncratic method of teaching and whether or not students had the sophistication to appreciate his methods. This year, there are no indications that anyone misunderstands Prof. Moskowitz's approach. I believe that he had made his true stand on issues clearer." The evaluation went on to indicate that the grievant had consciously curbed the sharpness of his humor in class in response to Dean Koelle's first year evaluation, and the results of that had become evident as time progressed.

There were several statements made by Dean Koelle in her cumulative sixth year review of the grievant for tenure/promotion which deserve comment here. One such comment concerned an incident before the time of the grievant's fourth year review where one of his students (who was on medication) pushed Professor June Speakman out of the grievant's office. Given the condition of the student and the fact that no mention was made of this incident at the time of the fourth year review, I believe that it was inappropriate to raise this incident several years later as a comment on the grievant's teaching style.

Dean Koelle further commented in her sixth year review that the grievant had offended some colleagues by making controversial statements which had been overheard by such colleagues; however, in her testimony Dean Koelle could only remember one such incident, and that incident was resolved when Dean Koelle spoke to the complaining faculty member. Given the extremely limited evidentiary basis behind Dean Koelle's comment and given considerations of relevance, I do not believe this particular comment belonged in the sixth year (tenure) review.

Also, while there was evidence that some friction had arisen in the Department of Social & Political Science when the grievant was pushing through the MPA Program (for which he received a merit pay increase from the University), there was, however, no evidence that there was any enduring friction between the grievant and his colleagues; in fact, the evidence indicated that any temporary

differences had been repaired as the grievant was on good terms with the other faculty members in the Department and was working with a number of them on joint conference preparations.

As previously indicated, the crux of this case centered on the question of whether or not the grievant had satisfied the criterion of scholarship.

There was some debate between the parties about whether or not the criterion of scholarship had been elevated as a criterion to a level of second in importance to the criterion of teaching as a result of the negotiations for the 2004-08 contract. The question of whether scholarship had been elevated in importance is not something that needs to be resolved in the context of this case.

What is clear is that the criterion of scholarship had been elevated in the grievant's mind as something that required his attention and effort. The evidence on this point was as follows. Dean Koelle had discussed with first year faculty including the grievant the evaluative criteria contained in the contract; she informed them that the University would look favorably on all-around achievement, and that achievement would be required in the three evaluative areas in addition to teaching.

In reappointing the grievant to a second probationary year, Vice-President of Academic Affairs Loretta Shelton wrote: "As you know, a record of effective teaching and of scholarship that informs teaching and ensures currency in your discipline is of paramount importance as you proceed toward tenure. I encourage you to submit your research for publication. In any case, copies of articles and conference programs documenting presentations need to be submitted with your self-study." Vice-President Shelton further noted: "The award of tenure is tied to a cumulative process that considers your full record of teaching and scholarship, although service to the University and to the external community are also considered."

In her second year evaluation of the grievant, Dean Koelle wrote: "Progress in professional development is necessary, and Prof. Moskowitz is strongly advised to divert some of his energy to that end.... Dedication to students and teaching is a laudable trait for a

faculty member, but it cannot be used to replace progress in either professional development or work in community service....The University will ultimately support well-rounded faculty members who can show adequate progress in all areas."

In her third year evaluation of the grievant, Dean Koelle wrote: "His evaluation this year shows that he has taken this advice seriously <pay more attention to professional development and service to the university and community>: he is involved in two political science association meetings, and has also become interested in the proposed international Relations Center. Prof. Moskowitz has also been more visible in the affairs of the Political Science Department, and has made several very useful suggestions as to its workings.... Prof. Moskowitz serves as an important faculty member with regard to his teaching. I am concerned about the sparseness of the other parts of his self-study, and repeat my observation of last year, that the University will ultimately support well-rounded faculty members who can show adequate progress in all areas."

In reappointing the grievant to a fourth probationary year, Provost Edward Kavanagh stated: "To enhance our mission 'all faculty are expected to maintain a program of professional development and scholarly and/or creative activities.' Let me urge you to include in your Self-Study evidence of external validation of your activities in this important endeavor."

In his reappointment to a fifth probationary year, the 2004-05 academic year, the grievant was advised by Provost Kavanagh as follows: "To enhance our mission 'all faculty are expected to maintain a program of professional development and scholarly and/or creative activities'. Let me urge you to include in your Self-Study evidence of external validation of your activities in this important endeavor. Since the nature and rigor of different external validations varies among disciplines, I advise you to discuss this subject with your dean." Dean Kavanagh gave the grievant a 25% course reduction in his fifth year and urged the grievant to get reconnected to his research as his tenure review was coming up; this course reduction along with all the other prior comments should have impressed upon the grievant

the serious nature of the administration's concern regarding the need for scholarly output on the grievant's part.

The University takes a broad view of scholarship as required by the collective bargaining agreement. Art. VIII, Sec. B.2 of the 2004-08 contract states in pertinent part: "Scholarship as needed to inform teaching, met accreditation requirements or advance one's discipline is also an important criterion; RWU recognizes multiple forms of scholarship as articulated by Ernest Boyer in Scholarship Reconsidered: Priorities for the Professoriate and by Charles Glassick et al. in Scholarship Assessed: An evaluation of the Professoriate."[4]

The record indicated that the grievant engaged in the following scholarly activities. In January 2005, he presented a paper on "The Differential Effects of Values and Affect on Support for Gay Rights Policies" at the Annual Meeting of the Southern Political Science Association, and he had two papers scheduled for presentation at future meetings of various political science associations - one paper was entitled "Perceptions of Responsibility for Public Assistance" and the other paper on which he was a co-author with other Political Science Department members was entitled "Professors as Practicing Politicians: Impact on Student Perceptions and Pedagogy". He had also written a number of articles which had been rejected for publication: they were: "Fluff, Puff & Stuff: Do Students Have a Preferred Teaching Style?"; "Race and Perceived Responsibility for Poverty"; and "Evaluating Measures of Racism from an African-American Perspective". The grievant had also worked on a number of research projects involving a study of three national civil rights interest groups and was a principal investigator on a study involving domestic partner benefits. The grievant had also served as a panel discussant on "Issue Advocacy and Party Activism in American Politics" at the annual meeting of the Northeast Political Science Association in 2002.

The 2004-08 collective bargaining agreement requires external validation of scholarship activities. This was not a requirement of

[4] This language on scholarship is a revision of what was in prior contracts and provides more detail about the constituent elements of scholarship."

prior contracts. The 2004-08 contract became effective at the beginning of the grievant's 5th probationary year in the Fall of 2004. With respect to external validation of the multiple forms of scholarship, the contract in Art. VIII, Sec. B.2 specifies: "External expert validation of the scholarly merit of these various activities is required."

Certainly, publishing an article in a peer-reviewed or refereed journal would be an acceptable form of external validation. The grievant had no publications in such journals. The grievant did, however, present a paper at a political science conference and had a few more scheduled for presentation at future political science meetings. Acceptance of papers for presentation at such conferences should be considered a form of external validation inasmuch as not every paper submitted is accepted for presentation. Also, serving as a discussant on conference panels should be considered as another form of external validation of scholarly activities. The grievant had served as a discussant on a conference panel. While, clearly, publication in a refereed or peer-reviewed journal would carry substantial weight, some weight should nonetheless be accorded to conference presentations and panel discussions.[5]

The Association cites the grievant's work on behalf of the establishment of the MPA Program as a factor to be considered in his credentials on scholarship. While Dean Koelle cited the grievant's "outstanding leadership" with respect to MPA Program development, such work is most appropriately considered under the evaluative criterion of program development. Even the grievant himself lists his MPA work under this moniker.

The Association also cites the grievant's efforts in staying current on political events and doing research to inform his teaching as work that should be recognized under the scholarship criterion. The University views such efforts as work in support of teaching and as something that would be evaluated under the teaching rather than the

[5] Dean Koelle acknowledged in her testimony that the 2004-08 contract recognizes attendance at professional workshops & conferences as a form of scholarship.

scholarship criterion. I tend to agree that such work should be considered in support of the grievant's teaching rather than his scholarship unless it can be shown that the research was incorporated into his written scholarship work, particularly manuscripts or articles sent out for potential publication. Accordingly, while credit should be given to the grievant for his efforts to stay current and to do research in support of his teaching, such efforts largely fall within the teaching, not the scholarship, category.

I think it is the obligation of the University through its various committees and representatives to evaluate in good faith the grievant's scholarship credentials for the purpose of deciding whether or not he should be granted tenure. In considering the grievant's scholarship credentials, I find that it would be appropriate to consider whether the grievant had accomplished the projected publication of papers referenced in his tenure/promotion self-study and also to consider other relevant scholarship activities as of the date that the re-evaluation occurs. The judgment to be made concerning the grievant's scholarship is best left to those charged with the responsibility for administering the University's tenure/promotion criteria, and the judgment to be made on this issue is likely supportable whichever way it is made so long as it is made pursuant to the contractually-prescribed process and the contractually-prescribed criteria and rests on a rational basis.

Finally, there is the Association's claim that the University acted arbitrarily and capriciously by failing to consistently apply the evaluative criteria for tenure in the case of its faculty members up for tenure review. The Association's claim that the University placed effectiveness in other evaluative criteria ahead of effectiveness in teaching in certain other tenure cases is irrelevant to this case. The University did not devalue the importance of teaching in this case, and the grievant's effectiveness in teaching is not at issue here; his scholarship is.

The Association also contends that the grievant was the victim of disparate treatment when his case for tenure/promotion is compared against the record of Laura Turner who was awarded tenure/promotion.

With respect to the Laura Turner case, I find that a comparison between her case and the grievant's yields enough differences, particularly insofar as her scholarship is concerned, as to eliminate any basis for a claim of arbitrary/capricious decision-making on the University's part with respect to the grievant.

All other contentions of the parties, if not addressed here, are not adopted.

In sum, then, I find that the University violated Art. VIII, Sec. B.3.i for the reasons previously stated herein.

For remedy, the grievant shall be reinstated to probationary status for one more full academic year and shall have his case for tenure reviewed in accordance with the contractual criteria and the contractual process. The principle of a make whole remedy subject to the customary deductions shall apply in this case. The parties are directed to implement an appropriate remedy, and if they are unable to agree upon an appropriate remedy, either party may request in writing within 60 days from the date of this decision that the Arbitrator resolve the outstanding remedial issues.

Therefore, after having considered the evidence and arguments of the parties, I award as follows:

**The University acted arbitrarily in denying tenure to Professor David Moskowitz in April of 2006. For remedy the grievant shall be reinstated to probationary status for one more full academic year and shall have his case for tenure reviewed in accordance with the contractual criteria and the contractual process. The principle of a make whole remedy subject to the customary deductions shall apply in this case. The parties are directed to implement an appropriate remedy, and if they are unable to agree upon an appropriate remedy, either party may request in writing within 60 days from the date of this decision that the Arbitrator resolve the outstanding remedial issues.**

Lawrence T. Holden, Jr.
Arbitrator