IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ROGER WILLIAMS UNIVERSITY,<br><br>Plaintiff / Defendant in Counterclaim,<br><br>v.<br><br>ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION (NEARI/NEA)<br><br>Defendant / Plaintiff in Counterclaim. | Civil Action No. 07-440-ML-DLM |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(a) and LR cv56, Plaintiff / Defendant in Counterclaim Roger Williams University ("RWU" or the "University"), moves that summary judgment be entered in its favor against Defendant / Plaintiff in Counterclaim Roger Williams University Faculty Association (NEARI/NEA) (the "Union"), and that the Decision and Award of Arbitrator Lawrence T. Holden, Jr. be vacated on the grounds that it does not draw its essence from the applicable collective bargaining agreement because: (1) Arbitrator Holden ignored crucial and unrebutted evidence that the University complied with the collective bargaining agreement in denying tenure to the grievant; (2) the award improperly relies on a *de minimus* procedural issue that the Union failed to raise during the grievance process; and (3) Arbitrator Holden improperly shifted the burden of proof to the University. Moreover, the award should be vacated because the remedy imposed by Arbitrator Holden exceeded his authority under the collective bargaining agreement. The remedy imposed conflicts with the express provisions of the very contract Arbitrator Holden was tasked with interpreting. If the award is enforced by this Court, it will result in a windfall for the grievant and provide him with rights that are otherwise

unavailable to him or the Union under the express terms of the applicable collective bargaining agreement.

## I. STATEMENT OF FACTS

The facts are set forth in detail in Plaintiff's Statement of Undisputed, Material Facts Pursuant to Local Rule Cv56(a) ("Facts"). The facts concerning this matter are taken, in most part, from the Award of Arbitrator Lawrence T. Holden, Jr. dated November 2, 2007, attached as Exhibit B to the Complaint (the "Award"). Where appropriate, facts are also derived from the transcript from the arbitration hearing, as well as the exhibits presented to Arbitrator Holden during the four days of testimony.

### A. The Collective Bargaining Agreement and Tenure

The University is a private institution of higher education with its main campus located at One Old Ferry Road, Bristol, RI. Originally a junior college when founded, the institution has expanded and grown into a four year university with numerous graduate programs. It has approximately 4000 undergraduate students and approximately 230 full-time faculty members. The largest school within the University is the Feinstein College of Arts & Sciences, with about 95 full-time and 125 part-time faculty. (Facts 1). The Union is the exclusive bargaining agent for all teaching faculty, among others. (Facts 2). The Union and RWU are parties to the Roger Williams University Faculty Association NEARI/NEA 2004-2008 Contract with the Board of Trustees of Roger Williams University, which expires on June 30, 2008 (the "CBA"). (Facts 3).

As set forth in detail in the CBA, faculty in the bargaining unit at RWU are classified by rank, from assistant professor to full professor, and generally are either probationary (*i.e*. pre-tenure, but on the tenure track), or tenured. (CBA at Article VIII).[1] The probationary period usually runs for six years, with a tenure review in the sixth year, during which time the faculty

[1] References to specific provisions of the CBA shall be designated by citing to either the Article/Section or page(s).

member is formally reviewed on a regular basis. (CBA at Article VIII). Tenure at the University may be earned after six years of service in a probationary status and after successfully completing an intensive review process. (CBA at 26). Faculty members – both tenured and non-tenured – are evaluated under four general performance areas: 1) teaching; 2) academic advising and program development; 3) scholarship, professional and creative activities; and 4) institutional and community service. (CBA at Article VIII.B.; Award at 2).[2] The tenure review process "is a cumulative review of a faculty member's probationary years, and the faculty member must meet or exceed each of the four evaluative criteria in order to receive tenure." (Award at 2). "A tenured faculty member is one who demonstrates superior teaching skills, a commitment to working with students, a solid command of their discipline and whose performance meets or exceeds the evaluative criteria in [Article VIII of the CBA]. The award of tenure is both a measure of esteem and a recognition of academic freedom." (CBA at Article VIII.D.). "Tenure is granted only by specific action. Tenure cannot be granted by error or inaction." (CBA at Article VIII.D.).

**B. The Subject of the Grievance**

David Moskowitz, an Assistant Professor in the Department of Social & Political Science, was hired commencing in the 2000-2001 academic year. (Facts 4). As set forth in the CBA, Professor Moskowitz was evaluated regularly during his first six years at RWU. (Facts 5). At the conclusion of his sixth year at RWU, as set forth in the CBA, Professor Moskowitz was considered for tenure. (Facts 6). In addition, at this time, Professor Moskowitz also applied for a promotion to the position of Associate Professor. (Facts 7).

In connection with his tenure application, in the Spring of 2006, the Faculty Review Committee ("FRC") reviewed Professor Moskowitz and recommended him for tenure, although

[2] References to specific provisions of the Award shall be designated by citing to the page(s).

not for promotion to the position of Associate Professor.[3] (Facts 8). The FRC noted that "[s]cholarship is one of Dr. Moskowitz's weakest contributions or activities over the previous probationary period…." (Facts 10). The next step in the review under the CBA was the Dean's Evaluation Report and Recommendation. (CBA at p. 6). In her written recommendation dated March 1, 2006, Ruth Koelle, Dean of the Feinstein College of Arts and Sciences, after reviewing the recommendation of the FRC, concluded that she could recommend neither tenure nor promotion for Professor Moskowitz. (Facts 12). The Dean's recommendation against promotion and tenure was sent to Professor Moskowitz and to Interim Provost Jeffrey Martin.[4] (Facts 13). On April 14, 2006, after consulting with University President Dr. Roy Nirschel, Provost Martin wrote to Dr. Moskowitz advising him that he would not receive tenure. (Award at 8; Facts 14).

The Union grieved the decision to deny tenure, as was its right pursuant to Article X of the CBA. On April 17, 2006, just three days after Provost Martin's letter, the Union filed a grievance over Professor Moskowitz's non-reappointment. (Facts 15). By way of an email dated May 9, 2006, Provost Martin denied the Step 1 Grievance. (Facts 16). On May 15, 2006, Mel Topf, President of the Union, sent a memo to President Nirschel outlining the arguments of the Union in anticipation of the Step 2 Grievance Hearing. (Facts 17).

By way of letter dated June 6, 2006, President Nirschel denied the grievance.[5] (Facts 18). In his written denial, President Nirschel summarized that Professor Moskowitz's main argument was that Professor Moskowitz "did not receive adequate notice of insufficiencies in [his] process toward tenure until this final review leading to tenure denial." (Facts 18). President Nirschel responded to Professor Moskowitz's argument by explaining that he (President Nirschel)

[3] Professor Moskowitz did not grieve the ultimate decision to deny him promotion to Associate Professor. (Facts 9).

[4] Professor Moskowitz prepared and submitted responses to both the FRC's recommendations and Dean Koelle's recommendation. (Award at p. 8).

[5] President Nirshcel's June 6, 2006, letter is misnomered a "Step 3 Grievance Answer." Rather, it was the response to Step 2 of the grievance process, as the Step 3 grievance process is arbitration. [CBA Article X].

"reviewed [Professor Moskowitz's] tenure track history" and that there were "written, express statements, on the record, of concern and directed notice for [Professor Moskowitz] to focus on scholarly and professional development during the probationary period." (Facts18) President Nirschel concluded that he agreed with the recommendation of the Dean and Provost to deny tenure. (Facts 18).

The CBA provides that after the denial of tenure, members of the bargaining unit may elect to work a one, final year of teaching (the "terminal year"). (CBA at p. 37: "Faculty members so notified [of their denial of tenure] may elect to work a terminal year."). Professor Moskowitz elected and subsequently worked his "terminal year" during the 2006-2007 academic year. (Facts 19).

**C. The Arbitration**

The Union pursued the matter to arbitration. The issue presented to Arbitrator Lawrence T. Holden, Jr., was as follows: "Did the University act arbitrarily or capriciously in denying tenure to Professor David Moskowitz in April of 2006? If so, what shall be the contractually authorized remedy?" (Award at 1; Facts 22). The parties engaged in four days of hearing, at which Arbitrator Holden heard testimony from witnesses and received exhibits. (Facts 21). In sum, there are over 800 pages of transcript testimony, and more than 70 exhibits. (Facts 21). At the hearing, the overwhelming focus of the testimony concerned whether Professor Moskowitz satisfied the criterion of scholarship. (Award at 21).

In his Award, Arbitrator Holden did not make his decision based on the voluminous evidence related to Professor Moskowitz's scholarship. Rather, Arbitrator Holden narrowed the focus of his consideration and concluded that the "decision-making process that occurred here was arbitrary in that the contractually prescribed process was not followed as a significant step was omitted, namely the final decision on tenure/promotion to be made by the President/Board."

(Award at 20). As a result of this finding, Arbitrator Holden concluded that RWU "violated Art. VIII, Sec. B.3.i." of the CBA. (Award at 28). As a remedy, Arbitrator Holden reinstated Professor Moskowitz "to probationary status for one more full academic year" and ordered that Professor Moskowitz "have his case for tenure reviewed in accordance with the contractual criteria and the contractual process." (Award at 28).

## II. PROCEDURAL BACKGROUND

On December 3, 2007, RWU filed its Complaint seeking to vacate Arbitrator Holden's award. In its Answer dated December 18, 2007, the Union filed a counterclaim seeking to confirm the Award. By way of order dated February 11, 2008, this Court ordered that RWU submit its Motion for Summary Judgment on its Petition to Vacate the Award on or before April 11, 2008.

## III. SUMMARY JUDGMENT STANDARD

Before the Court will be the parties' cross-motions for summary judgment, which are governed by the familiar Rule 56 standards. Only if there is no genuine issue as to a material fact is the moving party entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). In determining whether either party has met this burden, the Court must view the record in the light most favorable to the non-movant and draw inferences in that party's favor. *See Hayes v. Douglas Dynamics, Inc*., 8 F.3d 88, 90 (1st Cir.1993). "Where as here cross-motions for summary judgment are involved, the court must consider each motion separately, drawing inferences against each movant in turn." *Merchants Ins. Co. v. U.S. Fid. & Guar. Co*., 143 F.3d 5, 7 (1st Cir.1988) (internal quotation marks omitted).

## IV. ARGUMENT

### A. Standard of Review

Although review of arbitral decisions by this Court is narrow and deferential, the Court's role is "not the equivalent of granting limitless power to the arbitrator." *Georgia-Pacific Corp. v. Local 27 United Paperworkers Int'l Union*, 864 F.2d 940, 944 (1st Cir. 1989). In reviewing an arbitrator's interpretation of a collective bargaining agreement, "a court should uphold the view of the arbitrator so long as it can find within the four corners of the agreement, any plausible basis for that interpretation. In other words, an arbitrator may not ignore the plain language of the agreement, but a court need only be convinced that the arbitrator's reading draws its essence from the collective bargaining agreement and does not rely on the arbitrator's own notions of industrial justice." *Wheelabrator Environtech Operating Servs. v. Laborers District Council, Local 1144*, 88 F. 3d 40, 44 (1st Cir. 1996) (citations and quotations omitted). *See also*, *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An award fails to "draw its essence" from a collective bargaining agreement when the arbitrator bases the "award on some body of thought, or feeling, or policy, or law that is outside the contract…" *Labor Relations Div. v. Teamsters, Local 379*, 29 F.3d 742, 747 (1st Cir. 1994) (quoting *Newspaper Publishers' Assoc. v. WEB Printing Pressman's Union*, 821 F.2d 390, 394-95 (7th Cir. 1987)).

The First Circuit has explained that a court may vacate an arbitrator's decision if the decision is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling, or (3) mistakenly based on a crucial assumption that is concededly a non-fact." *Advest, Inc. v. Patrick McCarthy,* 914 F.2d 6, 8 (1st Cir. 1990) (quoting *Local 1145 UFCW v. Stop & Shop Cos.*, 765 F.2d 19, 21 (1st Cir. 1985)). A "non-fact" refers to a situation "where the central fact underlying an arbitrator's decision is concededly erroneous," *Electronics Corp. of Am. v. International Union of*

*Electrical Workers, Local 272*, 492 F.2d 1255, 1256 (1st Cir.1974), that is, where "there was a gross mistake ... made out by the evidence, but for which, according to the arbitrator's rationale, a different result could have been reached." *Id.* at 1257. *See also Prudential-Bache Sec., Inc. v. Vanner*, 72 F.3d 234, 237-38 (1st Cir. 1995).

An arbitrator who purports to interpret the language of a CBA "does not sit to dispense his own brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). "An arbitrator does not have unfettered discretion, and may not impose a remedy which directly contradicts the express language of the agreement. Nor can he or she interpret a clause or provision when its language is clear, unequivocal and unambiguous." *Strathmore Paper Co. v. United Paperworkers International Union, AFL-CIO,* 900 F.2d 423 (1st Cir. 1990). Moreover, an arbitrator "may not shield an outlandish disposition of a grievance from judicial review simply by making the right noises - noises of contract interpretation." *Leed Architectural Products v. Local 6674*, 916 F.2d 63, 65-66 (2nd Cir. 1990) (citations omitted).

**B. The Award Should Be Vacated**

Before discussing the specific grounds to vacate the award, it is important to emphasize that when reviewing RWU's decision to deny Professor Moskowitz tenure, Arbitrator Holden should have been mindful that "tenure decisions represent one of the most critical of all decisions made at institutions of higher learning." *Pratt Institute v. United Federation of College Teachers, Local No. 1460*, No. 79-C-2034, 1980 WL 2070, at *6 (E.D.N.Y. March 17, 1980) (citing cases). Indeed, it is precisely because of the crucial management function of selecting tenured professors that the parties agreed in the CBA that the University is entitled to the utmost deference in its tenure decisions.

Arbitrator Holden was contractually mandated to review the University's decision to deny tenure to Professor Moskowitz under the most deferential standard available – whether the University's decision to deny tenure was arbitrary or capricious. Article IX ("Due Process") provides that the "termination of non-tenured MBUs shall not be arbitrary or capricious. Dismissal for purposes of this Agreement shall mean non-renewal of contract of a MBU…."[6] (CBA at Article IX.A). The Union acknowledges that this very high standard was the proper standard of review by the Arbitrator when reviewing the University's decision on tenure. (Award at 8: The [Union] contends that the denial of tenure for the grievant was an arbitrary and capricious act on [RWU's] part."].

It is against this heightened standard – reviewing the most intimate of University personnel decisions – which Arbitrator Holden should have reviewed Professor Moskowitz's grievance. With these standards in mind, the following grounds exist for vacating the Award of Arbitrator Holden:

(1) The Award does not draw its essence from the CBA and Arbitrator Holden exceeded his authority by failing to recognize the uncontroverted evidence that President Nirschel denied Professor Moskowitz tenure prior to June 30, as required by the CBA, through Provost Martin's consultation with President Nirschel before issuing his denial letter, and/or through President Nirschel's letter to Professor Moskowitz dated June 6, 2006;

(2) The Award does not draw its essence from the CBA and Arbitrator Holden exceeded his authority by improperly relying upon a ministerial action by the President (the signing the initial tenure denial letter) that the Union failed to raise during the initial steps of the grievance process; and

(3) The Award does not draw its essence from the CBA and Arbitrator Holden exceeded his authority by improperly shifting the burden of proof in this matter from the Union to the University and ignoring uncontroverted evidence in the record demonstrating that the University President had concurred in and approved of the communication from the Provost to Professor Moskowitz informing Professor Moskowitz of the denial of his tenure.

The University will address each of these infirmities *seriatim*.

[6] An "MBU" is defined in the CBA as a member of the bargaining unit. (CBA at p. 1).

**1. The Award ignores crucial and unrebutted evidence that the University complied with Article VIII.B.3.i both through the actions of Provost Martin conferring with President Nirschel and President Nirschel's June 6, 2006 letter denying tenure.**

Article VIII, Section B.3.i. of the CBA provides that the Chief Executive Officer (President) and, when applicable, the Board of Trustees, have the authority to make all final decisions with respect to promotion and tenure…. Decisions regarding tenure and promotion will be communicated to such faculty members, in writing, by June 30…." Article VIII.B.3.i. vests authority in the President to make the tenure decision. Arbitrator Holden concluded that there was "no evidence in this case that the President or the Board of Trustees made the final decision in the grievant's tenure/promotion case in accordance with the criteria contained in Art. VIII, Sec. B.3.i. of the [CBA]" and that there is "no evidence that Provost Martin was authorized by the President or the Board to write a letter on their behalf detailing their judgment." (Award at 19).

Arbitrator Holden's analysis completely ignores two important pieces of evidence about the President's involvement – both the testimony that the President was consulted and the President's June 6, 2006 correspondence to Professor Moskowitz denying tenure. Either of these pieces of evidence – alone – is sufficient to meet the University's obligation under Article VIII.B.3.i. When taken together, they only serve to confirm that Arbitrator Holden was issuing his own brand of industrial justice without sufficient regard for the CBA or the facts in evidence in finding the University's decision-making process "arbitrary."

**a. President Nirschel denied tenure to Professor Moskowitz**

Although the April 14, 2006 letter denying tenure came from Provost Martin, the President had been consulted about the decision. At the arbitration hearing, Provost Martin testified as follows:

Q: Prior to writing this letter in April of '06, did you consult with anyone in addition to reviewing the documents you referred to?

A: Conversations with the dean and with the president.

(Facts 14). The Union presented no evidence whatsoever to rebut Provost Martin's testimony that the letter denying tenure to Professor Moskowitz resulted from consultation with President Nirschel. The logical implication of this testimony is that, at a minimum, President Nirschel fully participated in and (by extension) endorsed the decision to deny tenure to Professor Moskowitz prior to April 14, 2006. Thus, the President exercised his authority *de jure* in the decision-making process in accordance with the CBA. Absent any contrary evidence from the Union, Arbitrator Holden should have concluded that this consultation met the contractual mandate of Article VIII.B.3.i. Arbitrator Holden's finding was directly adverse to the only testimony presented.

Arbitrator Holden ignored the only evidence before him and, in a footnote, theorized that "[c]onsulting with the President while making a final decision… is not consistent with the contractual process requiring the President/Board to make the final decision…." (Award at 19 & fn. 2). Arbitrator Holden had no factual basis for making this finding. He did not conclude that Provost Martin was not credible or that the consultation never occurred. The Union presented absolutely no facts or testimony that the consultation did not satisfy the contractual language; rather, the Union relied upon arguments unsupported by any factual basis. This was insufficient for the Union to meet its heavy burden to overturn RWU's tenure denial, and Arbitrator Holden had no basis to ignore Provost Martin's testimony. *Associacion de Senoras Damas Del Santo Aslio de Ponce v. Unidad Laboral de Enfermeras Y Employados de law Salud*, 672 F.Supp. 54, 56-57 (D. P.R. 1987) (arbitrator may not exclude proper evidence presented by one party in favor

of mere unsupported arguments by the opposing party, and by doing so, arbitrator's decision is "unfounded in reason and fact.").

**b. President Nirschel's grievance response of June 6, 2006, reflects his decision to deny tenure to Professor Moskowitz**

Arbitrator Holden's decision also ignores the uncontroverted evidence that President Nirschel provided written notice, under his signature, that Professor Moskowitz was denied tenure prior to the June 30 deadline set forth in the CBA.

The CBA defines a grievance as an allegation "that there *has been* a violation, misinterpretation, or misapplication of any of the terms of this Agreement." (CBA at Article X.A.) (emphasis added). On April 17, 2006, just three days after Provost Martin's letter, the Union filed a grievance over Professor Moskowitz's non-reappointment. (Facts 15). The Union's filing of the grievance demonstrates that it believed that as of April 17, 2006, a final decision had been made *by the University* with respect to tenure. Once the Union files its grievance, it is conceding that the final decision had been made. Otherwise the grievance would have been premature in that there was no violation as of April 17, 2006. Had it truly believed that the President had not made the final decision through Provost Martin's April 14, 2006 letter, the Union would have been compelled to wait until July 1 to file the grievance – because the University had until June 30 to file make a final tenure determination.

The Union did not wait until June 30 to file its grievance. By way of an email dated May 9, 2006, Provost Martin denied the Step 1 Grievance. (Facts 16). On May 15, 2006, Mel Topf, President of the Union, transmitted a memorandum to President Nirschel outlining the Union's arguments for the Step 2 Grievance Hearing. (Facts 17). Importantly, by way of letter dated June 6, 2006, President Nirschel denied the grievance. (Facts 18). In his written denial, President Nirschel explained that there was "no process violation" and found that the decision to deny tenure was appropriate. (Facts 18).

President Nirschel's June 6, 2006, letter satisfies RWU's obligations articulated in Article VIII.B.3.i. – it reflects President Nirschel decision and it was communicated to Professor Moskowitz "by June 30." (CBA at Article VIII.B.3.i.). Arbitrator Holden does not mention – let alone analyze – the import of this June 6 communication in his Award. By ignoring the existence of President Nirschel's letter, Arbitrator Holden ignored crucial and undisputed evidence conclusively demonstrating that RWU complied with the express terms of the CBA because the President provided a decision prior to June 30. The fact that the writing signed by President Nirschel was part of the grievance process makes no material difference in the analysis. Contrary to the suggestion in the Award, President Nirschel did not sit on the sideline while the tenure decision was made by other University officials; rather, President Nirschel's June 6 letter reflects that he was indeed intimately involved in the consideration of Professor Moskowitz and this is a signed notice provided to Professor Moskowitz prior to the June 30 deadline mandated by the CBA. Because of Arbitrator Holden's failure to recognize – let alone analyze – the June 6 letter, the Award is unfounded in reason and in fact and must be vacated. *Associacion de Senoras Damas Del Santo Aslio de Ponce*, 672 F. Supp. at 56-57.

### 2. The Award Improperly Relies Upon a Ministerial Action by the President that the Union Failed to Raise During the Grievance Process, As Required By the Collective Bargaining Agreement

The Court should vacate the Award because it gives improper weight to the absence of a ministerial action that could have been corrected if properly raised during the grievance process. The grievance process focused exclusively on the issue of whether Professor Moskowitz met the four criteria for tenure, with particular emphasis on his efforts to satisfy the scholarship criterion. Provost Martin's May 9, 2006 denial of the Step One Grievance explained that the "principal issue is a lack of scholarly progress." (Facts 16). In the Union's May 15, 2006, memo to President Nirschel, Union President Mel Topf wrote that the "chief abuse of the administration's

discretion" was that Professor Moskowitz "was given insufficient, inaccurate, and indeed misleading notice of what is acceptable scholarly progress." (Facts 17). The Union's May 16, 2006 memo makes no mention at all of any procedural defect in the grievance process with respect to the President not issuing the final decision. The Union did not raise its concern that Article VIII.B.3.i. was not followed at any point during the pre-arbitration grievance process when any ministerial infirmity could have been easily rectified.

The Union's failure to raise Article VIII.B.3.i. during the grievance process should estop them from arguing this basis in the arbitration. Arbitrators have refused to consider new matters introduced at the arbitration hearings which were never heard during the grievance procedure. *In re City of Bay City*, 117 LA (BNA) 60, 2002 WL 1447055 (Lab. Arb.) (2002) (Allen, Arb.) ("Either party is entitled to know and consider, in the pre-arbitration steps of the grievance procedure, the essential claims and arguments upon which the other relies.") As one arbitrator succinctly stated in refusing to consider a Union argument because it had not been raised at the grievance procedure:

> Under the contract, arbitration is the final step in a complex and formal grievance procedure. Accordingly, the arbitrator's authority to determine a grievance not processed in accordance with the contract is open to serious question.…
>
> These legal considerations reflect and are reinforced by strong practical considerations. Arbitration is a supplement to, and not a substitute for the grievance process. The arbitrator's function is 'to decide questions which the parties themselves have tried to settle without success.' To treat these two processes as the same is to threaten the integrity and usefulness of both of them. Where, as in this case, there is a multi-step grievance procedure, one of the resultant advantages is that it brings to bear on the solution of a grievance with general implications the different kinds of know-how which exist at different echelons of the Union and the Company. But this advantage is lost or diluted where a new issue is formulated for the first time at the arbitration stage.

*Jenison Public School District*, 81 LA (BNA) 105, 1983 WL 30519 (Lab. Arb.) (1983) (Roumell, Arb.) (quotation omitted).

The same reasoning applies here. It is inequitable for the Union to process its grievance prior to June 30, making substantive arguments about Professor Moskowitz's scholarship, and then wait until after June 30 to argue in its post-arbitration brief that the University acted arbitrarily by failing to have President Nirschel issue his decision before June 30.[7] The effect is that by filing its grievance and proceeding on substantive grounds, the Union purposefully failed to bring forward to the University a minor procedural defect which could have easily been clarified. The University was prejudiced significantly by this inaction because had the Union raised the procedural issue at any of the early grievance steps, it could have been easily addressed.[8] Indeed, the Court can take notice of how easily it could have been corrected because the June 6 letter from President Nirschel authoritatively sets forth his decision to deny tenure. Part of any grievance process is to allow an employer to adjust a situation which can be easily rectified. It is evident that President Nirschel himself could have rectified this alleged ministerial infirmity before the June 30 deadline had the Union merely mentioned it at any point during the first two steps of the grievance process. The Court should not permit the Union to benefit from its action through the "windfall" of prevailing at a subsequent, binding arbitration based upon a ministerial deficiency that could have been timely addressed, if only the Union had presented it at the first two steps of the grievance process. In short, it was improper for Arbitrator Holden to base his decision on an issue that was never raised in the grievance process and by so doing, he overstepped his authority and his decision must be vacated.

---

[7] The CBA provides, in part, that the grievance shall be filed "in writing" and "the nature of the grievance, and which articles of the contract have been violated shall be specified in the filing." (CBA at p. 44). The Union failed to identify its concern over Article VIII.B.3.i.in its grievance. (Facts 15).

[8] As set forth above, the University presented affirmative evidence (unrebutted by the Union) that President Nirschel was involved in the decision to deny tenure.

**3. The Award Improperly Shifts the Burden of Proof to the University**

The Court should further vacate the Award because the Arbitrator improperly shifted the burden away from the Union to prove that the University's actions were arbitrary or capricious. As set forth above, Arbitrator Holden could only sustain the grievance if he determined that the University's denial of tenure for Professor Moskowitz was arbitrary or capricious. Arbitrator Holden improperly placed the burden to prove its case on the University.

It is first important to review the very high burden a party has to prove an action is arbitrary or capricious. The Rhode Island Supreme Court recently defined the legal standard "arbitrary and capricious" in reviewing an appeal under the Employee Retirement Income Security Act ("ERISA"), wherein the Court stated:

> Use of the arbitrary and capricious standard means that reviewing courts will uphold administrative decisions interpreting the plan as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical and supported by substantial evidence…. [A] reviewing court should not substitute its own judgment for that of the administrator, nor disturb an administrator's interpretation of a plan so long as it was reasonable…. When [administrators] are in existence… a court… will not interfere to control them in the exercise of a discretion vested in them by the instrument under which hey act – unless it is to prevent them from abusing their discretion. The administrators' determination need only be rational and reasonable with no abuse of discretion.

*Gonclaves v. NMU Pension Trust*, 818 A.2d 678, 682-683 (RI 2003) (quotations and citations omitted). Applied to this grievance, RWU's decision should have been upheld (*i.e.*, the grievance denied) unless the Union persuaded the Arbitrator that RWU denial of tenure was not rational. *See also, Ainsworth v. Skurnick*, 960 F.2d 939 941 (11th Cir. 1992) (noting that a decision is arbitrary and capricious "only if a ground for the… decision cannot be inferred from the facts of the case."); *Tustin Unified School District*, 1999 WL 1567640 (1999) (Hoh, Arb.) (arbitrator defined arbitrary or capricious based on dictionary definitions as meaning "decided by

chance or whim; prejudiced, not based on reasonable examination" or "unreliable, ruled by whims; changeable," respectively); Black's Law Dictionary (7th ed.) (defining arbitrary as "founded on prejudice or preference rather than on reason or fact"; defining capricious as "contrary to the evidence or established rules of law").

Despite the arbitrary and capricious language in the CBA, the Arbitrator effectively put the burden on RWU to demonstrate that its decision was proper. The Arbitrator wrote that if the University "departs from the contractually prescribed tenure/promotion process in some significant way in evaluating tenure/promotion cases, then the University is vulnerable to a claim that it acted arbitrarily or capriciously." (Award at 18-19). This is not the standard articulated in the CBA, which requires the Union to show that the decision was "arbitrary and capricious."

Even under Arbitrator Holden's own, improper articulation of the standard of review to determine whether an action is arbitrary or capricious, the Arbitrator was at least compelled to place the burden on the Union to introduce *some evidence* of the University's non-compliance. There is no dispute that the Union presented absolutely no evidence concerning the decision-making process at the University. Instead, the Arbitrator ignored the only affirmative evidence before him concerning President Nirschel's involvement (both in consultation and through his June 6 letter outlined above). The Union failed to establish that President Nirschel was not involved in the decision. Similarly, the Union did not rebut the affirmative evidence presented by the University.[9] By ignoring the University's evidence and failing to require the Union to submit any of its own affirmative evidence, the Arbitrator effectively placed the burden on the University to demonstrate that it did not act arbitrarily or capriciously. This shifting of the burden is improper and should not be countenanced by the Court.

---

[9] The Union did not call the President to testify, nor did it cross-examine Provost Martin on this issue.

### C. The Award's Remedy Is Beyond the Scope of the Parties' Rights Under the Collective Bargaining Agreement

The Award must be vacated because Arbitrator Holden crafted a remedy that is at odds with the fundamental elements of the CBA. Arbitrator Holden awarded rights to Professor Moskowitz that are contrary to the express terms of the CBA by providing Professor Moskowitz with eight teaching years (rather than the contractually-mandated six years) to compile his portfolio to be reviewed for tenure.

After concluding that "the decision-making process that occurred here was arbitrary in that the contractually prescribed process was not followed," (discussed above) Arbitrator Holden issued the following remedy:

> [T]he grievant shall be reinstated to probationary status for one more full academic year and shall have his case for tenure reviewed in accordance with the contractual criteria and the contractual process….

(Award at 28). Arbitrator Holden concluded that when evaluating Professor Moskowitz's scholarship, it "would be appropriate to consider whether the grievant had accomplished the projected publication of papers referenced in his tenure/promotion self-study and also to consider other relevant scholarship activities *as of the date that the re-evaluation occurs*." (Award at 27). (emphasis added). By crafting this remedy, Arbitrator Holden provided Professor Moskowitz eight years for tenure review, rather than the contractually established six years.

Article VIII of the CBA sets forth detailed guidance on evaluating a professor for tenure and requires that "[e]valuations shall be conducted in accordance with this Article [VIII]." (CBA at p. 25). The purpose of the evaluation system of Article VIII is to "provide a basis for decisions as to reappointment, promotion and tenure" among others. (CBA at p. 25). Tenure decisions at RWU occur no later than the sixth year of a probationary faculty member.[10]

[10] Tenure review may occur prior to the sixth year, in some circumstances not applicable to this case. (CBA at 26).

(CBA at p. 26). The evaluation criteria are to reflect upon the candidate's six years of teaching at RWU – based on the factors set forth in Article VIII, Section B.2. (CBA at 28-29). The review process is conducted through self-study and peer analysis. (CBA at 29-35). The Faculty Review Committee then reviews each candidate as follows: "Each [Faculty Review Committee] shall review faculty self-studies, and allied materials and reports, *submitted by the 6th year*… probationary faculty members (tenure decision)…" (CBA at 35). The Faculty Review Committee then issues a report. (CBA at 35-36). In addition, the Dean also completes a report based on "all material available [and] all reports from the school's [Faculty Review Committee]." (CBA at 36). The Chief Academic Officer also compiles a report. (CBA at 36). Thereafter, pursuant to Article Section B.3.i., "[d]ecisions regarding tenure… will be communicated to such faculty members, in writing, by June 30…" (CBA at 37).

Pursuant to these detailed provisions, the CBA mandates that the tenure decision must be made based on the performance of the faculty member within the first six years at RWU. There is nothing in the CBA which permits the evaluation of a faculty member to include any work performed beyond the sixth year. Indeed, the CBA could not be clearer on this point. The rationale is logical – professors have a limited time during which to prove they should be elevated to a tenured position.

Despite the clear language of the CBA, Arbitrator Holden's remedy provides Professor Moskowitz with two additional years of teaching in which to improve his performance before he is re-reviewed. The Award specifically counsels the parties to re-evaluate Professor Moskowitz after the conclusion of this eighth year of teaching – *i.e.* "as of the date that the re-evaluation occurs." Under this remedy, with respect scholarship and publishing, Professor Moskowitz will be entitled to eight appointment years – as his denial of tenure occurred on April 14, 2006, after

which Professor Moskowitz worked a "terminal year" (through the 2006-2007 school year),[11] and through force of the Award, would be granted an additional full appointment year before being re-evaluated.

Time for performance evaluation beyond the sixth year is expressly prohibited by the CBA. By expanding the period of review for Professor Moskowitz's tenure application, Arbitrator Holden ignored the language of the CBA that prohibits him from altering, adding, or subtracting from the terms of the CBA. (CBA at 45). *See Georgia-Pacific Corp.*, 864 F.2d at 945 ("[A]n arbitrator does not have unfettered discretion. He may not impose a remedy which directly contradicts the express language of the collective bargaining agreement.") (quotation omitted). *See also*, *Poland Spring Corp. v. UFCW, Local 1445*, 314 F.3d 29 (1st Cir. 2002) (same); *Associacion de Empleados Del Estado Libre Associado De Puerto Rico v. Union International De Trabajadores De La Industria De* Automoviles, 525 F.Supp. 2d 209 (D. P.R. 2007) (arbitrator exceeded authority by fashioning remedy that was not in accordance to statutory law in violation of the contract).[12]

**D. The Appropriate Remedy Is Remanding The Matter Back To Arbitrator Holden Or Concluding that RWU Did Not Act Arbitrarily Or Capriciously In Denying Tenure To Professor Moskowitz**

For the reasons set forth above, the Court should vacate the Award. In so doing, the Court could remand the matter back to Arbitrator Holden for a decision as to whether the University acted arbitrarily and capriciously in denying tenure to Professor Moskowitz based on the University's analysis of Professor Moskowitz's scholarship as of the conclusion of his sixth

[11] The CBA provides that after the denial of tenure, members of the bargaining unit may elect to work a one, final year of teaching (the "terminal year"). (CBA at 37: "Faculty members so notified [of their denial of tenure] may elect to work a terminal year.").

[12] Moreover, Arbitrator Holden issued a remedy beyond the scope of the authority vested in him by the parties. The issue presented to Arbitrator Holden expressly states that if he concluded that the University acted arbitrarily or capriciously, he was to announce the "contractually authorized remedy." Re-evaluation of tenure beyond the sixth year of teaching is not "contractually authorized."

year of teaching. Alternatively, if troubled by the lack of Presidential imprimatur on the tenure denying decision, Arbitrator Holden should have remanded the matter back to President Nirschel to announce the tenure decision based on Professor Moskowitz's qualifications as of the end of his sixth year at RWU. Arbitrator Holden could then determine whether President Nirschel's decision was arbitrary or capricious.

Logically, however, because it is evident from the record that Arbitrator Holden did not conclude that Professor Moskowitz was entitled to tenure based on his qualifications, the Court may also conclude that Arbitrator Holden should have denied the grievance based on the facts as Arbitrator Holden found them. Arbitrator Holden spent considerable effort in his Award to explain the evaluation criteria that should be used when the parties revisit Professor Moskowitz's tenure review. (Award at 20). Indeed, he devoted seven pages to discussing the evaluation criteria for Professor Moskowitz's tenure. (Award at 20-27). Arbitrator Holden then opined that the University should review Professor Moskowitz's scholarship as of the date of the re-evaluation, considering whether "the grievant had accomplished the projected publication of papers… and also… other relevant scholarship activities." (Award at 27).

It is clear that Arbitrator Holden could not conclude, on the basis of the record before him, that the University acted arbitrarily and capriciously in denying tenure to Professor Moskowitz based on the merits of the application. Indeed, had Arbitrator Holden believed that Professor Moskowitz's scholarship was sufficient, he would not have given him another year to "accomplish the projected publication of papers." (Award at 27). The only interpretation of this language is that Professor Moskowitz was not qualified for tenure after his sixth year. Given that Arbitrator Holden could not find that Professor Moskowitz should be granted tenure based on the evidence presented to him, Arbitrator Holden should have deferred to the University's well-reasoned denial of tenure. In these circumstances, the Court would be warranted in concluding

that Arbitrator Holden's lack of endorsement of Professor Moskowitz's scholarship credentials conclusively demonstrates that the University did not act arbitrarily and capriciously in denying tenure.

## V. CONCLUSION

For the reasons set forth above the Award should be vacated.

Respectfully Submitted,

ROGER WILLIAMS UNIVERSITY

By its attorneys,

/s/ Joseph P. McConnell
Joseph P. McConnell (RI Bar No. 5086)
Jeffrey S. Siegel (admitted *pro hac vice*)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

Dated: April 11, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including counsel for Defendant / Plaintiff in Counterclaim John E. DeCubellis, Jr., Esq., General Counsel, NEARI, on April 11, 2008.

/s/ Joseph P. McConnell
Joseph P. McConnell