# EXHIBIT C

JT 21

Roger Williams University
Learning to Bridge the World

Office of the Dean
Feinstein College of Arts & Sciences

**Name of Faculty Member:** Dr. David Moskowitz
**Title of Faculty Member:** Assistant Professor of Political Science
**Action:** Tenure and Promotion to Associate Professor
**Date:** March 1, 2006

## SECTION I: INSTRUCTION

1. **Describe your educational philosophy as it applies across your teaching.** Dr. Moskowitz has provided his philosophy of teaching. He defines teaching as "the task of getting students enthusiastic about (and wanting to go beyond) the material in the course so that they can learn to think critically about the material."

   He states that there are three essential ingredients: "the material in the course, what each student brings to the course, and the method (used) to present the information and engage the students."

   Throughout this self-study, Dr. Moskowitz has provided evidence of his construction of "the material of the course." He has also analyzed what students bring to the course, and discusses the methods he uses to present information and engage students. His methods of engaging students, which I have observed during his entire career at RWU, are sometimes daring and unusual. They are often very successful, as seen by the number of students who take his courses and stop by his office. However, it should be expected that such methods will occasionally backfire – and they have. Students occasionally take his remarks at face value rather than interpreting them in the context he intends. One of his more challenged students, for example, incorrectly used Dr. Moskowitz's supposed stand on women as an excuse for inappropriate behavior toward a female faculty member. Throughout his years here, I have advised caution because there were people who simply "didn't get it." Dr. Moskowitz has only somewhat heeded that advice; he has not significantly changed his style.

2. **Provide a list of courses taught.**
3. **Describe the goals and/or objectives for each course being considered, and, wherever possible, discuss how they relate to the goals and objectives of the academic program, the school/college, and the mission of the university.**

One Old Ferry Road
Bristol, RI 02809-2921
(401) 254-3149
Fax (401) 254-3286
email: rkoelle@rwu.edu
www.rwu.edu

4. **Describe the following components for each course providing a rationale for each in terms of the objectives of the course:**
   a. **organization of the course**
   b. **method of delivery**
   c. **assignments/activities**
   d. **examinations or other assessment tools**
5. **Describe student performance in each course and assess the performance in terms of the goals and objectives of the course. This should include but not be limited to an analysis of the student course surveys. Whenever possible, provide additional evidence that these goals and objectives have been met.**

Dr. Moskowitz has provided all of the material outlined above for his courses, to my satisfaction and the satisfaction of the FRC, which commented: "The committee finds Dr. Moskowitz's education philosophy is well articulated and its tenets are reflected in his classroom behavior and activities."

Further evidence is given by their quote from his Chair, Dr. Speakman, who comments that he has "very good rapport with his students, knows his students' names across his classes, teaches his students important information effectively and that he teaches the Core History course the way it is supposed to be taught."

## SECTION II: ACADEMIC ADVISING AND PROGRAM DEVELOPMENT

1. **Describe your approach to academic advising and analyze its effectiveness.** Dr. Moskowitz has described his careful approach to advising and gauges his success partially on the fact that both his advisees and other students from his classes avail themselves of his advice. He has an open door policy. He was the advisor for the MPA students. While he does not state the reason why he no longer advises MPA students, some of the answer lies in the difficulty of part-time evening students taking courses in Providence being advised by a day faculty member with a Bristol office. Some lies in the strained relationship with the Providence MPA faculty.

   In his discussion, Dr. Moskowitz states that he has spotted errors in the degree audits for his students and discussed them with the Registrar. While it may seem that all faculty rely on the information in degree audits, that is not always the case and I applaud Dr. Moskowitz for working to help both the students and the administrative system.

2. **Describe your activities in program development and assess your contributions.**
   Dr. Moskowitz's primary contribution in program development was his role in the MPA program that was created while he was the Department Coordinator in Social and Political Science. He has provided a full description of his work in

developing the MPA program and shepherding it through the required University and State processes. He is accurate in assessing his essential role in this process.

The FRC report alludes to a "level of controversy that surrounded the proposal of the Master's Program almost from its inception." This is true and can be traced, I believe, to several causes. One of them is the speed with which the administration urged the process. A second is that, possibly in response to that request for speed, Dr. Moskowitz states in his self-study that: "The curricular section of the RIOHE proposal as well as the new program proposal and all of the new course proposals for the MPA were written by me." This was, and continues to be, a troubling statement for a former department coordinator to make about a process that should have involved the entire department to varying degrees.

It was clear that Dr. Moskowitz had difficulty as department coordinator. Since the position, as described in the faculty contract, was new, it could be expected that there would be problems as both the coordinators and their faculty became accustomed to the new structure. Problems could be ascribed to faculty resistance, lack of management skills by the coordinator, lack of appropriate support by the administration, or a combination of all of these factors. Dr. Moskowitz certainly has to take some part of the blame.

It should be noted that Dr. Moskowitz has decided to distance himself from the MPA program, making a formal statement that he refuses to take further part in MPA meetings. Dr. Moskowitz has not described his reasons for this refusal, but it appears that he finds it difficult to work out compromises with the other members of the department, especially in relation to the MPA program.

The parameters in the MPA program – the course structure, the expectations for students, the part-time students for whom the program was intended – define the current situation. The program needs faculty who are committed to its success. Dr. Moskowitz, despite his early work in creating the program, did not seem to be dedicated enough to the success of the program to work through the compromises necessary to work effectively with his colleagues.

## SECTION III: SCHOLARSHIP AND PROFESSIONAL DEVELOPMENT

1. **List publications and conference presentations documenting your research; grant or academic fundraising activities (applications, awards, maintenance); and/or creative activities since the last self-study and indicate how these activities have enhanced your teaching and other work at RWU.**
Dr. Moskowitz lists his publications and conference presentations since his last self-study, which was in 2004-5. He made one presentation: "The Differential Effects of Values and Affect on Support for Gay Rights Policies – a paper presented at the Annual Meeting of the Southern Political Science Association in New Orleans in January of 2005.

He also lists another presentation: Perceptions of Responsibility for Public Assistance, also to be presented at the Annual Meeting of the Southern Political Science Association in Atlanta in January of 2006.

Finally, he discusses a presentation that he is co-authoring with Dr. Speakman and Charles Garabedian (student) on Professors as Practicing Politicians: Impact on Student Perceptions and Pedagogy, to be delivered to the American Political Science Association's Teaching and Learning Conference in Washington in February 2006.

The FRC Committee states that Dr. Moskowitz "counts the creation of the Master's of Public Administration a major contribution in the area of Professional and/or Creative Activities that consumed much of the time he would have normally allocated for research and writing. Additionally, he suggests that his time as acting administrator of the Political Science Department served as a major distraction from his chosen area of research." The FRC Committee did not accept that explanation for the lack of research, commenting that Dr. Moskowitz has "consistently taught overloads for his department" and that he "needs to become more active in the scholarship of his discipline."

Neither Dr. Moskowitz nor the FRC committee has engaged in any discussion of external validation of the presentations or the research agenda. There is no evidence of the acceptance ratio for papers submitted to the conferences and there is no external validation through comments by external peers.

Several other factors regarding scholarship need to be pointed out. First, Dr. Moskowitz did not, in fact, make presentations or conduct research in his discipline before he became Program Coordinator for his department. This lack of publications/research has been noted in every one of his evaluations since his first year at RWU. Secondly, in the year following his period as Coordinator, he was granted a 3-3 load and urged to do reduced teaching during the summer by the Provost with the specific intention of affording Dr. Moskowitz some time to re-connect to his disciplinary research. It does not appear that the course releases resulted in adequate production of scholarship.

2. **Describe other professional development activities undertaken since the last self- study and indicate how those activities have enhanced your teaching and other work at RWU.**

In this section, Dr. Moskowitz discusses the submission of two articles for review. These articles had been rejected for publication before he came to RWU and were revised and re-submitted. One article has been rejected and the second is currently under review. He intends to continue to submit these articles for publication. Since Dr. Moskowitz came to RWU six years ago, this does not seem to be a productive method of establishing a scholarly agenda.

3. **Provide a statement of your research interests and agenda.**
Dr. Moskowitz lists his research interests as the area of citizen politics, including political psychology and decision-making, racial politics, media effects, identity politics and interest group activism.

He states that he has been solicited by book representatives about writing a political psychology text and is considering a book on political psychology. It should be noted that there is no documentation of any planning for these texts.

## SECTION IV: SERVICE TO THE UNIVERSITY AND COMMUNITY

**Other than program development discussed above, describe your service to**

- a. **your department/program**
- b. **your school/college**
- c. **the University**
- d. **the community**

In this section, Dr. Moskowitz discusses his work as Department Coordinator and his participation in other departmental activities, such as serving on search committees, and participation in FCAS activities, such as accepted student days.

He lists University service as the moderator for the Young Democrat /Young Republican Debate, and a Socrates Café. He did serve as the advisor for a campus billiards club that was discontinued, and has been the faculty advisor for the campus "Squirrel Viewing Entente Club" since 2004.

Dr. Moskowitz lists a series of activities in the Barrington Public Schools.

The FRC committee recognizes those services, but comments that "there is a weakness in his participation/service in activities such as university standing committees."

## SECTION V: GOALS

1. **List the professional goals you set out in the last self-study.**
2. **Describe the extent to which you have met those goals.**
Dr. Moskowitz has provided the list from his last self-study. I will paraphrase. My comments are in italics.
    1. Teaching: continue to offer courses at the same high quality.
    *Dr. Moskowitz believes he has met this goal.*
    2. Advising: continue to offer student both academic and non-academic advice. Create a revised "checklist" for majors and a dedicated webpage for political science advisees.

*While Dr. Moskowitz continues to advise, he does not speak about the checklist and believes that MyRWU and Campus Cruiser have eliminated the need for the dedicated webpage.*

3. Expand the political science course offerings to include Political Attitudes and Behavior and Film and Politics. Launch the MPA program and hire a full-time new faculty member.
   *The new political science courses have not been formally proposed. The MPA program has been successfully launched, but the program has not been able to make a hire, despite several attempts.*
4. Complete data input and preliminary analysis for a study on public support for "domestic partner benefits." Explore an NSF grant to support prior research on interest groups.
   *Dr. Moskowitz presented research on this topic in the paper to the Southern Political Science Association in January 2005, mentioned above. He does not mention any results on seeking an NSF grant, but states that there is more data from the original study to code.*

**3. Describe how you have met the recommendations/concerns outlined by the Dean and Chief Academic Officer in your last comprehensive review.**

My recommendations from Dr. Moskowitz's last review centered on strengthening his scholarly activity. Dr. Moskowitz's efforts in that area have already been discussed.

**4. Describe your short- and long-term professional goals for the future.**

Dr. Moskowitz lists: (I, again, will paraphrase)

1. Teaching: continue to offer the courses he has been offering at the same high quality and offer an experiential learning course at Metro Apex during winter 2007.
2. Continue to offer students both academic and non-academic advice.
3. Expand the political science course offerings to include a series of courses.
4. Continue to present papers at national and regional political science meetings.
5. Turn conference papers into published articles in peer-reviewed journals.
6. Contract to write a textbook on research methods and a second on political psychology.
7. Outreach to local high schools to act as a resource for social studies teachers needing occasional class lectures or demonstrations for American politics topics.

Comments:

I am not aware of any activity regarding the introduction of new political science courses, although some of the topics have been taught under the Special Topics designation.

It appears that the "pure" research goal from the last self-study has been replaced with conference papers to be converted into journal articles.

The inclusion of plans to work on two textbooks – with no indication of whether that goal is short- or long-term -- seems overly optimistic to me.

## SECTION VI: SUPPORTING MATERIAL

1. **Provide a copy of the syllabus of each course being considered.**
2. **Provide copies of relevant materials that you prepared for use in your courses (representative samples of assignments, examinations, etc.).**
3. **Provide a current copy of your curriculum vita.**
4. **Provide copies of research material, professional publications, grant material, or documentation of creative activities produced since your last evaluation. Include evidence of peer review.**
5. **Provide copies of data summaries of student course surveys for courses taught during the last year.**
6. **Provide copies of the comprehensive reviews by the Dean and Chief Academic Officer:**
   **(For Probationary and Tenure submissions: the entire probationary period. For Post Tenure and Promotion submissions: the most recent review.)**
7. **Include any other materials that support your self-study**

Dr. Moskowitz has provided all of the materials requested above.

## CONCLUSION AND RECOMMENDATION BY THE DEAN:

The FRC Committee's report concludes that Dr. Moskowitz is a valuable member of the Political Science Program and unanimously recommends that he be awarded tenure because of his work in teaching, program development, service to the department, and advising activities.

They unanimously recommend against promotion for the following reasons:

Dr. Moskowitz's profile is low on service to the University.
Dr. Moskowitz's scholarship is one of his weakest areas.
Dr. Moskowitz needs to be more aware that some of his actions may be misinterpreted by people who are not cognizant of his style.

The FRC therefore recommends that he engage in more University service, redouble his efforts in scholarship and be more concerned about the possible interpretation of his behavior.

The rationale that the FRC used in their negative vote for promotion also applies to Dr. Moskowitz's application for tenure. Considering the areas of teaching, advising, program development, scholarship and service, Dr. Moskowitz is a dedicated but idiosyncratic instructor, who is engenders very positive or very negative reactions from his students.

His advising contributions are very good. In the area of program development, Dr. Moskowitz had an extremely productive period while he was department coordinator, but did not reach this level before that period or after it, and has distanced himself from his important creation – the MPA program. The FRC describes his scholarship as one of his weakest areas and states that his profile is low on service.

The comment the Dr. Moskowitz needs to be more aware that some of his actions may be misinterpreted by people who are not cognizant of his style extends beyond the classroom. Dr. Moskowitz has a tendency to make controversial statements in the social science pod and the hallways. On several occasions, faculty members who heard these remarks were offended. This is not collegial behavior, and I have spoken to Dr. Moskowitz about it. 7

All efforts to impress on Dr. Moskowitz that research was an essential part of a faculty member's responsibilities seem to be ineffective. Listing the rejections of research articles sent for publication seems to me to indicate that Prof. Moskowitz believes that the act of submitting these journal articles is enough to indicate an active research program – but the lack of acceptance of the articles belies external validation of the research. Research should not be just a condition of employment of a faculty member – it should be a fundamental part of an academician's professional life.

Weighing Dr. Moskowitz's contributions in all of the areas across his more than five years of service, I cannot recommend for tenure. I concur with the FRC with respect to promotion, and cannot recommend for it.

Having reviewed the appropriate documentation, I do not recommend either the award of tenure or the promotion to Associate Professor..

Ruth A. Koelle 3/1/06

**Ruth A. Koelle, Ed.D.**
**Dean, Feinstein College of Arts and Sciences**

I have received Dean Koelle's performance evaluation dated March 1, 2006

David Moskowitz

**David Moskowitz, Ph.D.**

# EXHIBIT D

JT 33

Roger Williams University
Learning to Bridge the World

Office of Academic Affairs

April 14, 2006

Dr. David Moskowitz
16 Beaver Road
Barrington, R.I. 02806

Dear Dr. Moskowitz

I have reviewed your tenure and promotion self study, the evaluation reports by both the Faculty Review Committee and your Dean, and your responses to both evaluations. This review is cumulative and serves as final evaluation for the award of tenure and promotion,

Dean Koelle outlines both strengths and serious concerns in your performance that taken as a whole result in her not recommending the awarding of tenure. Let me briefly summarize these issues below.

In the area of teaching you are considered a conscientious and dedicated faculty member whose student survey results are generally very positive, but there have also been consistent questions about your confrontational style of teaching which is misunderstood at times by some of your students. These concerns have also been pointed out by your faculty review committee.

In the area of advising, the Dean and Faculty Review Committee are both laudatory of your efforts both for working with your students and clarifying the system.

Your efforts in the curriculum development of the Master's Program in Public Administration have also won high praise. At the same time, however, the history of the controversy surrounding the development of the program and your subsequent disassociation with it tarnish your achievement. As the Dean points out, while there are a number of reasons for problems surrounding the program, your unwillingness to collaborate over issues of its implementation contributed to difficulties in its progress. As you put it in your response to the Faculty Review Committee's report: "when it was clear that compromising would affect the quality of the program I stepped down." It is

One Old Ferry Road
Bristol, RI 02809-2921
(401) 254-3058
Fax (401) 253-7768
www.rwu.edu

50TH ANNIVERSARY 1956 2006

also clear in your responses to both the Faculty Review Committee's report and that of the Dean that you have a contentious relationship with your peers. While collegiality is not itself a criteria for reappointment and tenure, its absence does contribute, as you have noted, to polarization of issues in your professional work that is problematic as fairly evaluated.

In the area of service to the university and community, the Dean notes and generally praises your contributions but agrees with the Faculty Review Committee that "there is a weakness in his participation/service activities such as university standing committees."

In the area of scholarship there is a decided and consistent weakness in your record. While development of the MPA and your work as area coordinator were time-consuming, your scholarly record over your full probationary period is meager. While it may well be argued that these activities were too time consuming to permit scholarly work it should be noted, as did the Faculty Review Committee, that you have consistently taught course overloads and summer courses and this was true even during this period. You're scholarly endeavors in the years prior to and following your work on the MPA show no significant difference even though after stepping down as area coordinator, as the Dean points out, you were "granted a 3-3 load and urged to do reduced teaching during summer by the Provost" with the specific goal of re-engaging your research. This additional encouragement has not resulted in substantial results.

While we are only in the second year of the new contract, deficiencies in your scholarly endeavors were consistently pointed out to you over the course of your probationary years and thus should not be considered a surprising change in expectations. While scholarship is not the only criteria for tenure and promotion it is an essential responsibility of a faculty member and needs to be present in combination with the other areas of performance outlined in the contract.

In summary, I concur with the finding of the Dean that there are serious deficiencies in your performance. The Dean and the Faculty Review Committee agree on the denial of promotion but disagree on the award of tenure with the FRC in favor and the Dean against. In this I concur with the Dean's assessment that scholarship is an essential, although not the only criteria, for evaluation and that this deficiency has been noted early enough in your probationary period and should be fairly applied as one standard for performance. This is a difficult decision because, as the Dean notes, you are a dedicated teacher even while you are one who engenders a range of polarized reactions both in and out of the classroom. Your record of performance over the probationary period, however, does not indicate that sufficient change or improvement is to be expected. In such a case, the university should not commit to long term employment. Therefore, I formally notify you that you will not be reappointed to the faculty. Under the terms of the contract you have the option of working a terminal year (2006-2007) if you notify me of your intention to do so by June 1st.

Sincerely,

Jeffrey B. Martin
Interim Provost

# EXHIBIT E

JT 35

**Rand, Rebecca**

---

**From:** Martin, Jeffrey B
**Sent:** Friday, May 05, 2006 3:33 PM
**To:** Rand, Rebecca
**Subject:** FW: Grievance

---

**From:** Topf, Melvyn
**Sent:** Monday, April 17, 2006 1:59 PM
**To:** Martin, Jeffrey B
**Cc:** Moskowitz, David
**Subject:** Grievance

Jeffrey,

Prof. Moskowitz wishes to proceed to grievance on the matter of your decision regarding his non-reappointment.

I suggest, if you have no objection, that we waive "step 1" of the grievance procedure to save time, and proceed immediately to "step 2." If you don't object to this, let me know and I'll contact the President's office to set a time for a grievance hearing.

Mel

cc: Prof. Moskowitz

# EXHIBIT F

**From:** Martin, Jeffrey B
**Sent:** Tuesday, May 09, 2006 5:38 PM
**To:** Moskowitz, David; Topf, Melvyn; Wright, Michael
**Subject:** Level one grievance

Dear Dr. Moskowitz

I want to thank you, RWUFA President Topf, and Michael Wright for meeting with Dean Koelle me last Monday and presenting your arguments for reversal of the negative tenure and promotion decision.

Unfortunately we disagree on some fundamental issues. Other matters aside, the principle issue is a lack of scholarly progress. We reject the idea that the work done on the MPA or as coordinator, while important, was so time consuming that no other work was plausible. Your undertaking of numerous overload, summer and intercession courses undercuts your argument that your work load made more scholarly effort impossible. We reject as well the contention that the obligation for scholarship only adheres to the duration of the semester. We further reject the argument that rejected articles have more value if they are rejected from publications with high standards. In our evaluation of your productivity and the assessment of your overall contribution we continue to agree with the details and analysis of your Faculty Review Committee and your Dean.

On this basis we reject the grievance.

Jeffrey Martin
Interim Provost

# EXHIBIT G

 JT37

TO: President Nirschel

FROM: Mel Topf
President, RWUFA

DATE: May 15, 2006

RE: Grievance of Prof. Moskowitz

I write to offer a summary of our chief arguments that, at present, we expect to raise at the grievance hearing this Thursday.

We understand that the administration has considerable discretion regarding promotion decisions and regarding denial of a non-tenured faculty member's application for tenure. Our contract provides only that the "termination of non-tenured MBUs . . . not be arbitrary or capricious" (line 1953).

It is our burden to show that the decisions to deny Prof. Moskowitz both tenure and promotion were indeed arbitrary and capricious. To show this we must demonstrate either that established procedures were violated or that the administration failed to give Prof. Moskowitz adequate, or any, notice of the expectations that Prof. Moskowitz would have to meet to achieve tenure and to achieve promotion. Both, we believe, are true here.

The chief abuse of the administration's discretion here is a matter of due process. The Provost, in his denial of Prof. Moskowitz's grievance (at step 1), identified the "principle issue" to be the "lack of scholarly progress" (Provost's memo, May 9). Prof. Moskowitz, we believe, was given insufficient, inaccurate, and indeed misleading notice of what is acceptable scholarly progress.

A crucial document that evidences this is the Dean's prior (February 2004) comprehensive evaluation report. That report expresses no concern about scholarly progress, offers no recommendations about Prof. Moskowitz's scholarly activities, indeed barely mentions the subject at all and never in a negative context, never indicating there may be a problem regarding tenure or promotion. Under the section on "evaluation of effectiveness in scholarship, professional and/or creative activities," the Dean notes only that "these activities have had to be postponed this last year due to his efforts to establish the MPA." Under the section on "professional goals stated in the last evaluation," the Dean observes only that he "had been working on an article for publication." In the final section, "summary of recommendations and justification, the Dean notes merely that he "increased his activities in . . . research/professional development" and that he intends next year, "if not Coordinator, to resume his professional development activities . . ."

That is all: we have no statement on whether Prof. Moskowitz should be making more scholarly progress. We have no expression of concern over any purported lack of such progress. We have no advice, no recommendations, no warnings. In short, no notice. Further, throughout the Dean's report, there is little but praise for the service that Prof. Moskowitz has performed, with little, in fact no, suggestion that, for example, he should cut back on service to pursue scholarly activity.

Now comes the Dean's report of March 2006 denying Prof. Moskowitz both tenure and promotion. Out of nowhere we read at length about the now serious, in fact fatal, "lack of research." Now there are whole paragraphs on the purported absence of scholarship, about his rejected articles and the non-productive nature of his "scholarly agenda." Now scholarship is "one of his weakest areas." Now "all efforts" to impress on him the importance of research "seem to be ineffective." And now we are told that this purported defect had been "noted" is all past evaluations. We see how it was "noted" in the 2004 report. Now the Dean says that her 2004 recommendations "*centered* on strengthening his scholarly activity." (Italics added) In fact such recommendations, if there at all, were hardly the "center" of the Dean's recommendations.

Further, an important step in the evaluation process where Prof. Moskowitz could have been, and should have been, notified regarding publishing or other expectations, is provided by the contract, lines 1145-47, requiring a "review immediately preceding the final probationary review," which *"should indicate any weaknesses or unmet expectation that could serve as an impediment to achieving tenure."* (Italics added.) This step in the process was either violated or disregarded, or both.

This does not meet the procedural requirement that evaluations for promotion or tenure be "cumulative" (contract, line 1716), or with the requirement that the Dean "meet and discuss" with Prof. Moskowitz the criteria by which he will be evaluated (line 1326). It does not accord with the crucial prohibition against creating "a publish or perish atmosphere" at this university (contract, line 1259).

These clear procedural violations warrant a reversal of the decision to deny Prof. Moskowitz tenure and promotion. Far from being merely technicalities, they evidence fundamental unfairness in the way he has been treated. Further, it is not a matter of giving tenure and promotion to a faculty member not deserving of them "merely" because of these serious procedural violations. Prof. Moskowitz' record of contributions to the University, excellence in teaching, and commitment to his program are of the highest quality.

# EXHIBIT H

JT 38

ONE OLD FERRY ROAD
BRISTOL, RHODE ISLAND 02809-2921
401-254-3201 FAX 401-254-3158

ROY J. NIRSCHEL, Ph.D.
*President*

June 6, 2006

Professor David Moskowitz
16 Beaver Road
Barrington, RI 02806

*Re: Step 3 Grievance Answer*

Dear Professor Moskowitz:

On Thursday, May 18, 2006, your grievance of the University's determination not to grant you promotion or tenure was heard with Association President Mel Topf, past President James Tackach and University General Counsel Robert Avery present.

The principal argument raised on your behalf was repeated from earlier advocacy in the grievance process; that you did not receive adequate notice of insufficiencies in your progress toward tenure until this final review leading to tenure denial. Your grievance labels this a violation of "due process" by the University and therefore an arbitrary and/or capricious decision in violation of the standard for retention of faculty as set out by the governing collective agreement.

I have reviewed your tenure track history, specifically including those evaluations you contend do not provide sufficient notice of the need to focus and deliver a record of accomplishment in scholarly and professional development. While these evaluations alone are neither dispositive of whether or not there was adequate notice of expectations nor dispositive of whether the decision to deny tenure was arbitrary or capricious, they are the focal point of your presentation of your grievance.

In your first annual evaluation, there was a brief reference to no scholarly activity. In your second annual evaluation, following commendation of your efforts in teaching, it was explicitly noted, *"...it cannot be done at the expense of other necessary components of the responsibility of a faculty member at RWU."* Further, it was stated, *"Progress in professional development is necessary. Professor Moskowitz is strongly advised to divert some of his energy to that end."* Later, it was noted following discussion of teaching, *"...it cannot be used to replace progress in either professional development or work in community service... I hope he will heed my advice to apply himself in the areas mentioned above. The University will ultimately support well-rounded faculty members who can show adequate progress in all areas."*

50TH ANNIVERSARY

In your third annual evaluation, the Dean wrote *"I am concerned about the sparseness of other parts of his self-study, and repeat my observation of last year, that the University will ultimately support well-rounded faculty members who can show adequate progress in all areas."*

In the fourth annual evaluation of your progress toward tenure, it was noted *"In the two year period remaining before the tenure decision, he should examine all of the requirements listed in the contract."* It was also noted that *"Professor Moskowitz had been working on an article for publication."*

While written annual evaluations alone are not at all dispositive of whether the University's decision concerning tenure denial was arbitrary or capricious, there were written, express statements, on the record, of concern and directed notice for you to focus on scholarly and professional development during the probationary period of your appointment. There was no process violation. The record is, however, more revealing than the evaluations alone. In the summer of 2004, you were specifically advised by then Provost Edward Kavanagh to focus and deliver in the area of scholarship and professional development. In fact, more than one course release was granted specifically for this purpose. There is no record or even a suggestion that you sought direction and/or counsel on expectations of scholarship and professional development and there is no report of scholarly achievement during your tenure track. The record shows that you chose to teach overloads, winter intercession and summers. The choices you made, in the face of advice to the contrary, and in the face of a governing collective agreement have lead the Dean and Interim Provost to recommend denial of tenure. Nothing in the body of evidence provided me indicates that this decision is either arbitrary or capricious.

Respectfully, your grievance is denied.

Sincerely,

Roy J. Nirschel, PhD
President

Cc: J. Martin
R. Koelle
R. Avery, Esq.
M. Topf
J. Tackach
J. DeCubellis, Esq.

# EXHIBIT I

AMERICAN ARBITRATION ASSOCIATION

PROCEEDINGS AT HEARING IN RE: :

RWUFA :

vs. :

ROGER WILLIAMS UNIVERSITY :

IN RE: DAVID MOSKOWITZ

May 8, 2007
10:00 A.M.
One Old Ferry Road
Bristol, RI 02809

HEARD BEFORE: LAWRENCE T. HOLDEN, JR., ESQ., ARBITRATOR

APPEARANCES:
ON BEHALF OF
THE UNION..............NEARI
BY: JOHN E. DECUBELLIS, JR., ESQ.

ON BEHALF OF
THE UNIVERSITY.........MORGAN, BROWN & JOY, LLP
BY: NICHOLAS DIGIOVANNI, JR., ESQ.
-and-
CHRISTOPHER M. NERONHA, ESQ.
ALSO PRESENT: DAVID MOSKOWITZ
MEL TOPF
RUTH KOELLE

RHODE ISLAND COURT REPORTING
747 NORTH MAIN STREET
PROVIDENCE, RHODE ISLAND 02904
(401)437-3366



INDEX


| DEPONENT | PAGE |
|---|---|
| RUTH KOELLE | |
| CROSS-EXAMINATION BY MR. DECUBELLIS (CONT'D) | 42 |
| REDIRECT EXAMINATION BY MR. DIGIOVANNI | 153 |
| JEFFREY MARTIN | |
| DIRECT EXAMINATION BY MR. DIGIOVANNI | 158 |
| CROSS-EXAMINATION BY MR. DECUBELLIS | 181 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| JOINT | | |
| 18 | COMPLETE COPY SUBSTITUTED | 3 |
| 23 | HISTORY OF COURSES TAUGHT | 4 |
| 34 | STUDENT SURVEYS SUPPLEMENTED | 28 |
| 40 | 3/30/06 LETTER FROM M. TOPF | 41 |
| 41 | 4/11/06 LETTER TO PROFESSOR ALFIERI | 42 |
| 42 | RE-STATEMENT OF PRINCIPLES ON ACADEMIC FREEDOM AND TENURE | 42 |
| UNION | | |
| 1 | FACULTY MEMBER EVALUATIONS & CVs | 41 |






(COMMENCED AT 10:10 A.M.)

MR. DeCUBELLIS: I believe there are some preliminary matters just to add some additional documents as exhibits, as well as supplements of the existing exhibits.

The first one I believe that's in front of you is Joint Exhibit 18. The last time we were here, we talked about it not being a complete copy. So Nick has brought, I guess, two complete copies in front of you, one for you, probably, and one for the stenographer at this point, but we'd like to supplement that in lieu of the previous document that had been introduced at the last hearing.

MR. HOLDEN: Okay. Thank you.

MR. DeCUBELLIS: So that would be Joint 18.

(JOINT EXHIBIT 18 SUBSTITUTED WITH FULL COPY)

MR. HOLDEN: So I guess one copy is for the employer.

MR. DiGIOVANNI: No. We have a copy.

MR. HOLDEN: Are these two different sets?



MR. DeCUBELLIS: They're identical.

MR. HOLDEN: So one for me and one is for whom?

MR. NERONHA: The witness or the court reporter.

MR. DiGIOVANNI: All right. We have no other additional documents to enter at this time. The only one that we clarified was we could enter Joint Exhibit 23 which was a history of courses taught by Professor Moskowitz, and that was subject to verification during the interim. And I gather from John, that's an accurate document?

MR. DeCUBELLIS: That's correct. We'll stipulate and concede that is an accurate document.

MR. DiGIOVANNI: That's a document you should already have, Joint 23.

(JOINT EXHIBIT 23 ENTERED)

MR. DeCUBELLIS: I'd also at this point like to substitute Joint Exhibit 34 which were student surveys that we had introduced last time.

MR. NERONHA: You might want to



COPY

177

If you submit your work to competition. For instance, I did a play and it was submitted to the American College Theater Festival and it went to the regional, the national festival. So that would certainly be seen as a form of validation. So every field provides ways of doing that.

And, again, in my field conferences, it's one thing to be invited to sit on a panel and talk. I don't have to have any preparation. It may mean I'm respected in my field, it may not, but it's doing one thing. To be invited to give a paper is another kind of scholarly level. Now, the question is has the paper been vetted, jury read. That is, did I submit an abstract and say --

**Q. What's an abstract?**

A. An abstract is maybe 50 or 100 words that may describe what I want to write about. I may not have even written the paper when I submit an abstract.

And usually a committee will say, "Oh, that's an interesting topic" or "He's a person we trust to do something interesting" and that fits in with the panel, the theme of the conference or the panel putting it together, and they'll put them on a

178

panel which is quite different than submitting a finished paper in a competitive panel and have it chosen by one or more people as a top paper. So even a conference, even to deliver a conference varies. Again, in my field, the theater convention every year, there are panels and there are discussions and there are a few panels in each area in theater history that are competitive, and these are considered -- if you're aiming for scholarship, these are considered the panels that you want to -- that you need to get to.

Just as there are different levels of journal. I'm the co-editor of a journal. We publish maybe 25 percent of the submissions we get. That's a pretty low average. But it's a regional journal. It's not as if it's the New England Theater Journal. It is a lower bar than publishing in the national theater journals.

So they vary, and every field has it's hierarchy, and we would look to the field, the department, the field, the school, the faculty to say, okay, what is your hierarchy?

**Q. On any of the examples that are in the contract on scholarly, professional, creative work, is there a**

179

**magic number that someone can hit that will put them over the top for tenure consideration?**

A. No. Neither the administration nor the faculty association wanted a criteria based on numbers. And, in part, that's -- there are a number of reasons. One is the field. It varies. In some fields it's very easy to publish and in some fields it is difficult to publish because there are fewer journals or it's a higher level. Sometimes you publish one book or one or two articles or whatever it is and it's tantamount to publishing and it's an important enough piece of work or a major piece work more important than publishing three of these or four of these. So it's not a good idea to reduce it to that kind of number.

**Q. Without that kind of specific guidance in the contract, how do you avoid arbitrary judgments in looking at a scholarship record, for example, of a candidate?**

A. It's difficult. You look for markers, I think, in part. Validation. You look for the pattern, for the pathway that is set in different fields so you can know what the landscape is. You

180

do some comparatives. You look at different cases, and you say we've achieved -- these people have been able to achieve this much. It seems to me, this one is less or more than that. That starts to give you some kind of level.

And you also look at just the totality. In a tenure case in particular, you look at the totality of the record. You look at the track record. Is this a person who is engaged in scholarship. We've had some cases where scholarship was coming to fruition, but not yet necessarily completely done so, but there was a clear ongoing scholarly agenda that had been pursued. There was an earlier record of achievement that you could say, okay, if we give this person tenure, they're going to do this because we can see they have been doing it and they're in the process of doing it. You can also look at some cases where you say there doesn't seem to be interest in doing this or there doesn't seem to be a record of achievement. This is certainly a judgment call.

**Q. Okay. Finally, one process question I forgot to ask you. Prior to writing this letter in April of '06, did you consult with anyone in addition to**

181

**reviewing the documents that you referred to?**
A. Conversations with the dean and with the president.
MR. DiGIOVANNI: Thank you, Jeff. That's all on direct.
CROSS-EXAMINATION BY MR. DECUBELLIS
**Q. Provost Martin, you spent a lot of time talking about publication, but it's a fact you don't have to publish in order to achieve -- to be effective in scholarship, correct?**
A. Right.
**Q. There's no publishing requirement here at Roger Williams University, correct?**
A. No. That's right.
**Q. So that is correct?**
A. That's correct.
**Q. You also testified about the language from the old to the new contract, and I believe in your opinion you indicated that you felt with the new contract changes, that although the basic criteria didn't change, the scholarship requirements somehow did change; is that your testimony?**
A. No. I think what I said was that the hierarchy had been -- scholarship had been

182

highlighted in the hierarchy and that scholarship itself had been more fully defined.
**Q. But you said, I believe your testimony was that it rose to second in position behind teaching with respect to the importance of this criteria?**
A. Yeah, I think that -- yes.
**Q. Now, that's your opinion, correct?**
A. I think -- well, it's my reading of the contract.
**Q. In fact, what the contract did was it took a broad view of scholarship and defined scholarship, correct?**
A. It did that as well, yes.
**Q. And when you say "as well," what language in the contract, and please point to specific language, where in your opinion it elevated the criteria of scholarship above and beyond all of the other criteria with the exception of teaching? Where in the contract?**
A. May I have a contract? This may take me --
**Q. I'll direct your attention to page 28 where it's all new language talking about scholarship. Maybe that's a starting point and hopefully that will help you, but...**

183

A. Thank you. Yeah. And I believe, and I'd have to look -- may I have an earlier contract?
MR. DiGIOVANNI: I'm showing the witness the '01-'04 contract which is Joint 3.
A. Yeah. And, again, the second -- the, what, second to last paragraph on 28.
**Q. Beginning with "documented"?**
A. Yeah. Teaching is listed as it was in the previous contract as the primary criteria. But then rather than as in the previous contract, it says, "Is committed to effective teaching foremost, other criteria also enter into it," and then it lists what they are.
**Q. Where are you reading?**
A. I'm on the old contract, "Although the university is committed to effective teaching first and foremost, other criteria also enter into the evaluation process."
MR. DiGIOVANNI: What page is that?
A. Page 22 of the old contract. "These may include, but are not limited to, academic advisory, program development, scholarly and/or creative activities and institution and/or community service."

184

The new contract says, after the first sentence, "Scholarship as needed to inform teaching, meet accreditation requirements or advance one's discipline is also an important criteria," and there's a sentence about Boyer and Glassick, and then, "Other criteria" --
**Q. Don't skip around. Why don't you read that whole sentence?**
A. "Roger Williams University recognizes the multiple forms of scholarship as articulated by Ernest Boyer, Scholarship Reconsidered, Priorities for the Professorship by Charles Glassick and all scholarship assessed in the evaluation of the professor. Other criteria also enter into the evaluation process."
It seems that the change in paragraph seems to take scholarship from the end of a list to directly after teaching and lists the other elements as also. That seemed to me a change not just in order, but in priority.
**Q. It specifically states, does it not, that teaching is a primary criteria?**
A. Absolutely.
**Q. It does not then continue with what you conclude**

set of agreed upon expectations.

MR. DeCUBELLIS: I have no further questions at this time.

MR. DiGIOVANNI: Nothing on redirect.

MR. HOLDEN: Okay. All set. Thank you.

THE WITNESS: Thank you.

MR. DeCUBELLIS: So I believe that concludes the witnesses for today. And we're back here I think it's nine o'clock the next time instead of ten; is that correct?

MR. DiGIOVANNI: I can't recall. Either one is all right.

DEAN KOELLE: Yeah, it was.

(HEARING ADJOURNED AT 4:35 P.M.)



C E R T I F I C A T E

I, Linda S. Taylor, a Notary Public in and for the State of Rhode Island, hereby certify that the foregoing pages are a true and accurate record of my stenographic notes that were reduced to print through computer-aided transcription.

In witness whereof, I hereunto set my hand this 2nd day of June, 2007.

Linda S. Taylor Notary Public

LINDA S. TAYLOR, NOTARY PUBLIC/CERTIFIED COURT REPORTER

My Commission Expires 7/2/09