**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **ROGER WILLIAMS UNIVERSITY,**<br><br>**Plaintiff/Counterclaim Defendant,**<br><br>**v.**<br><br>**ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION (NEARI/NEA)**<br><br>**Defendant/Counterclaim Plaintiff.** | **C.A. No.: 07-440-ML-DLM** |

**DEFENDANT/COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OBJECTION TO PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. 56(a) and this Court's Order of February 11, 2008 relating to the briefing schedule in this case, Defendant/Counterclaim Plaintiff hereby moves this Honorable Court to grant Summary Judgment in its favor, deny Plaintiffs/Counterclaim Defendant's Motion for Summary Judgment and confirm the arbitration award issued by Arbitrator Lawrence T. Holden, Jr.

In support of its Motion, Defendant/Counterclaim Plaintiff asserts that no genuine issues as to any material facts exist and it is entitled to judgment as a matter of law for those reasons set forth more fully in its Statement of Undisputed Facts, in accordance with LR Cv 56(a), and accompanying Memorandum in Support of its Motion for Summary Judgment and in Opposition to Plaintiff/Counterclaim Defendant's Motion for Summary Judgment.

Respectfully Submitted,

ROGER WILLIAMS UNIVERSITY
FACULTY ASSOCIATION (NEARI/NEA)

By its Attorney,

/s/ John E. DeCubellis, Jr.
John E. DeCubellis, Jr., Esq. (RI Bar No. 3327)
General Counsel
NEARI
99 Bald Hill Road
Cranston, Rhode Island 02920
(401) 463-9630

Dated: April 30, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including counsel for Plaintiff/Counterclaim Defendant, Joseph P. McConnell, Esq., MORGAN, BROWN & JOY, on this 30th day of April, 2008.

/s/ John E. DeCubellis, Jr.
John E. DeCubellis, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **ROGER WILLIAMS UNIVERSITY,**<br><br>**Plaintiff/Counterclaim Defendant,**<br>**v.**<br><br>**ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION (NEARI/NEA)**<br><br>**Defendant/Counterclaim Plaintiff.** | **07-440-ML-DLM** |

**DEFENDANT/COUNTERCLAIM PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF/COUNTERCLAIM DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. TRAVEL OF CASE

On or about April 13, 2006, Plaintiff/Counterclaim Defendant, Roger Williams University (hereafter referred to as "RWU" or the "University") terminated the employment of David Moskowitz ("Moskowitz"), a non-tenured Assistant Professor of Political Science. Pursuant to the grievance procedure enumerated in the existing 2004-2008 Collective Bargaining Agreement (the "CBA") between RWU and Defendant/Counterclaim Plaintiff, the Roger Williams University Faculty Association (NEARI/NEA) (the "Union"), a grievance was filed on behalf of Moskowitz challenging his tenure denial and the termination of his employment.[1] In accordance with the CBA, the grievance ultimately proceeded to arbitration through the American Arbitration Association ("AAA") and the matter was assigned to Arbitrator Lawrence T. Holden, Jr. ("Arbitrator Holden").[2] Arbitration hearings were held on February 22, May 8,

1 Facts ¶ 35.
2 Facts ¶ ¶ 39 and 40.

June 11, and June 18, 2007.[3] On November 2, 2007, Arbitrator Lawrence T. Holden, Jr., issued an award in favor of Moskowitz and the Union ("Award").[4]

As a result, RWU commenced this action seeking to vacate the Award. The Union responded by filing a Counterclaim seeking to confirm the Award under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. Pursuant to Fed. R. Civ. 56(a), LR Cv 56 and this Court's Order of February 11, 2008 relating to the briefing schedule in this case, the Union hereby moves this Honorable Court to grant Summary Judgment in its favor, deny RWU's Motion for Summary Judgment and confirm the Award based upon those facts and reasons set forth more fully below and in its Statement of Undisputed Facts, filed contemporaneously herewith in accordance with LR Cv 56(a), the Declaration of John E. DeCubellis, Jr., Esq. ("Declaration") and Affidavit of Mel A. Topf ("Topf Affidavit").

## II. STATEMENT OF UNDISPUTED FACTS

Pursuant LR Cv 56(a), all of the relevant facts are contained within the Union's Statement of Undisputed Facts ("Facts"). Since Arbitrator Holden has previously determined the pertinent facts, the undisputed facts are predominantly based upon his factual findings, which are entitled to great deference. The undisputed facts are also derived from the exhibits presented during the arbitration hearings, the Declaration and the Topf Affidavit.

---

3 Facts ¶ 40.

4 Facts ¶ 44; Declaration ¶ 7; *See*, the Award, which was attached to RWU's Complaint and as Exhibit A to Attorney Joseph P. McConnell's Declaration in support of RWU's Motion for Summary Judgment.

### A. **Moskowitz's Academic and Teaching Experience.**

Moskowitz obtained Bachelor of Arts degrees in Political Science and Psychology from the State University of New York ("SUNY") at Stony Brook in 1984.[5] He also earned a Master's Degree and Doctorate in Political Behavior and Political Psychology from SUNY at Stony Brook in 1987 and 1992, respectively.[6] From 1984 through 1987, Moskowitz was a Teaching Assistant at SUNY[7]. In 1988 and 1989, Moskowitz taught as an Adjunct Professor at Adelphi University in its ABL Program, which was a continuing education program for nontraditional students.[8]

In 1989, Moskowitz commenced his initial, full-time teaching position as an Assistant Professor of Political Science at Georgia Southern University ("Georgia Southern"), where he taught both undergraduate and graduate courses in a tenure track position from 1989 to 1993.[9] While at Georgia Southern, Moskowitz was named "Professor of the Year" during the 1991-1992 academic year.[10]

In 1993, Moskowitz left Georgia Southern for a position as an Assistant Professor of Political Science at the University of North Carolina at Charlotte ("UNC Charlotte"), where he taught in a tenure track position from 1993 to 2000.[11] Moskowitz left his employment at UNC Charlotte to assume a tenure track position at RWU in 2000.[12] Overall, Moskowitz has accrued more than 20 years of teaching experience at the university level.[13]

5 Facts, ¶ 2; Award at 1-2.
6 Facts, ¶ 2; Award at 1-2.
7 Facts, ¶ 3; Award at 2.
8 Facts, ¶ 3; Award at 2.
9 Facts, ¶ 4; Award at 2.
10 Facts, ¶ 4; Award at 2.
11 Facts, ¶ 5; Award at 2.
12 Facts, ¶ 5; Award at 2.
13 Facts, ¶ 5; Award at 2.

## B. The Collective Bargaining Agreement and the Award of Tenure

The Union is the exclusive bargaining agent for the RWU faculty.[14] At all pertinent times hereto, the Union and RWU were parties to the CBA.[15] The CBA provides a very detailed process for a faculty member to obtain tenure.[16] This process includes a pre-established number of extensive reviews and, in most cases, culminates with a final tenure review and decision within the sixth year of a faculty member's employment.[17] Prior to being awarded tenure, faculty members serve in a probationary status under the CBA.[18]

Throughout the reviews, faculty members (tenured and non-tenured) are evaluated in the following four (4) specific performance areas:

1. Excellence in teaching.
2. Academic advising and program development;
3. Scholarly, professional and/or creative activities; and
4. Institutional and/or community service.[19]

"The tenure review process is a cumulative review of a faculty member's probationary years, and the faculty member must meet or exceed each of the four evaluative criteria in order to receive tenure."[20] Although, the University considers all of these performance areas, excellence in teaching is the primary criterion under the CBA.[21]

---

14 Facts ¶ 1; Declaration ¶ 2 and Arbitration Joint Exhibit 4 ("Joint Ex. _") (the CBA), attached as Exhibit A to Declaration, Article I at 2.

15 Facts ¶ 6; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A; Declaration, ¶ 3.

16 Facts ¶ 7; Declaration, ¶ 3 and Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII at 24-38.

17 Facts ¶ 7; Declaration, ¶ 3 and Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII at 24-38.

18 Facts ¶ 7; Declaration, ¶ 3 and Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII at 24-38.

19 Facts ¶ 8; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, Section B 2 at 28-32.

20 Facts ¶ 9; Award at 2.

21 Facts ¶ 10; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, Section B 2 at 28.

Pursuant to the CBA, only "the Chief Executive Officer (President) and, when applicable, the Board of Trustees, have the authority to make all final decisions with respect to promotion and tenure."[22] Article VIII, Sections B.3.i and B.3.k further provide that final promotion and tenure decisions by the President and the Board of Trustees are made considering among other things, the recommendations of Deans and the Chief Academic Officer (Provost).[23] Moreover, those tenure decisions made by the President and/or Board of Trustees must be communicated to the faculty member, in writing, by June 30th.[24]

Prior to the 1995-1998 CBA, the President of RWU was not contractually involved in the evaluation process.[25] During the negotiations for the 1995-1998 CBA, the Union specifically proposed and the parties agreed that only the President and/or the Board of Trustees would have the authority to make all future tenure and/or promotion final decisions. This language and requirement was added to the CBA commencing with the 1995-1998 CBA and remained unchanged in the 2004-2008 CBA. The Union negotiated this language because it believed tenure decisions to be so important as to require them to be made by the Chief Executive Officer (President). Additionally, the President's role in the tenure process creates another layer of review prior to tenure decisions, leaving him the options of either following or rejecting the recommendations of the deans and provost.[26]

---

22 Facts ¶ 11; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.i and B.3.k at 37-38.

23 Facts ¶ 12; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.i and B.3.k at 37-38.

24 Facts ¶ 13; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B.3.i at 37.

25 Facts ¶ 28; Topf Affidavit ¶ 4.

26 Facts ¶ 29; Topf Affidavit ¶ 5.

## C. The Grievance

Moskowitz was hired by RWU as an Assistant Professor of Political Science commencing with the 2000-2001 academic year.[27] With the exception of his fifth year, he was evaluated annually during his first six years of employment at RWU.[28] During the 2005-2006 academic year, which was Moskowitz's sixth year of employment at RWU, he underwent a cumulative review for the award of tenure in accordance with the CBA.[29] The Faculty Review Committee ("FRC") was created to "...review faculty self studies, and allied materials and reports, submitted by the 6th year ...probationary faculty members...."[30] The FRC then forwards a recommendation to the appropriate dean regarding the faculty members' application for tenure and/or promotion.[31] As part of Moskowitz's sixth year evaluation process and tenure application, on November 11, 2005, the FRC unanimously recommended that Moskowitz be awarded tenure, but denied promotion at that time.[32]

This tenure review process also required Moskowitz's dean (Ruth Koelle ("Koelle")) to perform an evaluation of his cumulative performance and submit a recommendation to the Provost (or in this case, Interim Provost, Jeffrey B. Martin ("Martin")) regarding Moskowitz's tenure.[33] On or about March 1, 2006, Koelle completed her sixth year evaluation of Moskowitz's performance and recommended that he not be awarded tenure or promotion.[34] Next, Martin was required to furnish an "independent report" to Moskowitz and the President of the University,

---

27 Facts ¶ 14; Award at 2.
28 Facts ¶ 15; Award at 2-7. With the exception of his fifth year.
29 Facts ¶ 16; Award at 6-8; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B.1b at 26.
30 Facts ¶ 17; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B.3.d at 35.
31 Facts ¶ 18; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B.3.d at 36.
32 Facts ¶ 19; Award at 8; Joint Ex. 19 (the FRC Report), attached as Exhibit B to Declaration.
33 Facts ¶ 20; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B.3.e at 36.
34 Facts ¶ 21; Award at 7; Joint Ex. 21 (Koelle's 6th Year Evaluation), attached as Exhibit C to Declaration.

Roy J. Nirschel ("Nirschel"), with a recommendation regarding Moskowitz's tenure.[35] By correspondence dated April 14, 2006, the Martin denied tenure to Moskowitz and formally notified him that his employment was being terminated.[36] Martin's notification did not state that he would be "recommending" to the President and/or Board of Trustees that Moskowitz be denied tenure and not be re-appointed.[37]

Prior to denying him tenure and terminating Moskowitz's employment at RWU, Martin reviewed Moskowitz's Self-Study, the FRC Report, Moskowitz's response to the FRC Report, Koelle's sixth year evaluation, and Moskowitz's response to Koelle's sixth year evaluation.[38] Even though Martin was to make an "independent" recommendation regarding Moskowitz's tenure, he also "consulted with" Dean Koelle and President Nirschel prior to preparing his April 14th correspondence to Moskowitz.[39]

Thereafter, pursuant to the CBA, Nirschel was required to review, among other things, the recommendations of Koelle and Martin before making his own final decision on Moskowitz's tenure.[40] After reviewing all of the pertinent information, Nirschel was then required to render a final decision regarding Moskowitz's tenure and notify him of that decision in writing by June 30th.[41] However, even though the CBA requires the President and/or the Board of Trustees to render all final decisions with respect to an individual's tenure, throughout Nirschel's term as President of the University, he failed to adhere to this requirement. Nirschel

---

35 Facts ¶ 22; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.f, B.3.i and B.3.k at 36-38.

36 Facts ¶ 23; Award at 8; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

37 Facts ¶ 25; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

38 Facts ¶ 24; Award at 8; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

39 Facts ¶ 24; RWU's Memorandum at 4 and 10-11; *See*, Joint Ex. 4 (the CBA), attached as Exhibit A to Declaration, Article VIII, Section B.3.f. at 36-37.

40 Facts ¶ 26; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.i and B.3.k at 37-38.

41 Facts ¶ 27 ; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.i and B.3.k at 37-38.

routinely notifies faculty members that they have been granted promotion and/or tenure; however, as in Moskowitz's case, in all instances of which the Union is aware, Nirschel's consistent practice has been to refrain from personally informing faculty members that their bids for tenure and/or promotion had been denied.[42]

The CBA provides that "[g]rievances must be initiated within thirty (30) days after the grievant should have been aware of the event or action which give rise to the grievance or the action which gave rise to the grievance."[43] Consequently, on April 17, 2006, relying upon Nirschel's consistent practice of not rendering negative tenure decisions and recognizing that Martin had again exceeded his authority in actually denying tenure to and terminating Moskowitz's employment, the Union filed a Step 1 grievance.[44] The grievance was promptly filed to preserve the 30 day limit and avoid waiting fruitlessly for the President to act and render a written final decision denying Moskowitz's (and other faculty members') tenure and promotion, which he consistently never did.[45] On or about May 9, 2006, Martin denied the Step I grievance and the Union filed a Step II grievance, which was denied by Nirschel on June 6, 2006.[46]

### D. <u>The Arbitration and Award in Favor of the Union</u>

---

42 Facts ¶ 31; Topf Affidavit ¶ 6.

43 Facts ¶ 34; Topf Affidavit ¶ 10; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article X, § C.4 at 45.

44 Facts ¶ 35; Topf Affidavit ¶ 11; *See*, Award at 8; Joint Ex. 35 (Union's Step 1 Grievance), attached as Exhibit E to Declaration.

45 Facts ¶ 35; Topf Affidavit ¶ 11; *See*, Award at 8; Joint Ex. 35 (Union's Step 1 Grievance), attached as Exhibit E to Declaration.

46 Facts ¶ 38; Joint Exhibits 36 ( Martin's Step I Denial), 37 (Union's Step II Grievance) and 38 (Nirschel's Step II Denial), attached as Exhibits F, G and H to Declaration, respectively.

Pursuant to the CBA, on or about June 9, 2006, the Union next filed the grievance with the American Arbitration Association ("AAA").[47] In its Demand for Arbitration, the Union specifically stated as the nature of the dispute that "[t]he denial of tenure to [Moskowitz] is arbitrary and capricious and in violation of specifically, but not exclusively, Articles VII and IX of the contract."[48] The matter was assigned to Arbitrator Holden and hearings were held on February 22, 2007, May 8, 2007, June 11, 2007 and June 18, 2007.[49] Throughout the entire arbitration process, which spanned over more than one year, RWU never requested any further clarification as to its alleged violations of the CBA, and more specifically, the alleged violations of Articles VII and IX.[50]

The issues presented to Arbitrator Holden were

1. "Did the University act arbitrarily or capriciously in denying tenure to Professor Moskowitz in April of 2006?
2. If so, what shall be the contractually authorized remedy?"[51]

Arbitrator Holden resolved the grievance in favor of the Union and issued an Arbitration Award on November 2, 2007.[52] Arbitrator Holden essentially found that RWU had acted arbitrarily and capriciously in denying tenure to Moskowitz because it had violated the Article B 3.i of the CBA by not having the President make the final decision regarding Moskowitz's tenure.[53] As a result, Arbitrator Holden determined that Moskowitz should be reinstated to his probationary status and undergo another tenure review in accordance with the contractual criteria and contractual

---

47 Facts ¶ 39; Joint Ex. 39 (Union's Demand for Arbitration), attached as Exhibit I to Declaration.

48 Facts ¶ 41; Joint Ex. 39 (Union's Demand for Arbitration), attached as Exhibit I to Declaration.

49 Facts ¶ 40; Award at 1; Declaration, ¶ 5.

50 Facts ¶ 42; Declaration, ¶ 6.

51 Facts ¶ 43; Award at 1.

52 Facts ¶ 44; Award at 19-20.

53 Facts ¶ 44; Award at 19-20. It should be noted that if RWU violated Article B 3.i of the CBA, implicit in the Award is that it similarly violated Article B 3.k of the CBA since imposes the same procedural requirements upon the University regarding all final decisions on tenure and promotion. *See*, Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article B 3.k of the CBA at 38.

process.[54] Arbitrator Holden further determined that Moskowitz should be made whole, subject to the customary deductions.[55]

[54] Facts ¶ 45; Award at 28.

[55] Facts ¶ 45; Award at 28.

## III. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

As the University appropriately pointed out in its Memorandum of Law, motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. In Shaw's Supermarkets, Inc. v United Food and Commercial Workers, Union, Local 791 AFL-CIO,[56] this Court articulated that

> [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The fundamental question is whether a genuine issue of material fact exists. A genuine issue is one 'supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party.' (Citation omitted). Likewise, a material fact is one which 'might affect the outcome of the suit under the governing law.' (Citation omitted).
>
> On a motion for summary judgment, the moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. (Citation omitted). **This burden may be met by demonstrating to the court that a lack of evidence exists to support the nonmoving party's case**. (Citation omitted). Upon discharging that burden, the nonmoving party must show that the trier of fact could reasonably find in favor of the nonmoving party with respect to each issue on which that party has the burden of proof at trial. (Citation omitted). **In the end, the court must view all evidence and related inferences in the light most favorable to the nonmoving party**. (Citation omitted).

---

56 268 F. Supp. 2d 115, 120-121 (D.R.I. 2003). (Emphasis added). *See*, Eastern Maine Medical Center, Inc. v Maine State Nurses' Association, 866 F. Supp. 607, 608-609 (D. Me. 1994).

This Court further recognized that "[c]ross motions for summary judgment do not alter the well-established Rule 56 standard. (Citation omitted). **Rather, the motions simply require this Court to determine whether either party deserves judgment as a matter of law on the undisputed facts**. (Citation omitted)."[57]

## IV. ARGUMENT

### A. Standard of Review for Arbitration Awards

The so-called "Steelworkers Trilogy" cases[58] remain the leading authority regarding the appropriate standard that courts should apply when reviewing arbitration decisions. "The function of the Court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator".[59] "The courts, therefore, have no business weighing the merits of the grievance (footnote omitted), considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim."[60]

Implicit in the arbitration process is that "[t]he ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."[61] "[A]rbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process."[62] "It is the arbitrator's

---

57 Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121. (Emphasis added).

58 United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior and Gulf Navigation Company, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960).

59 United Steelworkers of America,363 U.S. at 567-568, S.Ct. at 1346.

60 Id. 363 U.S. at 568, 80 S.Ct. 1346.

61 United Steelworkers of America,363 U.S. at 582, 80 S.Ct. at 1353.

62 Steelworkers of America, 363 U.S. at 596, 80 S.Ct. at 1360.

construction which was bargained for; as so far as the arbitrator's decision concerns construction of the contract, **the courts have no business overruling him because their interpretation of the contract is different from his.**"[63] "Without great deference to arbitrators' awards, judicial review would gut arbitration and render it meaningless."[64] " **'Judges have no roving writ to second-guess arbitral decisions**.' (Citation omitted)."[65] Therefore, "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements."[66]

In Shaw's Supermarkets, Inc., *supra*, this Court reasoned that "[i]t is well-established that a **district court's ability to review an arbitrator's decision is severely limited**. The United States Supreme Court has stressed that '**a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one**. (Citation omitted)."[67] "While the arbitrator's award must draw its essence from the collective bargaining agreement, **it need not mirror a judge's notion of how the agreement's language might best be interpreted or might most fairly be applied to a given**

---

[63] Id. 363 U.S. at 599, 80 S.Ct. at 1362. (Emphasis added); *See*, Bull HN Information Systems, Inc. v Hutson, 229 F.3d 321, 330 (1st Cir. 2000) ("A court's review of an arbitration award is highly deferential because **the parties 'have contracted to have disputes settled by an arbitrator'** and thus, '**it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept**' "). (Emphasis added).

[64] Larocque v. R.W.F., Inc., 793 F.Supp. 386, 388 (D.R.I. Jun 19, 1992); affirmed 8 F.3d 95 (1st Cir. 1993);

[65] Id. at 388-389. (Emphasis added). *See*, W.R. Grace and Company v. Local Union 759, International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America, 461 U.S. 757, 765, 103 S. Ct. 2177, 2183, 76 L.Ed.2d 298 (1983).; Teamsters Local Union No. 42 v Supervalu, Inc., 212 F.3d 59, 67 (1st Cir. 2000); El Dorado Technical Services, Inc. v. Union General De Tarbajadores De Puerto Rico, 961 F.2d 317, 320 (1st Cir. 1992).

[66] Steelworkers of America, 363 U.S. at 596, 80 S.Ct. at 1360. *See*, Bettencourt v. Boston Edison Company, 560 F.2d 1045, 1048 (1st Cir. 1977) ("Where parties to a collective bargaining agreement have provided for arbitration as the final and binding method for settling grievances, **the arbitration award is normally non-reviewable by a court**"). (Emphasis added).

[67] 268 F. Supp. 2d at 121. (Emphasis added). *See*, W.R. Grace and Company, 461 U.S. at 764, 103 S. Ct. at 2182.

**set of facts**. So long as the arbitrator, acting within the scope of his delegated authority, is arguably construing the contract, his decision must stand. (Citations omitted)."[68]

> The First Circuit has followed this principle and cautioned that **judicial review of arbitration awards is 'extremely narrow and exceedingly deferential.'** (Citation omitted). **The Circuit has recognized that <u>'disputes that are committed by contract to the arbitral process almost always are won or lost before the arbitrator. Successful court challenges are few and far between'</u>**. (Citation omitted).[69]

Moreover, "... **a court should only set aside an arbitrator's interpretation of the meaning of a CBA in '<u>rare circumstances</u>'**. (Citation omitted)."[70] It cannot reject an arbitrator's factual findings even if the Court disagrees with them.[71]

> [T]his Court **should not set aside an award simply because it believes the arbitrator misread the CBA**. (Citation omitted). Likewise, when a CBA contemplates that an arbitrator will determine remedies for contract violations, 'courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined.' (Citation omitted). Consequently, **provided 'the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' <u>the fact that a court believes the arbitrator committed 'serious error' does not justify overturning his decision</u>**. (Citation omitted).[72] This Court, therefore, is **bound to enforce**

---

[68] <u>Larocque</u>, 793 F.Supp. at 388 (Citing <u>El Dorado Technical Services, Inc.</u>, 961 F.2d at 319). (Emphasis added). *See, also*, <u>Eastern Maine Medical Center, Inc.</u>, 866 F. Supp. At 611.

[69] <u>Shaw's Supermarkets, Inc</u>., 268 F. Supp. 2d at 121. (Emphasis added). *See*, <u>Keebler Company v. Truck Drivers, Local 170</u>, 247 Fed.3d 8, 10 (1st Cir. 2001); <u>Teamsters Local Union No. 42</u>, 212 F.3d at 61.

[70] <u>Shaw's Supermarkets, Inc</u>., 268 F. Supp. 2d at 121. (Emphasis added). *See*, <u>Eastern Associated Coal Corporation v. United Mine Workers of America, District 17</u>, 531 U.S. 57, 62, 121 S.Ct. 462, 466-467, 148 L.Ed.2d 354 (2000); <u>Eastern Maine Medical Center</u>, 866 F. Supp. at 609.

[71] <u>Shaw's Supermarkets, Inc</u>., 268 F. Supp. 2d at 121.

[72] *See*, <u>Eastern Associated Coal Corporation v. United Mine Workers of America, District 17</u>, 531 U.S. 57, 62, 121 S.Ct. 462, 466-467 ("**<u>The fact that a court is convinced that an arbitrator committed serious error does not suffice to overturn his decision</u>**). (Emphasis added); <u>Poland Spring Corporation v United Food and Commercial Workers International Union, AFL-CIO-CLC, Local 1445</u>, 314 F. 3rd 29, 33 (1st Cir. 2002) ("**...that a court is convinced [an arbitrator] committed serious error does not suffice to overturn his decision.**"). (Emphasis added); <u>Bull HN Information Systems, Inc.</u>, 229 F.3d at 330 ("While the arbitrator's award must 'draw its essence from the contract,' as long as the arbitrator is 'even arguably construing or applying the contract and acting within the scope of his authority, **<u>that a court is convinced he committed serious error does not suffice to overturn his decision</u>**.'" (Emphasis added); <u>Teamsters Local Union No. 42</u>, 212 F.3d at 65 ("The **courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract** ...."). (Emphasis added); <u>Eastern Maine</u>

> **the Award and may not review the merits of the contract dispute provided the Award draws its essence from the collective bargaining agreement**. (Citation omitted). In other words, **this Court's responsibility is to determine whether the arbitrator's construction of the CBA is at all 'plausible'**. (Citation omitted).[73]

In determining whether an arbitrator has exceeded his authority, "…courts 'do not sit to hear claims of factual or legal error by the arbitrator as an appellate court does in reviewing decisions of lower courts,' (citation omitted), and **'[e]ven where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards**,' (citation omitted)."[74]

## B. The Award Should Be Confirmed

Arbitrator Holden's factual findings in the Award were consistent with the testimony and documentary evidence, which support his determination that RWU acted arbitrarily and capriciously in denying tenure to Moskowitz. Moreover, the University's violation of the CBA was not merely a trivial and/or insignificant flaw. The President's role in making final tenure decisions is in no way a "ministerial action" as asserted by the University.

---

Medical Center, 866 F. Supp. at 609. ("**Courts are not authorized to make a final decision on the merits of the award**. (Citation omitted). '[C]ourts play only a limited role when asked to review the decisions of a arbitrator. The **courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract**.' " (Emphasis added).

[73] Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121-122. (Emphasis added). *See*, Keebler Company, 247 Fed.3d at 10 (The job for a reviewing court 'ordinarily is limited to determining whether the arbitrator's construction of the collective bargaining agreement is to any extent plausible.' (Citation omitted)."); Teamsters Local Union No. 42, 212 F.3d at 67 ("In all events, what counts is that the arbitrator's reading of the [contractual provision] **right or wrong**, had a plausible basis in the language and structure of the CBA. **A reviewing court can go no further.** (Citations omitted)."). (Emphasis added); Eastern Maine Medical Center, 866 F. Supp. at 609. ("… **a court should uphold that award 'if it can find within the four corners of the agreement, *any plausible basis for that interpretation*.'** (Citation omitted)." (Emphasis added); Larocque, 793 F.Supp. at 388 ("… a court should uphold an award that depends on an aribitrator's interpretation of the collective bargaining agreement if it can find, within the four corners of the agreement, any plausible basis for that interpretation. (Citing El Dorado Technical Services, Inc., 961 F.2d at 319).

[74] Bull HN Information Systems, Inc., 229 F.3d at 330.

In light of the evidence in this case and the applicable standard of review the Arbitration Award should be confirmed for the following reasons:

a. The RWU President's denial of the Union's Step II grievance under Article X of the CBA did not substitute for and/or fulfill his or RWU's required contractual obligations under Article VIII, Sections B.3.i and B.3.k of the CBA.

b. Arbitrator Holden acted within his authority by issuing an award that draws its essence from the CBA and is based upon a passably plausible interpretation of the CBA.

c. The Arbitration Award it is not inconsistent with any applicable laws, Arbitrator Holden did not manifestly disregard the law, and the award was not completely irrational and/or should otherwise be enforced.

d. The University's appeal of and refusal to implement the Arbitration Award is frivolous, without merit, and solely intended for undue delay and in bad faith.

### 1. **The Arbitrator's Determination That The University Failed To Comply With Article VIII, Sections B.3.i Drew Its Essence From The CBA And Is Based Upon A Passably Plausible Interpretation of the CBA.**[75]

As previously stated, Article VIII, Section B.3.i, "Chief Executive Officer and Board of Trustees Determination", of the CBA provides that only "the **Chief Executive Officer (President)** and, when applicable, the Board of Trustees, have the authority to **make all final decisions** with respect to promotion and **tenure**."[76] The CBA further requires that **all final tenure decisions are made by the President and the Board considering ". . . the recommendations** of deans and the Chief Academic Officer [**Provost**] . . . ."[77] Similarly, Article VIII, Section B.3.k, of the CBA provides that "... the **Chief Executive Officer** and, when

[75] Once again, **if RWU violated Article B 3.i of the CBA**, implicit in the Award is that **it similarly violated Article B 3.k of the CBA** since both sections impose the same procedural requirements upon the University regarding all final decisions on tenure and promotion. *See*, Joint Ex. 4 (the CBA), attached as Exhibit A to Declaration, Article B 3.k at 38.

[76] Facts ¶ 11; Joint Ex. 4 (the CBA), attached as Exhibit A to Declaration at 37. (Emphasis added).

[77] Facts ¶ 12; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A at 37-38. (Emphasis added).

applicable, the Board of Trustees, have the authority to **make all final decisions** with respect to promotion and **tenure**."[78] The **decisions made by the President** and/or Board of Trustees **regarding tenure must be communicated** to the faculty member, in writing, **by June 30**.[79] Here, Martin, the Interim Provost and Senior Vice President, made the final decision to deny tenure to Moskowitz.[80]

Upon considering the facts of this case along with these specific procedural requirements of the evaluation process under the CBA, Arbitrator Holden accurately reasoned that "[i]f the University departs from the contractually prescribed tenure/promotion review process in some significant way in evaluating tenure/promotion cases, then the University is vulnerable to a claim that it acted arbitrarily and capriciously."[81] In other words, if the University violates the CBA in a manner that the arbitrator deems to be a significant and in so doing, violates Moskowitz's rights thereunder, it should expect to be held accountable for its breach. Such a conclusion is entirely consistent with the general principles of contract law. Here, Arbitrator Holden specifically found that RWU had violated the CBA and thereby, acted arbitrarily and capriciously in the tenure evaluation process and denial of tenure to Moskowitz.

In a recent arbitration case involving a RWU tenured faculty member, who had his tenure revoked by Martin for performance reasons, the Union raised the same concerns about Martin's lack of authority to make a "final decision" revoking that grievant's tenure.[82] Although in that

---

78 Facts ¶ 11; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A at 38. (Emphasis added).

79 Facts ¶ 13; Joint Ex. 4 (CBA), attached to Declaration as Exhibit A at 37. (Emphasis added).

80 Facts ¶ ¶ 24 and 25; Award at 8, 19-20 and 28; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

81 Award at 18-19.

82 Roger Williams University Faculty Association and Roger Williams University, (Grievant Peter Alfieri), AAA Case No. 11 390 00973-06 (Arbitrator Gary D. Altman, September 4, 2007) ("Alfieri"). A copy of the Award is attached hereto as Appendix A.

case Arbitrator Altman rejected the Union's argument based upon a distinction between decisions "denying" tenure and those "revoking" tenure,[83] he reasoned that

> Under Article VIII (B) (3) (i), the president and board must make "all final decisions with respect to promotion and tenure." The fourth sentence of that paragraph clarifies this arguably ambiguous language by stating that **"tenure can only be awarded upon the affirmative act of the President and the Board of Trustees...,'** and other language in the subsection also refers to the award of tenure. **It is thus evident that Article VIII (B) (3) (i) applies to decisions to *award* tenure**, not to the discharge of a tenured faculty member.[84]

Although he was not persuaded that Article VIII (B) (3) (i) of the CBA was dispositive in Alfieri, because the faculty member's tenure had been "revoked", Arbitrator Altman concluded that this requirement would be controlling in those situations involving the University's decisions to "award" (or conversely deny) tenure. That conclusion is entirely consistent with Arbitrator Holden's determination in this case.

Another prior Arbitration Award involving RWU lends equal support to the Union's position that RWU acted arbitrarily and capriciously in the evaluation process and denial of tenure to Moskowitz.[85] In a predecessor case involving RWU and the Union, the arbitrator found that the University had acted arbitrarily and capriciously in its 1996-1997 evaluation of the grievant.[86] As a result, the grievant was reappointed for the 1997-1998 school year, and RWU was required to reevaluate her under the 1992-1995 CBA[87]. After reevaluating the grievant

---

83 Id. at 63, FN. 15.

84 Alfieri, at 63, FN. 15. (Emphasis added).

85 *See*, Roger Williams University Faculty Association-NEA/RI and Roger Williams University, (Grievant Sharon DeLuca), Case No. 11 300 00833-97 (Arbitrator Gary D. Altman, October 19, 1998) ("DeLuca II"). A copy of the Award is attached hereto Appendix B.

86 Roger Williams University Faculty Association-NEA/RI and Roger Williams University, (Grievant Sharon DeLuca), Case No. 11 300 00833-97 (Arbitrator Gary D. Altman, September 3, 1997) ("DeLuca I"). A copy of the Award is attached hereto Appendix C.

87 DeLuca I at 23. It is important to note that as discussed, infra, **the President of the University was not contractually involved in the evaluation process prior to the 1995-1998 CBA**, but since then, has been the final decision maker on tenure under all subsequent employment contracts. DeLuca II at 4.

during the 1997-1998 school year, the Dean recommended to the Vice President that the grievant be reappointed and granted tenure. The Vice President then recommended to the President that the grievant be reappointed and granted tenure.[88] However, the President disagreed with both the Dean and Provost and denied tenure to the grievant.[89]

The relevance and significance of that case is that RWU's President at the time, Anthony Santoro ("Santoro"), testified under oath that under the 1995-1998 CBA, as President, "he [was] the final determiner of tenure", [90] and that since the grievant was seeking tenure, "it could only be achieved by his decision under the terms of the 1995-1998 Agreement".[91] Santoro also personally notified the grievant of his decision to deny her tenure.[92] The relevant contract provisions of the 1995-1998 Agreement are identical to those in the CBA in this case.

Here, the facts regarding this same issue are undisputed. Moskowitz commenced his sixth year evaluation process in the fall semester of 2005. On or about March 1, 2006, Koelle completed her sixth year evaluation of Moskowitz's performance[93] and ultimately, concluded that she could not recommend Moskowitz for tenure.[94] By correspondence dated April 14, 2006, Martin denied tenure to Moskowitz and formally notified him that his employment was being terminated.[95] Martin's notification did not state that he would be "recommending" to the President and/or Board of Trustees that Moskowitz be denied tenure and not be re-appointed.[96]

---

88 DeLuca II at 6.
89 DeLuca II at 6-7.
90 DeLuca II at 6.
91 DeLuca II at 8.
92 Id. at 6-7. Once again, the Arbitration Award in DeLuca II required the University to reevaluate the grievant pursuant to the 1992-1995 CBA. However, because Santoro had injected himself into the reevaluation process and tenure decision, which essentially exceeded his authority under the older contract, the Arbitrator concluded that RWU had violated his previous Award and failed to apply the remedy.
93 Facts ¶ 21; Award at 7; Joint Ex. 21 (Koelle's 6th Year Evaluation), attached as Exhibit C to Declaration.
94 Id.
95 Facts ¶ 23; Award at 8; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.
96 Facts ¶ 25; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

There is no dispute that Martin's correspondence to Moskowitz of April 14, 2006 denied him tenure and terminated his employment at RWU.[97] Prior to doing so, Martin reviewed Moskowitz's Self-Study, the FRC Report, Moskowitz's response to the FRC Report, Koelle's sixth year evaluation, and Moskowitz's response to Koelle's sixth year evaluation.[98] Even though Martin was to make an "independent" recommendation regarding Moskowitz's tenure, he also "consulted with" Dean Koelle and President Nirschel prior to preparing his April 14th correspondence to Moskowitz.[99] Thereafter, on April 17, 2006, the Union filed a Step 1 grievance challenging the University's denial of tenure to Moskowitz.[100]

As previously discussed, the requirement that only the President and/or the Board of Trustees have the authority to make all future tenure and/or promotion final decisions regarding tenure and/or promotion was specifically negotiated by the Union beginning with the 1995-1998 CBA.[101] The Union negotiated this language because it believed tenure decisions to be so important as to require them to be made by the Chief Executive Officer (President).[102] Additionally, the President's role in the tenure process created another layer of review prior to tenure decisions, leaving him the options of either following or rejecting the recommendations of the deans and provost.[103]

---

97 RWU's Memorandum at 4 and 10-11; Award at 8; *See*, Joint Ex. 33 (Martin's correspondence), attached as Exhibit D to the Declaration.

98 Facts ¶ 24; Award at 8; Joint Ex. 33 (Martin's Correspondence), attached as Exhibit D to Declaration.

99 Facts ¶ 24; RWU's Memorandum at 4 and 10-11; *See*, Joint Ex. 4 (the CBA), attached as Exhibit A to Declaration, Article VIII, Section B.3.f. at 36-37.

100 Facts ¶ 35: Award at 8; Joint Ex. 35 (Union Step 1 Grievance), attached as Exhibit E to the Declaration.

101 Facts ¶ 29; Topf Affidavit ¶ 5.

102 Facts ¶ 29; Topf Affidavit ¶ 5.

103 Facts ¶ 29; Topf Affidavit ¶ 5.

Subsequent to the Award, the Union and RWU were parties to another arbitration case that involved identical issues as those addressed by Arbitrator Holden.[104] The relevant facts in this case and Dunn are essentially similar.[105] In Dunn, the University denied a faculty member a promotion[106] and, as in this case, the denial was based predominately upon Dunn's performance relating to scholarship. On May 19, 2006, Martin forwarded his recommendation against promoting Dunn to Nirschel.[107] As in this case, Dunn did not wait for the President to respond and instead, immediately filed a grievance.[108] During the Dunn arbitration, the University made arguments similar to those raised in this case, including that by immediately filing a grievance without waiting for the President to act, the Union essentially conceded that it was a final decision and that, since Martin had consulted with the President and kept him fully informed, it was actually the President who made the ultimate decision not to grant Dunn's promotion.[109]

In his decision, Arbitrator Ryan articulated a very insightful and extensive analysis of the evaluation process, which is applicable to both tenure and promotion cases. More specifically, Arbitrator Ryan determined that:

> [i]n sum, the evaluation procedure is a four-level sequence of careful reviews at successively higher levels of the University hierarchy. **Each level has the opportunity to consider the candidate's entire file afresh, and no level's recommendation is binding on the higher levels**. The procedure therefore leaves considerable discretion and authority in the hands of senior administrators, who may reverse the recommendations of

---

104 *See*, Dunn, supra. (The only distinction between the two cases was that this matter involved a denial of tenure, while the Dunn matter involved the denial of a promotion. However, this distinction is irrelevant since the evaluation criteria and procedures are identical for promotion and tenure under the CBA.)

105 One factual distinction is that the step 2 grievance was not heard by Nirschel until after June 30th. Therefore, there was no written grievance denial by the President prior to June 30th. However, for those reasons discussed below, this distinction makes no difference as it relates to RWU's violation of the CBA.

106 Under the CBA, there is really no distinction between the evaluation process and criteria for tenure and promotion. Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, § B and C at 25-42.

107 Dunn at 26. (It is significant that **in the Dunn case, Martin actually made a recommendation to Nirschel** where in his correspondence to Moskowitz, there was no such recommendation. Martin simply informed Moskowitz that he was being denied tenure and that his employment was going to be terminated.

108 Dunn at 28.

109 Id. at 37.

> the lower levels. This discretion is nevertheless balanced by a significant element of accountability because it is incumbent upon each level to produce a written report articulating the reasons for its recommendation or decision. This helps to ensure against any abuse of discretion by the upper levels of administration.
>
> Having created this multi-layered system, the parties must have seen that the various evaluators would not always be in perfect accord. But this is not necessarily detrimental to the candidate or to the faculty as a whole; indeed, the parties could well have seen it as an advantage. It allows different points of view to be aired and preserved, gives the lower levels a chance to affect the thinking of the higher levels, and exerts pressure on the higher levels to articulate and support their reasoning. All of this adds transparency and credibility to the system. While differences of opinion among the levels of review might create some uncertainty during the course of a given candidate's evaluation, ultimately the administration has the final say and can maintain some degree of consistency, if it wishes.[110]

In considering the CBA and analyzing the tenure/promotion evaluation process and procedures, Arbitrator Ryan recognized that the final step was to forward the faculty member's self-study and supporting material and the recommendations of the FRC, the Dean and the Provost to the "highest and final level of review", the President and/or the Board of Trustees.[111] Arbitrator Ryan reasoned that:

> An autonomous decision by the dean and **a final written decision from the president and/or board of trustees are not trivial procedural niceties. Institutions of higher education are renowned for their close attention to the procedural aspects of personnel decisions.** These parties conform to that reputation during the negotiations for the 2004-08 agreement. They devoted the most painstaking scrutiny to the procedures for tenure and promotional review and comprehensively revised and expanded them, leaving no detail unexamined.[112]

110 Id. at 47.
111 Id. at 45.
112 Id. at 51. (Emphasis added).

After carefully considering the facts and terms of the CBA, Arbitrator Ryan concluded, that notwithstanding Martin's consultation with Nirschel prior to preparing his recommendation and the Union's filing a grievance prior to June 30th, RWU had acted arbitrarily and capriciously and violated the CBA.[113] Arbitrator Ryan specifically rejected the University's contention that Martin's discussions with Nirschel and/or the Union's filing a grievance prior to June 30th equated to a final decision by the President or preempted the President from having to render the ultimate decision on Dunn's promotion.

There can be no dispute that Martin, not the President and/or the Board of Trustees, denied Moskowitz's tenure and terminated his employment. Clearly, Martin's actions resulted in a "final tenure decision". Although the CBA requires the President and/or the Board of Trustees to render all final decisions with respect to an individual's tenure, throughout Nirschel's term as President of the University, he failed to adhere to this requirement. Nirschel routinely notifies faculty members that they have been granted promotion and/or tenure; however, as in Moskowitz's case, in all instances of which the Union is aware, Nirschel's consistent practice has been to refrain from personally informing faculty members that their bids for tenure and/or promotion had been denied.[114]

Until recently, even though Nirschel consistently failed to adhere to the requirements of the CBA, prior to the 2005-2006 academic year, no faculty member had pursued a grievance through arbitration relating to the denial of his or her tenure and/or promotion.[115] However, during the 2005-2006 academic year, three faculty members pursued grievances on the denial of their tenure and/or promotion through arbitration, and raised the argument that Martin, rather

---

113 Id. at 43.

114 Topf Affidavit ¶ 6; See, Alfieri and Dunn.

115 Topf Affidavit ¶ 12. Although some faculty members may have initially grieved the University's adverse decisions on their tenure and/or promotion, the grievances were withdrawn or resolved before proceeding to the Step 3 arbitration under the CBA.

than Nirschel or the Board of Trustees, had made the final decisions regarding their tenure and/or promotion.[116]

Consistent with former RWU President Santoro's prior testimony in the DeLuca II arbitration and Arbitrators Altman and Ryan's recent awards in Alfieri and Dunn, respectively, the contractual language is very clear and unambiguous with respect to final tenure/promotion decisions. Such decisions can only be made by the President and/or Board of Trustees. The CBA is equally clear that Martin lacked any actual authority to deny Moskowitz's tenure. Martin's only authority and permissible role in the evaluation process was to make a recommendation to the President and/or Board of Trustees for their consideration.[117]

Even Nirschel acknowledged the limited authority of the Provost in tenure decisions. More specifically, an April 11, 2006 letter to the faculty addressing reappointment and tenure, Nirschel wrote that after the dean makes her recommendation to the Provost, **"[t]he Provost then has until May 20th to render a recommendation to the President, and the President then has until June 30th to overrule or endorse this recommendation**."[118] Because Martin overstepped his authority in denying Moskowitz's tenure and terminating his employment, and because the President opted not "overrule or endorse" his recommendation, the University violated the CBA and thereby, acted arbitrarily and capriciously.[119]

---

[116] Topf Affidavit ¶ 13. These cases include Moskowitz; Alfieri; Roger Williams University Faculty Association/NEA-RI and Roger Williams University, (Grievant: Kathleen Dunn), AAA Case No. 11 300 01993 06 (Arbitrator Michael C. Ryan, December 31, 2007) ("Dunn"). A copy of the award is attached hereto as Appendix D.

[117] Id.

[118] Facts ¶ 30; Joint Ex. 41 (Nirshel's Memorandum), attached as Exhibit J to Declaration. (Emphasis added).

[119] Although RWU argues that Martin's prior discussions with Nirschel and Nirschel's written denial of Moskowitz's Step 2 grievance equated to a final tenure decision by the President, Arbitrator Holden determined otherwise. For those reasons discussed below, the arbitrator was correct in concluding that these actions did not satisfy the requirements under the CBA.

As previously stated, Arbitrator Holden's factual findings and contract interpretation relating to the University's lack of compliance with "final tenure decision" requirements of the CBA are entitled to great deference. Courts should only set aside an arbitrator's interpretation of the meaning of a CBA in rare circumstances.[120] This Court should not set aside the Award simply because it believes Arbitrator Holden misread the CBA.[121] As long as he was even arguably construing or applying the contract and acting within the scope of his authority, this Court must refrain from overturning his decision even if it believes the arbitrator committed serious error relating to his factual findings and/or contract interpretation.[122] This Court should not second guess Arbitrator Holden and must simply determine whether his construction of the CBA is at all "plausible".[123] This Award draws its essence almost exclusively from the CBA and is predicated upon a plausible interpretation thereof.

Arbitrator Holden's determination that the University had acted arbitrarily and capriciously in violating the CBA was based on a careful and reasonable interpretation of the contract language. Can reasonable minds differ on interpreting the CBA and determining whether RWU acted arbitrarily and capriciously in this case? Probably not. Reasonable minds would not differ and instead, would consistently make the same findings as Arbitrator Holden. However, upon applying the standards for summary judgment to that question and viewing it in the light most favorable to the University, at the very least, reasonable minds could differ from

---

[120] *See*, Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121.; Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, 531 U.S. at 62, 121 S.Ct. at 466-467; Eastern Maine Medical Center, 866 F. Supp. at 609.

[121] *See*, Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, 531 U.S at 62, 121 S.Ct. at 466-467; Poland Spring Corporation v United Food and Commercial Workers International Union, AFL-CIO-CLC, Local 1445, 314 F. 3rd at 33; Bull HN Information Systems, Inc., 229 F.3d at 330; Teamsters Local Union No. 42, 212 F.3d at 65; Eastern Maine Medical Center, 866 F. Supp. at 609.

[122] Id.

[123] *See*, Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121-122; Keebler Company, 247 Fed.3d at 10; Teamsters Local Union No. 42, 212 F.3d at 67; Eastern Maine Medical Center, 866 F. Supp. at 609; Larocque, 793 F.Supp. at 388.

RWU's perspective on this issue. This is clearly evidenced by the fact that other arbitrators, under very similar or identical circumstances, have reached the same conclusion.[124] In those cases the arbitrators have ruled consistently and have not differed. Even if, assuming *arguendo*, the University's position is a "reasonable" one, at the very least, the fact that separate arbitrators have consistently reached a different conclusion from their own can only lead to one conclusion – that reasonable minds can differ on this issue. Under these circumstances, it is quite clear that the Award must be confirmed as a matter of law.

**a. <u>Arbitrator Holden Appropriately Considered And Rejected RWU's Contention That Martin's Conferring With Nirschel And Nirschel's June 6, 2006 Step 2 Grievance Denial Constituted Its Compliance With Article VIII B.3.i Of The CBA.</u>**

The University asserts that Arbitrator Holden ignored two important pieces of evidence: to wit, Martin's testimony that he consulted with Nirschel prior to denying Moskowitz's tenure and Nirschel's written Step 2 grievance denial of June 6, 2006. Although the University may not agree with Arbitrator Holden's findings and/or the weight that he chose to give to this evidence, it is erroneous to allege that he "ignored" the evidence. To the contrary, Arbitrator Holden specifically addressed the fact that "Provost Martin testified that he consulted with both Dean Koelle and the President before he issued his decision." However, he determined that "[c]onsulting with the President while making a final decision at the Provost level is not consistent with the contractual process requiring the President/Board to make the final decision in accordance with the specified contractual criteria after considering the recommendations of

124 *See*, <u>DeLuca 2</u>; <u>Alfieri</u>; <u>Dunn</u>.

the FRC, the Dean and the Provost."[125] This conclusion clearly draws its essence from the CBA and results from a "plausible" construction of the CBA.[126]

Again, there can be no dispute over the fact that Martin's correspondence to Moskowitz of April 14, 2006 denied him tenure.[127] However, the University asserts that because Martin had conversations with the Dean and the President prior to writing his letter of April 14th,

> [t]he logical implication of this testimony is that, at a minimum, President Nirschel fully participated in and (by extension) endorsed the decision to deny tenure to Professor Moskowitz prior to April 14, 2006. Thus, the President exercised his authority *de jure* in the decision-making process in accordance with the CBA. Absent any contrary evidence from the Union, Arbitrator Holden should have concluded that this consultation met the contractual mandate of Article VIII.B.3.i. Arbitrator Holden's finding was directly adverse to the only testimony presented.[128]

Even assuming, *arguendo*, that one inference from this evidence could be that the President "fully participated in" and "(by extension) endorsed" Martin's decision to deny Moskowitz tenure, there are other equally and/or more feasible inferences, including the ultimate conclusion reached by Arbitrator Holden in this case.

The evidence in the record is absolutely clear that Martin notified Moskowitz on April 14th that the University was denying him tenure and terminating his employment.[129] Unlike in Dunn, Martin's intent was very unambiguous and clear. He was not making a recommendation to the President. Instead, he was making a final determination regarding Moskowitz's tenure. The mere fact that Martin may have had conversations with the Dean and the President **prior** to writing his April 14th correspondence to Moskowitz in no way leads to the "logical implication"

---

125 Award at 19.

126 *See*, Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121-122; Keebler Company, 247 Fed.3d at 10; Teamsters Local Union No. 42, 212 F.3d at 67; Eastern Maine Medical Center, 866 F. Supp. at 609; Larocque, 793 F.Supp. at 388.

127 RWU's Memorandum at 4 and 10-11; Award at 8; *See*, Joint Ex. 33 (Martin's correspondence), attached as Exhibit D to the Declaration.

128 RWU's Memorandum at 11.

129 RWU's Memorandum at 4 and 10-11; Award at 8; *See*, Joint Ex. 33 (Martin's correspondence), attached as Exhibit D to the Declaration.

that the President had been consulted throughout the "entire evaluation process". Martin's conversations with the President before submitting his April 14th letter to Moskowitz in no way satisfies the CBA's post-recommendation requirement that Nirschel review Koelle's and Martin's recommendations prior to him personally making a final determination on Moskowitz's tenure.

Additionally, Martin's testimony offers uncontradicted evidence that the University committed yet another violation of the CBA in Moskowitz's tenure evaluation process. As Article VIII, §B.3.f. requires, the Provost shall prepare and forward "an independent" written report and recommendation to Moskowitz and the President.[130] Explicit in this contractual requirement is that Martin's recommendation was to have been "independent" and autonomous.[131] Martin failed to do this as well and thereby, further tainted Moskowitz's evaluation and tenure process.

Although the University may disagree with this determination and the factual findings by Arbitrator Holden, an arbitrator is afforded broad discretion and deference in interpreting the contract and facts in a given dispute.[132] Under the circumstances, Arbitrator Holden's factual findings and conclusions, particularly rejecting the University's notion that Martin's conversations with Nirschel prior to writing his April 14th letter to Moskowitz should have satisfied the requirements under the CBA, are predicated upon a reasonable interpretation of the CBA, draw their essence from the four corners of the CBA and are "passably plausible". After all, it is Arbitrator Holden's interpretation and findings that the parties bargained for in the CBA.

---

130 Joint Ex. 4 (CBA), attached to Declaration as Exhibit A at 36-37.

131 *See*, Dunn at 51. (**In Dunn, Martin was criticized by the Arbitrator for consulting with the dean prior to his "recommendation" and thereby, interfering with this independent process**.) Id. at 47.

132 *See*, W.R. Grace and Company, 461 U.S. at 765, 103 S. Ct. at 2183; Teamsters Local Union No. 42, 212 F.3d at 67; El Dorado Technical Services, Inc., 961 F.2d at 320; Larocque 793 F.Supp. at 388; affirmed 8 F.3d 95.

Once again, the function of courts reviewing an arbitration award is extremely limited and the award is only overturned in very rare cases.[133] This Court may not vacate the award simply because its own interpretation of the CBA would be different or even better.[134] Even in situations where a court believes that the arbitrator committed "serious errors" of fact or misinterpreted the contract, a court is not justified in overturning or vacating the award.[135] The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.[136] In this case, there is no basis for overturning the Award and instead, the Award should be confirmed as a matter of law.

**b. Arbitrator Holden Appropriately Considered And Rejected RWU's Contention That Nirschel's June 6, 2006 Step 2 Grievance Denial Constituted Its Compliance With Article VIII B.3.i Of The CBA.**

The University also erroneously asserts that the Award ignores the evidence that Nirschel issued a written response to the Level 2 Grievance prior to the June 30th deadline in the CBA. Once again, Arbitrator Holden did not ignore said evidence, but instead, was not persuaded that the evidence complied with the requirements under the CBA. Moreover, as Arbitrator Ryan pointed out in the Dunn, there is a four tier hierarchy of independent and autonomous decisions that are made throughout the tenure/promotion evaluation process.[137] "Each level has the

---

[133] *See*, Eastern Associated Coal Corporation, 531 U.S. at 62, 121 S.Ct. at 466-467; United Steelworkers of America, 363 U.S. at 567-568, 80 S.Ct. at 1346; Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121; Eastern Maine Medical Center, 866 F. Supp. at 609.

[134] *See*, W.R. Grace and Company, 461 U.S. at 764, 103 S. Ct. at 2182; United Steelworkers of America, 363 U.S. at 599, 80 S.Ct. at 1362; Bull HN Information Systems, Inc. v Hutson, 229 F.3d 321, 330; Shaw's Supermarkets, Inc., 268 F. Supp. 2d at 121.

[135] *See*, Eastern Associated Coal Corporation, 531 U.S. at 62, 121 S.Ct. at 466-467; Poland Spring Corporation, 314 F. 3rd at 33; Bull HN Information Systems, Inc., 229 F.3d at 330; Teamsters Local Union No. 42, 212 F.3d at 65; Eastern Maine Medical Center, 866 F. Supp. at 609.

[136] United Steelworkers of America, 363 U.S. at 596, 80 S.Ct. at 1360.

[137] Dunn at 46.

opportunity to consider the candidates' entire file afresh, and no level's recommendation is binding on the higher levels."[138] There is a clear distinction between this type of independent and autonomous evaluation process, which provides for the President to make the ultimate decision on an individual's tenure and/or promotion, as compared to an adversarial situation where a faculty member has filed a grievance against another administrator and now the President is called upon to rule on that grievance. The procedure and dynamics in situations involving tenure decisions are entirely different from those involving grievance decisions. Similarly, the thought process involving the President's determining whether a faculty member will be granted tenure and/or promotion is entirely different from determining whether one of his administrators has violated the CBA.

The University's assertion that even though Nirschel's writing was part of the grievance process, it made no material difference is relatively naïve and inaccurate. To the contrary, not only is the entire decision process completely different, but each decision initiates under a different section of the CBA. The President's tenure decision is required under Article VIII, §§ B.3.i and B.3.k of the CBA, while his Step 2 grievance decisions are governed by Article X.B of the CBA. Moreover, the information and criteria that the President is required to review in tenure decisions is entirely different than that in grievances. In this case, the record is also devoid of any evidence to show that the President ever considered the tenure criteria in the CBA, recommendations of Koelle and Martin, Moskowitz's evaluative background and the specifically identified interests of the University, as required by the CBA.

---

[138] Id.

The University also argues that by filing a grievance prior to June 30th, the Union conceded that the final decision had been made by the University regarding Moskowitz's tenure. Arbitrator Holden certainly rejected this argument under the CBA and a similar determination was made by Arbitrator Ryan in the Dunn case. To understand why the grievance was filed prior to June 30th it is important to again consider Nirschel's normal practice in adverse tenure and promotion cases. Although the President and/or the Board of Trustees is required to make all final decisions regarding tenure and/or promotion under the CBA, since Nirschel has been the President at the University, he has consistently failed to adhere to this requirement.

Nirschel's failure to make final decisions regarding the denial of tenure and/or promotion caused such confusion that the Union sought clarification from former Provost, Edward J. Kavanagh ("Kavanagh"), regarding the appropriate time to file grievances. In response, Kavanagh forwarded a memorandum to James Tackach, the then Union President, explaining that **grievances should be filed after receiving an adverse decision from the President** and that **all grievances filed prior to that decision, would be determined premature by the University**.[139]

Although Nirshel satisfied his contractual obligation of personally notifying candidates who were granted tenure and/or promotion, in all instances of which the Union is aware, Nirschel's consistent practice has been to refrain from personally informing faculty members that their bids for tenure and/or promotion had been denied.[140] As previously mentioned, even after Kavanagh's April 21, 2005 memorandum, Nirschel continued to refrain from getting involved in

139 Topf Affidavit ¶ 7; *See*, Exhibit K, attached to Declaration. (Emphasis added).

140 Topf Affidavit ¶ 6. (As previously stated, although Nirschel had failed to notify faculty members of adverse decisions regarding their tenure and/or promotion, it was not until the 2005-2006 academic year that any such members actually grieved those decisions up through the arbitration process.)

the negative tenure and/or promotion decisions.[141] Consequently, on April 17, 2006, relying upon Nirschel's consistent practice of not rendering negative tenure decisions and recognizing that Martin had again exceeded his authority in actually denying tenure to and terminating Moskowitz's employment, the Union filed a Step 1 grievance.[142] The grievance was promptly filed to preserve the 30 day limit and avoid waiting fruitlessly for the President to act and render a written final decision denying Moskowitz's (and other faculty members') tenure and promotion, which he consistently never did.[143]

For the University to argue that by filing a grievance before June 30th, the Union was conceding that a final decision had been made and essentially implying that the grievance prohibited or pre-empted Nirschel from following through with a final decision regarding Moskowitz's tenure, is very misleading and disingenuous at best. In fact, the contrary holds true. Kavanagh's memorandum of April 21, 2005, is unrebutted evidence that by proceeding with Moskowitz's (and Dunn's) grievance prior to June 30th, the University, and not the Union, had conceded that Martin's correspondence constituted a final tenure decision. RWU was well aware that, whether grievances were filed prior to June 30th, after June 30th or not at all, Nirschel consistently refrained from becoming involved in adverse tenure and/or promotion decisions and routinely failed to issue any written final decisions relating thereto. If the University did not believe that Martin's April 14th correspondence to Moskowitz constituted a "final tenure decision", consistent with Kavanagh's memorandum of April 21, 2005, it should have refused to hear the grievance and deemed it to be premature.[144]

---

141 Topf Affidavit ¶ 8.

142 Facts ¶ 35; Topf Affidavit ¶ 11; *See*, Award at 8; Joint Ex. 35 (Union's Step 1 Grievance), attached as Exhibit E to Declaration.

143 Facts ¶ 35; Topf Affidavit ¶ 11; *See*, Award at 8; Joint Ex. 35 (Union's Step 1 Grievance), attached as Exhibit E to Declaration.

144 Topf Affidavit ¶ 7; *See*, Exhibit K, attached to Declaration.

In Dunn, Arbitrator Ryan also addressed and rejected this very argument by the University. He determined that

> [a]lthough there was some testimony that the president and/or the board do not customarily issue written final decisions on promotional applications when they are negative, such conduct would not override the clear and unambiguous contractual requirement for a final decision by the president and/or the board. There is no evidence that the parties ever mutually agreed to waive it. For the same reason, the Union's decision to initiate the grievance immediately after Interim Provost Martin's adverse recommendation does not alter the contractual mandate.[145]

Under the facts and circumstances of this case, especially in conjunction with the specific language and requirements of the CBA, Arbitrator Holden's determination that Nirschel's Step 2 grievance denial did not constitute a "final tenure decision" and did not satisfy the June 30th notice requirement as required under the CBA was a reasonable and proper exercise of his discretion.[146] An arbitrator has wide latitude in determining the facts and making findings as long as he/she is arguably construing or applying the contract.[147] That is exactly what Arbitrator Holden did in this case. Therefore, the Award should be confirmed as a matter of law.

**c. The CBA's Requirement That The President Render All Final Tenure And Promotion Decisions Is Not A Ministerial Action.**

As previously discussed, the requirement that only the President and/or the Board of Trustees have the authority to make all future tenure and/or promotion final decisions regarding tenure and/or promotion was specifically negotiated by the Union beginning with the 1995-1998

---

145 Dunn, at 51, FN 11.

146 Moreover, since the University failed to even address this issue in its arbitration brief or file a reply brief to raise this argument before the arbitrator, arguably, it thereby waived its right to now assert that Arbitrator Holden ignored this so-called "crucial and unrebutted evidence".

147 *See*, Larocque, 793 F.Supp. at 388 (Citing El Dorado Technical Services, Inc., 961 F.2d at 319); Eastern Maine Medical Center, Inc., 866 F. Supp. at 611.

CBA.[148] The Union negotiated this language because it believed tenure decisions to be so important as to require them to be made by the Chief Executive Officer (President).[149] The President's role in the tenure process creates another layer of review prior to tenure decisions, leaving Nirschel the options of either following or rejecting the recommendations of the deans and provosts.[150] Once again, **"[a]n autonomous decision by the dean and a final written decision from the president and/or board of trustees are not trivial, procedural niceties**."[151] The CBA requires the President to make final decisions regarding promotion and tenure and "… not merely by rubber stamp."[152] It certainly was important enough to the Union to negotiate the new highest and final level of review as part of the tenure and promotion process. "[I]t would be disrespectful to the parties' intentions to treat these procedures lightly."[153] Moreover, it would make this language and requirement in the CBA meaningless. That was not the intention of the parties when they amended the CBA commencing with the 1995-1998 CBA.

Martin's acting without authority and RWU's violation of the CBA are not merely procedural and/or technical flaws in the evaluation and reappointment process. They are substantive violations of Moskowitz's contractual and due process rights that have resulted in what is routinely referred to in employment cases as "capital punishment" or the "death penalty"—the termination of an individual's employment rights. Moskowitz was deprived of another level of independent review in his evaluation process. Once again, the President of the University should have had the opportunity to "overrule or endorse [Martin's] recommendation."[154]

---

148 Facts ¶ 29; Topf Affidavit ¶ 5.
149 Facts ¶ 29; Topf Affidavit ¶ 5.
150 Id.; See, Joint Ex. 41 (Nirshel's Memorandum), attached as Exhibit J to Declaration
151 Dunn at 51. (Emphasis added).
152 Id. at 49.
153 Id. at 52.
154 Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article VIII, §§ B.3.i and B.3.k at 36-38.

The University suggests that the Union had failed to raise its concern that Article VIII.B.3.i was not followed in the earlier grievance proceedings, and if it had, the problem could have been corrected. The University further asserts that it was improper for Arbitrator Holden to consider these violations since the Union did not raise their concerns in the earlier grievance proceedings.

First of all, it is not incumbent upon the Union to provide the University with a blueprint for complying with the CBA. RWU is very familiar with the CBA and is well aware that the President is required to render final decisions relating to promotion and tenure. Also, RWU is familiar with Nirschel's routine of refraining from any involvement in adverse tenure/promotion decisions.

In addition, arbitration hearings are *de novo*. In its Demand for Arbitration, the Union alleged that the University had specifically, but not exclusively, violated Article VIII and X of the CBA.[155] Obviously, Article VIII, §§B.3.i and B.3.k are contained within Article VIII. Again, if the University had any questions relating to the specific alleged violations of the CBA and/or how it acted arbitrarily or capriciously in rendering a decision regarding Moskowitz's tenure, it had from June 9, 2006 through the completion of the arbitration hearings on June 18, 2007 to raise those concerns with the Union and the Arbitrator. Throughout the entire arbitration process, which spanned over more than one year, RWU never requested any further clarification as to its alleged violations of the CBA, and more specifically, the alleged violations of Article VIII and Article X.[156]

---

155 *See*, Joint Ex. 39 (Demand for Arbitration), attached as Exhibit I to Declaration

156 Facts ¶ 42; Declaration ¶ 6.

Arbitrator Holden was obligated to interpret and implement the specific terms of the CBA. In fashioning the Award, he was very careful and deliberate to assure that his decision drew its very essence from the CBA. Under the circumstances, the Award is a reasonable, and at the very least, a passably plausible interpretation of the CBA. Upon applying the existing federal law to the facts and circumstances of this case, there is absolutely no basis for this Court to reverse the Award and/or to second guess Arbitrator Holden. He determined that the University violated the CBA and thereby, acted arbitrarily and capriciously. RWU's procedural violations of the CBA are not merely ministerial and Arbitrator Holden's findings on this issue are entitled to great deference, limited review and should be confirmed as a matter of law.

**d. The Award Did Not Improperly Shift The Burden Of Proof From The Union To The University.**

The uncontradicted evidence is that the Provost, not the President, notified Moskowitz that his tenure was denied and that his employment at RWU was being terminated.[157] For those reasons previously discussed, that Martin may have had discussions with Nirschel prior to writing his April 14th correspondence to Moskowitz and that Nirschel drafted a written denial of Moskowitz's Step 2 grievance, does not change the fact that Arbitrator Holden was justified and reasonable in determining that neither the President nor the Board of Trustees had made the final decision regarding Moskowitz's tenure.

The cases cited by RWU in support of its contention that the Award was not rational, are clearly distinguishable. In those cases, the courts considered the substantive findings and determinations of the arbitrators. Here, however, RWU acted arbitrarily and capriciously by violating the terms of the CBA relating to the evaluation and tenure process itself. Creating a substantive defect in the actual process that directly led to the decision to deny tenure to

[157] Facts ¶¶ 24 and 25; Joint Ex. 33 (Martin's correspondence), attached as Exhibit D to Declaration.

Moskowitz had an adverse and prejudicial effect on the ultimate tenure decision. Based upon the specific language of the CBA and the factual findings of the Arbitrator, the Award was reasonable and drew its very essence from the CBA. The credible evidence before the Arbitrator permitted him to draw a reasonable inference that Nirschel did not make the final tenure decision in this case. The direct evidence supporting this finding is Martin's own April 14th correspondence to Moskowitz.[158]

### 2. The Award's Remedy Is Consistent With The CBA And The Arbitrator's Authority Thereunder.

In Steelworkers v. Enterprise Wheel & Car Corp., *Supra*, the United States Supreme Court recognized that arbitrators have wide discretion to fashion remedies for breaches of labor agreements.

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. **This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsman may never have thought of what specific remedy should be awarded to meet a particular contingency.** Nevertheless an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.[159]

---

[158] Joint Ex. 33 (Martin's correspondence), attached as Exhibit D to Declaration.

[159] 363 U.S. at 597, 80 S.Ct. at 1361 (Emphasis added); St. Elizabeth Health Center, 118 L.A. 37, 43 (Fullmer 2002); Maple Heights Bd. of Education, 115 L.A. 173, 177 (Fullmer 2000).

"[M]ost collective bargaining agreements leave a 'gaping void' on the topic of arbitral remedies, (citations omitted) and, in the absence of language limiting the scope of a remedy in the agreement itself, arbitrators generally have been considered to possess broad discretion to fashion an appropriate remedy. (Citations omitted.)"[160] As with the limited review of arbitration awards and the deference afforded to arbitrators in formulating their awards, courts "... cannot vacate the award because the arbitrator misreads the contract, where there is room to do so. (Citation omitted).[161] The law is well-established that arbitrators have the same level of freedom in fashioning a remedy as he or she has in interpreting a labor agreement. "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." [162] **Courts are not "...authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him the authority to decide that question**.[163]

Even if this Court disagrees with Arbitrator Holden's remedy in this case, it should not set aside the Award.[164] If courts were free to set aside arbitration awards in situations where an arbitrator is even arguably construing or applying the contract and acting within the scope of his or her authority, even in situations where a court believes that the arbitrator committed "serious error" and or misread the CBA, "... the speedy resolution of grievances by private mechanisms would be greatly undermined. (Citation omitted)."[165]

---

160 Elkouri & Elkouri, "*How Arbitration Works*" 1194 (BNA Books, 6th Ed. 2003).

161 Poland Spring Corporation, 314 F. 3d at 33.

162 United Paperworkers Inter. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987); *See*, Poland Springs Corporation, 314 F. 3d at 41-42 (*Dissenting Opinion*).

163 Poland Spring Corporation, 314 F. 3d at 33. (Emphasis added).

164 Shaw's Supermarkets, Inc. 268 F. Supp. 2d at 122.

165 Id.

Here, the only contractual restriction placed upon Arbitrator Holden in fashioning a remedy was that the remedy could not alter, add to or subtract from the terms of the CBA.[166] The CBA did not provide for specific remedies when the University acts arbitrarily and capriciously and/or violates its terms. Under such circumstances, an arbitrator must enjoy "remedial flexibility".[167] An "implied authority" to fashion remedies is inherent in labor agreements, even though the agreement might not explicitly provide for particular remedies.[168] Arbitrators have wide discretion in devising remedies unless the CBA specifically states otherwise and/or provides specific remedies for particular violations.[169]

"The usual remedy in cases where a union establishes that an employer's action has breached the parties' agreement is to invalidate the action of the employer."[170] That is exactly what Arbitrator Holden did in this case after determining that RWU had violated the CBA. The Award essentially invalidates Moskowitz's evaluation and tenure process that took place during the 2005-2006 academic year and the University's decision to deny him tenure and terminate his employment. Under the circumstances, it is not unreasonable for Arbitrator Holden to require the University to redo the process in compliance with the CBA. Such a remedy is a logical, reasonable and expected result In fact, in similar circumstances, other arbitrators tend to devise the same remedy.

In Alfieri, *Supra*, Arbitrator Altman fashioned an almost identical remedy after determining that RWU had violated the CBA by failing to comply with the post-tenure review process under the CBA. More specifically, RWU had failed to involve the FRC in the process.

---

166 Joint Ex. 4 (CBA), attached to Declaration as Exhibit A, Article X.B. at 44-45.

167 Safeway Stores, Inc. 64 L.A. 563, 570 (Gould 1974); Trailways Commuter Transit, Inc., 92 L.A. 503, 508 (Marcus 1989).

168 Safeway Stores, Inc., 64 L.A. at 571; Trailways Commuter Transit, Inc. 92 L.A. at 508.

169 Id.

170 Maple Heights Bd. of Education, 115 L.A. at 177.

As a result, the University was ordered to immediately "… restore the grievant to his former position as a tenured full professor and make him whole for all lost wages and other benefits, minus any interim earnings."[171] The remedy further provided that the University was to re-evaluate the grievant pursuant to the CBA during the 2008-2009 academic year.[172]

In Jefferson-Lewis-Hamilton Board,[173] the arbitrator determined that the employer had violated the evaluation procedure under the existing labor agreement. Consequently, the arbitrator held that "… **a proper remedy for the procedural violation would be to direct reinstatement for another year without tenure and evaluation in accordance with the contract**."[174] In other words, as with Moskowitz and Alfieri, that arbitrator also fashioned a remedy that required the employer to redo the tenure evaluation in compliance with the contracts. Therefore, in each of these cases, the grievants were afforded an additional year of employment to perform.

The University asserts that this remedy affords to Moskowitz an unfair advantage by allowing him an additional two years (the previously completed terminal year plus the newly ordered additional year) to complete the contractual requirements for tenure. The University further claims that all tenure decisions must be based upon a faculty member's first six years of employment at RWU and that there is nothing within the CBA which permits faculty members to include any work performed beyond a sixth year. However, although tenure reviews are generally conducted within the sixth year of a faculty member's employment at RWU, the CBA provides for opportunities to extend the six years.

171 Alfieri at 1 and 67.

172 Id. It should be noted that **RWU did not seek to vacate this award and immediately implemented its remedy**.

173 101 L.A. 856 (Liebowitz 1993)

174 Id. at 860. (Emphasis added).

More specifically, Article VIII.B.1.f of the CBA provides for probationary faculty members to delay his/her probationary period and tenure decision for one or more years.[175] Under Article VIII.B.1.f, "[a] probationary faculty member who takes a leave of more than one semester during the probationary period **shall have his/her tenure decision delayed one year**. **For each additional leave** of more than one semester taken during the probationary period, the **tenure decision will be delayed one additional year**."[176] Article VIII.B.1.f further provides that "[a] probationary faculty member who takes a leave of one semester or less (but more than thirty-five (35) consecutive weekdays during which the University has scheduled classes or final exams) since their initial appointment or last comprehensive evaluation, whichever is most recent, has the choice to be evaluated on schedule … **or to delay their evaluation one year and therefore extend their probationary period one year**."[177]

Article VIII.B.3.g provides yet another opportunity to extend a faculty member's probationary period. "**In the event of an emergency, evaluation timelines** set fort herein regarding completion and communication of evaluation reports to evaluees **may be extended with the consent of the RWU FA** which shall not be unreasonably withheld."[178] Although the University would disagree, the fact that it violated Moskowitz's contractual rights and acted arbitrarily and capriciously in its tenure review process could certainly constitute an emergency in his eyes.

Therefore, the CBA provides multiple opportunities for probationary faculty members to extend their probationary period (and evaluation timeframes) under different circumstances. In such cases, nothing contained within the CBA prohibits those members from including any

175 Joint Ex. 4 (CBA), attached to Declaration as Exhibit A at 27-28. (Emphasis added).
176 Id. (Emphasis added).
177 Id. at 28. (Emphasis added).
178 Id. at 37. (Emphasis added).

professional experience and/or accomplishments as part of the evaluation and tenure process. Contrary to the University's assertions, the remedy in this case does not create an unfair advantage for Moskowitz that is not available to other faculty members in different circumstances under the CBA. Nothing contained within the Award in any way contradicts or violates any of the expressed language of the CBA.

### 3. <u>The Remedy Contained In The Award Is The Only Reasonable And Equitable Remedy In This Case.</u>

Arbitrator Holden determined that RWU had violated the terms of the CBA. When a breach of contract occurs, generally, an appropriate remedy is one that places the parties back in the same position had a breach not occurred. Arbitrator Holden imposed the only logical, reasonable and equitable remedy that was available to him under the CBA. If the CBA did not provide the arbitrator the authority to require the University to redo the sixth year evaluation, the entire contractual evaluation and tenure process would be undermined and rendered meaningless. Stated another way, the University could embark upon a course of conduct that totally disregarded its obligations and the faculty members' rights under the CBA and not be held accountable.

An extreme illustration of this fact is that the University could substantively and procedurally violate the entire evaluation and tenure process throughout a faculty member's six probationary years and, if an arbitrator found it guilty of such violations, there would be no appropriate remedy to hold the University accountable and/or to make the faculty member whole. If the arbitrator was prohibited from requiring the University to correct the substantive and/or procedural violations and redo the evaluation process, a successful grievant would still be left with no viable remedy. Moreover, there would be no way to neutralize the taint and/or

prejudice that had resulted from the University's violation of the CBA. Such a result would be illogical and inconsistent with the intentions of the parties and the contractual language.

As with the other facets of the Award, Arbitrator Holden did not grasp the remedy out of thin air. Once again, the remedy is consistent with the contractual language and his wide discretion in labor disputes. At the very least, the remedy draws its essence from the CBA and is a viable exercise of the Arbitrator's authority thereunder. Even if this Court would have fashioned a different remedy or one that is believed to be better, that would not justify vacating the Award. Similarly, if this Court believes that the Arbitrator committed serious error and/or misinterpreted the CBA language, the Award should still be confirmed as a matter of law. As previously noted, the remedy is also consistent with those imposed by arbitrators in other similar labor disputes.

The other remedy options offered by the University would not be practicable and/or would not be as appropriate as the actual remedy in this case. If Arbitrator Holden had simply remanded the matter to Nirschel for him to announce his tenure decision, that decision would be flawed and biased. It would be impossible for him to render a fair and objective decision at this point in time.

Likewise, simply ignoring Arbitrator Holden's findings that the University acted arbitrarily and capriciously in violating the terms of the CBA and remanding the matter to Arbitrator Holden for a decision on the remaining substantive issue of Moskowitz's scholarship, would not only be inequitable, but would further violate the CBA. If Arbitrator Holden was required to turn a blind eye toward the University's contractual violations, he would essentially be altering and subtracting from the terms of the CBA. To do so, would be a blatant disregard for the contractual terms and a violation of the CBA.

The University's contention that Arbitrator Holden's failed to make a decision on Moskowitz's scholarship was due to his inability to do so on the record before him is entirely erroneous and speculative at best. The fact that Arbitrator Holden determined that the University had acted arbitrarily and capriciously in violating the CBA based upon its procedural deficiencies, eliminated the necessity for him to make additional determinations on the substantive issue of scholarship. Arbitrator Holden expressly recognized that "[t]he focus of this case centered on the issue of whether or not the grievant satisfied the criterion of scholarship in its case for tenure."[179] He had already dismissed the other evaluation criteria as having been satisfied by Moskowitz. The one remaining substantive issue of Moskowitz's scholarship was purposely left unresolved and preempted by the University's arbitrary and capricious violations of the contractual evaluation and tenure process. Of course, if Arbitrator Holden had concluded that Moskowitz had met all of the evaluation criteria for tenure and awarded tenure to Moskowitz, the University undoubtedly would be arguing that he exceeded his authority under the CBA, and ironically, contend that only the President and/or the Board of Trustees has the authority to grant tenure.

## VI. CONCLUSION

For those reasons set forth above the Award should be confirmed as a matter of law.

---

179 Award at 21.

Respectfully Submitted,

ROGER WILLIAMS UNIVERSITY
FACULTY ASSOCIATION (NEARI/NEA)

By its Attorney,

/s/ John E. DeCubellis, Jr.
John E. DeCubellis, Jr., Esq. (RI Bar No. 3327)
General Counsel
NEARI
99 Bald Hill Road
Cranston, Rhode Island 02920
(401) 463-9630

Dated: April 30, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including counsel for Plaintiff/Counterclaim Defendant, Joseph P. McConnell, Esq., MORGAN, BROWN & JOY, on this 30th day of April, 2008.

/s/ John E. DeCubellis, Jr.
John E. DeCubellis, Jr.