# AMERICAN ARBITRATION ASSOCIATION

## VOLUNTARY LABOR TRIBUNAL

Case No: 11-390-00973-06

---

**In the Matter of Arbitration Between:**

ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION

&

ROGER WILLIAMS UNIVERSITY

---

## AWARD OF THE ARBITRATOR

The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered by the above named parties and having been duly sworn and having duly heard the proofs and allegations of the parties AWARDS as follows:

For the reasons set forth in the attached Decision, the University violated the Agreement in its re-evaluation of Professor Alfieri in December 2005/January 2006, thereby allowing the University to terminate his employment on January 4, 2006 (effective June 30, 2006). The grievance is allowed.

As a remedy, the University shall forthwith restore the grievant to his former position as a tenured full professor and make him whole for all lost wages and other benefits, minus any interim earnings.

The University shall have the option of re-evaluating the grievant pursuant to Article VIII(B)(1)(d) during the 2008-09 academic year, such re-evaluation to be based on a new self-study that the grievant prepares during the intervening period.

September 4, 2007
Boston, Massachusetts

Gary D. Altman

**AMERICAN ARBITRATION ASSOCIATION**
**Voluntary Labor Tribunal**
Case No: 11-390-00973-06

**In the Matter of Arbitration Between:**

ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION

&

ROGER WILLIAMS UNIVERSITY

## INTRODUCTION

Roger Williams University ("University") and the Roger Williams University Faculty Association ("Union") are parties to a collective bargaining agreement ("Agreement"). Under the Agreement, grievances not resolved during the grievance procedure may be submitted to arbitration under the rules of the American Arbitration Association. The parties presented their case in arbitration before Gary D. Altman, Esq., on January 9, February 5, March 8 and March 9, 2007. The Union was represented by John E. DeCubellis, Jr., Esq. and the University by Nicholas DiGiovanni, Jr., Esq. and Christopher Neronha, Esq. Both parties submitted post-hearing briefs.

## ISSUE

The parties were unable to agree to an issue. The University proposed:

> Did the University act arbitrarily or capriciously in its negative re-evaluation of Professor Alfieri in December 2005/January 2006, thereby allowing the University to terminate his employment on January 4, 2006 (effective June 30, 2006)?
>
> If so, what shall be the contractually authorized remedy?

The Union's proposed issue was:

1. Whether the Interim Provost and Senior Vice President, Jeffrey B. Martin, lack actual authority to revoke Alfieri's tenure under the 04-08 CBA?

2. If so, what shall be the remedy?

3. Whether RWU violated the 04-08 CBA when it terminated Alfieri's employment without just cause?

4. If so, what shall be the remedy?

5. Whether RWU acted arbitrarily and capriciously by violating Alfieri's procedural due process rights and/or contractual rights with respect to the evaluation procedure?

6. If so, what shall be the remedy?

Ultimately the parties left it to the arbitrator to frame the issue. After considering the evidence and arguments of the parties, the following statement of the issue is appropriate:

> Did the University violate the Agreement in its re-evaluation of Professor Alfieri in December 2005/January 2006, thereby allowing the University to terminate his employment on January 4, 2006 (effective June 30, 2006)?
>
> If so, what shall be the remedy?

**RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT**

[Deleted language shown as ~~stricken~~. Inserted language shown in *italics*.]

**ARTICLE VIII**
**APPOINTMENT, EVALUATION, PROMOTION AND TENURE**

* * *

**B. Evaluation for Performance Assessment, Reappointment, Requests for Promotion and Tenure**
*[01-04 Agreement]*

Evaluations shall be conducted in accordance with this Article. The purposes of the evaluation system described herein are to help faculty members to improve their professional performance; to record a formal evaluation of how well an MBU has performed his/her duties; to provide for regular discussions about individual performance and improvement thereof…and to provide a basis for decisions as to re-appointment, promotion and tenure. Evaluations for re-appointment, promotion and/or tenure are a cumulative process.…

*[2004-08 Agreement]*

Evaluations shall be conducted in accordance with this Article. The purposes of the evaluation system described herein are to help faculty members to improve their professional performance; to record a formal evaluation of how well an MBU has performed his/her duties; to provide for regular discussions about individual performance and improvement thereof… and to provide a basis for decisions as to re-appointment, promotion and tenure. The University and its faculty members regularly conduct ongoing evaluations (such as student core surveys) to enhance the learning experience of students and faculty members. Comprehensive evaluations for reappointment, promotion, tenure and post-tenure review are conducted at stipulated times according to this Article. Evaluations for re-appointment, promotion and/or tenure are a cumulative process.…

1. **Frequency of Comprehensive Evaluations**

* * *

c. **Tenured Faculty Members**

*[2001-04 and 2004-08 Agreements]*

After the faculty member has received tenure, a comprehensive evaluation will be conducted every fifth year….

d. **Re-Evaluation of Tenured Faculty Members**

If the evaluation of a tenured MBU is considered negative by RWU, the faculty member shall be re-evaluated in the fall semester of the second year following the year of the negative evaluation. … In the event of a negative evaluation, the faculty member will be given recommendations in writing corresponding to the specific areas in which improvement is necessary. By October 1 of the fall semester of the second year following the year of the negative

evaluation, the faculty member must submit his/her self-study report in the form required by Article VIII.B.3 to his/her respective dean. The re-evaluation will be comprehensive. … The respective dean shall review the faculty member's submission and prepare a report which will be forwarded to the faculty member and the Chief Academic officer by November 1. By November 10, the faculty member may prepare his/her response to the dean's report and forward the same to the Chief Academic Officer. The Chief Academic Officer will have until December 1 to notify the faculty member of the results of the comprehensive evaluation. If the comprehensive re-evaluation results in a negative conclusion, then the faculty member may be terminated for performance evaluation as described in Article IX.B.

2. **Evaluation Criteria**

*[2001-04 Agreement]*

… Excellence in teaching is the primary criterion for awarding reappointment, promotion and tenure. Although the University is committed to effective teaching first and foremost, other criteria also enter into the evaluation process. These may include, but are not limited to, academic advisement and program development, scholarly and/or creative activities, and institutional and/or community service. …

Based on the material provided by faculty members, colleagues and students as well as some classroom visits by the appropriate deans … the dean of the appropriate school or college shall prepare a written evaluation… which shall generally assess the faculty member's effectiveness in the following categories:

1. Teaching;
2. Academic advising and program development;
3. Scholarly, professional and/or creative activities; and
4. Institutional and/or community service.

*[2004-08 Agreement]*

… Documented excellence in teaching is the primary criterion for awarding reappointment, promotion and tenure. Scholarship as needed to inform teaching, meet accreditation requirements or advance one's discipline is also an important criterion. RWU recognizes the multiple forms of scholarship as articulated by Ernest Boyer in *Scholarship*

*Reconsidered…*and by Charles Glassick et al. in *Scholarship Assessed…* . ~~Although the University is committed to effective teaching first and foremost,~~ Other criteria also enter into the evaluation process. These may include, but are not limited to, academic advisement and program development, scholarly and/or creative activities, and institutional and/or community service directly related to the Mission of the University.

Roger Williams University is a student-centered teaching institution. Accordingly, the primary responsibility of faculty is teaching and primary evaluation requirement is effectiveness in teaching. While all faculty are expected to maintain a program of professional development and scholarly and creative activities (especially as they inform and enrich teaching), a publish or perish atmosphere is not intended. Therefore, the current evaluative criteria on scholarship, professional and/or creative activities, as set forth herein may be satisfied in a variety of ways….

Further, RWU endorses a broad view of faculty scholarship. Evidence of scholarship includes, but is not limited to, books, articles in scholarly journals, articles and periodicals for general audiences, reviews, conference presentations, speaking engagements…. External expert validation of the scholarly merit of these various activities is required. …

~~Based on the material provided by faculty members, colleagues and students as well as some classroom visits by the appropriate deans…the dean of the appropriate school or college shall prepare a written evaluation…which may vary in form and which shall generally assess the faculty member's effectiveness in the following categories:~~

To prepare for a comprehensive evaluation, a faculty member must prepare a Comprehensive Self-Study that addresses the faculty member's effectiveness in the following four categories:

1. Teaching;
2. Academic advising and program development;

3. Scholarly, professional and/or creative activities; and
4. Institutional and/or community service.

…Specific guidelines for the content of the self-study are found in Appendix G.

**(b) Probationary and Tenured Teaching Faculty**

*[2001-04 Agreement]*

…With respect to tenured faculty members, at the faculty member's request, the appropriate dean and the faculty member shall meet and discuss the criteria which will be utilized during the evaluative process in the academic year preceding the evaluation year…The results of any meeting under this paragraph shall be reduced to writing and provided to the faculty member within fifteen (15) working days.

*[2004-08 Agreement:]*

…With respect to tenured faculty members, ~~at the faculty member's request,~~ the appropriate dean and the faculty member shall meet and discuss the criteria which will be utilized during the evaluative process in the academic year preceding the evaluation year…The results of any meeting under this paragraph shall be reduced to writing and provided to the faculty member within fifteen (15) working days.

*[2001-04 and 2004-08 Agreements:]*

Effectiveness in Teaching

1) Current knowledge of subject matter and the ability to organize and present it effectively.
2) Coherent syllabi stating course objectives….
3) Effective assessment of classroom teaching….
4) Ability to stimulate the interest of students….

Effectiveness in Academic Advising and Program Development

1) Responsible and well-informed advisement of assigned advisees….
2) Contributions to curriculum planning and assessment….

Effectiveness in Scholarship, Professional and Creative Activities

1) Ongoing professional development, such as attendance at conferences….
3) Publications related to the discipline….
4) Other research, study or publications. …

Effectiveness in Institutional and Community Service
1) Service on departmental, college/school or University committees.
2) Participation in program review and assessment and development of curricula.…

Effectiveness in Teaching
1) Current knowledge of subject matter and the ability to organize and present it effectively.
2) Coherent syllabi stating course objectives….
3) Effective assessment of classroom teaching….
4) Ability to stimulate the interest of students….

Effectiveness in Academic Advising and Program Development
1) Responsible and well-informed advisement of assigned advisees….
2) Contributions to curriculum planning and assessment….

Effectiveness in Scholarship, Professional and Creative Activities
3) Ongoing professional development, such as attendance at conferences….
2) Research and/or advanced study related to the disciplines taught.
4) Publications related to the discipline….
5) Other research, study or publications. …

Effectiveness in Institutional and Community Service
1) Service on departmental, college/school or University committees.
2) Participation in program review and assessment and development of curricula.…

**3. Procedures, Peer Review and Timelines**
**(a) Self-Study Report**

*[2001-04 Agreement]*

All…faculty members with tenure who are being evaluated must submit to their respective dean by November 15 a self-evaluation containing the information set forth below:

1) A detailed written statement of teaching duties performed and courses delivered…together with copies of syllabi, assignments, examinations, and other teaching materials for each course. The

statement must also address method(s) of teaching; an assessment of course design, objectives and student performance; and the faculty member's goals for each course.

2) Copies of all publications or other evidence of the faculty member's scholarly, professional and/or creative activities….
3) A description of non-teaching responsibilities…and assessment of these activities.
4) A description of professional development activities…and specific outcomes realized.
5) A description of professional development goals for the future.
6) A current curriculum vitae.…

*[2004-08 Agreement]*

~~All…faculty members with tenure who are being evaluated must submit to their respective dean by November 15 a self-evaluation containing the information set forth below:~~

~~1) A detailed written statement of teaching duties performed and courses delivered…together with copies of syllabi, assignments, examinations, and other teaching materials for each course. The statement must also address method(s) of teaching; an assessment of course design, objectives and student performance; and the faculty member's goals for each course.~~
~~2) Copies of all publications or other evidence of the faculty member's scholarly, professional and/or creative activities….~~
~~3) A description of non-teaching responsibilities…and assessment of these activities.~~
~~4) A description of professional development activities…and specific outcomes realized.~~
~~5) A description of professional development goals for the future.~~
~~6) A current curriculum vitae.…~~

As noted under Article VIII.B.2., faculty members are required to submit…a self-study by October 1st of the year of a scheduled comprehensive review….

*[New Provision in 2004-08 Agreement:]*

**(d) Peer Review by School/College Faculty Review Committees**

Each school/college of the University shall establish a Faculty Review Committee (FRC). …

Each FRC shall review faculty self-studies, and allied materials and support, submitted by the 6th year (or authorized equivalent) probationary faculty members (tenure decision), tenured faculty members (post-tenure review), and faculty members seeking promotion. …Upon completion of its review, the FRC shall forward a confidential report to the appropriate dean…and the evaluee with its recommendation regarding each decision/action at hand. The FRC report shall include the tally of the vote regarding the committee's recommendation along with the justification for the recommendation. … Committee and minority reports must be submitted by December 15.

If the faculty member under review has any comments…they must submit them in writing to the dean by January 5.

**ARTICLE IX**
**DUE PROCESS**

*[2001-04 and 2004-08 Agreements]*

A. No tenured MBU shall be dismissed without just cause. The termination of non-tenured MBUs shall not be arbitrary or capricious. Dismissal for purposes of this Agreement shall mean non-renewal of contract of a MBU or dismissal during the year of a MBU.

B. …Tenured MBUs who are terminated for performance (evaluation) as provided in Article VIII.B.1 d shall have the option of working a terminal spring semester (following the 3 semester post-negative review period) if the Chief Academic Officer is notified before December 15 of the academic year in which they are terminated.

**APPENDIX G**
**SELF-STUDY GUIDELINES**

* * *…

*[New Provision in 2004-08 Agreement]*

**SECTION I: INSTRUCTION**

1. Describe your educational philosophy as it applies across your teaching.
2. Provide a list of courses taught according to the following schedule:

a. Post-tenure faculty…should discuss four courses that the faculty member and the respective dean have agreed upon. …

3. Describe the goals and/or objectives for each course being considered, and, wherever possible, discuss how they relate to the goals and objectives of the academic program, the school/college, and the Mission of the University.

4. Describe the following components for each course providing a rationale for each in terms of the objectives of the course:

a. organization of the course
b. method of delivery
c. assignments/activities
d. examinations or other assessment tools

5. Describe student performance in each course and assess the performance in terms of the goals and objectives of the course. This should include but not be limited o an analysis of the student course surveys. Whenever possible, provide additional evidence that these goals and objectives have been met.

**SECTION II: ACADEMIC ADVISING AND PROGRAM DEVELOPMENT**

1. Describe your approach to academic advising and analyze its effectiveness.
2. Describe your activities in program development and assess your contributions.

**SECTION III: SCHOLARSHIP AND PROFESSIONAL DEVELOPMENT**

1. List publications and conference presentations documenting your research grant or academic fundraising activities (applications, awards, maintenance) and/or creative activities since the last self-study and indicate how these activities have enhanced your teaching and other work at RWU. …
3. Describe other professional development activities undertaken since the last self-study and indicate how those activities have enhanced your teaching and other work at RWU.
4. Provide a statement of your research interests and agenda. …

**SECTION V: GOALS**

1. List the professional goals you set out in the last self-study.
2. Describe the extent to which you have met those goals.

3. Describe how you have met the recommendations/concerns outlined by the Dean and Chief Academic Officer in your last comprehensive review.
4. Describe your short and long term professional goals for the future.

**SECTION VI: SUPPORTING MATERIAL**

1. Provide a copy of the syllabus of each course being considered.
2. Provide copies of relevant materials that you prepared for use in your courses (representative samples of assignments, examinations, etc.)
3. Provide a current copy of your curriculum vita.
4. Provide copies of research material, professional publications, grant material, or documentation of creative activities produced since your last evaluation. Include evidence of peer review.
5. Provide copies of data summaries of student course surveys for courses taught during the last year.
6. Provide copies of the comprehensive reviews by the Dean and Chief Academic Officer:…For Post Tenure…: the most recent review.
7. Include any other materials the support your self-study.

**FACTS**

**A. The University Hires the Grievant**

The grievant, Professor Peter Alfieri, began his employment with the University) in 1999. Before joining the University, the grievant was a tenured assistant professor of languages at Salve Regina College. He also had many years of experience as a public high-school teacher.

The University hired the grievant for the purpose of creating and directing a semester-abroad program in Rome, with the understanding that, should his responsibilities there end, he would return to the University's campus in Bristol, Rhode Island as a tenured full professor. From 1999 until December, 2001, the grievant resided in Rome and

served as director of the Rome program. He created the program from scratch, made all travel arrangements for students and faculty, negotiated with the American Academy in Rome for access to its library, organized cultural tours and lectures with local scholars, and helped design projects for the architecture students. He also taught at least one course and advised about fifty students every semester.

The University discontinued the Rome program at the end of the fall 2001 semester. The grievant returned to Bristol and taught in the Department of Modern Languages until his termination at the end of the 2005-06 academic year. In general, the grievant was a well-liked teacher. In the student surveys, students consistently commended his enthusiasm, helpfulness, dedication and knowledge of the subject matter. On the other hand, just as many remarked that classroom discussions tended to become irrelevant, off-topic and disorganized. Quantitatively, the grievant's average scores on the two critical questions - 21, "Overall, this course is educationally valuable," and 22, "Overall, this professor is an effective teacher" - ranged from 2.59 to 3.64, on a scale of 0 to 4.

**B. <u>The Grievant's First Post-Tenure Evaluation</u>**

In the spring of 2002, during the grievant's first semester of teaching in Bristol, Professor Ruth Koelle, the Dean of the College of Arts and Sciences, told the grievant that he was due for his first post-tenure evaluation. The grievant had not been evaluated, formally or informally, while he was director of the Rome program, and he told Dean Koelle that it seemed premature for an evaluation since he had just returned from Italy. Koelle agreed to evaluate him during the fall of 2003 instead.

The grievant then asked Koelle if the evaluation would include his work in Rome. According to the grievant, Koelle responded that it would cover only his work at the Bristol campus. The grievant testified that he had misgivings about what he perceived as the unduly limited scope of the evaluation, but decided to go along with it because he did not want to make a bad impression on the dean. Koelle did not remember this exchange at all, but testified that she "[could] imagine having such a conversation."

Under both of the Agreements that were in effect during the events leading to this grievance (2001-04 and 2004-08), the central document for the evaluation of faculty is the "self-study." During the grievant's first evaluation, the Office of Academic Affairs supplied the following outline for the self-study:

**OUTLINE FOR FACULTY SELF-STUDY**

**Section I** (Refer to Items 1-6: Effectiveness of Teaching in the current Agreement)

Detailed written statement of:

a. teaching duties performed and courses delivered since the last evaluation;
b. course assignments for each course;
c. course examinations for each course;
d. other teaching material for each course;
e. method(s) of teaching and analysis of effectiveness;
f. assessment of
   i. course design
   ii. course objectives, and
   iii. student performance;
g. goals for each course taught and degree to which goals have been met; and
h. analysis of student evaluations for courses taught.

**Section II** (Refer to Items 1 and 2: Effectiveness in Academic Advising and Program Development in the current Agreement)

Detailed self-evaluation of:
a. effective academic advisement;
b. effective program development
c. analysis of effectiveness.

**Section III** Description and self-evaluation of all other non-teaching responsibilities demonstrating Effectiveness in Institutional and Community Service.

**Section IV** (Refer to items 1 and 2: Effectiveness in Scholarship, Professional and/or Creative Activities in the current Agreement)

Detailed statement addressing:
a. professional development activities undertaken;
b. specific outcomes realized; and
c. professional development goals stated in last evaluation.

**Section V**
Copies of all publications or other evidence of scholarly, professional and/or creative activities since last evaluation.

**Section VI**
Current Curriculum Vitae

**Section VII**
Other information pertinent to performance including address of strengths and weaknesses cited in previous evaluations(s).

**Section VIII**
Statement citing:
a. goals stated in previous evaluation;
b. the degree to which those goals have been met; and
c. a statement of future goals relating to:
    i. effectiveness in teaching;
    ii. effectiveness in academic advising;
    iii. effectiveness in program development;
    iv. effectiveness in scholarship, professional and/or creative activities;
    v. effectiveness in other areas of

responsibility;
vi. Effectiveness in institutional and/or community service.

For each of the forty or so faculty who were due for evaluation that semester, Koelle's office prepared and distributed a three-ring binder containing the above outline, tabs for each section, and a document entitled "Notes for Discussion on Post-Tenured Faculty Self-Study," which was a detailed commentary by Koelle concerning her expectations for each section. For example, the "Notes for Discussion" stated:

> **Section I**
> …This assessment is based on the structure you have created for each of your courses. Your course design should be based on the learning objectives you set for each of the courses you are evaluating.
>
> Your assessment might talk about the following points:
> - The level of skills that your students had when they began the course
> - The skills that you expected them to master during the course
> - Methods you have used to evaluate their progress toward meeting your objectives. …
>
> **Section VIII**
> ...What are your professional goals, and how do you plan to work on them in the five years until your next evaluation? …
>
> Remember that the Dean will look at this part of your self-study during your next evaluation. It should be expected that at that time, the Dean would evaluate your progress on the goals you set for yourself now. …

The grievant found the evaluation process unexpectedly complex. He testified that he had undergone a review before attaining tenure at Salve Regina, but it was quite uncomplicated; his submission there consisted of a two- or

three- page questionnaire. He testified that he received no guidance from anyone in preparing his self-study except one of his colleagues, Professor Shieber, who told him simply to follow the outline in the three-ring binder.[1] The grievant also testified that he never saw the 2001-04 Agreement and was not really aware of its existence.

During this period, the grievant was having some extremely grave personal problems. He was in the midst of a contentious divorce. In the spring and summer of 2003, both of his teen-age daughters were victims of criminal assaults. As a result, the grievant was enmeshed in various legal proceedings during all of his employment with the University. Koelle was generally aware of these difficulties.

The grievant submitted his self-study by its due date of November 15, 2003. It is a forty-three-page document (five of the pages are blank) consisting of text written by the grievant in response to the outline;[2] a two-page essay entitled "The Generation of 1898"; four tests (one for Spanish 101, one for Spanish 350 and two for unidentified Spanish classes); final exams for Spanish 201 and "The Generation of '98"; and a *curriculum vitae*. The following is a representative sample of the text:

> **SECTION I**
> a. Teaching duties performed and courses delivered…
> b. Spanish 101 - This course is the first of a two-course sequence in the elements of language and

---

[1] Professor Tony Hollingsworth, the department coordinator at the time, disputing this, testifying that he advised the grievant on writing and organizing his self-study and supplied him with sample materials.

[2] At one point, the grievant testified that he did not recall ever seeing the "Outline for Faculty Self-Study," but it is evident that he used it.

culture and it focuses on the development of the five skills as mandated by the competency guidelines: *comprehension, speaking, reading, writing - and an appreciation of and understanding of the people and the culture of the Spanish-speaking world.*

c. I encourage students to be prepared for a quiz on the material(s) covered in the preceding class. The quiz could be on vocabulary, grammar or culture. …

d. I bring supplementary material related to the culture section that is found in each chapter: videotapes, photographs, DVDs and run-off material. I also discuss many culture-based situations based on my own personal experiences in those countries.

e. This type of course requires the use of lectures, reading out loud by students, the use of the language lab, the use of different internet sites, and written work….

e. Assessment of:

i. Course design: The course is designed for the Spanish studies novice and or those who have placed in it…. The major learning skills will be stimulated by means of an exposure to vocabulary skills, comprehension, Spanish speaking, reading and writing.

ii. Course objectives:

  a. Increase vocabulary and idioms to reflect standard language used by the educated native speaker of Latin America and Spain. …

  f. Course goals: the course objectives stated above give a general description of the course goals. I had to implement several changes as the course went along to accommodate some students.… I encouraged the ones who spoke well but wrote poorly to do more language lab work and come to see me for help…. I constantly make adjustments for each class because different students have different learning and testing styles.

[Sections on Spanish 201 and Spanish 350 followed, which were similar, if not identical, to the above section on Spanish 101.]

Spanish 340 "The Generation of '98"
…This course discusses the literary phenomenon that resulted in Spain as a result of their military defeat at the hands of the United States in the Spanish-American War of 1898.

a. This class is discussion-driven. … This class will have two major research papers, several quizzes, tests, a midterm, and a final exam. …

c. Assessment of:
   a. Course design: The course is designed for the Spanish student that has completed the required prerequisites and their success will be gauged by their oral discussion, quizzes, research papers, tests and exams.
   b. Course objectives:
      a. Increase vocabulary and idioms…

**SECTION II**

a. Effective academic advisement

…I view my role as a guide for the students that have not figured out which way they want to go with their education. I listen to what they like and dislike and, if they have not decided on a major, I make some suggestions based on what courses they said that they enjoyed. I make sure that the decision is theirs and theirs alone. …

I help students prepare for graduation by making sure that they have taken all the necessary courses…

b. Effective program development

I have worked and I continue to work with my colleagues to guide and improve my major. I have taken on courses that I had not previously taught and I have created new ones. … I have been working on the possibility of creating meetings for Spanish-speaking students in which some of the University's native Spanish-speaking students will attend and converse with other students. I hope to be able to do more in the near future by setting up gatherings with some Spanish movies, music, and other related subjects. I know that I could be of great help in increasing the visibility of my program if I were asked to participate more in the overseas programs, which happens to be an area that I have a great deal of

experience. To this day, however, I have been totally kept out by all the people involved in that program.

In the past I went to many national conferences related to my field and made several presentations. I will be attending the ACTFL [American Council for the Teaching of Foreign Languages] conference in… November, 2003

c. Analysis of effectiveness
Please refer to the above sections.

**SECTION III [Institutional and Community Service]**
Since my return to the US, I have been involved with several legal issues that have limited my time for other activities outside of caring for my two teen-age daughters and my university duties. I did many activities while in Rome that involved the community and the University through lectures and presentations. Since I am only discussing my activities in the US, I will not include any activity that preceded my return to the US.

**SECTION IV [Scholarship, Professional and/or Creative Activities]**

a. I am planning to return to the publication of some projects that I started before going to run the Rome program.
b. No comment related to this point [i.e., outcome of professional development activities] at this time.
c. This is my first evaluation.

**SECTION V [Copies of publications]**
I will include a copy of a translation to Italian that I did for John Hendrix while he worked with me in Italy. Professor Hendrix claims that the editor refused to include my name as the translator but he will upon request submit a letter testifying to the fact that the Italian version of the publication is indeed mine….

Koelle observed two of the grievant's classes in the fall of 2003. She never discussed them with the grievant and did not write them up until February, 2004. (She testified that she was habitually late at this task).

Another administrator, Dean Torell, did two additional observations in November 2003, but again did not write them up until the following January and February. Both Koelle's and Torell's impressions were generally positive, but Koelle also wrote that the grievant did not insist on full participation from all students. Torell found that in one class, too much English was spoken. Koelle also reviewed the grievant's student surveys from the fall of 2003. It is her practice to independently review only the most recent set of surveys, but she will also review any survey data that faculty choose to include in their self-studies.

On April 15, 2004, Dean Koelle issued her evaluation, which was negative. The following are excerpts:

> <u>Evaluation of effectiveness of teaching</u>
> This is difficult to do, given the limited information the Prof. Alfieri provided in his self-study. No syllabi were included, and the information that was included is not grouped according to course or according to type.
>
> For the most part, Prof. Alfieri's discussion of the courses are a discussion of the intent of the course and the skills that are to be gained, rather than a discussion of his personal approach to teaching those skills. …
>
> <u>Other teaching material for each course</u>
> …A few examples of hand-outs are provided. There is no information about the other materials. …
>
> <u>Assessment of course design, course objectives and students performance</u>
> …It is not clear that Prof. Alfieri used the catalog description to format his course. While some differences between an instructor's syllabus and the course description are expected, these seem too far removed, and the similar description for [Spanish] 101 and 201 is highly problematic. …
>
> …The references to the "five skills as mandated by the competency guidelines" stood out. Since I did not

know the competency guidelines to which Prof. Alfieri was referring, I began to investigate. Ultimately, a web search led to a course outline for a Fullerton State University course…. Unless Prof. Alfieri can provide additional information, I am led to conclude that plagiarism has occurred. …

Analysis of student evaluations for courses taught
Prof. Alfieri's student evaluations show that he is a popular instructor, and has an enthusiastic style in the classroom. Prof. Alfieri comes through in those evaluations as an instructor who connects with his students and appears ready to help them learn.

On the negative side, there are enough comments about his tendency to go off on tangents to make that an issue of concern. There are also a group of comments that indicate that he needs to put more structure into his teaching. …

Summary of strengths and concerns articulated in all classroom evaluation
…Prof. Alfieri's enthusiasm shows in his teaching. He has a pleasant style and interacts well with his students.

In the Intermediate Spanish class that I observed, there seemed to be a blend of English and Spanish that was acceptable.…

However, in the advanced Spanish course observed by Kurt Torell, Prof. Alfieri did most of the teaching in English, which is inappropriate at that level. …

Evaluation of academic advising
Prof. Alfieri's discussion of his methods of working with his advisees seems appropriate. He appears to give students the type of help that they need - working with them to understand the requirements of their majors and the wording of their catalog….

Evaluation of program development
…He does not state any particulars, other than taking on new teaching assignments, which involves more personal professional development than development of the department's program.

Evaluation of effectiveness in Institutional and/or Community Service
Prof. Alfieri has not listed any activities in this area. …

Evaluation of effectiveness in Scholarship, Professional and/or Creative Activities…
Prof. Alfieri has not stated any ongoing activities in this area. …

Summary of recommendations and justifications
Looking at both the form and content of the self-study…my evaluation is negative.

Regardless of the fact that this was Prof. Alfieri's first evaluation, his self-study was not suitable for a tenured professor.

His teaching appears enthusiastic and his relationship with students is admirable, but the structure of his teaching is weak. His analysis of his methods and his effectiveness is inadequate and troublesome…. The fact that he did not include his syllabi is symptomatic - the creation of and adherence to a course syllabus is one of the hallmarks of college teaching.…

…[H]e alludes to a translation that he did for Professor John Hendrix…and states that he will append a copy. No such copy has been appended.

Recommendations:
My recommendation for Prof. Alfieri is that he consider the contract and focus his activities on the role expected of a full-time professor at RWU.

In particular:
1. Create…effective syllabi for the courses that he is assigned.

2. Adhere to the class syllabi he creates….

3. When writing syllabi or designing courses, be sure to consider the catalog description of the courses….

4. Establish…guidelines for the appropriate ratio of work in the target language and in English for the

various levels of language instruction, and adhere to those guidelines.

5. Document more clearly the various supplementary materials that he uses for his classroom instruction. Arrange those materials in a logical fashion in the next evaluation.

6. While not changing the enthusiasm and style that students like, limit the number of "tangents" that distract students from the topic.

7. Participate more fully in departmental and College meetings and become involved in committee work at the Departmental and either the College or University level.

8. Become more visible in admissions activities: open houses, accepted student days, orientations.

9. Attend at least one professional conference per year.

10. Begin work on at least one publication/research project. Projects that involve senior language students would be particularly appropriate.

Having reviewed the appropriate documentation, I do not recommend the continued tenure of Professor Peter Alfieri.

Dean Koelle testified concerning the areas of the grievant's self-study that she found most troubling. The absence of syllabi was a grave omission, because a properly structured syllabus tells the students where the course is headed, the works they will studying, and how they will be graded. For the faculty member, the syllabus provides an opportunity to consider the goals and objectives of the course to that they can determined whether the students have attained them.

Koelle was also disturbed by what she perceived as a lack of self-analysis. In her view, the grievant did not address his teaching methods but simply described the course material. His reference to "competency guidelines" took her aback because the University had no such guidelines. She testified that she consulted Prof. Hollingsworth about this, and he did a Google search and came up with the course outline from Fullerton College, which Koelle concluded the grievant had used without attribution.[3]

Koelle further found that the grievant's treatment of the student evaluations was "vague," and that he described no initiatives in program development, no activities in institutional or community service, and no scholarship. In sum, Koelle testified, "There just wasn't enough there... and I didn't think what was there had been appropriately analyzed."

Koelle's negative evaluation surprised and dismayed the grievant. He had never received any complaints about any aspect of his performance from students, faculty or administrators. He had forwarded copies of his syllabi to Hollingsworth and to the dean's office and never received any complaints about them either. Nevertheless, the grievant opted not to file a written response to Dean Koelle's evaluation. He did discuss it with her briefly, and recalled that she particularly emphasized the absence of syllabi. The grievant also discussed the evaluation with Union President James Tackach and some other colleagues. The grievant testified that these individuals

---

[3] The grievant absolutely denied any knowledge of the Fullerton College outline. He testified that he drew the competency guidelines from some ACTFL materials.

told him that the negative evaluation wasn't a serious problem, and that while theoretically a second negative evaluation could lead to termination, in practice that usually didn't happen.[4]

On May 25, 2004, Provost Edward J. Kavanagh sent the grievant the following letter:[5]

> I regret to inform you that, after a review of your self-study and your dean's post-tenure evaluation report, I am making a negative finding in your request for continued tenure.
>
> …By October 1, 2005, you must submit a new self-study that documents your progress. I agree with and specifically refer you to the ten recommendations that Dean Koelle has made to you in her report.
>
> Your dean and your colleagues will be valuable resources for you in the coming year. Let me encourage you to build on your strengths, such as your relationships with students, by addressing concerns that have been identified in a thoughtful and determined manner.…

C. **Negotiation of the 2004-08 Agreement**

Between the grievant's evaluation in 2003-04 and his re-evaluation in 2005, the parties negotiated a new collective bargaining agreement. Some background to these negotiations is helpful.

---

[4] The grievant also mentioned the negative evaluation to Prof. Hollingsworth. According to Hollingsworth, the grievant was "nonchalant" and stated that it was "no big deal." Hollingsworth testified that he urged the grievant to take the matter more seriously and offered him various kinds of help and advice. The grievant denied all of this, and testified that Hollingsworth only advised him that the dean wanted him to publish more and attend more conferences.

[5] The grievant testified that he never saw this letter until he reviewed his personnel file in preparation for the arbitration. He freely conceded that it might have gotten mislaid in his house.

Before 1995, the University had no traditional academic ranks and no tenure system. Faculty were employed under annual contracts. During their first four years, faculty were considered probationary and evaluated annually; after the fourth year, they were considered permanent but continued to undergo periodic intensive reviews.

During negotiations for the 1995-98 Agreement, the parties agreed to the introduction of tenure and academic ranks. All full-time and part-time non-probationary faculty at the time (essentially, all faculty who had served more than four years) automatically received tenure. All current faculty who had either a terminal degree or fifteen years of continuous service automatically received the rank of full professor, and all other current non-probationary faculty received the rank of associate professor.

In general, the new probationary period for tenure-track appointments was six years, with tenure review in the sixth year. Probationary faculty would be regularly evaluated, and would continue to be evaluated even after receiving tenure, although at longer intervals (five years).

During their negotiations for the 2004-08 Agreement, the parties spent considerable time re-examining the contractual evaluation procedures. Ultimately they agreed to new guidelines for the self-study, set forth in Appendix G; new language concerning scholarship; a new Faculty Review Committee (FRC); and certain other changes.

In August of 2005, at the request of the Union, all the University's deans held workshops on the new contractual guidelines for the self-study. About forty faculty in the College of Arts and Sciences were due to prepare a self-study that year, including the grievant. Dean Koelle held her workshop on August 17. Once again, she prepared three-ring binders, this time containing a copy of Appendix G and a document entitled "Summary of Accomplishments," which the dean herself authored:

**Summary of Accomplishments**

*NOTE: Please answer the questions below in sentence form, using no more than two pages, and describing only those activities that took place during the period of your evaluation. Please make this document the first pages of your self-study.*

1. **Teaching Effectiveness**
   A. What regularly scheduled courses did you teach?
   B. What independent studies…did you teach?...
   E. What were your student evaluation averages on Questions 21 and 22?
2. **Academic Advising and Program Development**
   A. How many students did you advise per semester?
   B. What new courses did you develop/co-develop?...
   C. What courses did you or you and other colleagues revise?
   D. What programs that reached the Curriculum Committee did you or your and other colleagues develop?
   E. What other significant pedagogical accomplishments should be noted?
3. **Scholarly, Professional and/or Creative Activities**
   A. What books that you authored or co-authored were published? …
   C. What conferences/events did you…attend to give invited papers/talks…?
4. **Institutional and/or Community Service**
   A. To what University committees did you belong?...

> B. To what College/Core committees did you belong?...

Koelle testified that she went over both Appendix G and the Summary of Accomplishments. She explained to the faculty that the Summary of Accomplishments should be a "really short summary…so that anyone reading the self-study would be able to see the high points." Koelle further testified that she made it clear to the faculty that they were expected to include in the self-study whatever materials were needed to "make the best case" for themselves.

The grievant attended Koelle's workshop. This time, he had seen and in fact voted on the 2004-08 Agreement. According to the grievant, Koelle did not refer to Appendix G at all in her presentation. The grievant came away from the workshop with the impression that the Summary of Accomplishments, not Appendix G, was the framework for the self-study. He recalled that the dean repeatedly emphasized that the self-study should be "brief."

**D. The Grievant's Post-Tenure Re-Evaluation**

The fall 2005 semester was extremely hectic for the grievant.[6] First, he was assigned an Italian course that he had not previously taught at the University. Second, he received a fifth "overload" course. Such courses are wholly voluntary and cannot be assigned over the faculty member's objection. The grievant sent an email to Koelle asking to be relieved of the fifth course so that he could

---

6 The grievant testified that he did some preliminary work on his self-study in August 2005, but didn't go into depth because he had filed a grievance in the spring of 2005 claiming that his 2003 evaluation was premature. The University had responded that the grievance was untimely. There was no further evidence about this grievance.

prepare his self-study, but in the end he did not feel that he could turn it down.[7] Finally, the grievant received additional advisees that semester because Prof. Hollingsworth was on sabbatical and Prof. Shieber left the University.

Some time during the fall, the grievant and Koelle agreed upon the four courses that would be the focus of his re-evaluation: Spanish for Business, *El siglo de oro* (The Golden Century), Intermediate Spanish 201 and Elementary Italian 101. On October 1, 2005, the grievant submitted his self-study.

As was foreshadowed earlier, the grievant made a critical error in preparing this second self-study. Instead of organizing it according to Appendix G, he used the "Summary of Accomplishments" as the template and simply responded to the questions in that document. (He did not, however, reproduce those questions in the self-study itself.) Moreover, he made those answers as brief as possible. He testified repeatedly that these were the instructions that he had received from Koelle and from other faculty members. Before submitting the self-study, the grievant asked Koelle to review a draft to make sure the format was correct. She testified that she declined to do so because if she did it for the grievant she would have to do it for everyone, and that would be extremely time-consuming. Furthermore, Koelle didn't think it was her responsibility and was reluctant to offer an off-hand preliminary judgment that might come back to haunt her.

---

[7] Instead of responding to the email, Koelle forwarded it to Professor Blackburn, the new chair of the language department, who also did not respond.

The grievant's second self-study was a thirty-eight page document, of which ten were the printed agenda for conference. There were a number of pages of text that t grievant wrote in response to the "Summary of Accomplishments." Additionally, the self-study containe

- a three-page essay entitled "*El siglo de oro*
- descriptions of Spanish for Business, Intermediate Spanish 201 and Italian 101;
- syllabi for Spanish 430, Spanish for Busines *El siglo de oro*, Spanish 201, and Italian 10
- an abstract for a presentation at the Robert Dombroski Italian Conference at the Universi of Connecticut (in Italian, not translated);
- the ten-page conference agenda; and
- the published Italian translation of the article by Professor John Hendrix, which the grievant cited, but did not provide, in his first self-study.

Pertinent extracts from the grievant's text, in the same order and format as in the original, are as follows:

**1. Teaching Effectiveness**

A. I have taught several courses in Spanish and one i Italian. …

B. I have taught several independent courses. Some have been in advanced Spanish…. I have done one Spanish Romanticism and I am including a syllabus for it. …

E. The average for 21 is 3.27
The average for 22 is 3.35

**Spanish for Business**

…We go over business-related terms and practices as used in the US and the Hispanic world. … This might entail writing letters to businesses to learn about some products, or setting up appointments to discuss partnerships, purchases and sales of the products from that particular company. …

Besides the text, *Exito Comercial*, we use internet sources…and I bring current issues of *Hispanic Business*, an American magazine….

The grievant's second self-study was a thirty-eight-page document, of which ten were the printed agenda for a conference. There were a number of pages of text that the grievant wrote in response to the "Summary of Accomplishments." Additionally, the self-study contained:

- a three-page essay entitled "*El siglo de oro*";
- descriptions of Spanish for Business, Intermediate Spanish 201 and Italian 101;
- syllabi for Spanish 430, Spanish for Business, *El siglo de oro*, Spanish 201, and Italian 101;
- an abstract for a presentation at the Robert Dombroski Italian Conference at the University of Connecticut (in Italian, not translated);
- the ten-page conference agenda; and
- the published Italian translation of the article by Professor John Hendrix, which the grievant cited, but did not provide, in his first self-study.

Pertinent extracts from the grievant's text, in the same order and format as in the original, are as follows:

**1. Teaching Effectiveness**
A. I have taught several courses in Spanish and one in Italian. …
B. I have taught several independent courses. Some have been in advanced Spanish…. I have done one Spanish Romanticism and I am including a syllabus for it. …
E. The average for 21 is 3.27
The average for 22 is 3.35

**Spanish for Business**
…We go over business-related terms and practices as used in the US and the Hispanic world. … This might entail writing letters to businesses to learn about some products, or setting up appointments to discuss partnerships, purchases and sales of the products from that particular company. …

Besides the text, *Exito Comercial*, we use internet sources…and I bring current issues of *Hispanic Business*, an American magazine….

One part of the class that is very gratifying is the development of mock businesses by the students. I divide them into groups and they have to create viable business entities. … We have had some very interesting approaches to businesses. I am enclosing two - one is called "Cinema mistica" and the other is called "Fusion." … [There were no such enclosures in the self-study.] …

**2. Academic Advising and Program Development**

…B. I have helped develop some advanced courses like the Generation of 98, *"El siglo de oro,"* Cervantes, History of Spain. …

4. History of Spain is a 300-level course intended to teach students about the historical events that created what we know as Spain. We begin from its humble and obscure beginnings right up to the present. This course should be followed by a course on the history of Spanish America.

C. I was not directly involved in the revisal of some pre-existing courses.

D. I did not have any direct input into any program that has reached the Curriculum Committee.

E. I am presently writing an Italian text that I hope will be used in our courses. I am trying to tailor it to our students in order to get better results.

**3. Scholarly, Professional and/or Creative Activities**

A. None at the present time, but I have translated a document for Professor John Hendrix from English to Italian. …

C. I have attended the conferences held by ACTFL…in November of 2003…[and in] November of 2004. Although I did not present any papers at those conferences, I participated in several very productive discussions. …

E. I have attended and made a presentation at the annual Robert Dombroski Italian Conference…. I made a presentation on the persisting problems in the Italian South. … The conference was peer reviewed. …

**4. Institutional and/or Community Service**

A. I belong to the Academic Standards Committee.

B. I do not belong to any College/Core committee. I have not been involved with any courses in Core, but I have notified my department chair that I would be willing to be involved with Core work, if the University would need me. …

> G. I have come for the last two summers for freshman orientation. … I was part of the Foreign Language Department placement testing for all freshmen. I helped administer the tests, helped correct them and then determined placement levels. …

Dean Koelle submitted her re-evaluation of the grievant on December 1, 2005, one month beyond the contractual deadline.[8] She had mistaken the due date and did not realize her error until it was too late. She asked Provost Jeffrey Martin to clear the delay with Union President Melvyn Topf and sent a note of apology to both the grievant and Topf.[9]

Koelle's re-evaluation was negative. The grievant's mistaken use of the "Summary of Accomplishments," rather than Appendix G, was a major factor. According to Koelle, of the 48 faculty members who submitted self-studies in the College of Arts and Sciences that fall, the grievant was the only one who made that mistake. Koelle decided to analyze the grievant's self-study by breaking down the information according to the Appendix G categories. She wrote, in pertinent part:

> One basic difficulty I encountered in reading the Self-Study is that it is not clear which version of the outline for a Self-Study Prof. Alfieri used when writing it. The numbering of the topics within sections does not follow the Self-Study outline in the 2004-2008 RWUFA Agreement. …
>
> **Section I: Instruction**
> …Prof. Alfieri did not describe his educational philosophy at all. …

[8] In the meantime, she observed two of the grievant's classes in the fall of 2005, but never wrote them up.

[9] Both Martin and Topf were witnesses, and neither disputed Koelle's account.

**4. Describe the following components for each course [organization, method of delivery, assignments/activities, examinations or other assessment tools] providing a rationale for each in terms of the objectives of the course.**

Prof. Alfieri does not analyze his courses in these terms. He provides mostly description, from which it is extremely difficult to draw conclusions on course organization or methods of delivery. …

**5. Describe student performance in each course and assess the performance in terms of the goals and objectives of the course.** …

Prof. Alfieri does not discuss these matters. His only statement regarding student performance is:

"The average for 21 is 3.27."
"The average for 22 is 3.35."

While this must refer to the averages of Question 21 and 22 in the Student Survey, there is no semester indicated for these numbers.

Prof. Alfieri's averages on Questions 21 and 22 in the Student Survey were as follows:

**Fall 2004**…

| | | |
|---|---|---|
| Average: | 3.15 | 3.15 |
| University Average: | 3.33 | 3.64 |
| Language Average: | 3.62 | 3.65 |

**Spring 2004**…

| | | |
|---|---|---|
| Average: | 3.27 | 3.35 |
| University Average: | 3.35 | 3.37 |

While the student evaluations were largely positive, in Spring 2005 there were several negative comments from students:

> He gets off topic a lot and I do not have a chance to learn in class.
>
> Off topic casual teach to bottom end of class so we don't learn as much. …

**Section II: Academic Advising and Program Development**

**1. Describe your approach to academic advising and analyze its effectiveness**

Prof. Alfieri has a brief description of his work with advisees. … Prof Alfieri has included no analysis of the effectiveness of his advising.

**2. Describe your activities in program development and assess your contributions**

Prof. Alfieri lists the courses that he has worked on in the Spanish program. Mostly, this is a description of the content of the courses, not the methods of teaching or goals/objectives for students. …

Prof. Alfieri concludes the section with a reference to an Italian text that he is presently writing. However, there is no description of his approach or his progress and no examples from that text are present anywhere in the Self-Study.

There is no assessment of his contributions to his department.

**Section III: Scholarship and Professional Development**

…[H]e describes a presentation that was made at the Annual Robert Dombroski Italian Conference at UConn in September 2005. He has included an abstract of the paper (in Italian - not translated) and a program from the conference. He has not included a copy of the presentation. Prof. Alfieri states that the conference was peer reviewed, but there is no indication of the process.

…Prof. Alfieri ends the section with the statement: "I am working on two projects that should bring some positive results…." There is no additional information about what the projects entail or Prof. Alfieri's progress. …

**3. Provide a statement of your research interests and agenda:**

There is no such statement in this section. …

**Section V: Goals…**

This section is not discussed.

**Section VI: Supporting Material**

1. **Provide a copy of the syllabus of each course being considered.**

...Analysis of the Syllabi:
The syllabi are not consistent. If each of them contained all of the portions that appear in one or the other, they would be much better. While the content of a syllabus is much more important than the form, the formatting of the syllabi is not consistent through a given document - as if it was cut and pasted from other syllabi with different formats. ...

2. **Provide copies of relevant materials that you prepared for use in your courses...**

Prof. Alfieri provided three packets of 4-5 pages of material from courses...there is no description of the role of these pages in their respective courses. ...

5. **Copies of data summaries of student course surveys for courses taught during the last year.**

Prof. Alfieri did not attach these. ...

6. **Provide copies of [the most recent review] by the Dean and Chief Academic Officer.** ...

Prof. Alfieri did not provide these reviews.

**Status of Dean's Recommendations from the Previous Self-Study**

...I have listed my original recommendations and my analysis as to whether or not I see evidence of improvement.

1. **Create effective syllabi...**
   I see some improvement in that the syllabi for the courses were included in the Self-Study. However, I do not see evidence that the syllabi are particularly effective. ...

2. **Establish...guidelines for the appropriate ratio of work in the target language and in English...**
   My classroom observations of Prof. Alfieri indicate that he made progress in this recommendation. The classes I observed were good; students seemed to be participating at high levels and there was an appropriate mix of discussion and drill. While Prof. Alfieri spoke largely in the target language, he seemed to recognize when

students were having difficulties and translated when necessary. …

3. **Document more clearly the various supplementary materials that he uses…**
This was not done. The papers were not labeled and they were not included in the narrative about the courses. The materials that Prof. Alfieri did include were not even collated with the syllabi….

4. **...[T]ry to limit the number of "tangents" that distract students from the topic.**
If Prof. Alfieri's classes follow the format that they did when I observed him, he has made significant steps in this direction. The classes had identifiable content and students seemed to be quite satisfied. Prof. Alfieri was asking questions which they were able to answer in the target language, the students were participating and seemed satisfied with the class and the instruction.
**participate in department and College meetings and become involved in committee work…**
Prof. Alfieri has made some progress here. He participated in the placement and orientation work of the language department and has been a participant this year (not last year) on the Academic Standards Committee since September 2005.

5. **Become more visible in admissions activities….**
…Prof. Alfieri has been working with his Department at these functions.

6. **Attend at least one professional conference per year.**
Prof Alfieri has met this criterion by attending the meetings of the ACTFL….

7. **Begin work on at least one publication/research project. …**
Prof. Alfieri appears to have increased his professional activity, but he did not present any evidence of a publication/research project. …

**Conclusions**
…Prof. Alfieri's use of a different format, the lack of required documentation, the lack of materials and

the complete lack of integration of the few materials that were provided into his discussions are disturbing. Prof. Alfieri has failed to do any assessment of his performance - either in addressing the recommendations from the previous Self-Study or setting any professional goals.

My conclusion, reading the Self-Study, is that Prof. Alfieri is not fully engaged in his position. …

…There is very little data about Prof. Alfieri's activities last year. The syllabi from last year's courses are not complete, there is virtually no evidence of handouts and examinations for those courses, there is no information about the internet sites that Prof. Alfieri also referenced in his syllabi. Prof. Alfieri did not participate in any College or University Committees last year. There is no evidence of any professional development activities other than attendance at a national conference.

The goal of the faculty Self-Study…[is] that faculty plan their courses, interact with students, assess the students' knowledge, and then assess the entire educational process…. The faculty members should also be involved in professional development activities and research that informs their teaching. They should also be involved in other activities that support the mission and goals of the University.

I find that there is very little evidence that Prof. Alfieri considers these activities to be part of his professional responsibility, or, if he does, that he does not consider that it is his responsibility to document them. …

I see progress in his syllabi, but this is tempered by the knowledge that the language department makes standardized syllabus templates available every semester in Excel. The classes that I observed were excellent, with appropriate handouts for the work covered. However, nothing similar to those handouts is present in the selection of course materials attached to the Self-Study. Prof. Alfieri has attended the Foreign Language professional meetings - but that is at a minimum expected of a college faculty member. He did make a presentation to a professional group -

> but there is no information about the group, the peer review process for presentations, and no translation of his work.
>
> The aspect of this Self-Study that is most unsettling to me is that it is not, in fact, a Self-Study. …
>
> …This second Self-Study gives no indication that my first analysis was incorrect. In fact, considering that Prof. Alfieri had the warning and the time to make the Self-Study cogent, there is even more evidence that Prof. Alfieri's performance as a full professor has serious deficiencies. For that reason, I find this Post-Tenure re-evaluation negative.

Koelle testified that she once again found the grievant's self-study entirely lacking in analysis. There was no discussion of his teaching philosophy, course organization or goals and objectives. Instead, she testified, the grievant merely described the content of the courses. Koelle found some improvement in the grievant's contributions to the University in that he had joined a committee, albeit recently. However, she discounted his special-topic courses as a contribution to program development because such courses are not the "bread-and-butter" offerings that are vetted by the curriculum committee and placed in the course catalog.[10]

The dean was particularly dismayed that the grievant did not address the ten recommendations she had made in 2003. Given the seriousness of the grievant's situation, she expected him to be "very motivated to convince me that either my initial judgment was incorrect or that…it was no longer accurate." Comparing the grievant's self-study

---

[10] However, Hollingsworth testified that special-topic courses do contribute to program development because they are "trial balloons" that can eventually make it into the catalog if they are popular.

against her ten recommendations, she found that there were still problems with his syllabi, complaints from students about his going off on tangents, minimal department work, and no research project or publication. As to the latter, Koelle conceded that the University did not require faculty to publish regularly, but testified that she nonetheless expected them to have "a research agenda that they are forwarding through their professional activities." Moreover, she testified, scholarship must be peer-reviewed, meaning that it has been reviewed by a panel of academics and approved for publication or presentation.

Finally, even aside from the grievant's use of the wrong outline, Koelle found the self study sloppy. The syllabi seemed "hastily thrown together"; course materials were not integrated into the discussion; there was no time period for the averages of the student surveys and no indication of the publication in which his translation of the Hendrix article appeared. In sum, Koelle concluded, the grievant "just wasn't performing at the level that's expected of a tenured full professor at the University."

Before submitting her re-evaluation, Koelle e-mailed a draft to Hollingsworth, who was on sabbatical in France. This was not her usual practice, but she testified that she wanted to make absolutely sure she was construing the grievant's self-study correctly and giving him the benefit of the doubt. Hollingsworth sent her a reply e-mail that essentially confirmed her opinions.

Dean Koelle did not submit her re-evaluation of the grievant to the newly negotiated Faculty Review Committee under Article VIII(B)(3)(d) of the Agreement. She testified that she did not believe that post-tenure re-evaluations were subject to FRC review. As she read the

Agreement, the FRC's report was due six weeks after the due date for the dean's own re-evaluation, and she reasoned that therefore any input by the FRC was impossible.

**E. The Grievant's Response to the Re-Evaluation**

The grievant was shocked at Koelle's re-evaluation. In his view, he had diligently followed the outline that the dean provided and complied with her instructions (as he understood them) to make the self-study brief. Because he thought the dean's primary concern was his syllabi, the grievant made a point of revising them to conform to the course descriptions in the catalog. Also in accordance with the dean's instructions, he again did not include any of his activities as director of the Rome program.

The grievant testified that he had written four or five chapters of his Italian textbook, but did not include any excerpts in the self-study because the book was not a finished product. He did not include the full text of the paper he presented at the Dombroski conference because it was merely an oral presentation, not a "polished product," and one of his colleagues had told him that the abstract would be sufficient. He testified that he had done some presentations in Italy in the spring of 2006, but had not mentioned them in the self-study because his proposals had not yet been accepted.

On December 12, 2005, the grievant submitted a lengthy, detailed response to the dean's re-evaluation to Provost Martin. In this document, the grievant repeatedly stated that the dean had evaluated him based on criteria he had never received (i.e., Appendix G):

> …[Dean Koelle] said that [the outline for the Self-Study] had been streamlined and that we should not be giving too many samples of our tests and handouts…as per her instructions, I tried to be as brief and

concise as possible. Now she is trying to say that I was too brief….

I was told after the last evaluation that my syllabi deviated from…the college [catalog]. Since that time I have followed the course description in the [catalog]. I have not elaborated on them greatly because the other department members have similar syllabi. …

…Section 1 in my [self-study] went straight to Teaching Effectiveness. There are five sections from A through E. I answered those questions without too much elaboration since I had heard that we should not overdo it….

…I have pointed out that some students feel that teaching culture is "off topic." Our courses, however, are language and culture courses. …

…I did not include an analysis of my advising because none was required. I have been a good and effective advisor and I have improved every semester in spite of the fact that I had little or no guidance from my supervisors. …

…I did not talk about contributions to my department because the…questions did not ask so directly. The Italian text had been a project that I was working on for a while. … I have used some of the material in my class…

…I do not understand what the problem is concerning my participation in the Dombroski conference. I would not have been able to participate unless I submitted a relevant abstract after their invitation. They accepted my proposal. Does that not mean that it was peer-reviewed right from the beginning? …

My [binder] had only four sections in it. I did not [respond to Section V: Goals] because they were not in my [binder]. …

This syllabus [Spanish for Business] does have goals and objectives. It says "This course will introduce students to the Hispanic world of business and finance. The intent is to develop a better knowledge

> of the cultural and linguistic differences that shape the Hispanic world."…
>
> …Dean Koelle received a complete copy of the three-page syllabus [of Spanish for Business] and she has somehow misread it. …
>
> …I have been involved in all departmental activities from the very beginning. … I was a candidate for the senate, but was not elected. I was a candidate for the Faculty Review Committee and I was not elected. I volunteered to fill in for Professor Hollingsworth during his sabbatical and I was ignored.
>
> …[S]ince my involvement with the Rome Program for RWU, I have returned to a difficult atmosphere. I have had to fend for myself in every possible way, while undergoing very serious family problems of which Dean Koelle is aware. …

After consulting with counsel, Provost Martin asked Koelle for a written response to the grievant's response. This was unusual, but Martin testified that the grievant's response was so copious that he wanted the dean's reaction. On December 19, 2005, Koelle wrote a memo to Martin, without providing a copy to the grievant:

> …Given that the contract was clear that his job was on the line in this re-evaluation, and that he had time during all of last year to put things in order, there is no excuse for all of the apparent misunderstandings he had with the documentation. …
>
> None of the other faculty had any difficulty in understanding that they were to do the self-study and then append the summary to the front of it. None of them did only the summary.…

Koelle quoted at length from Hollingsworth's e-mail, which included a number remarks critical of the grievant, including references to "a handful of written complaints from students" about him.

**F. The Grievant's Termination**

At the time he reviewed the grievant's self-study, Provost Martin had taken part in eighty to ninety evaluations. Seven of these were negative, and Martin testified that the grievant's was the "most drastic." Martin described the grievant's second self-study as "a mess." In his opinion, it was actually worse than the first self-study. Martin testified that the grievant showed "little insight into teaching process, into teaching philosophy, into assessment, into outcome." He found the syllabi incomplete and unimpressive, the class materials "spotty," the grievant's contributions to the University "minimal at best," and "virtually nothing" in terms of scholarship.[11]

On January 4, 2006, Martin sent the grievant the following letter:

> … Your 2003 Self-Study was markedly inadequate, but even so the slim contents of the self-study indicated weaknesses in teaching, contributions to the University and in your scholarly program and achievement. … Although you were given adequate guidance about the deficiencies in the first self-study and about the requirements for the second, your current self-study is, unfortunately, an opportunity missed.
>
> On the evidence of the 2005 self-study there continue to be serious deficiencies in your performance as a teacher. While the dean notes progress in class delivery and written material she also raises serious concerns. The course material does not demonstrate serious and sustained attention to either the working documents nor to your role as a reflective practitioner. The lack of direction and detail in

[11] Martin testified that he did not consider Hollingsworth's comments at all, because they were not part of the dean's re-evaluation.

> your syllabi and course materials appear to continue to be reflected the classes that can lack focus. The dean notes the lack of complete syllabi and other course materials as well as the lack of evidence of reflection on learning outcomes and your success in achieving them. In the area of advising there is a similar lack of information or reflection.
>
> In the area of contribution to the University you have made some progress in assisting with orientation and language placement. But this is minimal engagement and beyond this there is little evidence of contribution to curriculum development within your department or committee work either in your department or outside of it....
>
> In the areas of scholarship there has also been some progress. … Unfortunately you do not provide the material involved for any kind of assessment. Similarly, while you may be engaged in writing a Spanish [sic] textbook, you provide no example of the work nor have you share it with your colleagues. …
>
> Your self study contains little external validation of your contributions in any of the above areas. Nor do you take the opportunity to describe the development and delivery of your courses, your contributions to the institution, or your scholarly activities. You have not taken the time to make a case for yourself in a manner that will demonstrate expertise and commitment in any of these areas. …
>
> …Therefore, I regret to inform you that your tenure will be revoked as stipulated in the RWUFA faculty contract (VIII.B.1.d.) and your employment will be terminated immediately. Under the terms of the contract, however, you have the option of working a terminal spring semester…

**POSITIONS OF THE PARTIES**

Summary of the University's Arguments.

The University argues that the termination of a tenured faculty member for performance reasons is not subject to a just-cause standard. Whatever tenure might mean at other academic institutions, this case involves the

interpretation of the specific Agreement at the University. While the parties used the word "tenure," they obviously did not intend adopt the history and mystique surrounding tenure at other universities. At the University, tenured faculty are subject to elaborate evaluations every five years, which can ultimately lead to termination "for performance reasons." Since the parties themselves gave the University the right to terminate tenured faculty following a second negative evaluation, the only pertinent question is whether the grievant's second evaluation was arbitrary or capricious.

The University maintains that the "just cause" language of Article IX(A) applies only to dismissal for misconduct, not for poor performance. Article VIII(B)(1)(d), which gives the administration the right to terminate after a second negative performance evaluation, references Article IX(B), not Article IX(A). Had the parties meant the just-cause standard to apply to a termination for performance, they would have referenced Article IX(A), or perhaps Article IX as a whole. Instead, they singled out only subsection B, which says nothing about just cause. The parties did not want an arbitrator second-guessing academic judgments on the performance of faculty. They were willing to have those judgments tested by the arbitrary and capricious standard, but not the just cause standard. It is not unusual for arbitrators to find a different standard of review in cases of non-disciplinary dismissals.

The University further argues that the bargaining history supports the University's position. When the parties adopted tenure in 1995, they continued essentially the same evaluation system they had always used. In the

2001-04 Agreement, they lengthened the post-tenure review interval from four years to five, but added a provision for termination of a second evaluation was negative. Article IX.B, new to the 2001-04 Agreement, only provided the terminated faculty member with a terminal spring semester of work. This suggests that the parties did not do anything special regarding tenure status. The same scrutiny of faculty would occur every few years, with the University having the right to terminate a faculty member after a second negative review.

The University contends that it did not act arbitrarily or capriciously in the grievant's re-evaluation. The grievant failed to follow the correct format for his self-study; did not address significant questions; submitted confusing and inconsistent class materials; and failed to analyze student evaluations. He had little or no significant service to the University and virtually non-existent scholarship. He did not address the dean's ten recommendations. With such deficiencies, the University concludes that it is beyond dispute that the University's judgment was not arbitrary or capricious.

Even if just cause is the appropriate standard of review, the parties themselves have sharply defined just cause to mean two negative post-tenure reviews. After a second negative evaluation, the parties themselves have answered the traditional arbitral inquiry of whether an employee received enough time to correct performance deficiencies. They have also dictated the penalty by giving the University the right to terminate. The University argues that the arbitrator cannot decide upon a different penalty.

The University followed all contractual procedures in the re-evaluation. It was not arbitrary for Dean Koelle to refuse to review a draft of the grievant's self-study. The Agreement does not require her to do it, and the dean was understandably reluctant to give any kind of preliminary opinion. The dean's re-evaluation was one month beyond the deadline, but the Union was notified of the delay and did not object. While it is true that no specific contract provision references a written response by a dean to a faculty member's rebuttal, nothing prevents such a communication. The Union would not complain if the dean had simply discussed her reaction to the grievant's rebuttal with the provost. That reaction was no more objectionable because it was in writing and incorporated Prof. Hollingsworth's e-mail. For the provost, the only significance of the e-mail was that it provided assurance that the dean's review of the grievant's service was accurate. It did not introduce new reasons for a negative review, and hence no response from the grievant was necessary.

Substantively, the University's negative judgment was neither arbitrary nor capricious. Although the grievant's self-study did not conform to Appendix G, Koelle took the trouble to measure it against the contractual format and criteria as best she could. His self-study demonstrated that he was unprepared, used irrelevant material, had poor syllabi, and organized his lectures poorly. His student surveys, while generally good, were not stellar. His numerical averages for Questions 21 and 22 for 2004-05 were below the University average and far below the Language Department averages. He was not an active department member, did no program development other than a few

special-topic courses, had no publications and no speaking engagements, and made only one presentation at a conference that was not externally validated. He produced no chapters of his Italian text. Even in his rebuttal the grievant failed to remedy these deficiencies. Provost Martin, in his final decision, underlined Koelle's points.

The University argues that the arbitrator must defer to the good-faith academic judgments of the administration regarding the grievant's performance. In court decisions, it is well settled that judicial review of academic personnel matters like reappointment, promotion and tenure is very limited. The arbitrator should adopt the same principle.

No mitigating circumstances warrant reversing the termination decision. The grievant's family problems were not inconsequential, but he certainly could have applied for an unpaid leave of absence if he needed time to deal with them. Alternatively, he could have asked for a postponement of his evaluation or re-evaluation. The University contends that since he continued to work, he was subject to standard performance expectations. The grievant was not a long-term employee. He was not a novice to teaching. His overload course in the fall of 2005 was voluntary, and one he had taught before.

The University asserts that, as a tenured faculty member undergoing re-evaluation, the grievant was not entitled to review by the FRC. Neither the Union nor the grievant ever raised this issue before. The parties did not intend for a peer committee to weigh in on such decisions, which are on an entirely different track. Article VIII(B)(1)(d) does not refer to FRC review. Indeed, FRC reports are to be submitted to the dean in all

cases by December 15, by which date re-evaluations have been completed.

The Union's claim that the grievant received no guidance through the evaluation and re-evaluation procedure is groundless. Guidance was available from the Agreement, from his first evaluation, and from his dean and colleagues. In fact, Koelle held a workshop on the subject of the self-study. The University was under no obligation to provide ongoing feedback outside the scheduled evaluations and classroom observations. The grievant failed to read the relevant portions of the Agreement and took a casual attitude toward the entire process.

Summary of the Union's Arguments

The Union first argues that the University never made an authorized, final decision to terminate the grievant. Under Article VIII(B)(3)(i), only the president and board of trustees have the actual authority to make final decisions regarding tenure. The contractual language is clear and unambiguous. It is undisputed that Provost Martin made the decision to revoke the grievant's tenure and terminate his employment, and so informed him by letter. There is no evidence that the president or board acted in this case or were even aware of Martin's decision. This was not merely a technical flaw. It deprived the grievant of another level of review.

Under Article IX(A), the University cannot dismiss a tenured faculty member without just cause. The Agreement specifies that the non-renewal of a contract constitutes dismissal. Although the University interprets Article VIII(B)(1)(d) to override Article IX(A), no language at all expresses such an intent. The just-cause clause has been in effect at least since 1992, predating the re-evaluation

language, and it is clear, unambiguous and precise. Had the parties so intended, they could have specified that a tenured faculty member could be dismissed after a second negative evaluation notwithstanding the just-cause clause, but they did not do so.

Even if there were some ambiguity in Article IX(A), the language must be read in the context of the Agreement as a whole. If one interpretation would lead to harsh, absurd or nonsensical results, the arbitrator must apply an alternative interpretation if it is equally plausible. The most plausible reading of the Agreement is that the parties added the performance-evaluation language of Article VIII to acknowledge their understanding that tenured faculty members could be terminated for performance reasons, not just misconduct. However, to justify such a termination, the concerns raised in the evaluations must rise to the level of just cause.

Although the University attempts to distinguish between tenure at the University and tenure at other institutions, none of the parties' Agreements makes such a distinction. Even before tenure at the University, there was a distinction between probationary and permanent faculty, with permanent faculty enjoying more job security. The arbitrator should give the word "tenure" its ordinary, popularly understood meaning. The Rhode Island Supreme Court has looked to "custom and usage of the academic community to discern the common understanding of tenure," and concluded that tenure "protects a teacher from dismissal except for serious misconduct or incompetence." Drans v. Providence College, 383 A.2d 1033, 1038-39 (R.I. 1978). The University's argument, if accepted, would mean that tenure is nothing more than a five-year employment

contract that the University can terminate virtually at will if it unilaterally deems two consecutive evaluations negative. The University's argument would also mean that faculty members who engage in misconduct are entitled to more protection than those who have performance deficiencies.

The University did not have just cause to revoke the grievant's tenure. Although it is not the Union's burden to show that the grievant satisfied the four contractual criteria, in fact the grievant did demonstrate effectiveness in each area. Since the contract is clear that the evaluation process is cumulative, the arbitrator must take into account the grievant's performance during his entire term of employment, including his service in Rome. By ignoring the grievant's accomplishments for half of his employment, the University deprived him of a fair and complete evaluation and converted a five-year review into a two-and-a-half-year review.

The Agreement provides that effectiveness in teaching is the primary evaluation criterion. The best evidence of the grievant's cumulative effectiveness in teaching are the classroom observations and student surveys. Koelle did not review the grievant's student evaluations for all the semesters he taught at RWU. Instead, she opted to review only those from the fall of 2003. The grievant's student evaluations were positive, indicating that students liked him and enjoyed his teaching style. Moreover, all of the grievant's classroom observations were positive.

As to academic advising and program development, the grievant developed the entire Rome program and did extensive academic advising. On the Bristol campus, he fulfilled his obligations as an academic advisor and worked

with senior thesis students every semester. Although there were few opportunities for program development within his department, the grievant developed and taught a number of special-topic courses.

As director of the Rome program, the grievant was not required to engage in scholarship. Thereafter, he translated an article into Italian, engaged in significant research for the special-topic courses, completed a portion of an Italian textbook, and conducted research for a new Italian course. In 2005 and 2006, he presented papers at conferences in Connecticut and Genoa.

With regard to institutional service, the grievant served on the Academic Standards Committee and ran for a seat on the FRC and the Faculty Senate. He participated in open houses, summer orientations and senior thesis reviews. Since he was only required to perform institutional service beginning in spring 2002, his accomplishments in this area meet or exceed his obligations under the Agreement.

The grievant made progress regarding each of Koelle's ten recommendations. He revised all of his syllabi, changing the course descriptions to be consistent with the catalog. He reduced the amount of English spoken in his classes. He included exams, handouts and other course materials in his second self-study. He took significant steps to keep classroom discussions on-topic. He increased his participation in departmental and college meetings and committee work. He participated in admissions activities, attended one professional conference annually, and began writing an Italian textbook. By requiring the grievant to begin working on at least one publication/research project, the administration in essence required the grievant to publish, in violation of the 2004-08 Agreement. Even

though the grievant improved in each area, the University terminated him because he did not completely remedy every deficiency. While this might be appropriate for a faculty member aiming to obtain tenure, it is undisputed that the standards in post-tenure review are less stringent.

The Union maintains that the University arbitrarily and capriciously disregarded the grievant's contractual procedural rights, violating both the express requirements and the underlying purposes of the entire process. A fundamental theme of the evaluation procedure is to give faculty members continuous input and assistance and avoid unfair surprise. Instead, the University set the grievant up to fail. He received inadequate feedback on his teaching. All of the written reports on the grievant's classroom observations were late; in fact, the grievant received no written or oral review of his classroom performance before his first evaluation. The University failed to alleviate the undue increase in the grievant's workload while he was preparing his second self-study. It did not take into account the extreme difficulties in his personal life.

Additionally, for both evaluations, Koelle violated Article VIII(B)(2)(b)by failing to meet and discuss the evaluation criteria in the academic year preceding the evaluation year and produce a written summary of the meeting within fifteen working days. She unreasonably refused to review the format of the grievant's second self-study before he turned it in, and violated the contractual timelines by failing to forward her re-evaluation to the grievant by November 1, 2005.

The University violated Article VIII(B)(3)(d) by failing to have the newly negotiated FRC review the

grievant's second self-study and make a recommendation. The parties apparently believed that it was important to add peer review to the evaluation process. Koelle wrongly interpreted the Agreement to dispense with the need for FRC review of post-tenure re-evaluations, but the Agreement does not distinguish between evaluations and re-evaluations.

Finally, although the Agreement does not provide for a dean's reply to a faculty member's response to an evaluation, the provost solicited one from Koelle and incorporated it into his consideration, without ever providing a copy to the grievant. Koelle's reply contained a critical e-mail from Hollingsworth and hearsay allegations of student complaints that the grievant had also never seen. The grievant had no opportunity to respond to this material.

As a remedy, the Union asks the arbitrator to order the grievant reinstated to his position as a tenured full professor and made whole for all losses resulting from his termination, including, but not limited to, full backpay and out-of-pocket expenditures for healthcare or health insurance. Any and all of the grievant's contractual rights and benefits should also be reinstated. All documents resulting from the evaluation processes and the grievant's termination should be expunged from the University's files and not used against him in any way in the future.

Alternatively, in addition to the above, assuming just cause is found, and because the university acted arbitrarily and capriciously throughout the evaluation processes, the University should be required to repeat the entire post-tenure evaluation processes, beginning with the

first post-tenure evaluation, and should be required to comply with the grievant's contractual and due-process rights.

**DISCUSSION**

**A. The Standard for Reviewing the Grievant's Termination Is Just Cause**

This is the parties' first arbitration of the termination of a tenured faculty member for performance reasons. It necessitates examining two central, interrelated provisions of the Agreement: the just-cause clause of Article IX(A) and the evaluation procedures set forth in Article VIII and Appendix G. The parties have fundamental disagreements about the meaning and application of those provisions.

Article IX(A) provides: "No tenured MBU shall be dismissed without just cause. … Dismissal for purposes of this Agreement shall mean non-renewal of contract of a MBU or dismissal during the year of a MBU." On its face, this language is unambiguous. It prevents the administration from dismissing *any* faculty member without just cause, and goes on to define "dismissal" broadly as covering both termination during the middle of the academic year, or non-renewal at the end of the academic year.

Notwithstanding the clarity of this language, the University argues that, read in the context of other aspects of the Agreement, the just-cause clause actually applies only to dismissals for misconduct, not for performance. The University argues that the proper standard for measuring the administration's decision to dismiss the grievant is not just cause, but the far more lenient "arbitrary and capricious" standard. The

University bases this argument in part upon Article VIII(B)(1)(d), which provides that if the re-evaluation of a tenured faculty member is negative, "the faculty member may be terminated for performance evaluation as described in Article IX.B." The University reasons that since Article IX(B) says nothing about just cause, but provides only that tenured faculty in this situation "shall have the option of working a terminal spring semester," the parties evidently did not intend just cause to apply to this category of dismissals.

The problem with the University's argument is that it pits a possible inference against the definite language of Article IX(A). There is no question that the parties agreed that *no* tenured faculty member shall be dismissed *without just cause.* It is well-known that just-cause language is of primary importance to both parties. In general, unless the parties themselves indicate otherwise, just cause signifies a panoply of substantive and procedural protections for bargaining unit members' job security. I do not agree that the cited language of Article IX(B) indicates an intention by the parties to limit these guarantees. Article IX(B) merely provides that a tenured faculty member who has been dismissed in the fall may work for one more semester in the spring, presumably so he or she can continue to earn a living while seeking employment elsewhere. It is not language of limitation.

A closer reading of Article IX(A) reveals other flaws in the University's argument. As noted, Article IX(A) defines dismissal as both a mid-year termination and "non-renewal of contract of a MBU." Mid-year termination usually occurs for reasons that require the immediate cessation of employment, such as misconduct. The parties,

however, also took care to extend just-cause protection to non-renewal of a contract. If this does not mean termination for performance reasons, it is hard to imagine what it does mean.

Moreover, after setting forth the just-cause standard for dismissal of tenured faculty, Article IX(A) also provides, "The termination of non-tenured MBUs shall not be arbitrary or capricious." This indicates that the parties actually thought about the arbitrary-and-capricious standard at the time they negotiated Article IX(A), and decided to apply it expressly to *non-tenured* faculty members. Obviously, they intended to allow the University much greater discretion to terminate non-tenured faculty, which is consistent with the whole concept of tenure as it is generally understood. Having been so explicit with regard to non-tenured faculty, it is improbable that the parties would use indirect, obscure means to apply the arbitrary-and-capricious standard to performance-related dismissals of tenured faculty.

In sum, the University's contention that the just-cause clause does not apply to the grievant's dismissal is untenable. The parties expressly agreed that the University cannot dismiss any tenured faculty member without just cause. Nothing in the Agreement indicates that they intended to carve out an exception for dismissals for reasons of performance.

This is not to say that the Agreement requires exactly the same analysis for performance-related dismissals and dismissals for other reasons. Just cause is not a one-size-fits all standard. It demands the evaluation of each case on its particular facts. The University correctly observes that arbitrators should not second-guess informed

academic opinions concerning the performance of faculty. When it comes to the dismissal of tenured faculty members, an arbitrator is likely to give considerable deference to the good-faith judgments of experienced administrators. An arbitrator's expertise is in construing and applying labor agreements, not in running institutions of higher education, and it is therefore wise to avoid substituting the arbitrator's personal judgment for the administration's concerning the academic capabilities of faculty.

**B. <u>The University Had Ample Reason for Its Substantive Judgments Concerning the Grievant's Performance</u>**

Was there just cause for the grievant's discharge? It is well-settled that just cause has both a substantive and a procedural aspect. The employer must not only have a genuine, sufficient, nondiscriminatory basis for terminating the employment, but must also afford the employee procedural fairness prior to the termination. Just what the latter might be varies with the circumstances, but in this case there is no occasion to ponder because the parties themselves negotiated a detailed procedure that must precede the termination of tenured faculty.

Turning first to the substantive aspect, the grievant was terminated for serious deficiencies in teaching, insufficient contributions to the University, and inadequate scholarship. The Union advances a comprehensive argument that each of these reasons was unfounded. Among other things, the Union contends that Koelle failed to consider the grievant's contributions as director of the Rome program, failed to review all of his student evaluations, and undervalued his scholarly activity and institutional service; and that the grievant did, in fact,

make progress in each of Koelle's ten recommendations. The Union advances many more shortcomings in Koelle's assessment, and marshals a fair amount of evidence in support of its contention that the grievant did, in fact, satisfy the contractual criteria for teaching, service and scholarship.

The problem with this approach is that the grievant himself did not include much of this evidence in his self-study. One of the striking aspects of this case is that Dean Koelle and Provost Martin based their judgments almost entirely on the quality of the grievant's self-study, as a document. They had little or no actual knowledge about his performance as a professor, nor were they expected to. At this University, as at many institutions of higher education, faculty are evaluated not so much by first-hand observation as by self-created dossiers, here known as self-studies.[12] These dossiers are widely understood and expected to be not mere summaries of activities but advocacy documents, designed to create the best possible impression of the faculty member.

Both parties understood and accepted this system, and in fact they devoted considerable attention to revamping the self-study in their negotiations for the 2004-08 Agreement. It is manifest from Appendix G that the parties viewed the form, content, creation and use of the self-study as matters of vital importance. Appendix G contemplates a dossier of considerable length and depth, containing specific information in a specific format. Among a host of other items, Appendix G requires the

---

[12] One atypical aspect of the University's evaluation system is that it continues after the faculty member has received tenure, although less frequently.

faculty member to describe and assess his or her educational philosophy, approach to academic advising, and contributions to program development; his or her goals and objectives for four courses, and how they relate to the wider objectives of the department and the University; and the organization and delivery method for each course, and their rationale. Also required is a list of all scholarly and creative activities and how each has enhanced the faculty member's teaching; a statement of research interests and agenda; a list and description of short- and long-term professional goals; and supporting documentation for all of the foregoing.

The overarching purpose of the self-study is to "make the case" (in Koelle's phrase) that the individual should be granted tenure, or retained as a tenured faculty member. The burden of making the case is on the faculty member, not the administration. Hence the self-study is not mere bureaucratic paperwork but the foundation of the evaluation process. I am convinced that the University, the Union, and most of the faculty fully understand this. By adducing evidence and arguments concerning the grievant's actual job performance, the Union is inviting me to go behind the grievant's self-study and conduct an independent investigation of his teaching, academic advising and program development, scholarly and professional activities, and institutional service. This is contrary to the parties' mutual understanding and intent, as expressed in their Agreement. The parties created the self-study as the vehicle for evaluating faculty. It is inconsistent with that effort for the arbitrator to engage in a *de novo* review of the grievant's work performance. The proper

focus for arbitral review is on the grievant's self-study, not the day-to-day details of his actual performance.

I am convinced that the grievant did not devote due care and attention to the preparation of this vital document. To begin with the self-study's most obvious deficiency, there is no question that it did not conform to Appendix G. The grievant testified that he attended Dean Koelle's August workshop on the self-study, but that she did not mention Appendix G and instead stressed that the self-study should be short and concise. This is not credible. The whole purpose of the workshop, which was requested by the Union, was to acquaint the faculty with the newly negotiated self-study format. Koelle testify that she went over Appendix G in detail and included a copy of it in the three-ring binders. Of the nearly fifty faculty who submitted self-studies to Dean Koelle that semester, only the grievant used the "Summary of Accomplishments" rather than Appendix G as a guide.[13] If the grievant did not know that Appendix G provided the framework for his self-study, it can only be because he was not paying sufficient attention.

There is little doubt that Koelle's and Martin's other criticisms of the grievant's self-study are well-founded. The two administrators stated in their evaluations, and testified at the hearing, that the self-study was disorganized, unreflective, devoid of analysis, insufficiently detailed, and lacking in documentation.[14]

---

[13] Additionally, the "Summary of Accomplishments" itself states, "*Please make this document the first pages of your self-study*," which should have given the grievant a clue that more was expected.

[14] As to the latter, Martin testified convincingly that it is common practice among faculty to "validate" every aspect

Even to a layperson's eye, the grievant's self-study is thin and hard to follow. His responses to many of the questions in the "Summary" are almost perfunctory, and it is difficult to relate the syllabi and other documentation to the grievant's text.

Koelle and Martin also remarked on the grievant's failure to address the ten recommendations that Koelle made in her initial evaluation. This is a conspicuous omission. Through these recommendations, Koelle provided a virtual roadmap to her expectations for his re-evaluation. Regardless of which format the grievant used as the basis for his self-study, common sense, as well as self-interest, would seem to advise responding to these recommendations in some fashion. Yet the grievant did not do so.

In sum, there were undeniably substantial grounds for Koelle's and Martin's negative judgments about the grievant. Although the Union argues that the University set the grievant up for failure by neglecting to give him ongoing assistance and feedback during his semesters in Bristol, discouraging him from including material relating to the Rome program in his self-study, and failing to take his serious personal problems into account, these contentions do not fit this grievant. As Martin testified, the grievant "is a seasoned professional educator who is not a naïve person straight out of graduate school." He was a tenured full professor at the University, a tenured assistant professor in his previous job, and a long-time professional educator for years before that. The grievant did not need hand-holding. If he wanted to include his

---

of their record with documentation, even including letters of commendation from an administrator for their service on University committees.

work in Rome, he could have done so; if he needed some accommodation to deal with his personal issues, he could have asked for one. He simply does not seem to have regarded the evaluation procedure with the seriousness that it warranted.

### C. The University Disregarded the Grievant's Important Procedural Right to Review by the Faculty Review Committee

Under different circumstances, the foregoing discussion would seem to lead directly to denying the grievance. However, as was previously observed, the just-cause standard has both substantive and procedural aspects. If the procedures leading to a termination are defective or disregarded, the fairness or even the accuracy of the employer's substantive judgment may be thrown into question. In this case, the University completely disregarded an entire stage of the negotiated evaluation procedure: peer review.[15]

Article VIII(B)(3)(d) is another newly negotiated aspect of the 2004-08 Agreement. Previously, there was no element of peer review in the evaluation procedure. The new subsection created Faculty Review Committees for the purpose of "review[ing] faculty self-studies, and allied

---

[15] The Union argues that the University also omitted another step: a final decision by the president and board of trustees. Under Article VIII(B)(3)(i), the president and board must make "all final decisions with respect to promotion and tenure." The fourth sentence of that paragraph clarifies this arguably ambiguous language by stating that "tenure can only be awarded upon the affirmative act of the [President] and the Board of Trustees…," and other language in the subsection also refers to the award of tenure. It is thus evident that Article VIII(B)(3)(i) applies to decisions to *award* tenure, not to the discharge of a tenured faculty member.

materials and support, submitted by…probationary faculty members (tenure decision), tenured faculty members (post-tenure review), and faculty members seeking promotion." After completing its review, the FRC must forward a confidential report and recommendation to the appropriate dean. Committee and minority reports "must be submitted by December 15."

The University does not dispute that the Agreement requires FRC review of post-tenure evaluations. But it strongly disagrees that FRC review also applies to post-tenure *re-evaluations* after an initial negative evaluation. The University bases its position on the requirement for the FRC to submit its report to the dean "by December 15." Since the dean's own re-evaluation is due by November 1, and the provost's final decision by December 1, the University argues that the parties could not have intended the FRC to have any input into the re-evaluation decision.

The contractual schedule for FRC review does seem anomalous as applied to post-tenure re-evaluations (although not to other types of evaluations). On the other hand, it would be even odder for the parties to require FRC input into post-tenure evaluation, which even in the worst case results in continued employment for the faculty member, while excluding the FRC from any role in the re-evaluation, which can result in termination. One would expect that the graver the decision, the more compelling the case for peer review. I am most reluctant to conclude that the parties created a FRC that is toothless when it comes to the termination of tenured faculty, absent some clear expression of that intent. That does not exist here. Article VIII(B)(3)(d) applies broadly to "tenured faculty members (post-tenure review)," without drawing any

distinction between evaluation and re-evaluation. Moreover, the December 15 deadline is not *necessarily* inconsistent with FRC review of post-tenure re-evaluations. Under Article VIII(B)(1)(d), the tenured faculty member's self-study is due on October 1, the dean's report on November 1, and the final decision on December 1. The language provides that FRC reports are due *by* December 15, but nothing precludes the FRC from issuing a report sooner.

Owing to the University's interpretation of Article VIII(B)(3)(d), the grievant's self-study was never submitted to the FRC. The omission of this entire step of the re-evaluation procedure was more than a mere technicality. Although the role of the FRC is purely advisory, the FRC adds an element of peer scrutiny to decisions that were formerly entirely in the hands of the administration. This can significantly influence the procedure, either by endorsing it and adding to its perceived legitimacy, or by dissenting from it and exerting pressure on the University to change, or at least strongly defend, its decision. That element was entirely absent from the grievant's re-evaluation. Whether FRC review would have changed the ultimate outcome is not for the arbitrator to say. The arbitrator is not a mind-reader and cannot presume to predict what a duly constituted FRC might decide.

I must therefore conclude that the University violated the Agreement by failing to accord FRC review to the grievant's re-evaluation, as was required by Article VIII(B)(3)(d). The omission of this significant step means that the grievant did not receive the full, meaningful performance evaluation that the parties envisioned.

**D. The Remedy**

There remains the question of the remedy. Where a performance evaluation has been procedurally defective, the standard remedy would be to order the grievant reinstated and made whole, and allowing the employer the opportunity to evaluate him afresh. However, there are certain practical considerations here. It is now September of 2007. The academic year has begun, or is about to begin. An immediate re-evaluation would be unduly stressful and hasty for both the grievant and the administration, to the detriment of the re-evaluation procedure. On the other hand, it would be imprudent to rigidly conform to the normal schedule for post-tenure evaluations, thus guaranteeing the grievant an additional four or five years of employment as a tenured professor before the University can evaluate him.

I will therefore order the University to reinstate the grievant and make him whole, and will give the University the option of re-evaluating him pursuant to Article VIII(B)(1)(d) during the 2008-09 academic year. In the interests of providing a fair and untainted process, since the University has already expressed its opinion on the grievant's existing second self-study, the re-evaluation will be based on a new self-study that the grievant prepares during the intervening period.

However, I will not accept the Union's suggestion to order the University to repeat the entire evaluation process from the beginning, including the first evaluation. The first evaluation did not suffer from the same procedural defect as the second, since the Agreement in effect at that time did not provide for FRC review. While

there was some extremely sketchy testimony that the grievant may have initiated a grievance challenging the first evaluation, there was no evidence that the grievance was pursued or is still alive. The first evaluation, including Koelle's recommendations, therefore, remains valid.

**CONCLUSION AND AWARD**

For the reasons set forth above, the University violated the Agreement in its re-evaluation of Professor Alfieri in December 2005/January 2006, thereby allowing the University to terminate his employment on January 4, 2006 (effective June 30, 2006). The grievance is allowed.

As a remedy, the University shall forthwith restore the grievant to his former position as a tenured full professor and make him whole for all lost wages and other benefits, minus any interim earnings.

The University shall have the option of re-evaluating the grievant pursuant to Article VIII(B)(1)(d) during the 2008-09 academic year, such re-evaluation to be based on a new self-study that the grievant prepares during the intervening period.

September 4, 2007
Boston, Massachusetts

Gary D. Altman