APPENDIX B

# AMERICAN ARBITRATION ASSOCIATION

## VOLUNTARY LABOR TRIBUNAL

Case No: 11-300-00833-97

---

IN THE MATTER OF ARBITRATION BETWEEN:

**ROGER WILLIAMS UNIVERSITY**
**FACULTY ASSOCIATION - NEA/RI**
**AND**
**ROGER WILLIAMS UNIVERSITY**
(Grievant: Sharon DeLucca)

---

## DECISION AND AWARD ON RETENTION OF JURISDICTION

The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered by the above named parties and having been duly sworn and having duly heard the proofs and allegations of the parties AWARDS as follows:

For the reasons set forth in the above Decision:

1. I have jurisdiction over the present controversy by virtue of my retention of jurisdiction set forth in the September 1997 Decision. In particular, the present controversy is a matter of clarification that falls directly under the terms for the retention of jurisdiction.

2. The University was required, under the terms of the Settlement Agreement and the September 1997 Arbitration Award to follow the terms of the 1992-95 Agreement with respect to determining Ms. DeLucca's future employment status. The University failed to do so and thus violated the terms of the settlement agreement and did not apply the remedy of my September 1997 Arbitration Award.

3. Ms. DeLucca shall be awarded permanent status. Moreover, her permanent status shall be as if she were awarded permanent status under the terms of the 1992-95 Collective Bargaining Agreement.

4. Any claim that Ms. DeLucca has to tenure status derives from the terms of the 1995-98 Agreement, which is a matter that is beyond the scope of this Arbitrator's retention of jurisdiction.

October 19, 1998
Boston, Massachusetts

Gary D. Altman

**AMERICAN ARBITRATION ASSOCIATION**
Voluntary Labor Tribunal
Case No: 11-300-00833-97

---

IN THE MATTER OF ARBITRATION BETWEEN
**ROGER WILLIAMS UNIVERSITY**
**FACULTY ASSOCIATION - NEA/RI**
**AND**
**ROGER WILLIAMS UNIVERSITY**
(Grievant: Sharon DeLucca)

---

# DECISION AND AWARD ON RETENTION OF JURISDICTION

## A. Background of the Present Proceeding

I. The September 1997 Arbitration Award.

On September 3, 1997 the undersigned Arbitrator issued an Award with respect to the Association's grievance challenging the non-renewal of the grievant, Sharon DeLucca. In particular, the Association alleged that the University violated the 1992-1995 Collective Bargaining Agreement and the terms of a settlement agreement on a prior grievance. The grievance was sustained and I retained jurisdiction "solely for the purpose of issues that arise with respect to implementation of this remedy."

The parties during the 1997 arbitration hearing, and in their briefs, made various arguments as to what should be the appropriate remedy if the grievance was sustained. On pages 23 and 24 of the Decision, I determined that:

> The appropriate remedy is to attempt to place Ms. DeLucca in the situation she would be in if the University had not

> violated the terms of the settlement agreement. This requires that Ms. DeLucca be again be reappointed for the 1997-98 academic year and to be evaluated for reappointment during this time period. It must also be stated that Ms. DeLucca complied with all the terms of the settlement agreement and that it was the University that breached its terms by using Ms. DeLucca's past employment record in deciding not to reappoint her. Accordingly, is is most appropriate at this time to prohibit the University from considering Ms. DeLucca's past problems working with colleagues, as having any impact on its decision to reappoint Ms. DeLucca for the 1998-99 academic year; it forfeited this opportunity by breaching the terms of the settlement agreement when it considered her past history for the 1996-97 evaluation. Moreover, as Dean Gould's evaluation was improperly tainted by his viewing Ms. DeLucca's past employment history, his evaluation must be removed from her personnel file and can not be used as a basis for any decision regarding Ms. DeLucca's future employment with the University.
>
> The Association also raises a legitimate point as to whether it is indeed possible for University officials to fairly consider Ms. DeLucca considering that it incorrectly used her employment history this year and that most likely it will be the same decision makers who will be involved in any subsequent reappointment decision. It is difficult, at this time, for this outside arbitrator to establish guidelines to ensure that Ms. DeLucca is evaluated fairly and impartially. Nevertheless, in view of the University's breach of the settlement agreement and to ensure that Ms. DeLucca's rights are protected, in the next evaluation process, should the University not reappoint Ms. DeLucca for the 1998-99 academic year, it is the University that must bear the burden of demonstrating that its decision was not based on Ms. DeLucca's past record but rather based on the criteria set forth in the Agreement. ...

II. Correspondence After Issuance of the Award.

On September 8, 1997 the University, through its counsel, sought clarification of the Award. The University stated in its letter, "as you recall, you retained jurisdiction for the purpose of issues that arise with respect to implementation of

the remedy in this case." The University sought clarification with respect to the extent that it may go back into Ms. DeLucca's employment history to review difficulties that she had with interpersonal relationships with other faculty and staff. On September 13, 1997 I responded to the University's inquiry and also stated that if the parties desired I would entertain a conference call on this matter. There was no further correspondence on this issue.

On October 9, 1997, Jennifer Wood, counsel for the Association, wrote to counsel for the University stating, in part, "I am writing at this time to request a meeting between us to review the implementation of the Arbitrator's Award in the references matter and discuss how this year will proceed". The letter was referred to Michael Schipper, Vice President for Human Resources. Mr. Schipper responded to Attorney Wood's letter, stating in part:

> As a result of the clarification of this arbitration award by Arbitrator Gary Altman, the University understands the award. We therefore do not believe that a meeting is necessary to review the implementation of the award. Nor do we believe it is necessary to discuss "how this year will proceed." As is the case with any arbitration award, if the University believes that there is a need to review the implementation of the award, it will certainly seek clarification from the arbitrator or discuss it with the employee's representative, In this case we have no issues in connection with the implementation of the award but would consider any issues that you would like to bring to our attention.

No further correspondence occurred on the matter.

III. <u>1992-1995 Agreement and the 1995-1998 Agreement.</u>

It is important to point out that the time lines for

evaluations, recommendations and the decision on the continuing employment status of bargaining units members in the 1992-1995 agreement differ from the procedures in the 1995-1998 Agreement. Moreover, there is no reference with respect to bargaining unit members actually receiving tenure status in the 1992-95 Agreement. The concept of tenure had its genesis in the 1995-98 Agreement.[1] Prior to the 1995-98 Agreement bargaining unit members who were appointed to a fifth year of employment were never actually awarded the status of tenure. Instead, they received permanent status, or, as has been characterized by the University "*de facto*" tenure, which meant that they could not be dismissed without just cause. For the 1995-98 Agreement the parties modified the employment status of those bargaining unit members who successfully completed their probationary period; now an employee is officially awarded the status of a tenured faculty member. In addition, under the 1995-98 Agreement the President is, by specific terms of the Agreement, actually involved in the decision to award tenure. President Santoro testified that those faculty members who had received permanent status before the execution of the 1995-98 Agreement were "grandfathered" into tenure status as a result of this Agreement.

IV. The 1997-1998 Evaluation and Reappointment Process.

Ronald Amborsetti became the new Dean of the College of Arts and Sciences at Roger Williams University in July of 1997. Dean Amborsetti was the administrator responsible for

[1] There is no disagreement on this matter.

evaluating Ms. DeLucca during the 1997-98 academic year. Dean Amborsetti stated that a couple of days prior to January 15, 1998, Ms. DeLucca came to him and asked "whether she would be getting a copy of the letter". Dean Amborsetti knew that Ms. DeLucca was referring to his letter regarding her future employment status and stated that he was surprised by Ms. DeLucca's comments since he believed that the time line for preparing his evaluation was February 15, 1998. Dean Amborsetti testified that he thought that he was to use the criteria under the 1992-95 Agreement but follow the time lines under the 1995-98 Agreement for submitting his evaluation and recommendation. Dean Amborsetti stated that he told Ms. DeLucca that he would call Vice President Schipper to confirm what time lines were to be used. Dean Amborsetti testified that Vice President Schipper told him that February 15 was the appropriate time period to submit his evaluation and recommendation.

Ms. Wood testified that on January 22, 1998, she had a meeting with President Santoro to discuss another grievance, and President Santoro brought up the matter of Ms. DeLucca's employment status. Attorney Wood testified that President Santoro told her that he would soon be involved in making a decision regarding Ms. DeLucca's employment status with the University. Ms. Wood stated that she was surprised by President Santoro's statement since, under the 1992-95 Agreement the President of the University had no role in the evaluation and renewal process of faculty members. Ms. Wood testified that she told him of the University's earlier request to clarify the

Award and also told him of the Association's belief that the University was supposed to be following the terms of the 1992-95 Agreement with respect to Ms. DeLucca's future employment status. Ms. Wood stated that she suggested to President Santoro that he should contact the University's counsel on the matter. There was apparently no resolution of the issue as to what contract provisions should apply to Ms. DeLucca's employment status and there was no further follow up on this matter.

In fact Dean Amborsetti submitted his evaluation and recommendation on February 15, 1998. He wrote:

> In accord with Article VIII of the Roger Williams College Faculty Association 1992-95 Contract with the Board of Trustees of Roger Williams University, I .. hereby recommend the reappointment with tenure of Ms. Sharon DeLucca ...

On March 20, 1998 Vice President Forbes wrote to President Santoro:

> In accordance with Article VII of the Faculty Contract (1992-95) and the Arbitration Decision and Award (Case no. 11-300-00833-97) in settlement of the grievance between Roger Williams University Faculty Association...
>
> Within the constraints imposed by the above mentioned Arbitration Decision and Award, I concur with the recommendation of Dean Amborsetti that Ms. DeLucca be reappointed to the the faculty for the 1998-98 academic year.

On March 31, 1998 in a five page letter President Santoro wrote to Ms. DeLucca informing her that:

> ...on the basis of the record and my professional judgment, I respectfully disagree with Dean Amborsetti's evaluation in very important respects. Accordingly, I will

> not recommend you for tenure appointment to the Board of Trustees.

President Santoro testified that under the 1995-98 Agreement he is "the final determiner of tenure." President Santoro stated that in considering Ms. DeLucca's tenure status he used the criteria set forth in the 1992-95 Agreement but used the time lines for making his decision under the procedures set forth in the 1995-98 Agreement.

President Santoro stated that he used the time lines in the 1995-98 Agreement for two reasons. First, he referred to a mistake in the Arbitrator's Award that omitted the word "not" in the recitation of the parties' 1996 settlement agreement of Ms. DeLucca's first grievance.[2] Second, President Santoro stated that the 1992-95 Agreement did not contain any reference

---

[2] In the September 1997 Arbitration Decision I included in the Decision the pertinent part of the grievance settlement agreement. The settlement agreement reads:

> For the 1996-97 academic year, Ms. DeLucca shall be reinstated as a full-time probationary faculty member with the rank of assistant professor, in the area of Art, at the fifth step on the salary schedule, as if she were in the fourth year of her probationary status, under the terms of said 1992-95 collective bargaining agreement, such that if she is reappointed for the 1997-98 school year, she shall have permanent status subject to dismissal only for just cause. If she is re-employed for the 1996-97 school year, her employment status shall be as a faculty member who elected to continue to be treated under the terms of the 1992-95 collective bargaining agreement provisions regarding Appointment and Evaluation and *not* under the alternative provisions regarding Appointment, Evaluation, Promotion and Tenure in the 1995-98 collective bargaining agreement.

The word "not" was omitted from the recitation of this provision of the settlement agreement. President Santoro stated that although he had access to the actual settlement agreement he mistakenly relied upon the recitation of the agreement set forth in the Arbitrator's Award.

to tenure status and that therefore, since Ms. DeLucca was seeking tenure, it could only be achieved by his decision under the terms of the 1995-98 Agreement. President Santoro also stated that he treated Ms. DeLucca as he did four other faculty members who had elected to use the criteria under the 1992-95 Agreement but whose tenure status was decided under the time lines and terms of the 1995-98 Agreement.

V. Request for the Arbitrator to Retain Jurisdiction

On April 3, Ms. Wood wrote to the American Arbitration Association maintaining that the University violated the Award and Remedy set forth in the September Decision. The University objected to appearing back before the undersigned arbitrator maintaining in part that the issue raised by the Association was in essence "a new grievance under the 1995-1998 collective bargaining Agreement and requires the selection of a new arbitrator." The Association wrote on April 23, maintaining that the hearing should be reopened.

On May 8, 1998 I responded by stating:

> I have reviewed the papers submitted by the parties in the above referenced case. In my Award and Decision dated September 3, 1997, I concluded that I would "retain jurisdiction solely for the purpose of issues that arise with respect to implementation of this remedy." I certainly respect the Employer's decision that the recent denial of tenure for Ms. DeLucca, is a new grievance and should be heard by a new arbitrator. In my view, however, the issues raised by the Association are directly related to the original remedy issued in the Decision and, a hearing must therefore be scheduled on the issues now raised by the Association.
>
> It should also be noted that I do not consider that the Employer, by appearing at any further proceeding, has

> waived its right to contest my continued jurisdiction. Nor, would I continue to "retain" jurisdiction if a court determined that I no longer had any authority over the dispute. Similarly, I would not stand in the way if the parties mutually agreed to the selection of a new arbitrator. Absent these occurrences, my original retention of jurisdiction is still valid. I have requested that the Tribunal Administrator begin the process of scheduling a hearing date.

Hearings were held on June 17, 1998 and July 13, 1998. The issues raised at the hearing were whether the Arbitrator had authority to consider the Union's request to retain jurisdiction, and, if so, whether the University complied with the Remedy issued in the September 3, 1997 Arbitration Award. The Association was represented by Thomas Ligouri, Jr. Esq., and the University by Karren Garrett, Esq.

**B. Retention of Jurisdiction in the Present Proceeding the Doctrine of Functus Officio**

The University strongly objects to the Arbitrator's continued involvement in this continuing controversy. It cites the common law doctrine of *functus officio* and claims that since the Arbitrator rendered his Decision last September he no longer can be involved, and that in fact the issue raised by the Association raises a new grievance that must be addressed by processing a new grievance and the selection of a new arbitrator. I disagree with the University's contention that the incumbent Arbitrator has no jurisdiction over the present controversy.

First, it must be stated that in the original Decision I retained "jurisdiction solely for the purpose of issues that

arise with respect to implementation of this remedy." The record does not reflect that there was any court challenge to my original retention of jurisdiction. Moreover, in September of 1997 the University sought clarification of the Award with respect to the awarded remedy. It is true that the University did not waive its right to challenge the Arbitrator's continued jurisdiction at this time. It is, however, ironic that the University sought clarification from the Arbitrator on the meaning of the remedy at that time and now vehemently objects to the Association's similar course of action.

Second, I do not consider the Association's request to be a distinct and separate matter from the original grievance. Again, it is important to review the terms of the my Award. As a remedy, I stated:

> The appropriate remedy is to attempt to place Ms. DeLucca in the situation she would be in if the University had not violated the terms of the settlement agreement.

The present controversy directly relates to the implementation of this Remedy; the parties disagree as to the position to which Ms. DeLucca should have been placed but for the University's violation of the Settlement Agreement. The Association maintains that original settlement agreement required Ms. DeLucca to be evaluated substantively and procedurally under the terms of the 1992-95 Agreement. The University, on the other hand, maintains that under the settlement agreement the parties intended to apply the

evaluation criteria of the 1992-95 Agreement but that since tenure did not exist under the 1992-1995 agreement the parties intended that the tenure process under the 1995-98 Agreement was to apply to Ms. DeLucca's continued employment status.

Both the Association and the University's contentions raise the issue as to the meaning of the settlement agreement. More importantly, both raise the issue of what is the proper status quo to which Ms. DeLucca should have been placed but for the University's violation of the settlement agreement. The very essence of the present controversy falls directly under the limited retention of jurisdiction which was to address issues relating to the implementation of the remedy.[3] The issue raised by the Association is analogous to the issue raised by the University in September of 1997, when it sought clarification from the Arbitrator. The difference is that instead of raising this issue in advance it was not brought before the Arbitrator until after the University made its decision on Ms. DeLucca's employment status in the Spring of 1997. The fact that the issue was raised by the Association after the University made its decision on Ms. DeLucca's employment status, still raises an issue of clarification of the September Award.

Moreover, it is also meaningful to consider the original issue at the Arbitration hearing. At the outset of the hearing,

[3] Indeed, even President Santoro stated that he relied on a typographical error in the Arbitrator's Award in applying the remedy. Correcting a mistake after the issuance of an award is a matter that has traditionally been within the Arbitrator's authority.

the parties could not agree to the appropriate issue. The parties agreed that the Arbitrator would have the authority to frame the issue. It was determined that the issue decided was as follows:

> Whether the non-renewal of the contract of the grievant by the Roger Williams University violated the earlier settlement agreement between the parties and Article VIII and IX A of the 1992-95 Collective Bargaining Agreement between the Roger Williams University Faculty Association NEA/RI and the Board of Trustees of Roger Williams University? If so, what would be the remedy?

The question now raised by the Association directly relates to the original issue; it is not a new grievance as alleged by the University.[4]

Finally, it would be irresponsible for me to avoid addressing the matter and compel the Association to file a new grievance and begin anew a chronicle that first began with a grievance filed back in 1995. The issue raised by the parties in this proceeding is a matter that originates from the remedy set forth in my September 1997 Award. The First Circuit Court of Appeals has recognized that an Arbitrators's authority, at times does not end upon the issuance of the Award. The Court

[4] The University also maintains that the arbitrator's retention of jurisdiction is "tantamount to self-appointment and perpetual employment". University's Brief p. 8. The University is mistaken. It is the grievant, Ms. DeLucca, that is seeking a permanent position not the Arbitrator. Moreover, the University's assertion flies in face of the Association's attempt to resolve the matter earlier in the academic year when it sought out the University to ensure there were no problems implementing the September Award. Assoc. Ex. 6. The Association's request was rebuffed by the University. Curiously, in its denial of the Association's request, the University stated that "if the University believes there is a need to review the implementation of the award it will certainly seek clarification from the arbitrator..." Assoc. Ex. 5.

stated:

> [T]he application of *functus officio* to labor disputes is considerably less absolute than the Union suggests. Strong authority in this circuit (as in other jurisdictions) holds that a labor arbitrator may, for example, "interpret or amplify" his award, *functus officio* notwithstanding. Red Star Express v. Teamsters, 809 F.2d 103, 106 (1st Cir. 1987)

**C. Did the University Comply with the Remedy in the September 3, 1997 Award.**

The dispute in this present proceeding is whether the University violated the Remedy set forth in the September 3, 1997 Award. I specifically mandated that Ms. DeLucca be reinstated to her position, and that the improper negative recommendation be stricken from her files. There is no dispute that the University has complied with these conditions; Ms. DeLucca was reinstated and Dean Gould's inappropriate recommendation was removed from her files. These provisions were required in order to effectuate the overall purpose of the remedy which was:

> ... to place Ms. DeLucca in the situation she would be in if the University had not violated the terms of the settlement agreement.

This was a classic remedy for breach of an agreement. It was an attempt to return the parties to the position they would have otherwise found themselves if there had no violation. Therefore it is necessary to consider the terms of the earlier grievance settlement.

The parties settlement agreement provided as follows:

* * *

2. For the 1996-97 academic year, Ms. DeLucca shall be reinstated as a full-time probationary faculty member with the rank of assistant professor, in the area of Art, at the fifth step on the salary schedule, **as if she were in the fourth year of her probationary status, under the terms of said 1992-95 collective bargaining agreement, such that if she is reappointed for the 1997-98 school year, she shall have permanent status subject to dismissal only for just cause. If she is re-employed for the 1996-97 school year, her employment status shall be as a faculty member who elected to continue to be treated under the terms of the 1992-95 collective bargaining agreement provisions regarding Appointment and Evaluation and not under the alternative provisions regarding Appointment, Evaluation, Promotion and Tenure in the 1995-98 collective bargaining agreement.** (Bold added)

3. During the 1996-97 school year Roger Williams University shall evaluate Ms. DeLucca's performance to determine if there exists concern regarding her professional relationships. Roger Williams University may rely upon documentation shown to her, including without limitation, during the grievance and arbitration process and placed in her personal file. **If such concerns exist, then these concerns together with past concerns in this area may be used in making the decision regarding continued employment and tenure status. If such concerns do not exist for 1996-97, then in that event, the decision regarding continued employment and tenure status shall be made without reference to the asserted concerns in previous years regarding professional relationships.** Ms. DeLucca shall have the opportunity to explain the circumstances or to rebut any allegation set forth in any document shown to Ms. DeLucca by Roger Williams University before it may be relied upon by Roger Williams University. (Bold added)

* * *

The parties disagree as to what the original grievance settlement provided with respect to the procedural and

substantive process that should have been used for Ms. DeLucca's reappointment during the 1997-98 academic year. Both parties point to different provisions of the settlement agreement to support their positions. The Association refers to paragraph 2 of the above referenced settlement agreement and maintains that Ms. DeLucca should have been considered solely under the terms of the 1992-95 Agreement. The Association states that nowhere in the settlement agreement did the parties ever state that the 1995-98 provisions should apply to Ms. DeLucca's employment status. The Association states that under the 1992-95 Agreement the Dean makes a recommendation to the Vice President and no where under the 1992-95 Agreement does the University President have any role in a faculty member's continued employment status. The Association argues that the University, by the terms of the settlement agreement, was required to apply the provisions of the 1992-95 Agreement and it violated the provisions of the Agreement when it did not award Ms. DeLucca a permanent position with the University.

The University, on the other hand, points to paragraph 3 of the settlement agreement to support its contention. The University contends that Ms. DeLucca was to be evaluated on the less stringent criteria of the 1992-995 Agreement, but that since her continued employment was a decision of tenure, which did not exist under the 1992-95 Agreement, the time lines of the 1995-98 Agreement should have applied. More importantly, the President of the University, as the ultimate decision maker of tenure, had a mandated role in Ms. DeLucca's tenure status.

In particular, tenure as an employment status, did not exist under the 1992-95 Agreement and since the settlement agreement refers to Ms. DeLucca's future tenure, the University asserts that it acted correctly in reviewing Ms. DeLucca's continued employment status under the process existing in the 1995-98 Agreement.

**Discussion**

This saga began when Ms. DeLucca was not reappointed at the end of the 1994-1995 academic year. Her non-reappointment was grieved and the parties resolved the grievance and executed a written settlement agreement. For all practical purposes, the settlement attempted to put Ms. DeLucca in the position she would otherwise have been if there had been no grievance. Specifically, the settlement agreement provides:

> For the 1996-97 academic year, Ms. DeLucca shall be reinstated as a full-time probationary faculty member with the rank of assistant professor, in the area of Art, at the fifth step on the salary schedule, **as if she were in the fourth year of her probationary status, under the terms of said 1992-95 collective bargaining agreement**... (emphasis added)

Under this settlement agreement, the 1996-97 academic year was now to be Ms. DeLucca's terminal year, and her continued employment was to be determined under the terms of the 1992-95 Agreement.

During the 1996-97 academic year the University followed both the procedural and substantive provisions of the 1992-95 Agreement in deciding upon Ms. DeLucca's continued employment. Specifically, both Dean Gould and Vice President Forbes used

the criteria and also followed the time periods set forth in the 1992-95 Agreement in evaluating and making their decision not to recommend Ms. DeLucca for a permanent position.[5] President Santoro had no involvement in the reappointment process. There can be no question that during the 1996-97 academic year the University acted as if Ms. DeLucca's continued employment status was to be decided for all purposes under the 1992-95 Agreement. It is true that Dean Gould violated the terms of the settlement agreement. His transgression, however, had nothing to do with the fact that Ms. DeLucca's continued employment status was considered both procedurally and substantively under the terms of the 1992-95 Agreement.

In my September 1997 Arbitration Decision I found that Dean Gould violated the terms of the Settlement Agreement. Specifically, I found that Dean Gould considered material, which under the terms of the settlement agreement, should not have been considered. The remedy imposed was to place Ms. DeLucca in the position that she would have otherwise found her self but for the breach of the settlement agreement. Pursuant to this remedy Ms. DeLucca was to be reinstated. Now the 1997-98 year was to be her terminal year of employment and again her review was take place as if it occurred at the end of the 1994-95 academic year under the terms of the 1992-95 Agreement, the year in which her first grievance arose. Moreover, the

[5] Association Ex. 5 and 7 of the first Arbitration. Also Assoc. Ex 13 clearly demonstrates that Dean Gould was following the 1992-95 Agreement with respect to Ms. DeLucca's employment.

University was to follow the same process that it used in the 1996-97 academic year, which was to follow the terms of the 1992-95 Agreement.

Moreover, not only was her review to be under the terms of the 1992-95 Agreement, her employment status at the end of this review was defined under the terms of the settlement agreement. Specifically, paragraph "2" of the settlement agreement provides:

> ...if she is reappointed for the 1997-98 school year, she shall have permanent status subject to dismissal only for just cause.

Ms. DeLucca was to be like those other faculty members who had completed their terminal year under the terms of the 1992-95 Agreement. If reappointed she was to receive permanent status since this was the status that existed for faculty members who had been reappointed after their probationary period under the terms of the 1992-95 Agreement.

The University, however, did not treat Ms. DeLucca exclusively under the terms of the 1992-95 Agreement during her review in the 1997-98 academic year. This time it used a hybrid process, it used the criteria under the 1992-95 Agreement but used the tenure process that was added in the 1995-98 Agreement. This time the University President, since in his mind it was a question of tenure, now intervened in Ms. DeLucca's employment status. This was not done in the previous year. Moreover, the University President had no role in the process under the terms of the 1992-95 Agreement. His participation, and making Ms. DeLucca's continued employment

status into a tenure review in 1998, was wrong. It violates the terms of the original settlement agreement, and it also violates the remedy set forth in the September 1997 Arbitration Award, which was to place Ms. DeLucca in the situation she would be in if the University had not violated the terms of the settlement agreement. This required the University to apply the terms of the 1992-95 Agreement for all purposes regarding Ms. DeLucca's continued employment.

The University raises various arguments as to why the President's involvement in Ms. DeLucca's continued employment was appropriate. It asserts that the President relied upon a mistake in the arbitrator's award when he was considering Ms. DeLucca's continued employment. There is no dispute that the Arbitrator omitted the word "not" in the above cited provision of the settlement agreement. I certainly regret this mistake. This omission, however, was immaterial to the matter in dispute at the original arbitration hearing. Specifically, in the 1997 Arbitration the matter in dispute concerned paragraph 3 of the settlement agreement which addressed what material could be considered in Ms. DeLucca's continued employment and not whether the 1992-95 Agreement or the 1995-98 Agreement should apply.[6]

Moreover, President Santoro acknowledged that it was a mistake and that he should have referred back to the terms of the original settlement agreement, of which he had a copy. Finally, the issue as to what agreement should apply to Ms.

[6] The University did apply the terms of the 1992-95 Agreement, when it reviewed Ms. DeLucca's employment during the 1996-97 academic year.

DeLucca's continued employment was brought to President Santoro's attention in January of 1998, when Ms. Wood explained to him that the Association believed that Ms. DeLucca's employment should have been considered exclusively under the terms of the 1992-95 Agreement. Thus, it must be concluded that the University persisted in its opinion that Ms. DeLucca should be reviewed under both the 1992-95 Agreement and 1995-1998 Agreement not because of the Arbitrator's mistake but because it genuinely believed that that was the proper course of action.

It is also true, as the University argues, that paragraph "3" in the original grievance settlement refers to the word "tenure". I agree that the use of the word "tenure' in this paragraph certainly raises an element of ambiguity to the matter. Nevertheless, I can not conclude that the use of the word "tenure", in this paragraph somehow meant Ms. DeLucca's continued employment was to be considered under the terms of the 1995-98 Agreement, instead of the 1992-95 Agreement. First, this paragraph dealt with what material could be considered in the future. It did not define what process or what Agreement was to be used. Moreover, the parties have used "tenure" and "permanent status" interchangeably during this controversy.

The use of the term "tenure" in this paragraph does not mean that the reappointment process to be used was the new tenure process contained in the 1995-98 Agreement. Paragraph "2", of the settlement agreement, on the other hand, specifically sets the parameters of the process that was to be

used for Ms. DeLucca's continued employment. It is specific, and the explicit terms setting forth the reappointment process in this provision must apply over the more general terms used in paragraph 3 and which stated nothing with respect to the process to be used for Ms. DeLucca's reappointment. Paragraph 2 is clear and unambiguous. It states

> ... if she is reappointed for the 1997-98 school year, she shall have permanent status subject to dismissal only for just cause. If she is re-employed for the 1996-97 school year, her employment status shall be as a faculty member who elected to continue to be treated under the terms of the 1992-95 collective bargaining agreement provisions regarding Appointment and Evaluation and not under the alternative provisions regarding Appointment, Evaluation, Promotion and Tenure in the 1995-98 collective bargaining agreement.

In addition it is significant that the first time the parties attempted to implement the settlement agreement, during the the 1996-97 review process, the University followed the terms of the 1992-95 Agreement. The procedure was used without any objection from the Association. The fact that the procedural and substantive process of the 1992-95 Agreement were the ones used in Ms. DeLucca's 1996-97 review, which occurred immediately after execution of the settlement, further supports the Association's position that it was the terms of 1992-95 Agreement that were to be used again for the reappointment process that occurred in 1997-98.

There is no dispute that the University did not follow the terms of the 1992-95 Agreement when it considered Ms. DeLucca's for continued employment. Under the terms of the 1992-95

Agreement the University did not follow the time periods for considering Ms. DeLucca continued employment. This alone could be grounds for concluding that Ms. DeLucca should receive permanent status. Under the terms of the 1992-95 Agreement there is a decision by the Dean, followed by a decision by the Vice President of Academic Affairs. Even though not completed by the time frame that existed under the 1992-95 Agreement, evaluations by both Dean Gould and Vice President Forbes were positive and recommended continued employment. Thus, this is not simply a case of a faculty member obtaining permanent status by default, simply because the University failed to follow the contractual time periods; both evaluators who had responsibility for reviewing faculty members under the 1992-95 Agreement recommended Ms. DeLucca's continued employment.

I have no hesitation in concluding that the University failed to comply with the terms of the grievance settlement and failed to put Ms. DeLucca in the position she should have been in but for the University's violation of the settlement agreement and as a result violated the September 1997 Arbitration Award. This is now the second time in two years the University failed to comply with the terms of the original settlement agreement.

The Association argues that Ms. DeLucca should, once and for all, obtain permanent status and also tenure status to bring closure to this controversy. There is no question that Ms. DeLucca should be awarded permanent status. This was the employment status that flowed from the 1992-95 Agreement and

should have applied to Ms. DeLucca's continued employment status. Moreover, her permanent status must be considered as having been achieved at the end of the 1994-95 academic year, the year that was her original terminal year under the 1992-95 Agreement.

Under the terms of the 1992-1995 Agreement the only employment status that Ms. DeLucca could have obtained was that of a permanent position. The status of tenure did not occur until the 1995-98 Agreement when the parties agreed to grant tenure to existing permanent faculty members, who had already received permanent status. It would certainly appear that Ms. DeLucca by virtue of this Award should be considered to have received her permanent status effective at the end of 1994-95 academic year, and that, as a result, she should receive tenure status under the terms of 1995-98 Agreement. On the other hand, I do not believe that I have jurisdiction to issue any relief that goes beyond the terms of my original remedy or to grant a status that originated after the expiration of the 1992-95 Agreement. In particular, I do not believe that I can not make any declaration under the 1995-98 Agreement as this would expand the matter beyond the retention of my jurisdiction set forth in my September 1997 Award.

**Conclusion and Award**

For the reasons set forth in the above Decision:

1. I have jurisdiction over the present controversy by virtue of my retention of jurisdiction set forth in the

September 1997 Decision. In particular, the present controversy is a matter of clarification that falls directly under the terms for the retention of jurisdiction.

2. The University was required ,under the terms of the Settlement Agreement and the September 1997 Arbitration Award to follow the terms of the 1992-95 Agreement with respect to determining Ms. DeLucca's future employment status. The University failed to do so and thus violated the terms of the settlement agreement and did not apply the remedy of my September 1997 Arbitration Award.

3. Ms. DeLucca shall be awarded permanent status. Moreover, her permanent status shall be as if she were awarded permanent status under the terms of the 1992-95 Collective Bargaining Agreement.

4. Any claim that Ms. DeLucca has to tenure status derives from the terms of the 1995-98 Agreement, which is a matter that is beyond the scope of this Arbitrator's retention of jurisdiction.

October 19, 1998
Boston, Massachusetts

Gary D. Altman