APPENDIX C

# AMERICAN ARBITRATION ASSOCIATION

## VOLUNTARY LABOR TRIBUNAL

Case No: 11-300-0833-97

---

IN THE MATTER OF ARBITRATION BETWEEN

**ROGER WILLIAMS UNIVERSITY**
**FACULTY ASSOCIATION - NEA/RI**
**AND**
**ROGER WILLIAMS UNIVERSITY**

(Grievant: Sharon DeLucca)

---

## AWARD OF THE ARBITRATOR

The Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered by the above named parties and having been duly sworn and having duly heard the proofs and allegations of the parties AWARDS as follows:

For the reasons set forth more fully in the attached Decision, the grievance is sustained. The University is to comply with the remedy set forth in the Decision.

September 3, 1997
Boston, Massachusetts

Gary D. Altman

**AMERICAN ARBITRATION ASSOCIATION**
Voluntary Labor Tribunal
Case No: 11-300-00833-97

---

IN THE MATTER OF ARBITRATION BETWEEN
**ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION - NEA/RI**
**AND**
**ROGER WILLIAMS UNIVERSITY**
(Grievant: Sharon DeLucca)

---

# ARBITRATION DECISION AND AWARD

## INTRODUCTION

The Roger Williams University Faculty Association NEA/RI ("Association") and Roger Williams University "University") are parties to a Collective Bargaining Agreement ("Employer" or ("Agreement"). Under the Agreement grievances not resolved during the grievance procedure may be submitted to arbitration under the rules of the American Arbitration Association. The parties presented their case in Arbitration before Gary D. Altman, Esq. on July 23, 1997. The Association was represented by Thomas Liguori, Esq. and the University by Karen Garrett, Esq. All witnesses were sworn. The parties had the opportunity to examine and cross examine witnesses and to submit documentary evidence. The parties submitted written briefs in lieu of presenting oral closing arguments.

## Issue

The parties could not stipulate to an issue and agreed that the arbitrator would frame the issue after they presented their case. The issue proposed by the Association is as follows

> Did the non-renewal of Sharon DeLucca violate Article VIII, IX, or other related provisions of the Collective Bargaining Agreement? If so what would be the remedy?

The University proposed the following issue:

> Whether the non-renewal of the contract of the grievant, a MBU by the Roger Williams University, was arbitrary capricious and in violation of Article IX A of the 1992-95 Collective Bargaining Agreement between the Roger Williams University Faculty Association NEA/RI and the Board of Trustees of Roger Williams University? If so, what would be the remedy?

In the present case the earlier settlement agreement of the parties must be reviewed when considering the provisions of the collective bargaining agreement. Accordingly, after considering the arguments of the parties, the issue can be appropriately stated as follows:

> Whether the non-renewal of the contract of the grievant by the Roger Williams University violated the earlier settlement agreement between the parties and Article VIII and IX A of the 1992-95 Collective Bargaining Agreement between the Roger Williams University Faculty Association NEA/RI and the Board of Trustees of Roger Williams University? If so, what would be the remedy?

**Facts**

The grievant, Sharon DeLucca, was hired to be an instructor in graphics arts for the 1991-92 academic year. Ms. DeLucca was rehired for the 1992-93, 1993-94, and 1994-95 academic years. Ms. DeLucca's history of employment during this period was not trouble free. Specifically in her 1993 evaluation, Vice President of Academic Affairs, Malcolm Forbes wrote:

> [s]everal of Sharon's peers give her very high marks for teaching effectiveness, cooperation and participation in the academic community. Others have expressed disappointment with her 'negative attitude' and narrow-minded outlook, and rate her performance at the low end of the scale. There is clearly a big difference between the way Sharon sees herself and how some of her colleagues see her. In order to become a fully accepted and productive member of the faculty, she will have to address these problems and come up with a viable solution.

After this evaluation, she was renewed for the 1993-94 academic year by the University. Ms. DeLucca was again renewed for the 1994-95 school year. For the 1994-95 academic year Vice President Forbes wrote in his evaluation:

> [t]he dean, however, has also referred to behavior on your part which is considered unprofessional and divisive. I view such behavior with extreme caution and urge you to take corrective action. If you fail to correct such behavior, it may result in you not being offered future employment.
>
> You are, therefore offered reappointment to the faculty for the 1994-95 academic year but with the clear understanding that you are on warning.

Under the Collective Bargaining Agreement a faculty member serves four years essentially in a probationary period. During the fourth year the University decides whether it will award permanent status (tenure) to the faculty member. The tenure decision for Ms. DeLucca was to occur at the end of the 1994-95 school year. Mark Gould was the Acting Dean of Science and Mathematics at that time. Dean Gould completed his written evaluation on January 13, 1995. The evaluation rated Ms. DeLucca on her teaching performance; Professional Competence and Intellectual Breadth, and Participation in the Academic Community.

Professor Gould favorably evaluated Ms. DeLucca's teaching performance and her professional competence. With regard to the category of "Participation in the Academic Community", Dean Gould wrote:

> Within the Roger Williams community, Ms. DeLucca is an active participant. At the Art Department level, Ms. DeLucca has been active in program review. The Art Department is not in agreement, and often her views are not well received. At times there is a bit of contention and intractable points of view develop. It is important that a consensus develops which incorporates all points of view. Ms. DeLucca will listen to other points of view, but sometimes does not want to hear differing views.

> Ms. DeLucca reviews materials and her comments are generally well thought out. The perceptions and opinion help make Roger Williams a better institution.

Despite this reservation, Dean Gould recommended that Ms. DeLucca be reappointed. He submitted his recommendation to Malcolm Forbes, Vice President for Academic Affairs.

Vice President Forbes, despite Professor Gould's positive recommendation, decided not to reappoint Ms. DeLucca for the 1995-96 academic year. In a letter dated FeLruary February 28, 1995 Vice President Forbes wrote:

> The reason for this action is based on the disruptive and unprofessional behavior you have exhibited toward one or more of your colleagues in the Art area.

Vice President Forbes' decision resulted in the University not awarding tenure to Ms. DeLucca.

Ms. DeLucca and the Association grieved the University's decision not to award her tenure and the matter ultimately proceeded to arbitration. The matter was scheduled for Arbitration on December 6, 1995. At the arbitration hearing the parties resolved the grievance and entered into a settlement agreement.[1] The pertinent terms of the Agreement read as follows:

> 2. For the 1996-97 academic year, Ms. DeLucca shall be reinstated as a full-time probationary faculty member with the rank of assistant professor, in the area of Art, at the fifth step on the salary schedule, as if she were in

---

[1] Attorney Liguori read the essence of the Agreement into the record of the earlier arbitration proceeding. The parties agreed that they would later formalize the Agreement into writing. The written agreement was introduced into evidence (Assoc. 3). The Association also offered the transcript of the earlier arbitration proceeding. The transcript was received over the objection of the University. As the parties disputed the interpretation of the terms of the written agreement and as the terms of the written agreement are ambiguous, the transcript was admitted solely for the purpose of deciphering the intent of the written settlement agreement not to supplant this agreement.

the fourth year of her probationary status, under the terms of said 1992-95 collective bargaining agreement, such that if she is reappointed for the 1997-98 school year, she shall have permanent status subject to dismissal only for just cause. If she is re-employed for the 1996-97 school year, her employment status shall be as a faculty member who elected to continue to be treated under the terms of the 1992-95 collective bargaining agreement provisions regarding Appointment and Evaluation and under the alternative provisions regarding Appointment, Evaluation, Promotion and Tenure in the 1995-98 collective bargaining agreement.

3. During the 1996-97 school year Roger Williams University shall evaluate Ms. DeLucca's performance to determine if there exists concern regarding her professional relationships. Roger Williams University may rely upon documentation shown to her, including without limitation, during the grievance and arbitration process and placed in her personal file. If such concerns exist, then these concerns together with past concerns in this area may be used in making the decision regarding continued employment and tenure status. If such concerns do not exist for 1996-97, then in that event, the decision regarding continued employment and tenure status shall be made without reference to the asserted concerns in previous years regarding professional relationships. Ms. DeLucca shall have the opportunity to explain the circumstances or to rebut any allegation set forth in any document shown to Ms. DeLucca by Roger Williams University before it may be relied upon by Roger Williams University.

4. Ms. DeLucca's appointment for 1996-97 shall be in the Art Department, provided however, that Ron Wilczek shall not be her Area Coordinator (Department Head), an alternative arrangement will be made with respect to Ms. DeLucca.

5. From the date of this Agreement until re-employment, Ms. DeLucca's status for the 1995-96 school year shall be termed as an unpaid leave of absence.

6. For the 1996-97 school year, Ms. DeLucca's office shall be located in the Computer Center or Business Department on a space available basis. If there is no such available space, reasonable effort will be made so that her office is not located in the Art Department.

* * *

After the settlement at the arbitration hearing, the parties met to review what written materials would be placed in Ms. DeLucca's personnel file pursuant to Article 3 of the above referenced settlement agreement.[2] The package of materials was entered into evidence in the current arbitration hearing. (Assoc. Ex. 5)[3] Susan Nardi was the Association representative who attended the meeting. Ms. Nardi testified that Ms. DeLucca and the Association believed that it would be better not to respond to the many documents as they interpreted the settlement agreement as being a "fresh start" for the upcoming school year and that the past documents could not be used against her unless there were additional interpersonal problems in the 1996-97 school year. Ms. DeLucca resumed teaching for the 1996-97 academic year.

Dean Gould testified that he had not seen the terms of the 1996 grievance settlement but that Vice President Forbes had told him that Mr. Wilczek would not serve as her department chair, that her office was to be located outside of the Art Department. Dean Gould further testified that Vice President

[2] Ms. DeLucca sighed this package of documents. The paragraph above the signature line reads:

> The undersigned acknowledges receipt of the documents ... and the fact that the material will be placed in the personnel file of Sharon DeLucca. In addition the undersigned has been informed that she may respond in writing to any or all of the documents, such responses to be placed in the personnel file as well.

Ms. DeLucca did not submit any written response to these documents.

[3] A fundamental disagreement between the parties is the extent, if any, to which the University could use these documents in its decision whether to reappoint Ms. DeLucca after the 1996-97 school year. The University believed that it had the authority to consider these earlier documents in the reappointment process. The Association maintained the University could not consider these earlier documents. Whether the University could do so under the 1996 settlement agreement, will be discussed later in the Decision.

At the arbitration hearing the University highlighted a number of the documents that it believed reflected negatively on Ms. DeLucca's ability to work constructively with members of the Art Department.

Forbes showed him the package of documents that had been placed in Ms. DeLucca's personnel file as a result of the settlement agreement.[4] Dean Gould indicated that his evaluation was to be in accordance with the 1992-95 Faculty Agreement and that he was to evaluate her as he would evaluate any other fourth year instructor. In other words, he was not told that the terms of the grievance settlement restricted his evaluation of Ms. DeLucca. He completed his written evaluation of Ms. DeLucca on January 13, 1997.

His evaluation, in pertinent part, reads as follows:

* * *

> Ms. DeLucca is in the last year of her probationary period. As a result, her performance over the entire time period of employment at Roger Williams University has been taken into account, even though Ms. DeLucca's self evaluation and the bulk of this report focus on the current academic year.
>
> **Teaching Performance**
>
> * * *
>
> Students indicated that Ms. DeLucca seeks quality work from them and that in the Graphic Courses, the use of the computers facilitates their projects. Students in her Drawing I course reported frustrations with the style of learning that occurred, several noting that to learn to draw on the computer should come after learning drawing fundamentals. Several Graphic Design students reported that critiques were often extensive for some students and too brief for others; some students reported that Ms. DeLucca's sarcasm was a bit harsh on their classmates. Other students reported that they had an enjoyable experience in learning the graphic art learning techniques. In general, it appears that Ms. DeLucca will work with students to help them learn and gives freely of her time.
>
> A concern raised by colleagues in the art area resulted from Ms. DeLucca's decision to teach Drawing I in a non-

[4] Dean Gould testified that he was never told that he could not consider these documents.

traditional mode, i.e. by using computer rather than by hand. They believe this will have negative consequences upon the student's ability to further their education in art. As indicated above, students have voiced the came concerns.

**Professional Competence and Intellectual Breadth**

A poster for the Alive Arts series was produced. Ms. DeLucca is designing a series of catalogues for the Frye Art Museum and she has arranged for an exhibit of Graffito/Active 8 for the campus during the spring semester. Ms. DeLucca uses graphics to convey information to the public and is quite competent in doing same. Ms. DeLucca had not attended any professional meetings in the past year according to her self evaluation.

**Participation in the Academic Community**

Ms. DeLucca specifically requested that her office not be located in the Art Building. As a result, Ms. DeLucca has little daily contact with her colleagues in Art and likewise with the students who are working in the art studios. However, Ms. DeLucca participated in all of the summer orientation programs giving freely of her time to advise students. Ms. DeLucca volunteered for College of Arts and Science committees and represents Art as the Study Abroad representative. She has volunteered to host the Honors students at a reception this spring.

The Art Department was criticized by Ms. DeLucca for holding meetings at an inconvenient time. The time selected was one in which all participants could attend and Ms. DeLucca has since attended regularly with protest.

Ms. DeLucca is a talented person but not all students feel that she teaches her area of expertise to the students in a successful manner. Her level of involvement in professional development activities is limited and she has provided no evidence of outcomes realized and goals she wishes to achieve in the future. Her activities beyond the classroom are not synergistic within the department.

Ms. DeLucca's difficulty relating to other members of the Art Department over a four year period are well documented. Her self imposed separation during the current year has not helped to repair the previous breakdown in interpersonal relationships. In my opinion, therefore, she does not contribute constructively to creating a sense of

community among colleagues and students. For the reasons above, I recommend that Ms. DeLucca not be reappointed.

Dean Gould testified that Ms. DeLucca caused "contentiousness" and "bickering" in the Art Department for the 1996-97 academic year. He mentioned the assignment of classrooms and also the scheduling of staff meetings as examples. Dean Gould stated that originally it was his prerogative to schedule the classrooms for faculty members. He stated that in the art department there was competition for rooms and that Ms. DeLucca went over his head to ensure that she had the classrooms that she wanted in the computer labs. There is no dispute, however, that Ms. DeLucca taught graphic art and that she and her students used computers in the classroom. Dean Gould stated that the other faculty members, however, resented the fact that Ms. DeLucca had classrooms outside of the Art Building.[5]

Ms. DeLucca testified that she did nothing different than she had done in past years in seeking to obtain a classroom with computers. Ms. DeLucca stated that she discussed her classroom assignment with Vice President Forbes after the settlement agreement and that he had no objection. After this conversation, she contacted the registrar to discuss her classroom needs.

Dean Gould also assigned the time for art department faculty meeting to occur on Tuesdays at 10:00 a.m. Ms. DeLucca stated that she had two labs; one went from 8:00 am to 10:00 am and the other from 11:00 to 1:00 pm on the days of the faculty meetings and that she needed time to set up and shutdown the computers and at times answer questions after class. As a result Ms. DeLucca stated that it made it very difficult to attend faculty meetings at 10:00 am. Moreover, Ms. DeLucca had to walk to the staff meetings as her class was in a different

[5] Ms. DeLucca put in a request for room assignments in November of 1996. Dean Gould also sent a memo back to Ms. DeLucca stating that he was not responsible for room assignments.

building. Ms. DeLucca wrote a memo to members of the Art Department which read:

> Well, the semester is upon us, and, like everyone else's my schedule is tight. I have two lab classes on Tuesdays 8-10 AM and 11-1 PM. It's difficult for me to meet during the one hour between classes, but I will make every effort to attend the scheduled meeting this Tuesday.
>
> I look forward to meeting with the new members of the department and wish to welcome them to the campus and to a new year. Although my office is located in the Humanities Pod, please feel free to call on me to say Hello.

The meetings were changed from Tuesday to Thursdays but the time of the faculty meetings was not changed. This memo was sent to Vice President Forbes, who was also sent the minutes that Ms. DeLucca had not attended a September 24, staff meeting.[6] Ms. DeLucca then wrote to Dean Gould:

> The scheduled meeting time of 10:00 am on Thursday is tight for me to attend. I have one hour between classes on this day from 10:00 am to 11:00 am. Could you suggest another meeting or a way for me to work my classes around this meeting time? I would appreciate any thoughts that you might have. Thank you.

Dean Gould testified that he considered Ms. DeLucca's response a "muted criticism". These memos were in Ms. DeLucca's personnel file. Not in the file, however, were the minutes that reflected that she attended all the staff meetings. Dean Gould testified that Ms. DeLucca attended the meetings "under protest". Dean Gould explained that Ms. DeLucca never used these exact words but that she griped about the time of the meeting to others.[7] Ms. DeLucca stated that she never protested the times of the meetings but simply sought an accommodation and that she attended all but the first faculty meeting.

[6] Ms. DeLucca stated that she did not attend the staff meeting because she was meetings with students after the class.
[7] Dean Gould did not attend all the Art Department faculty meetings.

Dean Gould in his written evaluation also criticized Ms. DeLucca for her "self imposed separation". There is no dispute that Ms. DeLucca's office was placed in another building as a result of the 1996 settlement agreement. Dean Gould stated that what he meant was that, "dealings with other faculty members had been put on a back burner...it was more of perfunctory duties that had to occur...when I have to deal with a faculty member indirectly, that to me is a means of isolation, separation."[8] Ms. DeLucca stated that she was elected to the faculty senate for the Spring of 1997. In addition, Ms. DeLucca stated that she participated in various department events during the year and that as far as she was concerned there was no friction between her and any members of the department during the 1996-97 school year.

Dean Gould stated that students and faculty were concerned about Ms. DeLucca's use of computers in teaching a drawing course. Ms. DeLucca testified that she had never before taught drawing at the University. She learned she would be teaching drawing prior to her return to teach in the Fall of 1996. Ms. DeLucca stated that when she learned of this assignment she contacted Vice President Forbes. Specifically, she stated that she suffers from severe eczema and is unable to handle chalk, which is usually used in drawing classes. Ms. DeLucca stated that Vice President Forbes sought a doctor's note regarding her condition. Ms. DeLucca stated that she provided the doctor's not and she understood that Vice President Forbes agreed that she could teach drawing in another medium. Ms. DeLucca stated that she decided to use computers as the method to teach drawing. Ms. DeLucca stated that her use of computers to teach drawing was discussed at a staff meeting and that the faculty accepted her method of teaching the class with computers.

Dean Gould also stated in his evaluation that Ms. DeLucca only provided minimal information with regard to her self

[8] Dean Gould referred to Ms. Nardi's letters to him on behalf of Ms. DeLucca.

evaluation. He explained that under the Agreement faculty members had until October 15, to submit their self evaluations. Ms. DeLucca submitted hers on October 16, at which point Dean Gould stated that he sent it back to her because it was only minimal and that he then wrote to her seeking further information. Dean Gould testified that Ms. DeLucca told him that she could not discuss it with him and that he did not understand the terms of the settlement agreement

Susan Nardi, Association Representative then wrote to Dean Gould on Ms. DeLucca's behalf also seeking clarification on what Dean Gould needed to complete his evaluation. Ms. Nardi indicated that since Ms. DeLucca was not teaching last year she could not provide any information for the past year, one of the criteria that was set forth in the Agreement. Ms. Nardi requested that Dean Gould inform Ms. DeLucca exactly what else was necessary to complete the evaluation process. She wrote:

> Sharon is willing to follow your directive within the terms of the Settlement Agreement between the University and herself. She also has the right to ask for guidance and assistance from you as her Dean and the right to have a reasonable expectation that you will respond. I believe that is a professional responsibility for a Dean at any University.

Dean Gould responded in writing to Ms. Nardi. He wrote part:

> Let me stress that any faculty member in the fourth year of probationary status will be evaluated on their performance over the entire period of employment at Roger Williams. The same criteria apply to anyone else in the same situation. I expect Sharon to provide me with as much information as possible which enables me to perform a thorough evaluation of her performance.
>
> When I met with Sharon shortly after her submittal on October 16 of the evaluation material, I asked her for further information. I tried to provide guidance to Ms. DeLucca in the evaluation process, just as I have with other faculty. She commented to me that she would have to contact others to see if she was responsible for the

> information requested. It is her responsibility to comply with the provisions of the settlement and the contract under which she is being evaluated.
>
> I am sending a copy of this letter to Ms. DeLucca; I am recommending to the Vice President for Academic Affairs that all of these letters be placed in her personnel file.

Ms. DeLucca submitted further information on November 22, indicating that it has been provided:

> in an attempt to comply with your directive and yet not violate the settlement agreement, I have tried to expand on each of the items contained in my self-evaluation.

Ms. DeLucca also submitted further information on December 18, 1996. This information was submitted to Vice President Forbes after Dean Gould completed his evaluation of Ms. DeLucca.

Vice President Forbes acted on Dean Gould's evaluation. On February 13, 1997 he wrote to Ms. DeLucca denying her reappointment for the 1997-98 academic year. He wrote:

> This action is based on your difficulty relating to other members of the art department, and your failure to contribute constructively to creating a sense of community among colleagues and students.

Vice President Forbes handed this letter to Ms. DeLucca. Also provided to Ms. DeLucca was a package of documents. (Assoc. Ex. 8.) Vice President Forbes testified that the only documents he relied upon in making his decision not to reappoint Ms. DeLucca were contained in Assoc. Ex. 5 and Assoc. Ex. 8.

Vice President Forbes stated that during her entire probationary period Ms. DeLucca had many difficulties working with her colleagues in the Art Department. These problems, Vice President Forbes, stated were well documented in Ms. DeLucca's personnel file and he had personal experience with many of these issues. Moreover, Vice President Forbes believed that he was not prohibited from considering the many documents that

were in Ms. DeLucca's file. Vice President Forbes stated that there were no specific documents existing in the 1996-97 school year that referenced any negative professional relationships with colleagues. Nevertheless, as for the 1996-97 academic year Vice President Forbes testified that:

> She made no attempt to repair the damage that had been done previously and performing duties as best she could under those circumstances, but by having as little to do with her colleagues as possible was not, I felt, contributing in the way a faculty member should do to the strength of the department in the operation of the department.

**Relevant Provisions of the Agreement**

> ARTICLE VIII APPOINTMENT AND EVALUATION
>
> A.3. Probationary Period
>
> The first four (4) years of full-time employment for all MBU's shall constitute a probationary period. ... During the probationary period the MBU shall be evaluated annually and the performance evaluation submitted to the Vice President for Academic Affairs by February 15. During any probationary period employment may be terminated by the Vice President for Academic Affairs, who will state reason(s) for termination in writing prior to March 1 of the current year. The reasons for termination may not be arbitrary or capricious.
>
> * * *
>
> B. EVALUATION FOR REAPPOINTMENT
>
> 3. The evaluation process shall be thorough and professional. Assessment of the general capabilities of individual faculty members shall be in relation to his or her specific discipline, program or duties, and to the needs and interests of the University. This process shall involve consultation with faculty members of the program/School, other MBU's outside the program/School, and with students in his/her courses. The Dean shall prepare a written evaluation which may vary in form, but must comply with the accepted procedures and must address each of the following categories:

(a) Teaching performance, e.g. effectiveness of teaching, concern for teaching.

(b) Professional competence, e.g. command of subject/discipline, academic growth/performance, and overall contribution to the profession.

(c) Participation in the academic community, e.g., acceptance of faculty responsibilities outside the classroom, relations with colleagues and students.

(d) Intellectual breadth, e.g. demonstration of interests and knowledge beyond subject taught, analytical/synthetic /artistic capacity.

* * *

ARTICLE IX, DUE PROCESS

A. No permanent MBU shall be dismissed without just cause. The termination of probationary MBU's shall not be arbitrary or capricious. Dismissal for purposes of this Agreement shall mean non-renewal of contract or dismissal during the year.

**Discussion**

Article VIII of the Agreement sets forth the procedures for the Appointment and Evaluation of faculty members. Under this provision of the Agreement, the first four years of employment consist of a probationary period. The decision to reappoint a faculty member for a fifth year of service means that the faculty member becomes a permanent member of the faculty. After her first four years of service Ms. DeLucca was not granted permanent status. The University's decision not to reappoint her for her fifth year of service resulted in a grievance that eventually proceeded to arbitration. The parties then entered into a comprehensive settlement of the grievance. Under the terms of the Settlement Agreement, Ms. DeLucca was rehired for a fifth year of service. Ms. DeLucca, however, was not considered a permanent faculty member; rather her probationary status was continued for another year with the

decision whether she would be reappointed and thus become a permanent member of the faculty to follow at the end of the 1996-97 year. Ms. DeLucca was evaluated and at the end of the evaluation process she was not reappointed for the 1997-98 academic year.

I. The Grievance Settlement Agreement

The initial and fundamental disagreement between the parties is the extent to which, if any, Ms. DeLucca's past employment record could be used by the University when it made its decision not to reappoint Ms. DeLucca after the 1996-97 school year. This not a case where a new faculty member, for the first time, is being evaluated for tenure during their fourth year of employment. Ms. DeLucca was evaluated after her fourth year, was denied tenure and pursued a grievance. The parties entered a settlement agreement which painstakingly delineated a process for Ms. DeLucca's continued employment and established the manner in which Ms. DeLucca was to be evaluated for 1996-97 school year. Thus, it is first necessary to consider the settlement agreement to determine the extent, if any, that it impacts the 1996-97 evaluation process.

There is no dispute that Ms. DeLucca was originally denied tenure in 1995 due to her "disruptive and unprofessional behavior". (Assoc. 2). Ms. DeLucca and the University challenged the process used by the University in reaching its decision. At the prior arbitration hearing the parties agreed that Ms. DeLucca would return to her position with the University. Ms. DeLucca, however, was not returned as a tenured faculty member but as a faculty member in her fourth year of employment, to again be evaluated for a decision on permanent status. With regard to the evaluation process, the parties agreed in paragraph 3 as follows:

> During the 1996-97 school year Roger Williams University shall evaluate Ms. DeLucca's performance to determine if there exists concern regarding her professional relationships. Roger Williams University may rely upon

> documentation shown to her, including without limitation, during the grievance and arbitration process and placed in her personal file. If such concerns exist, then these concerns together with past concerns in this area may be used in making the decision regarding continued employment and tenure status. **If such concerns do not exist for 1996-97, then in that event, the decision regarding continued employment and tenure status shall be made without reference to the asserted concerns in previous years regarding professional relationships.** Ms. DeLucca shall have the opportunity to explain the circumstances or to rebut any allegation set forth in any document shown to Ms. DeLucca by Roger Williams University before it may be relied upon by Roger Williams University. (emphasis added)

This paragraph deals only with the subject of Ms. DeLucca's interpersonal relationships. This was the deficiency that was the basis of Vice President Forbes reason not to grant her tenure after the 1994-95 school year. This inadequacy, in the settlement agreement, is labeled as the "concerns". The above sentence, in bold, can only be interpreted to mean that if there are no "concerns" in the 1996-97 academic year then Ms. DeLucca's past "concerns" would not be used against her for purposes of the decision to make her a permanent employee.

This conditional use of Ms. DeLucca's past record is further supported by the record that was made of the prior arbitration. As a general matter, arbitrators will consider statements made at the time the agreement is executed not to vary the terms of the agreement but as guide to interpret the meaning of the terms of the agreement. At the close of the arbitration Mr. Liguori, attorney for the Association, read the elements of the settlement agreement into the record. He stated:

> This will be accomplished with the understanding, however, that if the University has concerns regarding her professional relationships, that they will be able to refer to, with respect to her 96/97 employment, as they would have been able to refer in the 94/95 year.

> Further that her 96/97 performance will be evaluated to determine if these concerns persist, without the tenure decision being made reaching back, if they don't.

The written terms of the executed settlement agreement are totally consistent with the oral summation of Attorney Liguori.

The University, nevertheless, maintains that the Collective Bargaining Agreement reserves to the University the right to evaluate faculty members based on their entire period of employment with the University and that in no way did it limit its rights by agreeing to the terms of Ms. DeLucca's settlement agreement.

The clear terms of the settlement agreement require a contrary conclusion. The University specifically agreed to consider Ms. DeLucca's past employment history, with regard to her ability to work with her colleagues, **only** if related issues arose in the 1996-97 school year. If these concerns did not resurface then her past difficulties with her colleagues were to have no role in the evaluation process that occurred in 1996-97. For purposes of this case the University must be held to the terms to which it agreed in the settlement agreement. Thus the evaluation process in the Agreement must be read in conjunction with the parties' grievance settlement. Indeed, to hold otherwise would discourage the Association and the University from engaging in grievance settlements.

<u>II. The 1996-97 Evaluation</u>

There can be no question that both Dean Gould and Vice President Forbes believed they were free to consider Ms. DeLucca's past employment record. Dean Gould in his written evaluation states "Ms. DeLucca's difficulty relating to other members of the Art Department over a four year period are well documented." Similarly, Vice President Forbes testified that he could not close his mind to Ms. DeLucca's past problems with her colleagues and considered her past problems in deciding not to reappoint her for the 1997-98 academic year. This inability

to review Ms. DeLucca without reference to her past problems casts serious doubt as to whether the University could comply with the terms of the settlement agreement and actually give Ms. DeLucca an opportunity to have a fresh start, which was clearly the intent of the settlement agreement. In other words, the record shows that the University did not wait until problems surfaced before it went back to Ms. DeLucca's past employment record. Rather, it used her past to predetermine her 1996-97 evaluation. This in and of itself would lead to the conclusion that the University violated the spirit and intent of the settlement agreement.

The University argues that there were several events that occurred during the 1996-97 school year that would have justified its looking back and considering Ms. DeLucca's past employment record in making its decision not to reappoint Ms. DeLucca for the next year. These events will now be considered.

Dean Gould mentioned that Ms. DeLucca went over his head to obtain her classroom assignment and that this led to contentiousness with her colleagues. The record does not support this conclusion. Ms. DeLucca requested a computer lab for her graphic arts class. In the past she had been assigned a computer classroom. Making a request to the registrar for a classroom assignment hardly appears to be disruptive. The intent of the settlement agreement was to ensure that Ms. DeLucca was not disrespectful and acted professionally with her colleagues; it did not prevent her from making requests for her classroom assignments. There is absolutely nothing in the record that would lead an objective person to conclude that Ms. DeLucca went out of bounds in making her requests for classroom assignments.[9]

The University also points to Ms. DeLucca's attitude about staff meetings as a basis to justify its decision to look back to Ms. DeLucca's past record. This assertion is baseless. The

[9] Dean Gould testified that classroom assignments were out of his hands.

staff meetings were scheduled between 10:00 and 11:00 am on a morning that Ms. DeLucca had a lab class that ran from 8:00 a.m. to 10:00 a.m. and another class that ran from 11:00 a.m. to 1:00 p.m. Moreover, she was in another building from where the meetings were located. Ms. DeLucca sought to attend the staff meetings and inquired whether there was another time to have the staff meetings. Such an inquiry can hardly be considered as creating controversy within the Department. She wrote to Dean Gould:

> The scheduled meeting time of 10:00 am on Thursday is tight for me to attend. I have one hour between classes on this day from 10:00 am to 11:00 am. Could you suggest another meeting or a way for me to work my classes around this meeting time. I would appreciate any thoughts that you might have. Thank you.

Dean Gould testified that he was upset with this memo and that he considered it as "muted criticism." Again, the settlement agreement did not prevent Ms. DeLucca from communicating with Dean Gould. Her inquiry about changing the time for the staff meeting was a reasonable response. It can hardly be considered the course of action that under the settlement agreement would justify the University in concluding that Ms. DeLucca had not corrected her ways and that all of her past history could now be used against her. Moreover, there is no record evidence that Ms. DeLucca attended the staff meetings under protest. Indeed, the record reflects that she attended all of the meetings except for the first one. Indeed, she attended more meetings than Dean Gould.[10]

Dean Gould also criticized Ms. DeLucca for having her office in another building and for her self imposed isolation. It must be remembered that the settlement agreement was entered into by both the University and Ms. DeLucca. Thus, in this

[10] Indeed, if Dean Gould was not at all of the staff meetings it would be mere conjecture for him to conclude that Ms. DeLucca attended the meetings under protest.

regard, it was mutual understanding that Ms. DeLucca would have her office in another location; it was not her unilateral decision. If Ms. DeLucca was to be faulted for having her office in another building the University should never have agreed to let her have an office in another building in the settlement agreement. Moreover, there are no terms in the settlement agreement that required Ms. DeLucca to repair any past difficulties with colleagues in the Art Department. Thus, even if Ms. DeLucca did not make an effort to rectify any past problems this fact could not be used against her in so far as the University would be able to look back and use Ms. DeLucca's past history against her in the decision not to reappoint her.[11] This area of Dean Gould's evaluation is thus manifestly unfair.

Dean Gould also reproached Ms. DeLucca for not providing her self evaluation in a timely manner. Again, this is an area that was not covered by the settlement agreement. In any event, the confusion around the settlement agreement revolved around how much information Ms. DeLucca was required to provide since she had not taught in the previous academic year. Ms. DeLucca to clarify the situation, sought assistance from her Association representative. In view of the complexity of the terms of the settlement agreement and the history of her grievance, it was hardly unreasonable for Ms. DeLucca to seek guidance and assistance from her Association representative on this matter. Indeed, it was a judicious response to ensure that the issue was handled appropriately. Moreover, Dean Gould's testimony that Ms. DeLucca going to her Association representative was symptomatic of Ms. DeLucca inability to communicate with him, was totally inappropriate.

---

[11] It is certainly reasonable that faculty members in the department would have contact with one another during the course of the academic year. I make no finding as to whether Ms. DeLucca did in fact intentionally isolated herself during the year. Rather, even if she was isolated this was not a condition that could be considered a requirement of the settlement agreement that would then permit the University to look back at her past employment record.

The settlement agreement permitted the University to review Ms. DeLucca's departmental history **only** if she displayed the same course of conduct during the 1996-97 school year that she exhibited in past years. The fact of the matter is that she did not. The matters discussed above do not show that Ms. DeLucca had any negative confrontations or disruptive relations with any members of the Department during the 1996-97 academic year. The University, by the terms of the settlement agreement, was therefore prohibited from going back and using her past history as a basis to deny her reappointment for the succeeding academic year.

III. Discrimination

The Association essentially maintains that Ms. DeLucca was discriminated against due to her pursuing her grievance. It is true, that the University, as stated above, violated the terms of the settlement agreement. This breach, however, does not equate to discrimination. There can be no question that University, early in Ms. DeLucca's employment, had serious concerns about Ms. DeLucca's interactions with her fellow colleagues and the Department chair. These "concerns" are well documented in Ms. DeLucca's personnel file. Certainly, there can be no contention that any of these concerns were improperly motivated due to any of Ms. DeLucca's Association activities.[12] These concerns resulted in Vice President Forbes' decision not to reappoint her in 1995. Moreover, it is these same concerns that led Dean Gould not to recommend her and Vice President Forbes decision not to reappoint her in 1997.[13] Their decisions were not motivated because she pursued her grievance but due to

[12] The record does not reflect that Ms. DeLucca was involved in many association activities prior to the Arbitration hearing. Her election to the faculty senate occurred after the University's decision not to reappoint her.

[13] It is troubling that Dean Gould believed that Ms. DeLucca should have come to him directly instead of involving her Association representative in the matter of her self evaluation. Nonetheless, this fact does not lead to the conclusion that the University took the action it did but for Ms. DeLucca Association activities.

their assessment of Ms. DeLucca's adversity with colleagues in the Art Department prior to the 1996-97 academic year

IV Remedy

As set forth above, the settlement agreement restricted the University from considering her past difficulties if she did not perpetuate these "concerns" in the 1996-97 academic year. The record shows that she did not engage in the concerns that were the subject of the settlement agreement. The University therefore violated the terms of the settlement agreement when it based its decision not to reappoint Ms. DeLucca based on her past history dealing with members of the Department.

The issue then is what is the appropriate remedy for the University's violation of the settlement agreement. The Association maintains that Ms. DeLucca must be reinstated as a permanent member of the faculty at this time. The University maintains that this remedy is beyond the reach of the Arbitrator.

I have reviewed the Brown case cited by the Association and believe that the remedy in that case is differs from the present case. In Brown there was a judicial determination of unlawful discrimination. In other words the court concluded that the plaintiff would have received tenure but for the employer's unlawful discrimination. In the present case there has been no finding of unlawful discrimination. Moreover, despite the University's inappropriately considering Ms. DeLucca's past employment record, some issues were raised about Ms. DeLucca's teaching performance for the 1996-97 school year.

The appropriate remedy is to attempt to place Ms. DeLucca in the situation she would be in if the University had not violated the terms of the settlement agreement. This requires that Ms. DeLucca be again be reappointed for the 1997-98 academic year and to be evaluated for reappointment during this time period. It must also be stated that Ms. DeLucca complied

with all the terms of the settlement agreement and that it was the University that breached its terms by using Ms. DeLucca's past employment record in deciding not to reappoint her. Accordingly, is is most appropriate at this time to prohibit the University from considering Ms. DeLucca's past problems working with colleagues, as having any impact on its decision to reappoint Ms. DeLucca for the 1998-99 academic year; it forfeited this opportunity by breaching the terms of the settlement agreement when it considered her past history for the 1996-97 evaluation. Moreover, as Dean Gould's evaluation was improperly tainted by his viewing Ms. DeLucca's past employment history, his evaluation must be removed from her personnel file and can not be used as a basis for any decision regarding Ms. DeLucca's future employment with the University.

The Association also raises a legitimate point as to whether it is indeed possible for University officials to fairly consider Ms. DeLucca considering that it incorrectly used her employment history this year and that most likely it will be the same decision makers who will be involved in any subsequent reappointment decision. It is difficult, at this time, for this outside arbitrator to establish guidelines to ensure that Ms. DeLucca is evaluated fairly and impartially. Nevertheless, in view of the University's breach of the settlement agreement and to ensure that Ms. DeLucca's rights are protected, in the next evaluation process, should the University not reappoint Ms. DeLucca for the 1998-99 academic year, it is the University that must bear the burden of demonstrating that its decision was not based on Ms. DeLucca's past record but rather based on the criteria set forth in the Agreement. Finally, the arbitrator will retain jurisdiction solely for the purpose of issues that arise with respect to implementation of this remedy.

**Award**

For the reasons set forth in the above decision the

grievance is sustained. The University is to comply with the remedy set forth above.

September 3, 1997
Boston, Massachusetts

Gary D. Altman