# AMERICAN ARBITRATION ASSOCIATION, ADMINISTRATOR
## MICHAEL C. RYAN, ARBITRATOR

In the matter of the arbitration between:

ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION/NEA-RI

- and -

ROGER WILLIAMS UNIVERSITY

AAA#11 300 01993 06
Gr: Kathleen Dunn - Denial of Promotion

## DECISION AND AWARD

**For the University**

Nicholas DiGiovanni, Jr., Esquire
Christopher Neronha, Esquire

**For the Union**

Jeannette Wooley, Assistant Executive Director
Kathleen, Dunn, Esquire

## I. Background.

The hearing in this matter took place in Bristol, Rhode Island, on September 20, 2007. The parties stipulated to the following statement of the issues:

1. Did the Board of Trustees violate the collective bargaining agreement when it denied Kathleen Dunn promotion to full professor?

2. If so, what shall be the remedy?

The parties filed post-hearing briefs, which were forwarded to the arbitrator on November 14, 2007.

The hearing in this matter took place on September 20, 2007. The parties were able to stipulate to the following statement of the issue:

1. Did the Board of Trustee violate the collective bargaining agreement when it denied Kathleen Dunn promotion to full professor?

2. If so, what shall be the remedy?

Both parties submitted briefs, which were forwarded to the arbitrator on November 14, 2007.

## II. RELEVANT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

[New provisions in the 2004-08 Agreement appear in **boldface**. Deleted provisions are indicated by ~~strikethrough~~.]

<u>ARTICLE VII</u>
<u>CONDITIONS OF SERVICE</u>

<u>VII(A) Faculty Load</u>

~~1. Full-time teaching faculty will teach four (4) courses per semester (twelve [12] hours), or the equivalent teaching load. …~~

**VII(A)(1) <u>Teaching Load</u>**

**It is recognized that faculty…are committed to the provision of excellence in the academic endeavors of teaching, research and scholarship, professional service, advising, and other academically related activities that support students.**

Within an academic year…an individual faculty member may be assigned no more than 8 three-hour courses or 24 contact hours. …

Nevertheless, it is expected that the average teaching load for full-time tenured and probationary faculty members within a department or school will, over the course of an academic year, not exceed 21 contact hours. …

In order to enact this program…RWU agrees to minimally provide course releases by a variety of means…equal to the number of probationary and tenured full-time faculty members in active service for at least one full semester in each given year. These course releases will be distributed into two categories. Service Releases will be for such activities as department chairs, committee service and advising. Teaching & Scholarship Released will be assigned for such activities as research, teaching enhancement, curricular development, and graduate instruction. … It is the goal of the University to provide an equal number of Service Releases and Teaching & Scholarship Releases from the minimum number guaranteed above. As part of the teaching load program the following guidelines will be adhered to:

a. Research Intensive Release: Faculty members who are regularly engaged in scholarship/research as evidenced by referred publications, the application for and award of external grant support, or other widely accepted honors or recognitions, shall be regularly assigned a teaching load of no more than nine (9) contact hours per semester. …
b. New Faculty Release: To assist in their orientation to the University and the establishment of their scholarly programs, all probationary faculty members who commence service during the Fall 2004 semester and afterwards shall not be assigned more that twenty-one (21) contact hours in their first year. …
c. High Enrollment Release: During the duration of this Agreement, RWU and RWUFA agree to conduct and evaluate an experiment in curricular/teaching enhancement for MBUs with a higher average teaching load. If an MBU averages a student load of one hundred and five (105) students…over a three-semester period, she/he will be granted a course

**release in the fourth semester….to refresh and enhance their curriculum and/or pedagogical approaches. …**

* * *

**VII(A)(3) Graduate instruction requires a higher level of scholarship and research than undergraduate instruction. Specific requirements/policies for graduate faculty qualifications will be developed by the University's *Graduate Council*. Faculty who teach graduate courses will be expected to meet these requirements. Therefore, faculty members will have a regular teaching load of nine contact hours during semesters when they teach a graduate course(s)**

ARTICLE VIII

APPOINTMENT, EVALUATION, PROMOTION AND TENURE

* * *

VIII(B) Evaluation for Performance Assessment, Reappointment, Requests for Promotion and Tenure

Evaluations shall be conducted in accordance with this Article. The purposes of the evaluation system described herein are to help faculty members to improve their professional performance; to record a formal evaluation of how well an MBU has performed his/her duties; to provide for regular discussions about individual performance and improvement thereof… and to provide a basis for decisions as to re-appointment, promotion and tenure. …Comprehensive evaluations for reappointment, promotion, tenure and post-tenure review are conducted at stipulated times according to this Article. Evaluation for re-appointment, promotion and/or tenure are a cumulative process.…

The Chief Academic Officer [i.e., the provost] shall be responsible for ensuring the standards and carrying out the procedures described in this Article. …

* * *

VIII(B)(2) Evaluation Criteria **and the Comprehensive Self-Study**

Assessment of the general abilities of individual faculty members shall be in relation to his or her specific discipline, program or duties and to the needs and interests of RWU. This process may

involve classroom visitation and is not limited to consultation with faculty members of the program, college or school, with students in his or her courses, and with any other pertinent individual possessing knowledge of his or her performance. The faculty member, other faculty members in the academic unit, current and/or former students, external peers recognized as experts in the discipline, the dean and Chief Academic Officer may be consulted for input during the evaluation process.

**Documented** ~~E~~ **e**xcellence in teaching is the primary criterion for awarding reappointment, promotion and tenure. **Scholarship as needed to inform teaching, meet accreditation requirements or advance one's discipline is also an important criterion. RWU recognizes the multiple forms of scholarship as articulated by Ernest Boyer in *Scholarship Reconsidered*…and by Charles Glassick et al. in *Scholarship Assessed*…** . ~~Although the University is committed to effective teaching first and foremost,~~ **O**~~o~~ther criteria also enter into the evaluation process. These may include, but are not limited to, academic advisement and program development, scholarly and/or creative activities, and institutional and/or community service **directly related to the Mission of the University.**

**Roger Williams University is a student-centered teaching institution. Accordingly, the primary responsibility of faculty is teaching and primary evaluation requirement is effectiveness in teaching. While all faculty are expected to maintain a program of professional development and scholarly and creative activities (especially as they inform and enrich teaching), a publish or perish atmosphere is not intended. Therefore, the current evaluative criteria on scholarship, professional and/or creative activities, as set forth herein may be satisfied in a variety of ways….**

**Further, RWU endorses a broad view of faculty scholarship. Evidence of scholarship includes, but is not limited to, books, articles in scholarly journals, articles and periodicals for general audiences, reviews, conference presentations,**

**speaking engagements…. External expert validation of the scholarly merit of these various activities is required.**

It is recognized that all the evaluation criteria set forth below do not apply to all faculty members because of the non-traditional nature of their assignments as faculty. **It is also recognized that individual, specific criteria differ in importance within schools and departments due to accreditation requirements and the strategic initiatives of the University.** The degree and quality of participation will determine the overall contribution a faculty member has made to students, their department, their school/college and the University.

~~Based on the material provided by faculty members, colleagues and students as well as some classroom visits by the appropriate deans…the dean of the appropriate school or college shall prepare a written evaluation…which may vary in form and which shall generally assess the faculty member's effectiveness in the following categories:~~

**To prepare for a comprehensive evaluation, a faculty member must prepare a Comprehensive Self-Study that addresses the faculty member's effectiveness in the following four categories:**

1. teaching;
2. academic advising and program development;
3. scholarly, professional and/or creative activities; and
4. institutional and/or community service.

**…Specific guidelines for the content of the self-study are found in Appendix G.**

* * *

VIII(B)(2)(b) <u>Probationary and Tenured Teaching Faculty</u>

The following criteria may be considered for decisions regarding performance assessment of probationary and tenured teaching appointees. Faculty members are, however, expected to take part in as many of the activities as mentioned below as appropriate. These activities

illustrate the wide range of areas from which faculty demonstrates qualifications for reappointment, promotion or tenure....

Effectiveness in Scholarship, Professional and Creative Activities

1) Ongoing professional development, such as attendance at conferences; pursuing scholarly professional literature, advanced study, etc.

2) Research and/or advanced study related to the discipline(s) taught.

3) Publications related to the discipline(s) taught.

4) Other research, study or publications. ...

6) Professional consulting, especially as it related to the discipline(s) taught.

7) Delivery of and participation in workshops, lectures, professional panel presentations, colloquium conferences, etc.

8) Other professional activities. ...

* * *

VIII(B)(2)(d) ~~Evaluation Time Lines~~ **Peer Review by School/College Faculty Review Committees**

**Each school/college of the University shall establish a Faculty Review Committee (FRC). Each FRC shall review faculty self-studies, and allied materials and support, submitted by the 6th year (or authorized equivalent) probationary faculty members (tenure decision), tenured faculty members (post-tenure review), and faculty members seeking promotion. ...Upon completion of its review, the FRC shall forward a confidential report to the appropriate dean...and the evaluee with its recommendation regarding each decision/action at hand. The FRC report shall include the tally of the vote regarding the committee's recommendation along with the justification for the recommendation. ... Committee and minority reports must be submitted by December 15.**

**If the faculty member under review has any comments...they must submit them in writing to the dean by January 5.**

VIII(B)(2) **(e) Dean's Evaluation Report and Recommendation**

**In each case** ~~T~~the respective dean shall review all the material available, ~~and prepare a report.~~ **all reports from the school's FRC and prepare a Dean's Evaluation Report. The report may vary in form and will address the faculty member's effectiveness in the four categories of evaluation and give the dean's recommendation regarding reappointment, tenure or promotion.** Evaluation reports will be completed and communicated to the evaluee by~~… April 15 in the case of full-time faculty members with tenure….~~ **March 1 both for probationary full-time faculty members and for eligible full time faculty members requesting promotion.** …

The dean's report, together with materials provided by the evaluee, **the FRC report** and the evaluee's response to the **dean's evaluation** report (if any) shall be forwarded to the Chief Academic Officer by March 15, in the cases of probationary full-time faculty members and promotion requests…

VIII(B)(2)**(f) Determination of the Chief Academic Officer**

**The Chief Academic Officer, by May 20, shall furnish an independent written report to full-time faculty members of his/her determination in matters of reappointment, tenure or promotion….**

* * *

VIII(B)(2)**(i) Chief Executive Officer and Board of Trustees Determination**

**It is understood that the Chief Executive Officer (President and, when applicable, the Board of Trustees, have the authority to make all final decisions with respect to promotion and tenure. Final promotion and tenure decisions are made by the President and the Board considering (1) the criteria in this Agreement; (2) the recommendations of deans and the Chief Academic Officer; (3) the evaluative background of the candidate; and (4) the specifically identified interests of the University. Decisions regarding tenure and/or promotion will be communicated to such faculty members, in writing, by June 30.**

**Because tenure can only be awarded upon the affirmative act of the Chief Executive Officer and the Board of Trustees, tenure cannot be awarded by default or omission of any action by or on behalf of RWU. …**

VIII(C) Criteria for Eligibility for Promotion

* * *

VIII(C) ~~3.~~ 2. Promotion from Associate Professor to Professor

An associate professor is a full-time faculty member who holds a terminal degree from a nationally or regionally accredited institution of higher education or internationally renowned institution of higher education or equivalent professional attainment and who, as determined by the Chief Executive Officer of the University or his or her designee, is qualified and best meets the needs of the University. …

An eligible associate professor may be recommended for promotion to professor if he or she:

(a) has a terminal degree from a nationally or regionally accredited institution of higher education or internationally renowned institution of higher education in the academic or professional discipline to be taught or equivalent teaching professional;

(b) has ten (10) years of experience in full-time teaching, at least five (5) of which must have been as an associate professor at an accredited institution of higher education; and

c) has demonstrated superior performance in teaching and advising students, and has made distinctive contributions in professional and/or creative activity and institutional and/or community service that advances the mission of the University as documented in the individual's comprehensive evaluations, and merit program materials if submitted by the faculty member.

**ARTICLE XIII**

COMPENSATION

* * *

A. Salary Program

* * *

4. While promotion through the University's academic rank structure is not a condition of continuing employment, it is the natural and expected recognition of continuing professional growth and improvement toward academic leadership to the chosen discipline, the Department/School/College and the University. Accordingly, the achievement necessary for promotion will be significant and the monetary recognition significant. Commencing with the 2004-05 academic year, salary compensation attendant to promotion will be as follows:

(a) Upon promotion from either Assistant Professor to Associate Professor to Professor, a salary step placement will be effected such that the step occupied prior to promotion will be advanced by at least five thousand dollars ($5000) through the placement of the promoted MBU on the same or nearest higher step on the new salary range after the $5000 increase.

(b) For those MBUs whose base salary is at or above the highest step of the salary range for the rank, promotion will be effected such that their base salary will be advanced by $5,000 in 2004/05, by $5,200 in 2005/06, $5,400 in 2006/07 and $5,600 in 2007/08.

* * *

~~8. An additional annual stipend of $500 will be given to any MBU promoted to the rank of associate professor or professor. An MBU may receive this award only once.~~

APPENDIX G
SELF-STUDY GUIDELINES

* * *

SECTION III: SCHOLARSHIP AND PROFESSIONAL DEVELOPMENT

1. List publications and conference presentations documenting your research grant or academic fundraising activities (applications, awards, maintenance) and/or creative activities since the last self-study and indicate how these activities

**have enhanced your teaching and other work at RWU. ...**

**3. Describe other professional development activities undertaken since the last self-study and indicate how those activities have enhanced your teaching and other work at RWU.**

**4. Provide a statement of your research interests and agenda. ...**

* * *

**SECTION VI: SUPPORTING MATERIAL**

* * *

**4. Provide copies of research material, professional publications, grant material, or documentation of creative activities produced since your last evaluation. Include evidence of peer review.**

## III. Facts.

### A. Background

The case concerns the University's denial of promotion to the grievant, Kathleen Dunn, an associate professor in the School of Justice Studies (SJC).

The University hired the grievant in 1977 as an assistant professor. In 2001, she applied for both tenure and a promotion, and the dean and the provost at that time recommended both actions. On August 8, 2001, President Roy Nirschel wrote her a congratulatory letter informing her that he and the Board of Trustees had approved the grants of tenure and promotion effective August 21, 2001.

The grievant applied for promotion to full professor on September 13, 2005, immediately upon completion of five

years as an associate professor.[1] She was also due for her first post-tenure review that academic year, so her post-tenure and promotional reviews took place simultaneously.

Between the grievant's promotional evaluation in 2001 and the promotional evaluation at issue here, the parties negotiated the 2004-08 collective bargaining agreement and substantially revised the evaluation procedures. They drafted an entire new set of guidelines for the candidates' "self-study," the dossier that is the foundational document of the evaluation procedure. There was also new language addressing scholarship and professional activity, which is one of the four basic evaluation criteria (the others being teaching, academic advising and program development, and institutional or community service). The parties also added a new peer-review component to the evaluation procedure, the Faculty Review Committee (FRC).

In addition, the parties substantially revised Article XIII, the compensation article, and Article VII(A), governing teaching load. One component of the compensation revision was a considerable increase in the money attached

---

[1] Under the Agreement, there is a ten-year service requirement for promotion from associate to full professor, at least five of which must be at the rank of associate professor. Aside from the service requirement, the decision to apply for a promotion and the timing of the application is entirely up to the faculty member. Promotion is not necessary for continued employment.

to a promotion. In essence, the parties moved from an annual stipend of $500, outside the base salary, to a minimum $5,000 increment included in the base. As to teaching load, the parties negotiated a menu of course releases for various reasons, including scholarship.

**B. The Grievant's Promotional Evaluation**

During the 2004-05 academic year, the dean of the SJS was Gordon Cruz. He and the grievant had no discussions about her upcoming evaluation. In 2005-06, Cruz left the University and Associate Professor Stephanie Manzi became the interim dean of the SJS. It was Manzi's first year in that capacity. On September 14, 2005, Manzi met with the grievant and they discussed the contractual evaluation procedure, and specifically the criteria that applied to promotion. Manzi sent her a letter summarizing the discussion the next day, which the grievant countersigned:[2]

> …As per the collective bargaining agreement…the faculty evaluation program will focus on the following areas: effectiveness in teaching; effectiveness in academic advising and program development; effectiveness in scholarly, professional and/or creative activities; and effectiveness in institutional and/or community service. …
>
> Excellence in teaching is the primary criterion for awarding…promotion and tenure. …

---

[2] The letter generally addresses all types of reviews, including those of non-tenured faculty. It is evidently a form document, which Manzi modified slightly for each recipient.

> In a similar manner, each evaluation will inform you as to how your progress in the areas of academic advisement and program development and institutional and/or community service is progressing. …
>
> Effectiveness in scholarship, professional and/or creative activities can be demonstrated by any of the following: ongoing professional development such as attendance at conferences, pursuing scholarly professional literature in advanced study, research and advanced study related to the discipline taught, publications related to the discipline taught and other research study or publications, professional consulting as it relates to the discipline taught, delivery of and participation in workshops, lectures, professional panel presentations, colloquium conferences and other professional activities.
>
> For a positive recommendation for…promotion to be made, all of your work will be considered with the primary emphasis on excellence in teaching. …

On October 4, 2005, the grievant submitted her self-study to the FRC. Because there is really no dispute that her record in teaching, academic advising and program development, and institutional and/or community service was outstanding, I only need to focus only on that section of the self-study that addresses scholarship and professional activities. This was as follows:

1. **Conference attendance/presentation**
   - Annual Meeting of the Northeastern Association of Criminal Justice Sciences, June 2005, Bristol, Rhode Island
   - Annual Meeting of the American Society of Criminology, November 2004, Nashville, Tennessee
   - Annual Meeting of the American Society of Criminology, November 2003, Denver, Colorado

- Annual Meeting of the Association of Criminal Justice Sciences, March 2002, Anaheim, California, **Peer reviewed panel presentation**[3]

**2. Other professional development activities: Applied Scholarship**

***Legal consultant for the Rhode Island General Assembly 1998-2005:***

- Drafted legislation for the Rhode Island General Assembly
- Researched and wrote legal memoranda on proposed legislation
- Prepared legal opinions regarding constitutionality of proposed legislation
- Researched law in other states and prepared reports for senators and representatives

***Relationship between applied scholarship and teaching scholarship***

…My consulting work involves research and writing on current legal issues and requires a command of current law and relevant literature, an activity that is also a crucial element of effective teaching. …

My work with the legislature and my previous position as a law clerk for the Rhode Island Supreme Court also allow me to complement the theoretical component of my teaching with practical knowledge. …

***Quality and Documentation of Applied Scholarship:***

My written work for the General Assembly speaks to current, often controversial, legal issues. Written documents must be well prepared, up to date, and presented in language appropriate for public officials, most of whom are not lawyers. Documentation of the quality of my applied scholarship is presented in the form of (1) samples of applied scholarship… (2) reviews from a fellow attorney, who is also the Director of Legislative Council, and from a legislator/client, who is also Deputy Speaker in the House of Representatives….

---

[3] The grievant did not provide any further details or documentation of the conferences she attended or her panel presentation.

> ***Project Safe Neighborhoods:***
> I am currently co-authoring a Project Safe Neighborhoods Report with Dean Stephanie Manzi. The study analyzes the results of the implementation of a number of Project Safe Neighborhoods initiatives in Providence, Rhode Island. The report is scheduled for completion in Fall 2005. Dr. Manzi and I will present the results of our study at the Annual Meeting of the Academy of Criminal Justice Sciences in Baltimore, Maryland in Spring 2006. …

The grievant worked on several additional projects during 2005-06 that she was unable to include in her self-study because of the timelines. Dean Manzi, the FRC, and the interim provost at the time, Jeffrey Martin, knew about these projects and took them into account in evaluating the grievant for promotion. First, the grievant applied for and received a grant from the Justice Training and Research Institute, an affiliate of the University, to update the Rhode Island Law Enforcement Officers' Manual. Dean Manzi approved the grant in December 2005, and the grievant and her co-author completed the manual in October 2006. Second, the grievant received another grant from the same source to study the link between police professionalism and college education. She testified that work on that grant "never got off the ground." Third, at the request of Dean Manzi and Professor Laura Moriarty (who teaches at another university), she began co-authoring, with Manzi, a chapter of a book on victimology. The chapter was finished in

October 2006. Finally, she worked on developing secondary-school courses for which the students would receive college credit.

***B.1 The FRC's Recommendation***

The grievant's FRC consisted of four tenured faculty from the SJS (two of whom are full professors) and one associate professor from another department. On December 14, 2005, the FRC issued a written recommendation "wholeheartedly endors[ing] and enthusiastically support[ing]" the grievant's application for promotion. In addition to warmly commending her "superior" teaching, her "vital presence" in student advising, her "significant role" in program development, and her "very effective service to the academic and off-campus communities," the FRC wrote:

> …Dr. Dunn has made distinctive contributions to the university and the field of criminal justice in her scholarship and professional activity. She is very active professionally in a number of contexts. … Dr. Dunn is presently co-authoring…a Law Enforcement Officer's Handbook on Criminal Procedure [which] has been sought by the Rhode Island Attorney General's Office for a number of years, and Dr. Dunn and [her co-author] have been awarded an RWU Justice Studies and Training Institute Grant in order to make it possible. Dr. Dunn is an active participant (along with Dean Manzi) in the Project Safe Neighborhoods Project, as well as a participant in the Rhode Island Department of Education's effort to develop a law and criminal justice training network for Rhode Island secondary teachers. Dr. Dunn's body of scholarly work informs her teaching and represents the level of

> excellence befitting an outstanding faculty member [and]…a member of the RWU faculty seeking promotion from associate to full professor. …
>
> Dr. Dunn also should be counted among the most active professors in the Justice Studies program in the areas of professional consulting and applied scholarship [in connection with her work for the Rhode Island General Assembly]. … The credibility of the…department is greatly enhanced by the applied scholarship of Dr. Dunn, and her ability to provide students with an education grounded in the theoretical components of the law, as well as the practical application of the law, is unsurpassed.…

### *B.2 Dean Manzi's Draft Recommendation*

After reviewing the self-study and the FRC's recommendation and doing some classroom observations, Dean Manzi drafted a seven-page report recommending the grievant's promotion. After effusively praising her teaching, advising, involvement in program development, and institutional and community service, Manzi wrote:

> Dr. Dunn currently serves as co-principal investigator on the three-year Project Safe Neighborhoods…grant that was awarded to [the University] by the Bureau of Justice Statistics in 2003.… Her role…is to study the effectiveness of the Providence Police Department's Gun Crime Task Force…. It is anticipated that Dr. Dunn will present the findings of this report at a national criminal justice conference in March 2006 and will submit a shorter version for publication to a referred policing journal.
>
> Dr. Dunn is also the recipient of grant funds from the Justice System Training and Research Institute. The first grant is an award of $5000 for a proposal which will culminate in the development of the Rhode Island Law Enforcement Officers' Official Manual….

> The second grant award, "The Link between Police Professionalism and College Education," will be completed with several of her Justice Studies' colleagues. The intent of this study is to examine the need for college-educated police officers and determine if a college education makes the field of policing more professional.…
>
> During the fall semester Dr. Dunn was asked to co-author a chapter in Dr. Laura Moriarty's edited textbook, *Current Issues in Victimology Research*…. The request for inclusion in this seminal work speaks very highly of Dr. Dunn's ability to write on contemporary legal issues.
>
> For the past eight years, Dr. Dunn has served as a legal consultant for the Rhode Island General Assembly. … [The Deputy Speaker of the House of Representatives] states that Dr. Dunn's expertise in the area of constitutional law was highly valued and that her research was always thorough and of exceptional quality; she was the most sought-after legal counsel on his staff.
>
> Dr. Dunn has also represented the [SJS] at several regional and national conferences. …
>
> Dr. Dunn's scholarly pursuits are both diverse and directly related to the courses she teaches. Her applied scholarship in the legal arena strongly informs her teaching by allowing her the opportunity to weave the practical knowledge gained to the theoretical component that is the foundation of her courses. Dr. Dunn's legal research and writing keeps her current in the legal field which is directly translated to our students in the classroom. …

Dean Manzi testified that, after drafting this document, she was "leaning toward" recommending promotion. However, in the concluding paragraphs of her draft report,

Dean Manzi did recommend promoting the grievant.[4] Moreover, upon finishing the report (but before meeting with Interim Provost Martin), Dean Manzi told the grievant that her report was completely positive and that she was recommending the promotion.

***B.3 Dean Manzi's Meeting With Interim Provost Martin***

In mid-February 2006, before the deans' evaluations were due to him, Interim Provost Martin asked every dean for summaries of their recommendations for every faculty member who was up for evaluation that year. There were 80 or 90 such reviews pending, including probationary, tenure, post-tenure, and promotional. Martin then met individually with each dean to discuss their recommendations. Martin testified that 2005-06 was the first year that it was possible to implement the new provisions of the Agreement in full.[5] He wanted to make sure that he and the deans "were all using the same set of standards" to evaluate the candidates. Martin testified that in 2004-05, the provost had reversed a number of the deans' recommendations, and this had led to "confusion" about the meaning of the

---

[4] Dean Manzi's draft recommendation, with its original final paragraph, was not submitted into evidence. It is not clear whether it still exists.

[5] It was not feasible to apply the new evaluation language during 2004-05 because by the time the 2004-05 Agreement was ratified, faculty had already submitted their self-studies.

contractual standards. Martin testified: "We had many different schools but one Agreement…evaluation criteria might vary from school to school, or…from discipline to discipline…." In his view, that was undesirable. He did not think that faculty in one school should have grounds to complain that if they "had only been in another school, they would have been evaluated differently."

Dean Manzi forwarded the complete draft of her recommendation to Interim Provost Martin, and the two went over it during their meeting.[6] Martin explained to Manzi that he wanted the deans' recommendations to be consistent across the board so that he would not have to overturn them. He also told Manzi that he would not agree with a positive recommendation to promote the grievant (although this statement was "conditional," Martin testified, because he "still had to go through a full process"). Martin told Manzi that the parties had negotiated a "heightened expectation of scholarship" into the new Agreement, as well as a requirement for "external expert validation" of scholarly activity. He advised Manzi to reconsider her recommendation in light of these new standards.

---

[6] The grievant's was not the only recommendation that Manzi provided to the provost. She was also evaluating several other faculty at various stages of their careers.

Interim Provost Martin, who was a member of the University's bargaining team for the 2004-08[7] Agreement, testified at some length concerning his interpretation of the provisions of the Agreement governing evaluation and promotion, and it is worth setting forth his views:

> First of all, throughout the contract there was a heightening of emphasis on scholarship…. Second, there was an increased reward for scholarship, particularly in the areas of promotion; and, third, in order to promote further scholarship and also work at the institution … there was a workload balancing and reduction that was specifically tied to research and service at the institution.…
>
> In this contract there was an agreement to reduce the workload from four courses per semester to four one semester and three one semester, but…it was not universal… and it was for specific obligations, either administrative obligation or research-related obligations. …
>
> [The second paragraph of Article VIII(B)(2)] begins with "teaching," but then it follows immediately with "scholarship as needed to inform teaching, meet accreditation requirements, and advance one's discipline is also an important criterion." Scholarship has been moved from a list at the end of the paragraph to a prominent place as second to teaching….
>
> …[I]t was made explicit that scholarship needed to be validated externally, and that can take various forms, but as a general principle, it applied across the board.

Martin testified that at the conclusion of the meeting with Manzi, "[t]here was an agreement…that there would be a

---

[7] The grievant, too, was a member of the Union's bargaining team, and was a signatory to the Agreement.

negative recommendation here." He was apparently referring to Dean Manzi's recommendation, because Martin testified that while he himself was already inclined toward a negative recommendation, "that's an inclination, it's not a decision."[8]

### *B.3 Dean Manzi's Final Recommendation*

Soon after her meeting with Martin, Dean Manzi entered the grievant's office, closed the door, and said, "I don't know what to do. They won't let me recommend you." She asked the grievant whether the administration could make her change her recommendation. The grievant advised her to write her recommendation as she saw fit, because the provost had the prerogative to make a negative recommendation in any case. Manzi asked the grievant whether she would consider withdrawing her application for promotion. The grievant replied, "Probably not." After some further discussion, the two agreed to take the weekend to think the matter over.

Shortly thereafter, there was a similar conversation among the grievant, Manzi, and Jeff Jenkins, another

---

[8] It is uncertain how Martin formed his early negative opinion of the grievant's scholarship. He did not remember whether he had seen the grievant's self-study or the FRC's recommendation at the time of this meeting, but it is unlikely that he had, since Manzi testified that she had not yet forwarded those documents to him.

faculty member of the SJS. Jenkins testified that both women were distraught.

In the end, Dean Manzi did revise her recommendation, but only by changing the final paragraphs.[9] She testified that her discussion with Interim Provost Martin caused her to change her mind. While preparing to evaluate her faculty, she had read the relevant portions of the Agreement, but no one in the administration had told her that the Agreement contained an increased emphasis on scholarship and external validation of scholarly work. She testified that she had not taken these factors into consideration when evaluating the grievant.

In her final recommendation, Dean Manzi retained the references to the grievant's "skill at encouraging student participation," "ability to educate a diverse population," "excellent command of the literature," "continual self-assessment of her teaching" and "high energy level" in the classroom, as well as her citations of the grievant's "thorough advising," "noteworthy" efforts in program development, and contributions to institutional and community service "[which] are among the highest of her peers within the SJS." She also retained her description

---

[9] Dean Manzi's evaluation and recommendation also served as the grievant's post-tenure review. For that purpose, it was viewed as positive.

of the grievant's scholarship. But she redrafted the final section so that it read:

> The faculty contract requires that for promotion from associate to full professor, the faculty member "has demonstrated superior performance in teaching and advising students, and has made distinction contributions in professional and/or creative activity and institutional and/or community service that advances the mission of the University." Therefore, promotion to full professor, the highest level of recognition bestowed upon a faculty member, necessitates a level of achievement beyond that required for obtaining tenure.
>
> Given the above…it is my belief that [the grievant] has achieved the above criteria in the areas of teaching, advising, and institutional/community service. At this time however, Dr. Dunn's scholarly/professional activity do not establish the level of accomplishment and external validation needed to attain the rank of full professor. I would look favorably upon her request for promotion to full professor once the following list of items is completed:
>
> 1. complete and submit for publication the book chapter entitled, "Hate Crimes Victimization: A Legal and Personal Perspective"
>
> 2. complete and submit the Rhode Island Law Enforcement Officers' Official Manual, 4th ed.
>
> 3. submit an article from the Project Safe Neighborhood's grant for publication to a refereed journal
>
> 4. submit an article from the Police Professionalism and College Education grant for publication to a refereed journal.

On March 9, 2006, the grievant submitted a lengthy response contesting Dean Manzi's negative conclusion, which

was forwarded to Interim Provost Martin along with Manzi's recommendation, the FRC's recommendation, and the grievant's self-study.

### *B.4 Interim Provost Martin's Negative Recommendation*

On May 19, 2006, after reviewing her entire dossier, Interim Provost Martin forwarded his recommendation against promoting the grievant to University President Roy Nirschel and to the grievant. It stated, in pertinent part:

> …The key question to answer is whether [the grievant's] overall scholarly activity has yielded sufficient fruit as evidenced by external recognition to merit promotion to full professor.…
>
> Here there is positive and appropriate achievement in a promotional track but not yet a mature record.… Her scholarship is appropriate and legitimate and would certainly be positively evaluated for a post-tenure evaluation, but for the voluntary application for promotion to full professor there is a heightened expectation of prolonged and consistent excellence.…
>
> …[B]y comparison with the records of others who are receiving promotion to Full Professor this year under the expressly heightened terms and rewards of the current contract and given the greater expectations of a graduate faculty member, Professor Dunn's scholarship has yet to bear sufficient fruit to recommend promotion to Full Professor at this time.
>
> Professor Dunn's legislative work in applied scholarship is noteworthy. But many of her other projects in both traditional and applied research have yet to come to fruition. As works in progress, evaluation of prolonged scholarly achievement is premature if even possible.…
>
> Recommendation

> Professor Dunn is a valued member of the faculty whose achievements and contributions to her school are strong. She is a dedicated and engaged teacher…who has the respect of her peers. The focus in this discussion on sustained scholarship when compared with achievements in teaching, advising and service does not indicate that this area is given greater weight, only that, since there is general that the standard for promotion has been met in these other areas they need not be discussed at length. … However, by comparison with the records of others who are receiving promotion to full professor this year under the expressly heightened terms and rewards of the current contract and given the greater expectations of a graduate faculty member, Professor Dunn's scholarship has yet to bear sufficient fruit to recommend promotion to full professor at this time. I suggest that such a promotion be deferred but that she be advised that she is on the appropriate track toward promotion.…

Martin testified that in evaluating the grievant's promotional material he was "particularly concerned with external validation" and "with the general weight of what had been done over…that span of time of the review period." He found that while there was "a flurry of activity" during and after 2004-05, the grievant had not actually completed any of the scholarly work.[10] "There…was no validation of any of the work because the work hadn't been completed…this was really almost the first substantial set of such things in the five-year period." Furthermore, the grants were from an internal, affiliated institution, which, in

[10] In fact, the grievant herself testified that she began to beef up her scholarly activities during 2004-05 in anticipation of her promotional application.

Martin's opinion, "didn't provide a high level of validation, certainly."

Martin thought the grievant's work for the Rhode Island General Assembly was "positive" and had some validation "in terms of a boss and other letters of support." But again, the work was not new; she had been doing it for several years. Although the grievant had attended four or five conferences, Martin thought that activity was not entitled to much weight. The grievant provided no details concerning her conference presentation and no description of the type of peer review. In sum, Martin thought that a single panel presentation in five years, plus the legislative work, did not merit a promotion to full professor.

Neither University President Nirschel nor the University's board of trustees issued a separate decision denying the promotion. Interim Provost Martin's recommendation was the last notice of any action on her promotion that the grievant received. Martin testified that he discussed his recommendation with President Nirschel before issuing it, and Nirschel actually made the final decision not to promote.

Dunn initiated this grievance almost immediately after receiving Martin's recommendation. She testified that she

was uncertain whether to wait for some further decision from the president before filing the grievance, but the Union advised her to consider Martin's recommendation a final action for purposes of the grievance.

The grievant has not reapplied for promotion since filing this grievance. She was on sabbatical for one year, and she testified that this arbitration had taken up so much of her time that she did not have sufficient time to assemble another self-study.

**IV. Contentions of the Parties.**

**The Union.** Interim Provost Martin arbitrarily and capriciously impaired Dean Manzi's independence by intervening in the stage of the evaluation process reserved exclusively for the dean. Article VIII(B) sets forth a detailed process for promotional decisions. It requires the dean to independently evaluate the relevant materials and make her own recommendation to the provost. The provost, in turn, must review the pertinent documents, including the dean's recommendation, and make his own recommendation to the president. Here, however, Martin exerted *a priori* undue influence over Manzi's decision. Before she met with Martin, Manzi unequivocally recommended promotion. Afterward, she told that grievant that "they" would not let her recommend the promotion. Martin himself

admitted that, by the end of the meeting, he and Manzi had agreed that Manzi's recommendation would be negative.

Although the University maintains that the interim provost's meeting with Manzi was completely appropriate given the confusion that had resulted from promotion and tenure decisions the previous year and the need for consistency in these decisions, one must question whether these were the administration's concerns. If so, it is curious that the provost did not sponsor an open discussion with all the deans at the beginning of the 2005-06 year. Instead, a mere week before the deadline for Manzi's recommendation, Martin met privately with her behind closed doors to discuss the particular promotion of the grievant.

Interim Provost Martin's decision was also arbitrary and capricious because he made it before reviewing any of grievant's promotional materials. Martin suggested that this was harmless because his meeting with Manzi "was not an attempt to make the definitive decision, but rather to look together in a general way where we were with these [promotion] cases." Even if Martin had not conclusively made up his mind at the time of the meeting with Manzi, the resulting damage - a negative recommendation from the dean - had the same effect. Moreover, the evidence warrants that conclusion that Martin had indeed decided to deny the

promotion even before receiving the self-study, the FRC report, or an independent evaluation from the dean. If the administration makes decisions regarding promotion before carefully reviewing the contractually required materials, then the entire procedure is a complete waste of time.

The provost also acted arbitrarily and capriciously by comparing the grievant's record with the records of other faculty seeking promotion to full professor. Martin's own recommendation expressly states that he made this comparison. This sets up a competition among peers rather than allowing each individual to be judged based on objective contractual criteria. In fact, the Agreement provides that the application of the evaluation criteria will vary across departments and schools. Furthermore, because faculty have no knowledge of the records of other faculty, such a comparison violates procedural due process. Will the contractual standards for promotion change from year to year depending on the records of the applicants? If so, the promotional decisions will be arbitrary and capricious by definition.

Although the Agreement provides that only the president and/or board of trustees have the authority to make final decisions regarding promotion, neither rendered any final decision regarding the grievant. In a recent

case under this Agreement, Arbitrator Larry Holden determined that it was arbitrary to omit this step in a decision on tenure/promotion. Roger Williams University Faculty Association, AAA No. 11-300-01321-06 (Holden, 2007) (the Holden Award).

The substantive decision to deny promotion lacked any rational basis. The University must base its promotional decisions on the criteria in Article VIII(B)(2). Every one of the scholarly and professional activities that the grievant undertook is a valid form of scholarship under the Agreement. The Agreement does not favor any one except for scholarship that informs teaching.

The University arbitrarily and capriciously applied a non-existent standard, the asserted "heightened expectations" of scholarship. The administration's sole contractual source for this is the second paragraph of Article VIII(B)(2). This is very weak support, given that the detailed list of evaluation criteria in the 2004-08 Agreement is unchanged from the predecessor agreement and continues to rank scholarship third. Moreover, the Agreement repeatedly stresses that teaching is the most important criterion. Neither Manzi nor the grievant received any notice from the administration of this

supposed "heightened expectation" prior to the promotional evaluation procedure.

Furthermore, Martin applied the "heightened expectation" even more stringently to the grievant based on his unilateral identification of her as "graduate faculty." The Agreement neither defines graduate faculty nor establishes distinct scholarship requirements for that group. Although the provost relied on Article VII(A)(3), the Graduate Council has yet to define who graduate faculty are (for example, is the grievant, who primarily teaches undergraduates, a member of that group?) or develop any graduate faculty qualifications or policies.

The University arbitrarily and capriciously privileged traditional scholarship over other forms, contrary to the Agreement's express adoption of a broad view of scholarship in Article VIII(B)(2). Boyer and Glassick identify scholarships of teaching, integration, and application, as well as the more traditional scholarship of discovery, and assign equal weight to all four forms of scholarship. The SJS is a professional school, in which applied scholarship is particularly valuable. Although the Agreement does not assign primacy to peer-reviewed publications, the University gave no weight to any other form of scholarship. Unlike the FRC and Manzi, Interim Provost Martin dismissed

the grievant's applied scholarship in the form of her ongoing work for the legislature.

The University arbitrarily and capriciously enforced a requirement for "external validation" of scholarship. The Agreement references external validation in a single sentence of Article VIII(B)(2). Since this was a new provision, it only applied to scholarship undertaken during and after 2004-05. However, Interim Provost Martin applied it to work undertaken before that year, and in a manner that effectively discounted all of the grievant's external validation. In Martin's opinion, acceptance of her abstract for her conference presentation; acceptance of her proposal to co-author a chapter in a book; her co-authorship of the law enforcement officers' manual; and her work on the Project Safe Neighborhoods - all lacked adequate external validation. The Agreement, however, does not provide for "levels" of external validation.

As a remedy, the Union asks the arbitrator to order the University to promote the grievant retroactive to July 1, 2006, and make her whole. Although the typical arbitral remedy for the violation of a contractual promotional procedure is remand, such would be meaningless here because it is already available to the grievant.

Furthermore, citing AAUP and Board of Regents (Rhode Island), AAA No. 1139-0798-73 (MacLeod, 1974)(the MacLeod Award), the Union urges that, even under the limited scope of arbitral review in academic judgment cases, the decision must be set aside if there is no substantial objective basis for the judgment. That is the case here. Allowing the University's decision to stand would render the contractual procedure and standards meaningless. The arbitrator has the authority to direct that that the grievant be promoted effective July 1, 2006, and compensated consistent with the Agreement.

**The University.** Interim Provost Martin did not order Dean Manzi to change her recommendation. He merely shared his preliminary thoughts on the grievant's application. This was perfectly appropriate. The contract was new, there were many changes in the evaluation process, and the previous year was marked by confusion. Martin did not single out Dean Manzi. He met with all the deans. Manzi admitted that she was leaning toward recommending promotion until Martin pointed out several things she had not considered. According to the grievant's own testimony, after meeting with Martin, Manzi was ambivalent about the best course of action and took the weekend to decide what to do. This does not sound like an administrator who is

under orders. Furthermore, Martin had no need to give such an order to Manzi because he had the authority to make his own recommendation regardless of what she did.

Dean Manzi's final recommendation is not internally inconsistent. Despite some positive observations, her recommendation was negative. The activities that may have constituted an acceptable record for the grievant's promotion in a previous year were insufficient under the new higher scholarship expectations and requirement for expert external validation.

Article VIII does not require a written denial of promotion from the president. It only requires that the "decision regarding…promotion will be communicated…in writing, by June 30." The prior agreement did require the "Chief Executive Officer" to make a "final written determination…by May 31." The change suggests an intent to do away with the need for the president to issue a written decision as long as the University's decision was communicated to the candidate. This was done via Provost Martin's written recommendation, which he discussed with the president, and which the president ultimately accepted. Since the grievant filed this grievance immediately after receiving the provost's letter, it is obvious that both the

Union and the grievant knew that this was the final decision.

The Holden Award is distinguishable. Arbitrator Holden found that the failure by the president to issue a written decision regarding an application for tenure made the denial of tenure arbitrary and violated the Agreement. There are sharp differences from this case. First, Article VIII(B)(3)(i) requires the president to issue a written decision on a tenure application, but there is no such language regarding denials of promotion. Second, the provost talked to the Union and the grievant and it was decided that the Union could grieve the provost's decision. Third, the president was fully informed and actually made the decision. Finally, if it was error at all, it was clearly harmless.

The Union's complaint that the University never told the grievant about her deficiencies before her promotion review is misplaced. This is not a job-security case. While the grievant did not achieve promotion, she remains a valued member of the SJS. The Agreement does not oblige the University to advise faculty members of their deficiencies in advance of promotion reviews. It lays out four broad areas of review, provides examples of what constitutes scholarship, and suggests that faculty take

part in as many scholarly activities as may be appropriate. The parties assumed that faculty would understand that they bore responsibility for making the best case possible for promotion.

The parties were also familiar with the diversity of the faculty and their disciplines and how there could be considerable variation in the scholarship records of worthy candidates. Faculty have the power to decide when to apply for promotion, which gives them as much time as they need to develop their record of achievement. The administration then makes a subjective academic judgment on that record. Such a judgment cannot be reduced to a mathematical equation. That the parties opted to adopt the requirement for external validation shows that they expected more fully developed records from the candidates, since works in progress are not ripe for validation.

The Union's attacks on the substance of the decision must be analyzed under the arbitrary-and-capricious standard. While not expressly stated in the Agreement, that standard is certainly implied and is reasonable. It avoids placing the arbitrator in the position of second-guessing the University's academic decisions, while allowing him to verify that those decisions had a reasonable basis. The dictionary definitions of arbitrary

include, "Based on random or convenient selection or choice rather than on reason" and "Without adequate determining principle … nonrational … capriciously." The University's decision was an academic judgment made in a deliberative fashion by professionals charged with making such decisions. It centered on whether the grievant met the contractual evaluative criteria. No extra-contractual criteria were used. Courts have traditionally left such academic judgments in the hands of administrators, with only a very limited scope of review.

Given the facts of this case, the University's decision was not arbitrary or capricious. While the grievant has an admirable record of teaching, advising, and service, her scholarly record was insufficient for promotion to full professor. She had published no books and no articles in either scholarly journals or general-interest publications, given no workshops, trainings or speeches, and sought no significant grants from external institutions. She had attended four conferences since 2001, but gave only one peer-reviewed panel presentation. Her consulting with the Rhode Island General Assembly was not original scholarship and was not new. Some items, such as the chapter of the Moriarty book, were not yet complete. Although the grievant was fully aware of the need for

expert external validation, she was only able to provide it for her General Assembly work because most of her activity was incomplete. This is not the kind of record that warrants promotion to the highest rank. While one may disagree with the University's decision, it cannot be said that it was arbitrary or capricious.

The denial of promotion was particularly defensible given the heightened importance of scholarship in the 2004-08 Agreement. The parties placed greater emphasis on scholarship in three ways. First, the parties added a great deal of language specifically addressing that criterion. Where the old agreement placed three criteria on the same footing after the primary criterion of teaching, the new Agreement pointedly states that scholarship will be considered an "important" factor right after teaching, with the other two factors also to be considered. They also broadened the definition of scholarship, referencing Boyer and Glassick, while at the same time retaining more traditional examples. While Boyer and Glassick recognize a "scholarship of teaching," the parties clearly did not intend to allow teaching to satisfy the separate requirement of scholarship. Moreover, whatever the candidate's scholarly activity might be, the Agreement requires "external expert validation of [its]

scholarly merit." This was obviously an effort to raise the bar on scholarly work, even while broadening the concept of scholarship.

Second, the parties significantly increased the compensation attached to promotion. By expressly stating that "the achievement necessary for promotion will be significant and the monetary recognition significant," the parties made clear their expectation that the University was going to demand more to justify a promotion.

Third, the parties reduced the teaching workload to allow more time for scholarly work. While the old contract generally required four courses per semester, the new Agreement provides that full-time faculty members may expect an average teaching load that does not exceed 21 contact hours over the course of an academic year. This was reduced still further for faculty who were teaching graduate courses, since "[g]raduate instruction requires a higher level of scholarship and research than undergraduate instruction." It was therefore proper for the provost to hold the grievant to a somewhat higher standard because she taught graduate students. She enjoyed the workload reduction but did not convert the extra time into significant scholarly work.

The provost did not deviate from the Agreement by stressing the singular status of the rank of full professor. By stating that the evaluation process for promotion is "cumulative," the Agreement recognizes that a candidate for promotion to full professor must show something more than she did when seeking promotion to associate professor. Nor did the provost use a floating standard when he compared the grievant's record to the records of others who were promoted that year. He simply noted that he had reviewed other promotional applications and found them worthy. The Union provided no evidence of other faculty who were promoted with comparable scholarship records.

If the arbitrator upholds the grievance, the only appropriate remedy is to remand the case to the University for a re-review by the current dean and provost. Under no circumstances should the arbitrator award a promotion to the grievant. As noted, the Agreement specifically reserves "the authority to make all final decisions with respect to promotions and tenure" to the president and/or board of trustees. The arbitrator has no power to "alter, add to or subtract from the terms" of the Agreement. Article X(B), step 3. The MacLeod Award is distinguishable, because in that case the same decision-

makers were in place, so a remand would most likely accomplish nothing. Here, Martin is no longer interim provost.

If the arbitrator remands the case to the parties and the grievant achieves promotion through a re-review, she should receive back pay for 2006-07, but not for any succeeding year. It was her choice not to reapply for promotion during those years.

## III. Opinion.

The parties agree that the standard for deciding this case is whether the University was arbitrary or capricious when it denied the grievant's application for promotion. This is not an easy standard for the Union to satisfy. It allows the University wide scope for the exercise of its academic judgment. Because there were two significant, material deviations from the contractual procedure for evaluating promotional applications, however, I conclude that the University did indeed act arbitrarily and capriciously and thereby violated the Agreement.

The first deviation occurred when Interim Provost Martin met with Dean Manzi for the purpose of influencing her as-yet unsubmitted recommendation. The word

"influence" can have a harsh ring. I do not at all mean to suggest, however, that Martin acted out of self-interest, personal prejudice, or bad faith. He plainly had the best interests of the University at heart. Nevertheless, Provost Martin did wish to influence Manzi's recommendation, in the sense of exerting some control over her decision-making. The Agreement, however, prohibits this. It precludes the provost from intruding into the promotional evaluation of a specific candidate until the application has, in due course, reached his level. I explain below.

The first sentence of Article VIII(B) requires all evaluations to be conducted in accordance with that article, and vests the provost with responsibility for "carrying out the procedures described in this Article." After setting forth the substantive evaluation criteria in detail, Article VIII turns to the procedural aspects. The first level of promotional review is the newly negotiated FRC, which is charged with reviewing the self-study and related materials and forwarding a confidential report and recommendation to the dean and the applicant "along with the justification for the recommendation." Article VIII(B)(2)(d). At the next level, the dean must review "all the material available and all reports from the

school's FRC and prepare a Dean's Evaluation Report" addressing "the faculty member's effectiveness in the four categories of evaluation" and providing a "recommendation regarding reappointment, tenure or promotion." Article VIII(B)(2)(e). The dean forwards her report, the FRC's report, and the candidate's entire file to the provost, who must prepare "an independent written report…of his/her determination…in matters of reappointment, tenure or promotion…." Article VIII(B)(2)(f).

Finally, the candidate's self-study and other supporting material, and the recommendations of the FRC, the dean and the provost, are forwarded to the highest and final level of review, the president and/or board of trustees. Under Article VIII(B)(2)(i), these entities "have the authority to make all final decisions with respect to promotion and tenure … considering (1) the criteria in this Agreement; (2) the recommendations of deans and the Chief Academic Officer; (3) the evaluative background of the candidate; and (4) the specifically identified interests of the University."

The Agreement provides due dates for each reviewing entity's recommendation or decision - December 15 for the FRC, March 15 for the Dean, May 20 for the provost and June

30 for the final decision - and allows the candidate to submit written responses at various levels.

In sum, the evaluation procedure is a four-level sequence of careful reviews at successively higher levels of the University hierarchy. Each level has the opportunity to consider the candidate's entire file afresh, and no level's recommendation is binding on the higher levels. The procedure therefore leaves considerable discretion and authority in the hands of senior administrators, who may reverse the recommendations of the lower levels. This discretion is nevertheless balanced by a significant element of accountability, because it is incumbent upon each level to produce a written report articulating the reasons for its recommendation or decision. This helps to ensure against any abuse of discretion by the upper levels of administration.

Having created this multi-layered system, the parties must have foreseen that the various evaluators would not always be in perfect accord. But this is not necessarily detrimental to the candidate or to the faculty as a whole; indeed, the parties could well have seen it as an advantage. It allows different points of views to be aired and preserved, gives the lower levels a chance to affect the thinking of the higher levels, and exerts pressure on

the higher levels to articulate and support their reasoning. All of this adds transparency and credibility to the system. While differences of opinion among the levels of review might create some uncertainty during the course of a given candidate's evaluation, ultimately the administration has the final say and can maintain some degree of consistency, if it wishes.

Interim Provost Martin upset this carefully crafted system of checks and balances when he attempted, successfully, to avert any contradiction between Dean Manzi's recommendation and his own. There is little doubt that this was his motive. Martin asked Manzi and every other dean to send him summaries of their recommendations before they were actually due because he wanted the deans to apply the contractual criteria consistently, particularly the criterion of scholarship. He testified that he wanted to avoid reversing any dean's recommendations so that there would not be "confusion" among the faculty about how the administration was applying the contractual standards.

Avoiding confusion is a laudable goal. But under the contractual evaluation procedure, advice and recommendations flow upward, not downward. It is not the provost's role to advise the dean or FRC regarding the

qualifications of the individual candidates that are before them. There is plenty of opportunity for him to state his views at the proper time. Furthermore, contrary to Martin's belief, the Agreement expressly envisions that the diverse schools and departments within the University will weigh and apply the criteria somewhat differently (subject to the uniform requirement that teaching be weighted most heavily). Article VIII(B)(2) provides:

> Assessment of the general abilities of individual faculty members shall be in relation to his or her specific discipline, program or duties and to the needs and interests of RWU. …
>
> It is also recognized that individual, specific criteria differ in importance within schools and departments due to accreditation requirements and the strategic initiatives of the University. …

It certainly would have been acceptable for Martin to meet openly and collectively with all of the deans at the beginning of the academic year, before the self-studies were due, to discuss, in general terms, the new contractual language. Instead, he impaired the evaluation procedure of a specific candidate, the grievant, by meeting privately with Dean Manzi to suggest that she reconsider the positive recommendation the dean had already drafted. He told Manzi that he would most likely disagree with that recommendation and expressed his opinion that the grievant had not yet met

the "heightened expectation of scholarship" in the 2004-08 Agreement.

This discussion took place before Martin himself had carefully examined the grievant's self-study and the FRC's recommendation. The net result was that Martin avoided the pressure to justify his own recommendation that a contrary recommendation from the dean would inevitably have exerted. He also deprived the president and board of trustees of the benefit of Dean Manzi's true opinion, which could conceivably have affected the outcome for the grievant.

The second deviation from the contractual evaluation procedure is the absence of any final decision from the president and/or board of trustees. As noted earlier, these are the sole bodies that have authority to make final decisions regarding promotion, and not merely by rubber stamp. Rather, the contract expressly provides that the president and/or board must consider four factors: the contractual criteria, the recommendations of the dean and provost, the candidate's evaluative background, and "the specifically identified interests of the University." Once made, the decision regarding promotion must be "communicated to such faculty members, in writing, by June 30." Article VIII(B)(2)(i).

The grievant never received any written notice of the final promotional decision. Indeed, it is undisputed that no such document exists.

Although the University argues that the quoted language of Article VIII(B)(2)(i) does not require the president himself to author the written communication of the final decision, the point here is that the grievant did not receive *any* written communication of *any* final decision from *anyone*. The last notification she received was the interim provost's May 19 recommendation. This neither purported to be a final decision nor could have been. As Arbitrator Holden observed in the Holden Award at 20, the Agreement does not give the provost independent authority to make final decisions on tenure or promotion.

The University also points out that the provost discussed the grievant's promotional application with the president and the president made the final decision. This private, informal oral exchange did not satisfy the contractual requisite that the decision, including "the specifically identified interests of the University," be

conveyed to the grievant in writing by June 30 of the evaluation year.[11]

An autonomous decision by the dean and a final written decision from the president and/or board of trustees are not trivial procedural niceties. Institutions of higher education are renowned for their close attention to the procedural aspects of personnel decisions. These parties conformed to that reputation during their negotiations for the 2004-08 agreement. They devoted the most painstaking scrutiny to the procedures for tenure and promotional review and comprehensively revised and expanded them, leaving no detail unexamined.

Since the parties' ratification of the 2004-08 Agreement, two arbitrators have found that defects in the evaluation procedure warranted rescinding personnel actions. Arbitrator Holden ordered a probationary faculty member reinstated and re-evaluated for tenure because of the absence of a final decision from the president or

---

[11] Although there was some testimony that the president and/or board do not customarily issue written final decisions on promotional applications when they are negative, such conduct would not override the clear and unambiguous contractual requirement for a final decision by the president and/or board. There is no evidence that the parties ever mutually agreed to waive it. For the same reason, the Union's decision to initiate the grievance immediately after Interim Provost Martin's adverse recommendation does not alter the contractual mandate.

board. Arbitrator Gary Altman ordered a tenured faculty member reinstated and re-evaluated because of the omission of FRC review. Roger Williams University Faculty Association, AAA No. 11-390-00973-06 (Altman, 2007). I concur with these arbitrators that it would be disrespectful to the parties' intentions to treat these procedures lightly.

Given the critical procedural defects in the grievant's promotional evaluation, it is neither necessary nor desirable to address the substantive question of whether the University was arbitrary or capricious when it concluded that she did not meet the contractual criteria for scholarship. Actually, these very procedural shortcomings make it difficult, if not impossible, to identify the basis for the University's conclusion because there is no written record of the president's decision. And even if the president did pass judgment on the grievant's scholarship in some manner, he did not have the benefit of Dean Manzi's true opinions. The record before him was skewed by virtue of the interim dean's interference with her recommendation.

**Remedy**

In general, where there have been significant procedural violations of an evaluation procedure, I prefer

to award a straightforward, traditional remedy. I seldom remand the question of remedy to the parties absent a specific joint request. In this case, however, I believe it is appropriate and constructive to give the parties an opportunity to agree on a remedy. Both this case and the Holden Award have exposed deep disagreements between the parties concerning the interpretation and application of the contractual criterion of scholarship. The parties may wish to address these themselves rather than leaving them to the ministrations of an arbitrator.

Furthermore, time has brought some changes in circumstance. Professor Martin is no longer the interim provost, and the grievant has finished some or all of the scholarly work that was incomplete at the time of her evaluation. This may open the way for a practical resolution. The parties have more flexibility than the arbitrator to construct a remedy that meets the current state of affairs.

If the parties are unable to agree on a remedy, I am fully prepared to order one. I will retain jurisdiction over this case for 90 days from the date of this award. Either party may resubmit the case during that period and I will proceed to issue a remedial order as expeditiously as possible.

## AWARD

The Board of Trustees violated the collective bargaining agreement when it denied Kathleen Dunn promotion to full professor.

The matter is remanded to the parties so that they may attempt to agree upon an appropriate remedy.

I will retain jurisdiction over this case for 90 days from the date of this Award. In the event that the parties are unable to agree upon a remedy, either party may invoke this retained jurisdiction in writing, with notice to the other, and resubmit the case for a decision and award on the remedy.

Michael C. Ryan
Arbitrator
December 31, 2007