IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| ROGER WILLIAMS UNIVERSITY,<br><br>Plaintiff / Defendant in Counterclaim,<br><br>v.<br><br>ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION (NEARI/NEA)<br><br>Defendant / Plaintiff in Counterclaim. | Civil Action No. 07-440-ML-DLM |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT/**
**<u>OPPOSITION TO PLAINTNIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff/Defendant in Counterclaim Roger Williams University ("RWU" or the "University") submits this memorandum in further support of its Motion for Summary Judgment and in opposition to Defendant/Plaintiff in Counterclaim Roger Williams University Faculty Association's (NEARI/NEA) (the "Union's") Motion for Summary Judgment (the "Union's Memorandum"). Nothing in the Union's Memorandum undercuts the University's arguments presented in its Memorandum in Support of its Motion for Summary Judgment (the "University's Memorandum") that explains the fundamental infirmities of the arbitration award (the "Award").

Rather than merely re-state or reiterate its position set forth in the University's Memorandum which counter the arguments presented by the Union, the University will outline four areas where the Union's opposition fails. Specifically, (1) the Union improperly articulates the University's burden in this action as though there were virtually no right for this Court to review or vacate an arbitration award, (2) the Union improperly relies on other arbitration decisions which are irrelevant to the current proceeding, (3) the Union fails to refute that the Union understood Provost Martin's letter to Professor Moskowitz was a transmittal of the

University's final action related to Professor Moskowitz's tenure, and (4) the Union fails to demonstrate how the Arbitrator acted within his authority in crafting a remedy in this case.

For each of these reasons and for the reasons set forth in the University's Memorandum, the Court should vacate the Award.

## I. Contrary to the Union's Suggestion, Courts Are Empowered to Review and Vacate Arbitration Awards

The Union cites throughout its brief citations from cases suggesting that courts are circumscribed from virtually ever vacating an arbitrator's award once it is issued. *See generally* Union's Memorandum at 12-15. Although it is certainly correct that courts do not enjoy unlimited discretion in reviewing arbitration awards on a *de novo* basis, courts are required to vacate an arbitrator's award in circumstances such as this case where the award does not draw its essence from the collective bargaining agreement.

As fully set for the University's Memorandum, arbitration agreements are creatures of contract and an arbitrator is proscribed to determine an award and a remedy within the parties' agreement. "[A] court should uphold the view of the arbitrator so long as it can find within the four corners of the agreement, any plausible basis for that interpretation. In other words, an arbitrator may not ignore the plain language of the agreement, but a court need only be convinced that the arbitrator's reading draws its essence from the collective bargaining agreement and does not rely on the arbitrator's own notions of industrial justice." *Wheelabrator Environtech Operating Servs. v. Laborers District Council, Local 1144*, 88 F. 3d 40, 44 (1st Cir. 1996) (citations and quotations omitted). *See also, United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An award fails to "draw its essence" from a collective bargaining agreement when the arbitrator bases the "award on some body of thought, or feeling, or policy, or law that is outside the contract…" *Labor Relations Div. v. Teamsters, Local 379*, 29 F.3d 742, 747 (1st Cir. 1994) (quoting *Newspaper Publishers' Assoc. v. WEB Printing*

*Pressman's Union*, 821 F.2d 390, 394-95 (7th Cir. 1987)). The Court's role is "not the equivalent of granting limitless power to the arbitrator." *Georgia-Pacific Corp. v. Local 27 United Paperworkers Int'l Union*, 864 F.2d 940, 944 (1st Cir. 1989).

The First Circuit has explained that a court may vacate an arbitrator's decision if the decision is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling, or (3) mistakenly based on a crucial assumption that is concededly a non-fact." *Advest, Inc. v. Patrick McCarthy*, 914 F.2d 6, 8 (1st Cir. 1990) (quoting *Local 1145 UFCW v. Stop & Shop Cos.*, 765 F.2d 19, 21 (1st Cir. 1985)). A "non-fact" refers to a situation "where the central fact underlying an arbitrator's decision is concededly erroneous," *Electronics Corp. of Am. v. International Union of Electrical Workers, Local 272*, 492 F.2d 1255, 1256 (1st Cir.1974), that is, where "there was a gross mistake ... made out by the evidence, but for which, according to the arbitrator's rationale, a different result could have been reached." *Id.* at 1257. *See also Prudential-Bache Sec., Inc. v. Vanner*, 72 F.3d 234, 237-38 (1st Cir. 1995).

"An arbitrator does not have unfettered discretion, and may not impose a remedy which directly contradicts the express language of the agreement. Nor can he or she interpret a clause or provision when its language is clear, unequivocal and unambiguous." *Strathmore Paper Co. v. United Paperworkers International Union, AFL-CIO*, 900 F.2d 423 (1st Cir. 1990). Moreover, an arbitrator "may not shield an outlandish disposition of a grievance from judicial review simply by making the right noises - noises of contract interpretation." *Leed Architectural Products v. Local 6674*, 916 F.2d 63, 65-66 (2nd Cir. 1990)(citations omitted).

In short, the Court is not without authority and precedent to examine whether Arbitrator Holden issued the Award at odds with the mandate of the CBA between the parties. When the

Court carefully examines the Arbitrator's findings and the CBA upon which his authority is based, it is evident that the Court should vacate the Award.

## II. The Union's Citation to Other Arbitration Awards Does Not Support its Motion To Confirm the Award

In support of its memorandum, the Union has submitted four other arbitration awards (Appendix A to D to the Union's Memorandum) attempting to use the reasoning and/or facts found in those awards in order to bolster its arguments against vacating Arbitrator Holden's Award. These awards are not relevant to the Court's consideration of whether -- on the facts of Professor Moskowitz's case -- the Award should be vacated or confirmed. The Court is not assisted in its review merely because another arbitrator may have found evidence or come to legal conclusions based upon a different fact pattern after reviewing myriad other considerations presented in those cases.

The University has requested this Court to review the Arbitrator Holden Award *only*. It is inappropriate for the Union to suggest that the other arbitrators' findings about the University's actions in those cases have a conclusive or persuasive affect on this matter. Nothing in these other awards relieves this Court of its obligation to examine the Arbitrator Holden Award on its own facts. The Union's suggestion to the contrary is wrong.

Moreover, the awards submitted to the Court are irrelevant to the current action. Indeed, the two *Delucca* Awards (Appendices B and C to the Union's Memorandum) arose under the CBA before substantial revisions were made to appointment procedures. The *Alfieri* award (Appendix A to the Union's Memorandum) centered on post-tenure review and discharge of a faculty member and whether he met the ongoing standards to remain in a tenured position. Finally, the *Dunn* award (Appendix D to the Union's Memorandum) arose *after* the decision in the current case and involved a promotion decision (*not* a tenure review). Moreover, it is especially curious that in support of the justness of its current case, the Union appears to cite

more frequently to the *Dunn* award that to Arbitrator Holden's decision in this matter. *See, e.g.*, Union's Memorandum at 21-23, 29, 30, 33-34. In short, none of these awards provides a valid basis for the Court's consideration of whether Arbitrator Holden fulfilled his obligation to make a finding based upon -- and limited to -- the power vested to him by the parties through their CBA.

## III. The June 6, 2006 Letter From President Nirschel Satisfies Any Ministerial Requirement Imposed by the Contract and the Union Otherwise Understood that Provost Martin's Letter Constituted the Final Decision of the University

In its memorandum, the Union asserts both that President Nirschel's June 6, 2006 letter was considered and rejected by Arbitrator Holden and that the Union filed its grievance in response to Provost Martin's letter because it had no good faith belief that the President would act beyond the Provost's letter. *See* Union's Memorandum at 26-33. Neither of these contentions is supportable and the University's position on these matters should prevail.

As articulated in the University's Memorandum, the CBA defines a grievance as an allegation "that there *has been* a violation, misinterpretation, or misapplication of any of the terms of this Agreement." (CBA at Article X.A.) (emphasis added). On April 17, 2006, just three days after Provost Martin's letter, the Union filed a grievance over Professor Moskowitz's non-reappointment. (Facts 15). The Union's filing of the grievance demonstrates that it believed that as of April 17, 2006, a final decision had been made *by the University* with respect to tenure. The Union did not wait until June 30 to file its grievance. By way of an email dated May 9, 2006, Provost Martin denied the Step 1 Grievance. (Facts 16). On May 15, 2006, Mel Topf, President of the Union, transmitted a memorandum to President Nirschel outlining the Union's arguments for the Step 2 Grievance Hearing. (Facts 17). Finally, by way of letter dated June 6, 2006, President Nirschel denied the grievance. (Facts 18). As argued in the University's Memorandum, President Nirschel's June 6, 2006, letter satisfies RWU's obligations articulated

in Article VIII.B.3.i. – it reflects President Nirschel decision and it was communicated to Professor Moskowitz "by June 30." (CBA at Article VIII.B.3.i.).

The Union contends in its memorandum that "Arbitrator Holden did not ignore said evidence [President Nirschel's June 6, 2006 letter], but instead, was not persuaded that the evidence complied with the requirements under the CBA." *See* Union's Memorandum at 29. This is pure conjecture, and there is no basis in the Award from which to come to this conclusion. Contrary to the Union's assertion, Arbitrator Holden does not mention – let alone analyze – the import of this June 6 communication in the Award. As fully set forth in the University's Memorandum, to the extent that the Arbitrator concluded that the communication from Provost Martin was lacking, the June 6 communication from the President satisfies any unfulfilled requirement of the CBA and directly sets forth the President's position regarding Professor Moskowitz's request for tenure.

The Union's argument concerning its reason for filing a grievance immediately upon recent of Provost Martin's April 14, 2006 letter is equally unavailing. As part of its submission, the Union submits an April 21, 2005 memorandum from the University's prior provost, Edward J. Kavanaugh. *See* Exhibit K to the DeCubellis Declaration. In the memorandum, Provost Kavanaugh warns against premature filing of grievances regarding tenure and promotion – before the final decision of the Board of Trustees is reflected. The Union then also submits an affidavit from Union President Mel Topf, where he states that after this memorandum, President Nirschel did not transmit "negative tenure and/or promotion decisions." *See* Affidavit of Mel A. Topf at ¶ 8. The Union then argues that from these facts that it concluded that it should file a grievance related the denial of tenure from Professor Moskowitz's immediately after receiving notification from Provost Martin.

This series of actions does not support the Union's position, but rather supports the University's contention (1) that the Union understood that Provost Martin had transmitted the University's position and (2) that the Union failed to raise the issue of the alleged failure to act by President Nirschel in the initial grievance when it could have easily been rectified. First, if the Union understood Provost Kavanaugh's memorandum to clarify that some further document was necessary to reflect the President/Board of Trustee's tenure denial, it would have waited to file the grievance until at least June 30 – the deadline for final action regarding tenure. Indeed, because of the substance of Provost Kavanaugh's memorandum, that would be the only logical conclusion. Secondly, if it believed that President Nirschel had forgone some required action necessary under the CBA to make the tenure denial decision final, the Union would have specifically asserted that infirmity in its grievance. At that time, the grievance process could have easily achieved one of its intended functions – the University could have quickly and directly corrected any purported ministerial concern regarding President Nirschel's involvement in the decision-making.[1] The combination of the Union's quick-filed grievance and failure to raise any and all legitimate, substantive concerns related to the process foreclosed the University from addressing these issues promptly. If the Union had acted as it should have, the appropriate focus of the subsequent arbitration would have remained where it rightfully belonged (and to which the extensive testimony focused) – to decide whether the University properly considered whether Professor Moskowitz met the criteria for tenure at the University. The Union's opposition merely provides further evidence implicating the Union, not absolving it of responsibility.

---

[1] The University, of course, has shown that the only positive evidence in the record at the arbitration hearing was that President Nirschel was involved in the decision-making prior to Provost Martin's notification. *See* University's Memorandum at 16-17. As argued previously, Arbitrator Holden erred by improperly shifting the burden of proof to the University to further "prove" President Nirschel's involvement, rather than keep the burden with the Union to provide *any* evidence to counter the evidence submitted by the University. *See id*.

## IV. The Union Fails to Refute That the Remedy Crafted by the Arbitrator Is Beyond the Scope of the Parties' Collective Bargaining Agreement

In the final two section's of the Union's Memorandum (at 37-44), the Union asserts Arbitrator Holden acted within his authority under the Collective Bargaining Agreement ("CBA") when he fashioned a remedy that effectively provided Professor Moskowitz eight years to obtain tenure rather than the contractually-mandated six years. In support of its claim, the Union contends (1) that arbitrators have wide latitude in fashioning remedies and there are other circumstances recognized in the contract where tenure review may occur longer than six years after a faculty member's appointment and (2) that the remedy crafted was the only reasonable and equitable resolution available because the decision-making by the President would otherwise be tainted by the University's alleged arbitrary and capricious decision-making. Neither of these arguments effectively counters the University's well-taken position that Arbitrator Holden exceeded his authority in crafting the remedy he did in this case.

In the Award, Arbitrator Holden issued the following remedy:

> [T]he grievant shall be reinstated to probationary status for one more full academic year and shall have his case for tenure reviewed in accordance with the contractual criteria and the contractual process….

(Award at 28). Arbitrator Holden concluded that when evaluating Professor Moskowitz's scholarship, it "would be appropriate to consider whether the grievant had accomplished the projected publication of papers referenced in his tenure/promotion self-study and also to consider other relevant scholarship activities *as of the date that the re-evaluation occurs*." (Award at 27). (emphasis added). There is no dispute that the effect of this crafting of the Award was that Arbitrator Holden provided Professor Moskowitz eight years for tenure review, rather than the contractually established six years.

Article VIII of the CBA establishes that tenure decisions at RWU occur no later than the sixth year of a probationary faculty member.[2] (CBA at 26). The evaluation criteria are to reflect upon the candidate's six years of teaching at RWU – based on the factors set forth in Article VIII, Section B.2. (CBA at 28-29). Pursuant to the detailed provisions regarding peer and academic officer review, the CBA mandates that the tenure decision must be made based on the performance of the faculty member within the first six years at RWU. As explained in the University's Memorandum, the rationale is logical – professors have a limited time during which to prove they should be elevated to a tenured position.

Despite the unambiguous language of the CBA, Arbitrator Holden's remedy effectively provided Professor Moskowitz with two additional years of teaching and opportunities for scholarship during which to improve his performance before he is re-reviewed. Pursuant to the Arbitrator's remedy, with respect scholarship and publishing, Professor Moskowitz would be entitled to eight appointment years – as his denial of tenure occurred on April 14, 2006, after which Professor Moskowitz worked a "terminal year" (through the 2006-2007 school year),[3] and through force of the Award, would be granted an additional full appointment year before being re-evaluated.

As set forth in the University's Memorandum, arbitrators exceed the scope of their authority (which is granted through the contract between the parties) when they add to, delete from, or ignore the contract between the parties when fashioning a remedy. By expanding the period of review for Professor Moskowitz's tenure application, Arbitrator Holden violated this precept and further ignored the plain language of the CBA that prohibited him from altering, adding, or subtracting from the terms of the CBA. (CBA at 45). *See generally Georgia-Pacific*

---

[2] Tenure review may occur prior to the sixth year, in some circumstances not applicable to this case. (CBA at 26).

[3] The CBA provides that after the denial of tenure, members of the bargaining unit may elect to work a one, final year of teaching (the "terminal year"). (CBA at 37: "Faculty members so notified [of their denial of tenure] may elect to work a terminal year.").

*Corp. v. Local 27 United Paperworkers Int'l Union*, 864 F.2d 940, 945 (1st Cir. 1989)("[A]n arbitrator does not have unfettered discretion. He may not impose a remedy which directly contradicts the express language of the collective bargaining agreement.") (quotation omitted).[4]

Neither of the arguments set forth by the Union undercuts the sound reasons for vacating the Award.

**A. Arbitrator Cannot Fashion a Remedy That Adds to the Collective Bargaining Agreement**

The Union argues that arbitrators enjoy "remedial flexibility" in crafting remedies to contract violations and that because the CBA recognizes limited circumstances where the six year time limit for tenure review is extended, the Arbitrator did not exceed his authority. *See* Union's Memorandum at pp. 37-42. The Union fails to effectively counter the University's position.

The Union cites to two provisions of the CBA where limited extensions of the six year tenure review rule apply. First, Article VIII.B.1.f permits the extension of tenure review where the faculty member has been on an extended leave of absence from the University. This circumstance is the opposite of the remedy provided by Arbitrator Holden. As set forth above, under the remedy contrived by Arbitrator Holden, Professor Moskowitz will be permitted to perform teaching, advising, scholarship and service at the University for eight years to fulfill the contractual tenure criteria. Conversely, pursuant to Article VIII.B.1.f, the faculty member on a leave of absence has separated from active service to the University during the leave. In short,

[4] In support of its argument that Arbitrator Holden's remedy was consistent with the CBA, the Union relies upon *Jefferson-Lewis-Hamilton Board*, 101 LA (BNA) 856, 1993 WL 565598 (Liebowitz 1993). (Union's Memorandum at 40). The Union not only misstates the holding in *Jefferson*, but also fails to recognize that *Jefferson* actually supports the University's position. In *Jefferson*, the arbitration concerned the union's claim of a procedural violation of the collective bargaining agreement by improperly evaluating the grievant for tenure. The union sought a probationary year for the grievant before she was re-evaluated for tenure. The arbitrator did not award that remedy – explaining, "[w]here an evaluation is improperly done under contract provisions, it is a proper remedy to direct that the evaluation be expunged and, where appropriate, done over in accordance with the requirements of the contract." *Id.* at *8. Here, as in *Jefferson*, the University is simply asking that Professor Moskowitz' tenure decision be "done over" as of the end of his sixth year of teaching, as provided for in the CBA.

the contract contemplates six years where a faculty member can “show his stuff” so that the University can determine whether to grant the substantial benefit and honor of tenure at the institution. The fact that a faculty member on leave is permitted additional time for tenure review was a bargained-for provision that assists both the faculty member and the University. This narrow exception to the six-year rule does not create a foundation upon which the Arbitrator was free to add to the CBA and create a remedy where a faculty member has eight years to fulfill the requirements for tenure.

Similarly, Article VIII.B.3.g does not provide a basis for the extraordinary remedy proposed by the Arbitrator. This provision contemplates potential extension of evaluation deadlines in “the event of an emergency.” Although the Union glibly states in its memorandum that the University’s purportedly acting arbitrarily and capriciously “certainly constituted an emergency in [Professor Moskowitz’s] eyes,” this does not constitute a blanket extension of tenure timelines under which the Arbitrator’s extra-contractual remedy can easily rest. *Black’s Law Dictionary* defines an “emergency” as:

> A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation.

*Black’s Law Dictionary* (6th ed. 1990) at 522-523. As is evident from this definition (and from common sense), an emergency situation is one of extreme, unforeseen and emergent nature – such as an act of nature or other catastrophe. The potential improper denial of tenure does not constitute an “emergency” within the normal meaning of that word. Arbitrator Holden did not have authority under this article to create the remedy he ordered.

**B. The Remedy Ordered is Not the Only Reasonable and Equitable Remedy Available.**

The Union further argues that Arbitrator Holden "imposed the only logical, reasonable and equitable remedy that was available to him under the CBA. If the CBA did not provide the arbitrator the authority to require the University to redo the sixth year evaluation, the entire contractual evaluation and tenure process would be undermined and rendered meaningless." (Union's Memorandum at 42). This position is absolutely without merit.

As set forth in the University's Memorandum, based on the voluminous record evidence presented to him, Arbitrator Holden should have made a decision as to whether the University acted arbitrarily and capriciously in denying tenure to Professor Moskowitz based on the University's analysis of Professor Moskowitz's scholarship as of the conclusion of his sixth year of teaching. Upon vacating the Award, the University requests that this Court remand this matter to the Arbitrator to make such a decision. However, if the Arbitrator were troubled by the lack of Presidential imprimatur on the tenure denying decision, Arbitrator Holden should have remanded the matter back to President Nirschel to announce the tenure decision based on President Nirschel's review of Professor Moskowitz's qualifications as of the end of his sixth year at RWU. Arbitrator Holden could thereafter have determined whether President Nirschel's decision was arbitrary or capricious.

The Union suggests that "[i]f Arbitrator Holden had simply remanded the matter to [President] Nirschel for him to announce his tenure decision, that decision would be flawed and biased. It would be impossible for him to render a fair and objective decision at this point in time." *See* Union's Memorandum at 43. This conclusion has absolutely no supporting reasoning. The materials and information that President Nirschel would review were already assembled in Professor Moskowitz's portfolio, and there is no reason to believe that it would take President Nirschel more than a number of hours to review this material and render a good-

faith judgment as to his position. Unlike instances where an earlier event in the review process was improperly completed, there is no "domino effect" to the President's purported inaction[5]. Rather, the President's final determination is the terminal event in the tenure review. There is absolutely no reason to believe that President Nirschel could not easily complete a review and issue a determination that Arbitrator Holden found lacking. Indeed, it was this event -- and only this event -- that Arbitrator Holden concluded was missing. Hence, it is this process that should have been ordered to be completed as a remedy to "right" the alleged wrong that had been committed. Adding two years of additional work and materials onto this process invokes a procedural morass and creates rights not negotiated by the parties or contemplated by the CBA. The Union's bald assertion that President Nirschel could not be fair and unbiased in his consideration is totally without basis. Moreover, even the remedy endorsed by Arbitrator Holden and sought to be confirmed by the Union involves a new presidential review within a year after reinstatement and President Nirschel would be the final decision-maker at that point as well. The Court should not allow Arbitrator Holden's illogical and extra-contractual remedy to stand.

## V. Conclusion

For the reasons herein and for those set forth in the University's Memorandum, the Award should be vacated.

---

[5] Indeed, that was the circumstance found in the *Alfieri* arbitration award submitted by the Union at Appendix A. In that case, the arbitrator found that the University had not properly utilized the Faculty Review Committee ("FRC") -- which is the *first* step in the review process -- during a post-tenure reevaluation of a professor. Because the subsequent review levels could not be premised upon the earlier FRC proceeding that had never occurred, it was not inappropriate for the previously-tenured faculty member to be reinstated and for the post-tenure reevaluation review process (beginning with the FRC) to be fully conducted after reinstatement. This circumstance is entirely different from the lack of terminal piece of the review process (i.e., the President's review) which can be easily conducted based on previously gathered materials.

Respectfully Submitted,

ROGER WILLIAMS UNIVERSITY

By its attorneys,

/s/ Joseph P. McConnell
Joseph P. McConnell (RI Bar No. 5086)
Jeffrey S. Siegel (admitted *pro hac vice*)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, MA 02109
(617) 523-6666

Dated: May 16, 2008

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including counsel for Defendant / Plaintiff in Counterclaim John E. DeCubellis, Jr., Esq., General Counsel, NEARI, on May 16, 2008.

/s/ Joseph P. McConnell
Joseph P. McConnell